```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                         LUBBOCK DIVISION

 3  UNITED STATES OF AMERICA      )  CAUSE NO. 5:11-CR-015
                                  (
 4  vs.                           )
                                  (  JUNE 26, 2012
 5                                )  AMARILLO, TEXAS
    KHALID ALI-M ALDAWSARI        (  9:00 A.M.
 6  _____

 7


 8                          VOLUME 4 OF 5

 9  _____


10                        TRIAL ON THE MERITS

11


12            BEFORE THE HONORABLE DONALD E. WALTER
                  UNITED STATES DISTRICT JUDGE
13                          and a jury
    _____

14

15

16

17

18

19

20

21

22              SHAWN M. McROBERTS, RMR, CRR
               1100 COMMERCE STREET, RM. 1654
23                 DALLAS, TEXAS  75242
                      (214) 753-2349
24

25
```

1
                      A P P E A R A N C E S
2

3
          FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
4                               1205 TEXAS AVENUE, 7TH FLOOR
                                LUBBOCK, TEXAS  79401
5                               (806) 472-7351
                                BY:  MR. JEFFREY HAAG
6                                    MS. DENISE WILLIAMS
                                     MR. MATTHEW KACSMARYK
7
                                UNITED STATES ATTORNEY'S OFFICE
8                               1100 COMMERCE STREET, 3RD FLOOR
                                Dallas, TEXAS  75242
9                               (214) 659-8725
                                BY:  MR. JAMES JACKS
10
                                U.S. DEPARTMENT OF JUSTICE
11                              NATIONAL SECURITY DIVISION
                                950 PENNSYLVANIA AVENUE, NW
12                              ROOM 1538
                                WASHINGTON, DC 20530
13                              (202) 514-7259
                                BY:  MR. DAVID CORA
14
          FOR THE DEFENDANT:    COGDELL LAW FIRM, PLLC
15                              1401 McKINNEY STREET
                                SUITE 1625
16                              HOUSTON, TEXAS  77010
                                (713) 426-2244
17                              BY:  MR. DAN COGDELL
                                     MR. J. DAVID HESTER
18
                                PAUL DOYLE & ASSOCIATES
19                              600 TRAVIS, SUITE 4700
                                Houston, TEXAS  77002
20                              (713) 228-9200
                                BY:  MR. PAUL DOYLE
21
       OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
22                                1100 COMMERCE STREET, RM. 1654
                                  DALLAS, TEXAS  75242
23                                (214) 753-2349

24

25

## INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| MICHAEL ORNDORFF | |
| Cross By MR. COGDELL | 5 |
| Redirect By MR. HAAG | 42 |
| Recross By MR. COGDELL | 56 |
| Redirect By MR. HAAG | 58 |
| MICHAEL WHITAKER | |
| Direct By MR. JACKS | 59 |
| Cross By MR. DOYLE | 73 |
| Redirect By MR. JACKS | 75 |
| ROBERT MOTHERSHEAD | |
| Direct By MR. CORA | 76 |
| Cross By MR. DOYLE | 120 |
| Redirect By MR. CORA | 124 |
| W. MARK WHITWORTH | |
| Direct By MR. CORA | 130 |
| Cross By MR. COGDELL | 175 |
| Redirect By MR. CORA | 179 |
| DAVID PARKER | |
| Direct By MR. HAAG | 179 |
| Cross By MR. DOYLE | 199 |
| Redirect By MR. HAAG | 202 |

| Government Exhibits | Page |
|---|---|
| No. 337-339 Admitted into Evidence | 62 |
| No. 421, 422 Admitted into Evidence | 129 |
| No. 431 Admitted into Evidence | 130 |
| No. 340-386 Admitted into Evidence | 141 |
| No. 402 Admitted into Evidence | 185 |
| No. 410 Admitted into Evidence | 185 |
| No. 413 Admitted into Evidence | 186 |
| No. 415 Admitted into Evidence | 187 |
| No. 417-420 Admitted into Evidence | 198 |

| Defendant Exhibits | Page |
|---|---|
| No. 10 Admitted into Evidence | 38 |

**Government Rests**                                              **Page**
                                                                 202

**Defendant rests**                                              **Page**
                                                                 205

**Charge Conference**                                            **Page**
                                                                 205

1          THE COURT:  Anything before we bring the jury in?

2          MR. HAAG:  Nothing for the United States, Your

3   Honor.

4          THE COURT:  I have copies or will have copies at

5   noon of my proposed jury instructions, and if Mr. Cogdell is

6   right and we finish the evidence today, we will have our

7   charge conference at the end of the day.

8          MR. HAAG:  Yes, Your Honor.

9          THE COURT:  Okay.  Bring them in, please.

10          (Whereupon, the jury entered the courtroom.)

11          THE COURT:  You may be seated.

12      Good morning, ladies and gentlemen.  I am just amazed you

13   are so prompt.  I thank you so much.

14      All right.  Mr. Cogdell?

15          MR. COGDELL:  Good morning.

16                        CROSS EXAMINATION

17   By Mr. Cogdell:

18   Q.   Good morning, Special Agent Orndorff.

19   A.   Good morning.

20   Q.   For the benefit of the jury, you and I have seen each

21   other from time to time throughout the evolution of the

22   progress of this case.  Correct?

23   A.   That is correct.

24   Q.   You have certainly been professional every time I have

25   dealt with you.  I hope the feeling is mutual.

1    A.    Yes.

2    Q.    You talked yesterday, Special Agent Orndorff, about the

3    role of a case agent.  Could you extrapolate on that just a

4    little bit and tell us generally what the duties of case agent

5    are?

6    A.    A case agent is responsible for, once again, usually

7    initiating the case, examining the first data, conducting some

8    interviews if they are necessary, running database checks,

9    trying to corroborate the initial complaint, and then

10   issuing or getting a search warrant issued in the case,

11   conducting a search warrant, examining the evidence, and then

12   bringing it to the prosecution.  Actually we are working with

13   prosecutors the entire way, but then bringing it to the

14   prosecution for the final stage.

15   Q.    I don't think it is hyperbole, Case Agent, for me to

16   suggest that the case agent--that being you in this case--is

17   probably the most important law enforcement officer in the

18   case.

19   A.    On -- I am not going to say -- On a normal case I would

20   say that the case agent has the most -- a lot of say so.

21   Q.    And I am not trying to embarrass you at all.  I am just

22   trying to proportionalize your role or scale your role as

23   opposed to other agents.

24   A.    Yes.

25   Q.    You said in a normal case just then.  Right?

1    A.    Yes, sir.

2    Q.    I think we would all agree that whatever this is, it is

3    not a normal case.  Would you agree with me on that?

4    A.    That is correct.

5    Q.    Is it fair to say, Special Agent Orndorff, that this is

6    probably the biggest case you have ever been involved in?

7    A.    Manpower-wise, yes.  It is similar to another case I have

8    worked before.

9    Q.    But it is at or near the top of the most important cases

10   you have ever been involved in to date.  Right?

11   A.    Yes.

12   Q.    And likely be ever be in as a law enforcement officer.

13   Right?

14   A.    Could be.

15   Q.    I don't think Mr. Haag told us much about, if anything,

16   your personal background.  Are you married?

17   A.    Yes, I am.

18   Q.    Children?

19         MR. HAAG:  Your Honor --

20         THE COURT:  Sustained.

21   Q.    (BY MR. COGDELL:)  Let me go at it another way.  Have you

22   spent more time working on this case in the last year, year

23   and a half, than you have spent with your own family?

24   A.    I can't say that.  I have spent a lot of time on this

25   case.

1    Q.    Okay.  You talked about resources, Special Agent

2    Orndorff, and I think you are eluding to the quantity or depth

3    of those resources.

4              MR. COGDELL:  And Your Honor, I have cleared these

5    visuals with Mr. Haag that I am going to display.

6              THE COURT:  Okay.

7    Q.    (BY MR. COGDELL)  I would like to cover a few of those,

8    and there may be more.  Of course the first is the FBI.

9    Right?

10   A.    Yes, sir.

11   Q.    And I think you told us yesterday that there are

12   approximately a hundred FBI agents that are involved in this

13   case to date.

14   A.    Yes, sir; and possibly more.

15   Q.    Okay.  There is also the Internal Revenue Service.

16   Right?

17   A.    Yes.

18   Q.    Lubbock Police Department.  Correct?

19   A.    Correct.

20   Q.    Lubbock Sheriff's Department.  Correct?

21   A.    That is correct.

22   Q.    Texas Tech Police Department?

23   A.    That is correct.

24   Q.    The Department of Homeland Security.  Right?

25   A.    That would be ICE.  That would be ICE at the time.  They

1   are the same.

2   Q.   The Joint Terrorism Task Force?

3   A.   That is correct.

4   Q.   The United States Attorney's Office for the Northern

5   District of Texas?

6   A.   That is correct.

7   Q.   The United States Attorney's Office main Justice out of

8   Washington, D.C.

9   A.   Yes.

10   Q.   Who did I forget?

11   A.   I can't think of anybody right now.

12   Q.   Okay.  All right.  If you think of any along the way,

13   just let me know.  Okay?

14   A.   Yes, sir.

15   Q.   Now, without taking the time to read each of these

16   agent's names, I am going to show you a list.  I am just going

17   to mark it for identification purposes as Defense Exhibit

18   No. C because I don't intend to offer it.

19          MR. COGDELL:  But may I approach the witness, Your

20   Honor?

21          THE COURT:  You may.

22   Q.   (BY MR. COGDELL)  Let me show you a list, Special Agent

23   Orndorff, of about 80 or so FBI agents that I was able to find

24   that had some role in this case and see if that is consistent

25   with your memory.

1   A.   Numerous names are familiar to me, and numerous are not

2   because they are from around the country and I just don't know

3   all the names.

4   Q.   Okay.  Fair enough.  Can you share with me approximately

5   how many states or countries different agents have visited in

6   connection with the investigation into this case?

7   A.   I am sorry.  Could you repeat the question?

8   Q.   Sure.  How many different states have agents traveled to,

9   to your knowledge, that have investigated or had an

10   investigative role in this case?

11   A.   I am not sure.  We interviewed people in numerous states

12   around the country, and the agents were already in place in

13   those states.

14   Q.   Well, suffice it to say, we have got hundreds of agents

15   investigating this case in many, many states across the

16   country.  Right?

17   A.   Yes.

18   Q.   Whatever criticisms--and frankly, I don't have many--of

19   law enforcement in this case, certainly the devotion to

20   resources is not a fair criticism.  You all have made an all

21   out effort in this case.  Agree with me?

22   A.   Yes, sir.

23   Q.   Now, have you ever been involved in the investigation,

24   Special Agent Orndorff, of an attempted use of a weapon of

25   mass destruction before?

1    A.    I have done white powder letters before, but nothing of

2    this sort.

3    Q.    Okay.  And you have -- I am assuming, like the other

4    agents, you have gone to various seminars and training

5    sessions to learn about how to investigate and prosecute

6    weapon of mass destruction cases.

7    A.    Yes.

8    Q.    Can you share with us some of those, the highlights of

9    some of the different seminars or lectures or schools that you

10   have gone to there?

11   A.    I believe I have gone to beginning -- Introduction to

12   weapons of mass destruction; I have gone to -- I was on the

13   Hazardous Material Response Team in Dallas, so I went to

14   various hazmat schools of how to handle hazmat.

15   Q.    Is that it?

16   A.    I think so.

17   Q.    You would agree with me, Case Agent Orndorff, that you

18   have different options available to you as a case agent when

19   you are working the investigation of an attempted use of a

20   weapon of mass destruction case.  Right?

21   A.    As far as working with the case, there are different

22   options available to me.

23   Q.    One of the things you can do is insert people in an

24   undercover capacity to try to meet with the suspect.  Right?

25   A.    Yes, sir.

1    Q.   You did that in this case.  Right?

2    A.   Yes, sir.

3    Q.   One of the things is you can -- as a case agent or as a

4    law enforcement agent, you can make an undercover call, if you

5    will, representing to be a different person than who you are

6    in an effort to gain information.  Right?

7    A.   Yes, sir.

8    Q.   And you personally did that in this case.  Am I right?

9    A.   I did.

10   Q.   I think that is Government's Exhibit No. 11.

11              MR. COGDELL:  Could we play Government's Exhibit

12   No. 1?

13   Q.   (BY MR. COGDELL)  And before she plays it, can you set

14   the stage, give us the background of why you made this call?

15   A.   The reason I made this call was Mr. Aldawsari had talked

16   with Carolina Biological representatives on the 3rd and the

17   4th of February.  He had told them that he wanted to -- he

18   needed the phenol for off-campus research that he was working

19   on, but it was connected with Texas Tech University.  I was

20   trying to ascertain if he was working with somebody else and

21   where he was -- If he had other materials where he would be

22   storing this materials at.

23   Q.   All right.  Let me stop you right there.  And I am going

24   to get to this in a minute, but you had a number of very

25   specific concerns about who Mr. Aldawsari was, whether or not

1    he had help, whether or not he had, for lack of a better

2    description, Special Agent Orndorff, a stash house where he

3    was preparing these -- You had a plethora of different

4    concerns prior to his arrest.  Right?

5    A.    Yes.

6    Q.    And among the primary concerns was whether or not he was

7    working with someone else.  Right?

8    A.    That is correct.

9    Q.    And would you agree with me, Case Agent Orndorff, that if

10   he was working with someone else, he might present -- he would

11   present a greater danger than if he was working alone?

12   A.    No.  I wouldn't agree with that, sir.  He could be

13   working with somebody else in a different state.  I mean,

14   there could be a conjunction that two people are doing a

15   simultaneous thing, so I would say no to that.

16   Q.    Would you give me this much?  You would feel better if

17   you knew there was only one person involved as opposed to

18   whether there were other people involved.  Would you give me

19   that much?

20   A.    I would like the complete picture.

21   Q.    Yes, sir.

22   A.    And --

23   Q.    And the complete picture is one that is an easier picture

24   to contain than if the complete picture is a multitude of

25   individuals.  Correct?

1   A.   That is true.

2          MR. COGDELL:  Could we play Government's Exhibit

3   No. 11?

4          (Whereupon, Government's Exhibit No. 11 was played

5          in open court.)

6   Q.   (BY MR. COGDELL)  As part of the back story here, Special

7   Agent Orndorff, it is true is it not, that one of the things

8   you were trying to accomplish through this call was to buy

9   some time.  Right?

10  A.   That is true.

11  Q.   And I think one of the things that was going on behind

12  the scenes is that you all had attempted to get a -- send some

13  phenol or some inert phenol to Quantico and then have a

14  tracking device put on that phenol and ship it to

15  Mr. Aldawsari.  Right?

16  A.   Not exactly.

17  Q.   Help me.

18  A.   Not exactly, no, sir.

19  Q.   Tell me what you were doing.

20  A.   When I called Mr. Dallas and asked him if it was possible

21  to make a thing of fake phenol, he said he would check with

22  his chemists and see what they could come up with.  The next

23  time I talked to Mr. Dallas, he had already made up ten

24  bottles of the fake phenol, so they were very willing to help,

25  so they had made up the ten bottles of phenol.

1    Q.   And that was going on during this same time.  Right?

2    A.   That would have been -- I am not sure, but it is close.

3    It is very close to the same time.

4    Q.   You have been in the courtroom the entire time,

5    obviously.  Right?

6    A.   Yes, sir.

7    Q.   And you recall the testimony of the Carolina Biological

8    people where we saw it sort of day after day he would call

9    Carolina Biological and they would put him off, and he would

10   call back a day or two later and they would put him of, and he

11   would call back a day or two later and they would put him off.

12   A.   Yes, sir.

13   Q.   And this is the same time you, the case agent, are

14   calling Mr. Aldawsari using the ruse that you are with

15   Carolina Biological.  Agree?

16   A.   Correct.

17   Q.   Okay.

18            (Whereupon, Government's Exhibit No. 11 continued to

19            be played in open court.)

20   Q.   (BY MR. COGDELL)  All right.  Now, I am not going to play

21   the entirety of the conversation, but at the end of it, you

22   tell him what?

23   A.   That I would contact him.

24   Q.   Okay.  And you suggest to him that the phenol is on the

25   way.  Right?

1   A.   No, sir.

2   Q.   Okay.

3   A.   He is supposed -- I have asked him for a point of contact

4   or a physical address that -- He gave me the 803 University

5   Avenue address as a physical address, and I was asking for a

6   physical address at Texas Tech University for his off-lab

7   campus that he was using or for a point of contact there that

8   we could put down on the order form for -- And he was supposed

9   to get that information.  I was supposed to call him back the

10  next day to get that information.

11  Q.   You are going to follow up to get a proper address where

12  he at least can be led to believe that the phenol was going to

13  be delivered.  Correct?

14  A.   Yes, sir.

15  Q.   You certainly never suggested to him during this

16  conversation that "There is no way we are going to send the

17  phenol to you."  Right?

18  A.   No, sir.

19  Q.   You left him with the opposite impression that "If you

20  get us the right address, we are going to send you the

21  phenol."  Agree with me?

22  A.   I believe that is right.

23  Q.   Now, during this same period of time, you have him under

24  physical surveillance.  Right?

25  A.   It was just starting.

1    Q.    This is at the early stage of the investigation.  Right?

2    A.    Correct.

3    Q.    And then as we have talked about through the other

4    witnesses, the covert surveillance begins.  Correct?

5    A.    On the 14th.

6    Q.    On the 14th.  And the cameras are installed and the

7    physical surveillance, the eye surveillance that you talked

8    about yesterday, that continues.  Right?

9    A.    Right.  The cameras were installed on the 19th.

10   Q.    Okay.  Let's get to the tipping point, if you will, Agent

11   Orndorff, about the decision to arrest.  I believe Mr. Haag

12   asked you yesterday what caused you to decide to or make the

13   decision to arrest Mr. Aldawsari.  Do you recall that line of

14   questioning?

15   A.    Yes, sir.

16   Q.    And yesterday I think you indicated that one of the

17   reasons that you decided to make the arrest of Mr. Aldawsari

18   was that he was speeding?

19   A.    No, sir, I don't think that --

20   Q.    Maybe I misheard you.  I thought that was what you told

21   us yesterday, that was one of the decisions --

22   A.    If I did I misspoke.  We were talking -- I think when I

23   was talking about speeding was whether we had eyes on him 24/7

24   did we ever lose sight of him.

25   Q.    Okay.  Okay.  Well, if I misheard you yesterday, I

1    apologize.  But to be fair, there was a transponder on his

2    car.  Right?

3    A.    That is correct.

4    Q.    And a transponder -- I think the jury gets it, but for

5    those who do not, a transponder is a device that allows you to

6    know where his vehicle is.  It is the kind of devise that

7    allows you to know where his vehicle is any time that it is

8    moved or any time it is traveling.  Correct?

9    A.    No, sir.  There are different types of transponders.

10   Q.    Okay.  What is this one?

11   A.    This one would give you a signal on a periodic basis, and

12   if it pulls into a garage you would lose it.

13   Q.    You could lose it in the garage, but if it is moving you

14   are going to get a signal.  Right?

15   A.    If it is moving, yes.  It is not realtime, but it is

16   close.

17   Q.    Okay.  But you had -- During this period of time

18   immediately prior to his arrest, did you tell us yesterday

19   there were a hundred or so active law enforcement in Lubbock?

20   A.    Throughout this three-week period we had people coming

21   and going.

22   Q.    You had tons of effort on Mr. Aldawsari during this

23   three-week period.  Right?

24   A.    Using the various -- Yes, the various surveillance means.

25   Q.    Okay.  Did you have airplanes available?

1    A.    Yes.

2    Q.    Did you use those?

3    A.    Yes.

4    Q.    Okay.  So would you agree with me that if Mr. Aldawsari

5    was traveling anywhere in his vehicle, you were generally

6    aware of that, if not specifically aware of that.  Right?

7    A.    I would say yes.

8    Q.    Okay.  And yesterday --

9              MR. COGDELL:  And I am not going to need anymore of

10   this, Ms. Christensen.  Can you turn this thing back up before

11   I screw it up?

12   Q.    (BY MR. COGDELL)  I thought you told us yesterday as

13   well, Special Agent Orndorff, that one of the tipping point

14   decisions in terms of arresting Mr. Aldawsari was that you had

15   found out that he had obtained a small refrigerator that we

16   saw a picture of in his apartment.  Did I hear you right on

17   that?

18   A.    Yes, sir.

19   Q.    And he obtained that refrigerator from another individual

20   that was -- you all associated with him.  Right?

21   A.    That is correct.

22   Q.    And so in addition to the obtaining of the refrigerator,

23   can you tell me any other reason why you decided to arrest

24   Mr. Aldawsari when you did?

25   A.    I believe I stated also that my management had advised

1   that that was the date we were shooting for.

2   Q.   Stop for just a second.  First off, who is your

3   management?

4   A.   My supervisor and the supervisors above him.

5   Q.   Okay.  Let's get a name and a job description.  Who is

6   your supervisor?

7   A.   Frasier Thompson.

8   Q.   And I am assuming, being your supervisor, he would be the

9   resident agent in charge in Lubbock.

10   A.   That is correct.

11   Q.   What is known in the trade as a RAC?

12   A.   For us it would be a senior supervisory resident agent.

13   Q.   He is the senior agent in Lubbock--Mr. Frasier?

14   A.   Yes, sir.

15   Q.   He is your boss.  Right?

16   A.   That is correct.

17   Q.   And you said people above him.  Who are people above him?

18   A.   Assistant Special Agent in charge in Dallas.

19   Q.   Who is that?

20   A.   Would have been Kevin Colby.

21   Q.   Okay.  Now, we have not seen Mr. Frasier in the

22   courtroom.  Right?

23   A.   No, sir.  He is here.

24   Q.   I am sorry?

25   A.   He is here.

```
1    Q.    Oh, he is.  Where is he?

2    A.    He is right there.

3    Q.    The nice looking fellow in the front row there?

4          THE COURT:  Let's move on.

5    Q.    (BY MR. COGDELL)  Okay.  Are we going to hear from him?

6    A.    No, sir.

7    Q.    And who is the other person that you shared?

8    A.    ASAC Kevin Colby.

9    Q.    And are we going to hear from Colby?

10   A.    No, sir.

11   Q.    Okay.  And you said that Colby and Frasier, Special

12   Agent, made the decision to use February 23rd as the target

13   date?

14   A.    I don't know if they made the decision or who made the

15   decision, because we were in constant contact with our

16   headquarters and the United States Attorney's Office, so I am

17   sure it was in consultation with the United States Attorney's

18   Office and the Department of Justice that we felt that all

19   the -- that he had -- we had the elements proven as far as a

20   crime goes, and that we were -- we needed to go the next step

21   to find out if there was anybody else involved with him.

22   Q.    Okay.  Let's go there.  You agree with me, Special Agent

23   Orndorff, that the amount of proof or evidence required to

24   arrest is probable cause.  Right?  That is the legal standard

25   that law enforcement uses to arrest.  Right?
```

1    A.    That is correct.

2    Q.    And the amount of proof required for a jury to convict is

3    proof beyond a reasonable doubt.  Agree with me?

4    A.    Yes, sir.

5    Q.    And to be clear, this standard--that is the probable

6    cause standard, and the Judge will instruct the jury, not

7    me--but just generically speaking, probable cause is a

8    significantly lesser standard than proof beyond a reasonable

9    doubt.

10   A.    Yes, sir.

11   Q.    Right?

12   A.    That is correct.

13   Q.    If everybody is doing their job, it is easier to arrest

14   somebody in terms of the amount of proof required than it is

15   to convict somebody.  Agree with me on that?

16   A.    That is correct.

17   Q.    Okay.  Now, in a case like this, Special Agent Orndorff,

18   would you agree with me that it presents specific security

19   concerns, because of the very nature of the allegation, that

20   normally don't exist.  An attempted use of a weapon of mass

21   destruction can theoretically impact dozens or hundreds or

22   more of lives.  Correct?

23   A.    That is correct.

24   Q.    There are significant security concerns for the public.

25   Right?

1    A.    Yes, sir.

2    Q.    For all of us.  Right?

3    A.    Yes, sir.

4    Q.    And would you agree with me that it is better to be sort

5    of safe than sorry and make an arrest than not make an arrest

6    in a case like this?

7    A.    Yes, sir.

8    Q.    Okay.  And you had, and I have got a list that I have

9    talked with Mr. Haag about, but you had a number of pre-arrest

10   concerns about Mr. Aldawsari.  Right?

11   A.    Yes, sir.

12   Q.    You were concerned, and rightfully so, as to whether or

13   not Mr. Aldawsari had phenol.  Right?

14   A.    That is correct.

15   Q.    Now, they have heard more than enough about the

16   surveillance and the cancelled orders and all that, but to be

17   fair to law enforcement, you didn't know whether or not he

18   might have had phenol stashed some place else.  Right?

19   A.    We didn't know that and we didn't know, like I said, the

20   night before when he received the refrigerator.

21   Q.    Okay.  You didn't know whether Mr. Aldawsari was working

22   with others.

23   A.    That is correct.

24   Q.    You didn't know--and again, the testimony they have heard

25   notwithstanding--you couldn't be 100 percent sure whether or

1  not he had attempted to assemble a weapon of mass destruction.

2  Right?

3  A.  We knew that he had started working with the clocks and

4  the wires and the Christmas tree bulbs as far as the detonator

5  goes.

6  Q.  Right.

7       THE COURT:  Let him finish his answer.

8  Q.  (BY MR. COGDELL)  Repeat that answer because I didn't

9  mean to step on you.  If I did, repeat it.

10      THE COURT:  He said, "We knew he had started working

11  with the clocks and the wires and the Christmas tree bulbs as

12  far as the detonator goes."

13  Q.  (BY MR. COGDELL)  Right.  You certainly knew he had

14  started working on a detonator.  Right?

15  A.  Yes, sir.

16  Q.  But you didn't know if he had gone further than that.

17  Right?

18  A.  That is correct.  He was obtaining the chemicals, so --

19  Q.  And you didn't know whether or not he had made any

20  attempts to detonate a weapon of mass destruction.  Right?

21  A.  That is correct.

22  Q.  And you didn't know whether or not he had identified a

23  specific target.  Right?

24  A.  No, we didn't know.

25  Q.  And you didn't know whether or not he had decided upon a

1    specific arrest.  Right?  I am sorry.  A specific date.  My

2    bad.  Freudian slip, I suppose.  You didn't know whether or

3    not he had decided upon a specific date.

4    A.    It appeared he had immediacy, but no, I didn't know of a

5    specific date.

6    Q.    Okay.  Now, this was a list of your concerns on or about

7    February 23rd, 2011.  Right?

8    A.    Yes, sir.

9    Q.    And you have done a massive amount of work, or the law

10   enforcement has done a massive amount of work since his

11   arrest.  Right?

12   A.    Yes, sir.

13   Q.    And you would agree with me that you know much, much more

14   now than you knew on February 23rd.

15   A.    You know, we know more now, yes, sir.

16   Q.    To be fair, you know a lot more now.  Right?

17   A.    We know more from his computer analyzation and that.

18   Q.    Sure.  You know more --

19   A.    A lot of the other things, such as what it was in his

20   apartment, those things haven't changed.

21   Q.    Okay.  Would you agree with me that today, Special Agent

22   Orndorff, you know that he had not acquired phenol?  Right?

23   A.    That is correct.

24   Q.    Today we know that he was not working with others.

25   Right?

```
1   A.   That is correct.

2   Q.   Today we know that he had not attempted to assemble a

3   weapon of mass destruction.  He was working on a detonator.

4   Right?

5   A.   Yes, sir.

6   Q.   But a detonator, to be clear, in and of itself is not a

7   weapon of mass destruction.  Correct?

8   A.   It is part of it.

9   Q.   Okay.  Today we know that he had not attempted to

10  detonate a weapon of mass destruction.  Agree?

11  A.   That is correct.

12  Q.   Today we know that he had not selected a specific target.

13  Right?

14  A.   No, sir, I can't agree with that.  I don't know if he

15  selected a specific target or not.

16  Q.   Okay.  But -- Let me put it another way.  If he had

17  selected a specific target, you don't know what that target

18  is.  Fair enough?

19  A.   That is correct.

20  Q.   And I will change this for purposes later on.  And if he

21  had selected a specific date, you are unaware of it.  Right?

22  A.   That is correct.

23  Q.   I am writing "Can't say he had settled" just for

24  accuracy.  You can't say for certain whether or not he had

25  settled on a selected target or selected date.  Fair enough?
```

1    A.   Yes, sir.

2    Q.   Now, we are going to hear, I think, later today, Case

3    Agent Orndorff, about -- from the chemical experts and some

4    bomb experts.  Right?

5    A.   Yes, sir.

6    Q.   You do not profess to be an expert in either one of those

7    areas, I am assuming.

8    A.   No, sir.

9    Q.   But would you agree with me that creating picric acid in

10   and of itself can be a dangerous thing?

11   A.   Yes, sir.

12   Q.   And, for example, if the picric acid is too dry it can

13   explode?

14   A.   I believe the crystals are highly sensitive.

15   Q.   And if it is too wet it won't work.  Right?

16   A.   It has to be dried out, yes, sir.

17   Q.   Okay.  Now, we saw a number of videos--maybe it was just

18   one, but it felt like a number to me--we saw at least one

19   video where Mr. Aldawsari is, through his computer, looking at

20   how to create a remote detonator with two cell phones.  Recall

21   that?

22   A.   I believe so, yes, sir.

23   Q.   Okay.

24   A.   I know of one, anyway, that you are talking about.

25   Q.   It was the one with the kind of rock music background?

1    A.    Crocodile clips.

2    Q.    Crocodile clips.  That one.  How many working cell phones

3    did Mr. Aldawsari have?

4    A.    He had four cell phones.

5    Q.    How many working?  How many that were --

6    A.    One was activated that I knew of.

7    Q.    So he had one active cell phone.  Right?

8    A.    Yes.

9    Q.    Okay.  One that would work.  Right?

10   A.    One that was activated, yes, sir.

11   Q.    To be blunt, unless your cell phone is activated it won't

12   work.  Right?

13   A.    I think you can make 911 calls on -- Yes, sir.  So they

14   still function, but you just --

15   Q.    Okay.  But they wouldn't function in the way displayed on

16   that videotape unless they were active.  Right?

17   A.    Right.

18   Q.    You personally interviewed how many people in connection

19   with your efforts in this case, Case Agent Orndorff?

20   A.    I think that my main interviews, or people I talked to,

21   were less than ten.

22   Q.    As the case agent, you have reviewed a number of FBI

23   302s, which are the law enforcement reports in this case.

24   A.    Yes, sir.

25              MR. COGDELL:  If the Court -- If I could inquire of

```
 1    the Court or the Clerk as to the Defense exhibit number next?

 2    We are confused over here.

 3              THE CLERK:  Your exhibit list shows 38 exhibits.

 4              MR. COGDELL:  Okay.  Let me mark this as Defense

 5    Exhibit No. 39.  Actually let me hand these to Mr. --

 6    Q.   (BY MR. COGDELL)  Yesterday, Mr. Orndorff, the Government

 7    took you through a number of exhibits that were snippets from

 8    Mr. Aldawsari's journal.  Right?

 9    A.   That is correct.

10    Q.   And I think the very first one that they had you testify

11    to was this exhibit, which is Government's Exhibit No. 133 at

12    page 6.  Recall that?

13    A.   I recall it.  Okay.  That is better.

14    Q.   Recall this one?  I think the very first one you talked

15    about yesterday.

16    A.   I think that was included in the pages that -- yes, that

17    we went through.

18    Q.   Would you agree with me that despite what it says in this

19    journal, Mr. Aldawsari was not in the possession of any false

20    birth certificates.  Right?

21    A.   He did not have any false birth certificates.

22    Q.   Mr. Aldawsari did not go to New York in a car, as far as

23    you know, that was booby-trap a remote detonated bomb.  Right?

24    A.   He went to New York but not in a car that had a remote

25    detonated bomb.
```

```
1    Q.   We are going to get to New York.  He went to a Mariah

2    Carey concert, did he not?

3    A.   That is true.

4    Q.   You don't have any evidence to believe that on that trip

5    to New York, whether Mariah Carey concert attended or

6    otherwise, that he booby-trapped a car or attempted to

7    booby-trap a car.  Right?

8    A.   No, sir.

9    Q.   He talks about a busy day of the week like Monday or

10   Tuesday.  This is a lot of very detailed and offensive

11   information.  Right?

12   A.   Yes, sir.

13   Q.   Incredibly offensive.  Correct?

14   A.   Yes, sir.

15   Q.   But it didn't happen, did it?

16   A.   No, sir.

17   Q.   Another that the Government took you through a couple of

18   pages later once again talks about reserving a large car

19   through the internet, going to New York, renting offices,

20   taking cars to a place where the bombs are and booby-trapping

21   them.  Right?

22   A.   Yes, sir.  This was the page you showed me previously and

23   the pages before and after it summarized.

24   Q.   Same sequence.  Right?

25   A.   Yes, sir.
```

1    Q.    Once again, didn't happen.  Right?

2    A.    No, sir.

3    Q.    Now, would you agree with me, Special Agent Orndorff,

4    that as offensive as these journal entries are, there was some

5    stuff in his journals that just made absolutely no sense at

6    all?

7    A.    Yes, sir.  There were other entries in there.

8    Q.    He would talk about -- I won't take the time, but he

9    talked about establishing an island.  Right?  And where people

10   would -- an island near Antarctica where people would go and

11   live.  Do you recall that?

12   A.    Yes, sir, there was an entry.

13   Q.    He talked about creating, for example, business

14   opportunities.  Recall some of those?

15   A.    Yes, sir.

16   Q.    One of these is contained in Government's Exhibit No. 123

17   at page 23 where he is talking about designing a website that

18   catered to, in his word, the fat, the lonely, and the

19   divorcees.  Right?

20   A.    Yes, sir.

21   Q.    Well, once again, none of this ever happened.  Right?

22   A.    No, sir.

23   Q.    He talked about establishing a bank in America that

24   catered to Islamic banking only.  Right?

25   A.    That is correct.

```
1    Q.   Once again, none of that ever happened.  Right?

2    A.   No, sir.

3    Q.   Here is the one I was referring to earlier, Special Agent

4    Orndorff, which is contained in Government's Exhibit No. 127.

5    Let me pull it back.  It is not focused.  It says, "I have a

6    crazy idea, a challenging adventure, the adventure to south

7    Antarctica."  This is nonsense.  It is just kind of ramblings

8    that make no sense at all.  Right?

9    A.   And he advises that it is a crazy idea --

10   Q.   It is a crazy idea.

11   A.   -- in there.

12   Q.   He talks about solving global warming.  Recall that one?

13   A.   I think that was a school project, I think.

14   Q.   Well, let me challenge you a bit on that.  He was talking

15   about solving -- Do you have that one?

16            MR. COGDELL:  May I have just a minute, Your Honor?

17            THE COURT:  Yes.

18            MR. COGDELL:  While he is looking at that, may I

19   approach the witness, Your Honor?

20            THE COURT:  You may.

21   Q.   (BY MR. COGDELL)  Mr. Orndorff, let me show you what is

22   marked as Defense Exhibit No. 39 and see if you have

23   reviewed -- It is an FBI 302 concerning an interview with a

24   specific individual, and ask you if you have seen that

25   interview before.
```

1    A.    Yes.

2    Q.    That concerns an interview with Mr. Aldawsari's lab

3    partner.

4    A.    Yes, it does.

5    Q.    And for the benefit of the jury, an FBI 302 is, we talked

6    about I think through another witness, Case Agent Orndorff, a

7    finding by a law enforcement agency.  Right?

8    A.    It is a memorandum of the interview in this case.

9    Q.    And it is done as part of an official investigation.

10   A.    Yes, sir.

11   Q.    And it is made by a person at or near the time of the

12   event.  Right?

13   A.    Yes, sir.

14   Q.    Accurately characterizes their observations of their

15   interview.  Right?

16   A.    Yes.

17            MR. COGDELL:  Would offer Defense Exhibit No. 39

18   under 803, Your Honor.

19            MR. HAAG:  Your Honor, I don't believe this meets

20   the requirements for 803.  It is a police report prepared in

21   anticipation of the case.

22            THE COURT:  Let me see it, please.

23            MR. COGDELL:  And to be clear, Your Honor, 803(8).

24            THE COURT:  A public record and report?

25            MR. COGDELL:  Keep reading.  It is -- I didn't mean

```
 1    to sound --

 2              THE COURT:  Yes, sir.

 3              MR. COGDELL:  I didn't mean to sound disrespectful,

 4    Your Honor.  (c), a civil action of proceedings.

 5              THE COURT:  I see it.  What about it?

 6              MR. COGDELL:  Look at 803 (8)(c).

 7              THE COURT:  "Civil actions and proceedings and

 8    against the Government in criminal cases, factual findings

 9    resulting from an investigation made pursuant to authority

10    made by law."

11              MR. HAAG:  Yes, Your Honor.  This witness, from my

12    recollection, didn't author this specific report.  I don't

13    have a problem with him testifying as to what is written in

14    the report.  I just don't think it should be introduced into

15    evidence.

16              THE COURT:  I am sorry.  I missed that.

17              MR. HAAG:  I don't have any problem with this

18    witness testifying to what is written in the report.  I just

19    don't believe it should come into evidence.  That would be my

20    only argument.

21              MR. COGDELL:  I think it is admissible.

22              THE COURT:  Do it that way.

23              MR. COGDELL:  Okay.  May I put it on the display,

24    Your Honor?

25              THE COURT:  No.  Just ask him questions.
```

```
1              MR. COGDELL:  Okay.
2    Q.   (BY MR. COGDELL)  Can you read that document to us?
3    A.   "Kinsey Michelle McDonald, date of birth" blacked out
4    social security number, address, all redacted "Lubbock, Texas,
5    was interviewed at her residence" --
6    Q.   You have a soft voice.  Try to keep it up.
7    A.   Sorry.  "...was interviewed at her residence" --
8              THE COURT:  I think I know what part you want to get
9    to.  Do you want to just get to it?
10             MR. COGDELL:  Sure.
11   Q.   (BY MR. COGDELL)  Why don't you take it us to -- I want
12   you to read for the jury the part where Mr. Aldawsari's lab
13   partner is describing his competency in the lab.
14   A.   Okay.  "Khalid Aldawsari was McDonald's laboratory
15   partner in the chemistry lab in the fall semester 2009 Texas
16   Tech University.  They both missed the first lab and because
17   they were late were partnered up by a graduate assistant
18   instructing the lab.  A third person was later partnered up
19   with the pair but McDonald does not recall the person's name.
20   McDonald did not think highly of Aldawsari because of his
21   incompetence in the lab."
22   Q.   Stop.  His lab partner is telling an FBI agent she didn't
23   think highly of him because he is incompetent in the lab.
24   Right?
25   A.   That is what it says.
```

1  Q.   Now, are you aware, Special Agent Orndorff, whether or

2  not this lab is the very same lab that was discussed

3  previously through another witness where I believe

4  Ms. Williams pointed out that he got an A in the lab, and

5  Mr. Doyle pointed out on cross examination that that A might

6  well be due to his lab partner and whether or not, in fact,

7  this is that lab partner?

8  A.   It says fall semester 2009, and I believe he got an A.

9  Q.   That is the only time he got an A.  Right?  In lab, as

10 far as you know?

11 A.   I am not sure about the next semester, sir.

12 Q.   If I represent to you he didn't get an A but one time,

13 will you at least take me at my word on that?

14 A.   If you represent it, yes, sir.

15 Q.   Keep going.

16 A.   "He appeared to not really care about getting assignments

17 completed and left the majority of the work to be done by

18 McDonald.  She frequently complained to her boyfriend that her

19 lab partner was inept.  McDonald spent time with Aldawsari

20 outside of the courtroom.  She recalled him saying that he was

21 from Egypt and that he had a distinct accent."

22 Q.   That is fine.

23        MR. COGDELL:  May I retrieve this document, Your

24 Honor?

25        THE COURT:  Yes, sir.

```
 1    Q.   (BY MR. COGDELL)  Now, this is the journal entry I am

 2    talking about where he is dealing with global warming and you

 3    suggested that it might be a school project.  I am asking you

 4    to revisit that.  It is Government's Exhibit No. 123 at page

 5    20, and see if perhaps looking at that document might change

 6    your mind as to whether or not that was a school project.

 7    A.   I took this to mean that he is talking about his animated

 8    funny movie and that that is the part about the global warming

 9    and the defecating of the tree, that is part of it.

10    Q.   The point of this is, there are a bunch of ramblings,

11    some of which make sense; some of which make no sense.  Right?

12    A.   There are those in his journals, but the central theme --

13    Q.   Well, the central theme is horrific.  Right?

14    A.   Yes.

15    Q.   Frightening as anything you have seen.  Right?

16    A.   Yes.

17    Q.   But it didn't happen.  Agree with me?

18    A.   Yes, sir.

19    Q.   Now, there was a suggestion through your testimony, or

20    did you intend to suggest through your testimony, Special

21    Agent Orndorff, that Mr. Aldawsari came to the United States

22    for the purposes of engaging in terroristic conduct?

23    A.   I believe that is in his writings.

24    Q.   Okay.  Well, there is also -- I show you what has been

25    marked as Defense Exhibit No. 10--I will tender it to
```

1    Mr. Haag first--which is a part of his journal.  Before I show

2    it to you I will offer it.

3              MR. COGDELL:  May I approach, Your Honor?

4              THE COURT:  You may.

5    Q.   (BY MR. COGDELL)  Let me show you what has been marked as

6    Defense Exhibit No. 10, which is another journal entry that

7    Mr. Aldawsari created or entered.

8    A.   Yes, sir.

9    Q.   You saw that in your review.  Right?

10   A.   Yes, sir.

11             MR. COGDELL:  Offer Defense Exhibit No. 10, Your

12   Honor.

13             MR. HAAG:  No objection, Your Honor.

14             THE COURT:  Without objection.

15   Q.   (BY MR. COGDELL)  And he is referring to his goals or

16   aims.  Right?

17   A.   Correct.

18   Q.   That is Monday August 3rd, 2009.  Right?

19   A.   That is right.

20   Q.   He is in this country on that date.  Right?

21   A.   I believe so, yes.

22   Q.   And his goals are achieve the full mark in the math

23   placement test.  Correct?

24   A.   Yes.

25   Q.   Achieve the full mark in the chemistry placement test.

1    Right?

2    A.    Yes.

3    Q.    Achieve the full mark in the SAT 11 subject physics and

4    chemistry.  Right?

5    A.    Yes.

6    Q.    Buy -- Like any college student, buy a BMW 5 Series.

7    Right?  That is one of his goals?

8    A.    That is right.

9    Q.    Achieve the full mark in the TOEFL test.  Do you know

10   what that is?

11   A.    It is English -- it has to do with English proficiency.

12   Q.    Okay.  Achieve the full 4, I think it says, 4 out of 4 in

13   his GPA.  Right?

14   A.    That is correct.

15   Q.    Achieve a Master's degree in nanotechnology.  Right?  And

16   marry a very beautiful and loyal wife and live in the United

17   States.  Right?

18   A.    That is correct.

19   Q.    That doesn't sound like --

20         THE COURT:  Just ask questions.

21   Q.    (BY MR. COGDELL)  Does it sound like somebody who was

22   brought over here to participate in terroristic activities?

23   A.    That document alone doesn't.

24   Q.    Okay.  For the record, none of these goals ever happened

25   either.  Correct?

```
 1    A.    I don't think so.

 2    Q.    Now, would you agree with me, Case Agent Orndorff, that

 3    your investigation led you to the conclusion that

 4    Mr. Aldawsari really was not successful academically here?

 5    Right?

 6    A.    That is correct.

 7    Q.    Okay.  He was not successful socially here.  Right?

 8    A.    That is correct.

 9    Q.    Had very few friends.  Right?

10    A.    Yes, sir.

11    Q.    To call him unsuccessful from a girlfriend or a

12    relationship standpoint would be accurate as well.  Right?

13    A.    I know of no relationship of a girlfriend relationship

14    that he had.

15    Q.    I am sorry.  I am stepping on you.  Let me -- You know of

16    no girlfriend relationship that he had.  Right?

17    A.    That is correct.

18    Q.    You know of no close personal friends that he had.

19    Right?

20    A.    No.  Mr. Alzahrani I believe was a close personal friend.

21    He took the trip with him to California.

22    Q.    Right.

23    A.    Just prior to this.

24    Q.    Now, during that trip to California, your investigation

25    revealed that that trip to California was over the Christmas
```

1   holiday in late 2010.

2   A.    It started sometime around that period.

3   Q.    And there was nothing of any significance from a

4   prosecution standpoint that happened in that trip.  Right?

5   A.    Nothing that we know about, no, sir.

6   Q.    Well, and the FBI made extensive efforts to find out --

7   For example, one of the topics we have talked about is the

8   blowing up of dams.  Right?

9   A.    Yes, sir.

10  Q.    Never stopped at any dams.  Right?

11  A.    Not that we know of.

12  Q.    Never made any remarks that were dangerous or

13  threatening -- What was the fellow's name he was with?

14  A.    Alzahrani.

15  Q.    Alzahrani.  There was nothing from Mr. Alzahrani's

16  standpoint that was perceived as threatening or dangerous.

17  Right?

18  A.    No, sir; nothing that he told us.

19  Q.    I mean, and this is happening 30 days or so before this

20  investigation began.

21  A.    Yes, sir.

22  Q.    Okay.  Was it Mr. Alzahrani from whom he got the

23  refrigerator?

24  A.    Yes, it was.

25  Q.    And he is not -- Mr. -- Say it for me because I can't.

1  A.  Alzahrani.

2  Q.  Alzahrani.  Thank you.  Mr. -- That person.  Sorry.

3  Terrible with names.  He is not suspected by the FBI of

4  engaging or being involved in terrorism in any way.  Right?

5  A.  No, sir.

6  Q.  And he is the one friend that you can tell us about that

7  Mr. Aldawsari had.  Right?

8  A.  That is correct.

9        MR. COGDELL:  May I have just a minute, Your Honor?

10        THE COURT:  All right.

11        MR. COGDELL:  Tender the witness, Your Honor.

12        THE COURT:  Redirect?

13        MR. HAAG:  Thank you, Your Honor.

14        THE COURT:  Mr. Haag.

15                  REDIRECT EXAMINATION

16  By Mr. Haag:

17  Q.  Good morning, Special Agent Orndorff.

18  A.  Good morning, sir.

19  Q.  I am going to try and go through Mr. Cogdell's cross in

20  the order he went through it.  He first talked about whether

21  this is a normal case.

22        Since 9/11 what is the FBI's top priority in

23  investigations?

24  A.  The prevention of a terrorist attack or disruption of

25  terrorist groups.

```
1    Q.   As the FBI's top priority, does it supersede any other
2    case that the FBI has at the time?
3    A.   Yes, it does.
4    Q.   Within the Lubbock office, did everyone literally drop
5    what they were doing and work on this case?
6    A.   Yes, they did.
7    Q.   Did the Dallas field office literally drop everything it
8    was doing and turn its sole attention to this case?
9    A.   Yes, sir.
10   Q.   Did FBI offices around the country that were impacted
11   literally do the same?
12   A.   That is correct.
13   Q.   Is that standard procedure in a terrorism case?
14   A.   Yes, it is.
15   Q.   Mr. Cogdell brought up the possibility of a meet in an
16   undercover capacity.  The undercovers that met with
17   Mr. Aldawsari during that conversation, did Mr. Aldawsari ever
18   raise anything about his plans for terrorism in the United
19   States with the undercover officers?
20   A.   No, sir.
21   Q.   Did he ever make any anti-American statements during the
22   conversations?
23   A.   No, sir.
24           MR. HAAG:  If we could turn to Government's Exhibit
25   No. 121, page 3, please.  And if we could go down to No. 5.
```

```
 1    Q.   (BY MR. HAAG)  And looking at this journal entry, would

 2    you please read what Mr. Aldawsari writes in No. 5?

 3    A.   "All operations must be highly secretive.  No one should

 4    be informed about them at all, even the close ones."

 5              MR. COGDELL:  What exhibit number is that?

 6              MR. HAAG:  Exhibit No. 121.

 7    Q.   (BY MR. HAAG)  Based upon what happened in the meeting

 8    with the undercover officers, did you feel it was a viable

 9    strategy to introduce an undercover officer to Mr. Aldawsari?

10    A.   No.

11    Q.   Mr. Cogdell then brought up the possibility of an

12    attempted controlled delivery of phenol.  Did you need time in

13    this investigation?

14    A.   Yes, sir.

15    Q.   Why did you need time?

16    A.   We needed time to find out if he was -- if Mr. Aldawsari

17    was working with anybody else or if there were other

18    co-conspirators or plots around the country, and to analyze

19    the information that we had.

20    Q.   Something else Mr. Cogdell brought up was he talked about

21    physical surveillance and he talked about speeding as a reason

22    for the arrest.  Would you just clarify to the jury, was

23    speeding a reason for Mr. Aldawsari's arrest on February 23rd?

24    A.   No, it was not.

25    Q.   In the context of physical surveillance, did
```

1    Mr. Aldawsari's speeding have an impact?

2    A.   Yes, it did.

3    Q.   And I think when we talk about speeding we all sort of

4    imagine 50 in a 40.  When you say speeding as to

5    Mr. Aldawsari, would you give the jury an example of what you

6    are talking about?

7            MR. COGDELL:  They testified to this yesterday; 90

8    miles an hour.  Objection; asked and answered.

9            THE COURT:  Do you have an objection?

10           MR. COGDELL:  I do.  Objection; asked and answered.

11           THE COURT:  Overruled.  He may answer.

12           THE WITNESS:  Yes, he was traveling at 90 miles an

13   hour in a 55 mile an hour zone.

14   Q.   (BY MR. HAAG)  Also we talked about the refrigerator.

15   Did you conduct or ask for a swab of -- that refrigerator that

16   came from Mr. Alzahrani be swabbed?

17   A.   Yes.  It was done.

18   Q.   What was it swabbed for?

19   A.   It was swabbed to see if it had any chemical.

20   Q.   After Mr. Aldawsari was arrested, did you interview

21   Mr. Alzahrani?

22   A.   Yes, I did.

23   Q.   Did you ask Mr. Alzahrani to surrender his computer?

24   A.   Yes.

25   Q.   Did you conduct a thorough forensic evaluation of that

1    computer?

2    A.    Yes, we did.

3    Q.    Mr. Cogdell also touched a little bit about the decision

4    in making the arrest.  Did you coordinate with higher ups in

5    this case in making the decision to arrest?

6    A.    Yes, sir.

7    Q.    And how high up did that decision go?

8    A.    The decision went all the way to the top of the Bureau,

9    as far as I know.

10   Q.    Did the Bureau have to coordinate with other field

11   offices in making this arrest?

12   A.    Yes, it did.

13   Q.    Why did you have to coordinate with other field offices

14   across the country?

15   A.    Because we were going to go out and interview all of

16   Mr. Aldawsari's associates that we had identified from our

17   research.

18   Q.    Why was it so important for you to interview all of

19   Mr. Aldawsari's associates as soon after his arrest as

20   possible?

21   A.    To get the most accurate answers from them so that they

22   didn't have time to either talk to each other or change their

23   story because they knew he had been arrested; those types of

24   concerns.

25   Q.    Mr. Cogdell talked a little bit about some of the journal

1    entries, and we will go ahead and go through those.  He noted

2    a journal entry where Mr. Aldawsari talked about obtaining a

3    false birth certificate.  Did you examine the Google search

4    records in this case?

5    A.    Yes, I have.

6    Q.    Did Mr. Aldawsari conduct any research in obtaining a

7    false birth certificate?

8    A.    Yes, he did.

9    Q.    He also talked a little bit about some of the other plans

10   that Mr. Aldawsari had.  Let's talk about some of those.  Was

11   there any sort of consistent theme in the journals about any

12   other plan?

13   A.    No.  The only one that came close was video games.

14   Q.    Did he -- Was there any sort of consistency as compared

15   to his writings about jihad?

16   A.    No.

17   Q.    And some of these ideas that Mr. Cogdell brought up, did

18   you ever see any sort of steps towards accomplishing those

19   goals?

20   A.    No.

21   Q.    For example, I think he mentioned Antarctica.  Did you

22   find snow shoes in Mr. Aldawsari's apartment?

23   A.    No, sir.

24   Q.    Did you find a heavy parka?

25   A.    No, sir.

```
1    Q.   Did you find other things that would accomplish what he

2    wrote about?

3    A.   No, sir.

4    Q.   He also talked about the lab partner interview.

5    Mr. Aldawsari actually took lab twice at Texas Tech.  Is that

6    correct?

7    A.   I believe so.

8    Q.   I am sorry.  Took chemistry lab twice at Texas Tech.

9    A.   Yes, sir.

10   Q.   He was also a SABIC scholarship award winner.  Correct?

11   A.   That is correct.

12   Q.   And he was one of the 100 out of 15,000 applicants --

13            MR. COGDELL:  First off, I didn't go into

14   -- Objection; leading, and beyond the scope of cross; both of

15   those.

16            THE COURT:  I don't think it was leading, and I

17   don't think it is -- I think it is fair redirect.  Overruled.

18   Q.   (BY MR. HAAG)  Let me ask it this way.  Was Mr. Aldawsari

19   a SABIC scholarship award winner?

20   A.   Yes, he was.

21   Q.   How many SABIC scholarships were awarded?

22   A.   One hundred.

23   Q.   And in the letter from SABIC, how many applicants did it

24   note were made for that scholarship?

25   A.   Thousands.  I can't recall the exact number.
```

1      MR. HAAG:  Let's go ahead and, if you could, please

2  pull up Government's Exhibit No. 127, page 26.

3  Q.   (BY MR. HAAG)  And before we talk about this entry, have

4  you had a chance to look at the timeline of Mr. Aldawsari's

5  actions in his journal writings in this case?

6  A.   Yes, sir.

7  Q.   And do they build towards a crescendo on the jihad side

8  of the operation?

9      MR. COGDELL:  I am sorry, Judge.  Objection;

10  leading.

11      MR. HAAG:  I can rephrase, Your Honor.

12      THE COURT:  Put it as a question rather than -- That

13  can be answered with a yes or no, I know, but they seem to

14  suggest an answer, so put your questions in the form of a

15  question without a suggestion of an answer.

16      MR. HAAG:  Yes, Your Honor.  I apologize.

17  Q.   (BY MR. HAAG)  Did you notice a change in the tenor of

18  the journal writings over time?

19  A.   Yes, sir.

20  Q.   What was that change in the tenor of the journal

21  writings?

22  A.   It seemed to become more immediate and more -- become

23  more immediate with his goal.

24  Q.   When you say "goal," which goal are you referring to?

25  A.   The goal of producing a WMD.

```
 1    Q.    And let's go ahead and we are going to look at page 26.

 2    What is the date of this journal entry?

 3    A.    March 25th, 2010.

 4    Q.    Would this be -- And what -- In the academic calendar,

 5    what time frame would this be?

 6    A.    This would have been the spring of 2010.

 7    Q.    And would you please read what Mr. Aldawsari writes in

 8    his journal in the spring of 2010?

 9    A.    "I, Abu-Zidan Al-Najdi, confirm my determination to kill

10    the infidel assailants.  I no longer have an interest in life

11    of this world so I did not study hard as I did when I was in

12    the Land of the Two Noble Sanctuaries.  The focus of my

13    interest is jihad for God's sake, which I will do in the near

14    future, hoping that God will reward me with the higher

15    paradise, and the hour is in the paradise of resort."

16    Q.    You just noted that he said "The focus in my interest is

17    jihad for God's sake."  Did that same shift in focus seem to

18    apply with regard to his friendships?

19            MR. COGDELL:  Judge, I am sorry.  Objection;

20    leading.

21            THE COURT:  Well, Mr. Cogdell, I don't think it is

22    leading, so I will overrule the objection as leading.

23            MR. COGDELL:  Would the Court entertain

24    argumentative?

25            THE COURT:  The question was, "You just noted that
```

1    he said the focus in my interest is jihad for God's sake.  Did

2    that same shift in focus seem to apply with regard to his

3    friendships?"  I don't think that is leading.

4              MR. COGDELL:  Yes, sir.

5    Q.   (BY MR. HAAG)  Would you please answer the question?  Or

6    I can repeat it.

7    A.   Yes, sir.  It narrowed his friendships.

8              MR. HAAG:  And let's go ahead and turn to

9    Government's Exhibit No. 127.  And we will look at page 44,

10   please.

11   Q.   (BY MR. HAAG)  What is the date of this journal entry?

12   A.   May 16th, 2010.

13   Q.   And if you would, starting where I have got the laser

14   pointer on "I," would you please read what that sentence says?

15   A.   "I met some young men on Face and chatted with others via

16   Hotmail, and strengthened the relationships with them in

17   regards to doing good deeds and jihad for the sake of Almighty

18   God."

19   Q.   If we could turn the page, please, and go to page 45.

20   And if you would, would you please read this paragraph?  I am

21   sorry.  Would you read the date of the journal entry first?

22   A.   May 17th, 2010.

23   Q.   Would you please read the paragraph I have highlighted

24   with my laser pointer starting with "Today"?

25   A.   "Today was a good day, for in addition to the interesting

1    conversation with my brother in God Abu Al-Walid, may God

2    protect him, I talked to a number of young men who are eager

3    for jihad and for proceeding in that direction.  Some of them

4    are from the Islamic countries of North Africa, some are from

5    the Land of the Quiver, Egypt, some are from the Land of the

6    Two Noble Sanctuaries, and some are from Jordan.  May God

7    grant us the highest level of paradise after a long age in the

8    jihad battlefield to fight jihad and obtain martyrdom."

9    Q.    Thank you.

10        Mr. Cogdell also spent some time talking to you about

11   post-arrest and some of the things that happened and whether

12   those events had actually occurred.  In your review of the

13   evidence after Mr. Aldawsari's arrest, did you have any

14   indication from the evidence that Mr. Aldawsari would have

15   stopped?

16             MR. COGDELL:  Objection; speculation, Your Honor.

17             THE COURT:  No.  From the review of the evidence he

18   says there is no indication that he would have stopped.

19             MR. COGDELL:  It is speculating as to the mindset of

20   Mr. Aldawsari, Your Honor.

21             THE COURT:  But he has limited his answer -- I don't

22   want to argue with you, Mr. Cogdell, but he is limiting his

23   answer to the evidence that he has reviewed.

24             MR. COGDELL:  Yes, sir.  Just note my objection.

25   Q.    (BY MR. HAAG)  From the review of the evidence, was there

1    ever any indication that Mr. Aldawsari would have stopped?

2    A.    No, sir.

3    Q.    Was there ever any indication from the evidence that he

4    would have stopped until he had detonated a weapon of mass

5    destruction?

6            MR. COGDELL:  Judge, objection; argumentative.

7            THE COURT:  It is -- I am sustaining.  You have got

8    your evidence in, Mr. Haag.  Proceed.

9            MR. HAAG:  Thank you, Your Honor.

10   Q.    (BY MR. HAAG)  Let's talk about a few things that

11   happened in proximity to Mr. Aldawsari's arrest.

12           MR. HAAG:  If we can go to Government's Exhibit

13   No. 123, page 57.

14   Q.    (BY MR. HAAG)  Would you please remind the jury the date

15   of Mr. Aldawsari's arrest?

16   A.    The 23rd of February, 2011.

17   Q.    What is the date of this journal entry?

18   A.    February 22nd, 2011.

19           MR. COGDELL:  I am sorry.  Objection; asked and

20   answered.  This exact slide was gone into yesterday at the

21   close of his direct.  I didn't question it.  Objection; asked

22   and answered.

23           MR. HAAG:  Your Honor, Mr. Cogdell went into whether

24   any of these things had happened, and the point I am trying to

25   draw with the witness is that the immediacy of those is

```
 1   pointed out in the evidence.

 2              MR. COGDELL:  It has been asked and answered.

 3              THE COURT:  I think it has.  I think it has.  Next

 4   question.

 5              MR. HAAG:  Yes, Your Honor.

 6   Q.   (BY MR. HAAG)  Are you familiar with whether Mr.

 7   Aldawsari on the day of his arrest attempted to order any

 8   phenol?

 9   A.   Yes, sir.

10   Q.   Did he do so?

11   A.   Yes, he did.

12              MR. COGDELL:  Objection; asked and answered.

13              THE COURT:  No.  I will permit it now.

14              MR. COGDELL:  Okay.

15   Q.   (BY MR. HAAG)  Looking at Government's Exhibit No. 285 --

16   I am sorry.  No. 284 and 285.  And we won't play those right

17   now.  We will play those later on.  But are you familiar with

18   a microphone overhear on February 22nd, 2011?

19   A.   Yes, I am.

20   Q.   And we are going to talk about first --

21              MR. HAAG:  Your Honor, may I approach so the witness

22   may have an understanding of the exhibit I am talking about?

23              THE COURT:  Yes.  Show them to Mr. Cogdell.

24              MR. HAAG:  May I approach, Your Honor?

25              THE COURT:  You may.
```

1    Q.    (BY MR. HAAG)   Talking first in sequence of a period of

2    time, Government's Exhibit No. 284 and 285, which is going to

3    be Mr. Aldawsari's soliloquy, are you familiar with that?

4    A.    I am.

5    Q.    And just hours before the arrest, what in general is

6    Mr. Aldawsari talking about?

7    A.    He is talking like -- he is giving like there is a press

8    conference, and he is explaining that he smiled to the -- he

9    smiled to everybody because of the terrorist attack that he

10   had carried out.   He refers to himself as the terrorist Khalid

11   Aldawsari, and I can't remember exactly the rest.

12   Q.    And the jury will hear that in just a little while.

13         Moving on to Government's Exhibit No. 288 and -- I am

14   sorry.   No. 290 and 291, hours before his arrest are you

15   familiar with the microphone overhear regarding Mr. Aldawsari

16   talking about Federal Express or FedEx?

17   A.    Yes, I am.

18   Q.    And in that conversation just hours before his arrest

19   what is he talking about?

20   A.    He is practicing the address of Federal Express 7802 -- I

21   think it is 7802 Cedar Avenue, which is the address of the

22   FedEx hub by the airport in Lubbock, and he is practicing

23   saying the address and talking about that.

24              MR. HAAG:  No further questions, Your Honor.

25              MR. COGDELL:  Briefly, Your Honor.

1     THE COURT:  Tell me what area.

2     MR. COGDELL:  About four specific areas.

3     THE COURT:  What are they?

4     MR. COGDELL:  The prevention of terrorism which he

5  was questioned about, Exhibit No. 121, 003 which he was

6  questioned about, and then the goals that he claims

7  Mr. Aldawsari had that he was questioned about.

8     THE COURT:  All right.  Essentially you are saying

9  as to those exhibits, the overheard --

10     MR. COGDELL:  As to those -- Well --

11     THE COURT:  Well, let's see.

12                    RECROSS EXAMINATION

13  By Mr. Cogdell:

14  Q.   Mr. Haag had you detail for the jury, Mr. Orndorff, that

15  prevention of terrorism is the No. 1 goal of the FBI since

16  9/11.  Right?

17  A.   That is correct.

18  Q.   You understand that that is not what Mr. Aldawsari is

19  charged with.  Right?  He is charged with attempted use of a

20  weapon of mass destruction.  Agree with me?

21  A.   That is correct.

22  Q.   Now, you detailed for us that you believed he was getting

23  closer towards his goals.  Right?  Mr. Aldawsari.  On

24  redirect.

25  A.   Yes, sir.

1    Q.   When was Mr. Aldawsari going to assemble the weapon of

2    mass destruction?

3    A.   It seemed like there was immediacy when he got the --

4    Q.   Do you know when?

5    A.   No.

6    Q.   Do you know who the target was?

7    A.   No, sir, I do not.

8    Q.   Do you know --

9              THE COURT:  I think we have done that.

10             MR. COGDELL:  Sir?

11             THE COURT:  I think we have done that on your cross

12   examination.

13             MR. COGDELL:  Okay.

14       Can I have Government's Exhibit No. 121, page 003,

15   please, ma'am?  In the lower right hand side.  Yes, ma'am.

16   Q.   (BY MR. COGDELL)  Mr. Haag questioned you about item No.

17   5, "Must be highly secretive.  No one should be informed."

18   What does No. 6 say?

19   A.   "All arrangements must be on paper and not through

20   electronic mean."

21   Q.   That is not at all what happened here, is it?

22   A.   I believe that as far as his planning -- I mean, his

23   journals are full of his plans and they are in writing.

24   Q.   I am sorry?

25   A.   And they are in writing.

```
1    Q.   And so are the attempts to order chemicals through

2    electronic means.  Right?

3    A.   The purchases are, yes.

4    Q.   Yes, sir.  With his own credit card.  Right?

5    A.   Yes.  But they don't say that "I am buying this for

6    terrorist means."

7    Q.   It says, "Arrangements on paper not through electronic

8    means."

9    A.   Yes, sir.

10   Q.   He is using his credit card.  Right?

11   A.   That is correct.

12   Q.   Email.  Right?

13   A.   Yes.

14   Q.   Registered to him.  Right?

15   A.   That is correct.

16            MR. COGDELL:  If I may have just a minute, Your

17   Honor?

18            THE COURT:  Yes, sir.

19            MR. COGDELL:  Thank you, sir.

20            MR. HAAG:  Your Honor, if I may, just one brief

21   question.  Mr. Cogdell brought up targets.

22            THE COURT:  Let's see.

23                     REDIRECT EXAMINATION

24   By Mr. Haag:

25   Q.   Mr. Cogdell asked you about a specific target and whether
```

1   there was one.  Were you able from the evidence to determine

2   whether there were any parameters as far as the selection of a

3   target?

4           THE COURT:  I think not.  Thank you, sir.

5           MR. HAAG:  Thank you, Your Honor.

6           THE COURT:  You are excused, sir.  Thank you very

7   much.

8       Call your next witness.

9           MR. JACKS:  Your Honor, the Government would call

10  Mike Whitaker.

11          (Whereupon, the oath was administered by the Clerk.)

12                  MICHAEL WHITAKER,

13  Testified on direct examination by Mr. Jacks as follows:

14  Q.   Sir, would you tell us your name, please?

15  A.   My name is Michael Whitaker.

16  Q.   There is a microphone in front of you.  If you could kind

17  of pull it --

18  A.   Michael Whitaker.

19  Q.   You will figure it out.

20       How are you employed?

21  A.   I am employed at Cole-Parmer Instrument Company full

22  time.

23  Q.   Let me ask you to lean forward, move forward in the chair

24  perhaps a little bit.  And the company?  I am sorry.  Would

25  you say that again?

1    A.    It is Cole-Parmer Instruments.

2    Q.    Would you spell that?

3    A.    Yes.  It is C-O-L-E dash P-A-R-M-E-R, and then

4    Instruments.

5    Q.    And how long have you worked for that company?

6    A.    Since 1989.

7    Q.    Where is it located?

8    A.    It is in Vernon Hills, Illinois, which is a suburb of

9    Chicago.

10   Q.    And what is your position or title with that company?

11   A.    I am regulatory compliance safety, and I have a couple of

12   other titles like quality and continuous improvement.

13   Q.    Are you one of the custodians of records kept by

14   Cole-Parmer?

15   A.    Yes, sir.

16   Q.    Cole-Parmer is in what business?

17   A.    We are in the business of providing scientific

18   instrumentation to the research community as well as

19   industrial equipment.

20   Q.    Can you give just kind of an illustrative examples of the

21   type of equipment that you might sell?

22   A.    Certainly.  It ranges from A through Z, everything from

23   diagnostic equipment like ph meters, conductivity meters, to

24   ovens, fluid handling pumps, things of that sort.

25   Q.    Does Cole-Parmer manufacture the equipment or do they

1    acquire it from other manufacturers and then sell it?

2    A.    We acquire it from other manufacturers.  We are purely a

3    distribution company.

4    Q.    In front of you there is a small black binder.  If you

5    would open it up and in it there are three plastic sleeves

6    that are labeled Government's Exhibit No. 337, 338, and 339.

7    The documents in those plastic sleeves, have you seen those

8    before today?

9    A.    Yes, sir.

10   Q.    And let me just ask you, are they a part of the business

11   records of Cole-Parmer?

12   A.    Yes, sir.

13   Q.    Does Cole-Parmer keep records on a day-to-day,

14   week-to-week, month-to-month basis, or all three of those

15   things?

16   A.    Yes, sir; all three of those things.

17   Q.    Are the records made -- Are the entries into those

18   records made by somebody who has personal knowledge of what

19   they are putting in there?

20   A.    Yes, sir.

21   Q.    And do they do it at or near the time of the event that

22   they are recording?

23   A.    Yes, sir.

24          MR. JACKS:  Judge, we would move the admission of

25   Government's Exhibit No. 337, 338, and 339.

1            MR. DOYLE:  No objection.

2            THE COURT:  Without objection No. 337 through 339

3    are admitted.

4            MR. JACKS:  Ms. Christensen, would you please

5    display Government's Exhibit No. 337, the first page.

6    Q.  (BY MR. JACKS)  And Mr. Whitaker, you can use the screen

7    there in front of you.  This page of Government's Exhibit

8    No. 337, could you tell us essentially what this page

9    represents?

10   A.  Yes.  This is a screenshot of our order entry system.  It

11   is referred to as the header.  This particular page will have

12   information that is crucial to the customer's order--for

13   example address, ship to address, billing address, things of

14   that nature.

15   Q.  Now, there is a date in the upper right hand corner of

16   2/24/11, and what does that date represent?

17   A.  That date represents the day that I printed this off of

18   my computer, so as you can see to the left of that is my name,

19   so that is just a screenshot print date.

20   Q.  Okay.  Now, does this document -- Can you just kind of

21   walk us through, and the fields or the entries in there, tell

22   us what this tells you or represents as far as what is going

23   on?

24   A.  Certainly.  In the upper left corner which is circled is

25   a reference number.  That is an exclusive number to this

1    particular order.  As we move from the left to the right on

2    the top, you can see the status that is in, which billed,

3    meaning that we have shipped the item and that we are going to

4    collect.  Down to the middle on the left where it says "ship

5    to," it will show the individual's name or the customer, the

6    address where we wish to ship that product to, and on the

7    right side will be the bill to where the invoice or the bill

8    will go to.  In this case it was Amazon.

9    Q.   All right.  Let me just question you about what you said.

10   The ship to refers to whom?

11   A.   It refers to the customer who actually will receive the

12   goods.

13   Q.   All right.  And this indicates Khalid Ali-M Aldawsari.

14   Correct?

15   A.   That is correct.

16   Q.   You said the bill to reflects what category?

17   A.   Well, the bill to is to Amazon, so this tells me that

18   this transaction went through amazon.com, so the order was

19   placed through Amazon.  We fulfilled the order by shipping to

20   the ship to and then we bill Amazon.

21   Q.   Can you tell us a little bit about what that tells you?

22   In other words, where is Amazon in your sales chain?  How do

23   they fit into this?

24   A.   We refer to Amazon as a channel, so we will put

25   particular products within the Amazon website and they

1    facilitate the advertisement of those items and the

2    transactional piece, and then we will fulfill the order at the

3    back end of that and then bill Amazon directly.

4    Q.    Okay.  So if somebody is looking for a particular type of

5    product that you all sell, but they don't know about you, can

6    they go on Amazon, type in what they are looking for, and then

7    your company's products will appear?

8    A.    Yes, sir.  And that is the intent of Amazon.

9    Q.    All right.  Is it also possible for a customer that knows

10   about your company to directly contact Cole-Parmer to see

11   about purchasing one of your products?

12   A.    Yes, sir.

13   Q.    Can they do that through the internet?

14   A.    They can do it through our website.

15   Q.    Okay.  And I believe you said that the way the money

16   flows, your company bills Amazon, and then who collects from

17   the customer?

18   A.    In this case it would have been Amazon.

19   Q.    Okay.  And then there is an address there in Lubbock,

20   Texas, and does that represent the address of the customer?

21   A.    That is correct.

22   Q.    Is there a date on this page that indicates when this

23   transaction took place?

24   A.    One moment.  I do not believe it is on this page.

25              MR. JACKS:  Ms. Christensen, would you go to the

1   next page?  And if you could enlarge that, please.

2   Q.   (BY MR. JACKS)  Mr. Whitaker, let me direct your

3   attention to the second page of this exhibit.  And what is

4   this page called?

5   A.   This page is referred to as a detail page, and it has

6   more specific details of the order besides the header page.

7   So this will actually show us the actual item that is

8   purchased as well as the date that the transaction occurred

9   and shipped, things of that nature.

10   Q.   All right.  What was the item that was purchased?

11   A.   It appears to be a two liter flask, referred to as

12   Ehlenmeyer.

13   Q.   And is there a date down there that indicates when this

14   transaction took place?

15   A.   Yes, sir.  It is in the middle of the page in the bottom.

16   It is referred to as pricing date.  So it was January 17th,

17   2011.

18   Q.   And would you --

19        MR. JACKS:  Would you, Ms. Christensen, go back to

20   the preceding page.

21   Q.   (BY MR. JACKS)  This page, does it indicate how the

22   product was to be shipped to the customer?

23   A.   Yes, it does.  Middle of the left it shows the service

24   was selected of FedEx Ground.

25        MR. JACKS:  Would you go to page 4 of this exhibit

1   please?

2   Q.   (BY MR. JACKS)  Directing your attention to this page,

3   Mr. Whitaker, the total cost for this particular flask is

4   reflected where on this page?

5   A.   It would be in the lower right next to invoice amount.

6   Q.   Okay.  Are you familiar with the products that you all

7   sell?  I am assuming there is several.

8   A.   Yes, sir.

9        MR. JACKS:  Ms. Christensen, can you pull up

10  Government's Exhibit No. 112.

11  Q.   (BY MR. JACKS)  Do you know, Mr. Whitaker, is this the

12  flask that your company sold, or is it one like it?

13  A.   I would have to say it is one like it.

14  Q.   Okay.

15       MR. JACKS:  Would you go back to No. 338?  Would you

16  publish No. 338?

17       Let me ask you -- Would you go to the next page, please?

18  Q.   (BY MR. JACKS)  Could you tell us on this page, I believe

19  it is going to be the second page of Government's Exhibit

20  No. 338, and could you describe what is reflected in this

21  record from your company?

22  A.   Yeah.  This is the header screen once again, so on the

23  left side it shows a ship to address and a company name of

24  Disinfectants, Limited, and then a ship to address on the

25  right side.  It shows a bill to address with an individual's

```
 1    name, and then an address to where that bill will go to.  It

 2    shows that the service that has been selected for shipment is

 3    UPS Ground in the lower left side.

 4    Q.   And can you tell from looking at this particular record

 5    how this -- in this transaction how the customer contacted the

 6    company?

 7    A.   One moment.  Not from this screen.  I would have to look

 8    at the detail.

 9    Q.   And this is one of the documents described as bearing the

10    heading "detail lines."  Does this give you some idea of how

11    the customer contacted Cole-Parmer?

12    A.   Yes, sir.  On the left side middle you will see an

13    abbreviation ORD ORG with the letter W.  The W represents

14    website, so that means that the individual placed this order

15    on our website.

16    Q.   Okay.  As opposed to going through Amazon?

17    A.   Correct.

18             MR. JACKS:  I am sorry.  Would you go back to the

19    second page?

20    Q.   (BY MR. JACKS)  Now, with regard to the addresses in this

21    particular record, as far as the address where the bill was

22    supposed to go, what is that?  What is shown there?

23    A.   The billing address?

24    Q.   Yes.

25    A.   That is an address where we would mail the invoice to.
```

```
 1   Q.   And as far as the ship to address for this Disinfectants,

 2   Limited, what address is shown there?

 3   A.   It is showing a different address at 7802 North Cedar

 4   Avenue, and that is where we would actually ship the physical

 5   goods.

 6        MR. JACKS:  If you could go to the first page again.

 7   And take in all of the writing, if you will.

 8   Q.   (BY MR. JACKS)  And what item was ordered in this

 9   particular transaction?

10   A.   In this case the item was phenol, which is a chemical,

11   one kilogram, and two of them were ordered.

12   Q.   So there would be two items, each weighing one kilogram?

13   A.   Yes, sir.

14   Q.   And that is 2.2 pounds.  Is that --

15   A.   Yes, sir.

16   Q.   Okay.  And the total price was going to be what?

17   A.   From this screen here it appears to be $233.80.

18   Q.   Okay.  Does your company have certain policies regarding

19   when and to whom that you will sell certain products?

20   A.   Yes, sir.  We have a program called "good neighbor

21   policy."

22   Q.   Okay.  I will just ask you to make sure you are speaking

23   closer --

24   A.   Yes, sir.  We have a policy referred to as a "good

25   neighbor policy."
```

1   Q.   And what is the general purpose of that policy?

2   A.   The good neighbor policy is our attempt to make sure

3   chemicals don't end up in the residential areas or in the

4   hands of individuals who will make illicit drug processes,

5   things of that sort.  So we are trying to screen and vet out

6   the chemicals.

7   Q.   Okay.  What steps does your company take to vet or check

8   out customers that they may not know?

9   A.   There is two primary steps that are taken.  One is we

10  will actually look at the ship to address and the bill to

11  address using different tools to verify that it is not a

12  residential area.  We will also take a look at who is

13  purchasing the product, and we refer to them in one of two

14  ways.  You will either have a business that is purchasing the

15  product or an individual.  In our case, our policy won't allow

16  us to sell to individuals.  You have to be part of a business.

17         MR. JACKS:  Ms. Christensen, will you go back to the

18  previous page?  Yes.  I am sorry.  The header, the one that is

19  called header.  It is probably the second page.

20  Q.   (BY MR. JACKS)  Mr. Whitaker, this particular transaction

21  shows that the ship to address is 7802 North Cedar Avenue,

22  Lubbock, Texas.  Did your company perform any kind of due

23  diligence on this address before you filled this order?

24  A.   Yes, sir.  That address would have been put into one of

25  our screening tools and it came back as FedEx shipping hub.

```
1    Q.    So a FedEx office in Lubbock, Texas?

2    A.    That is correct.

3    Q.    And what reaction or what did your company do when

4    receiving that information?

5    A.    Upon receiving that information, we will not ship to a

6    FedEx hub.  We consider that to be part of our good neighbor

7    policy.  So at that point we would have started to cancel the

8    order and inform the customer.

9    Q.    All right.  And what is the reason that a -- If a product

10   is going to, what I would term, a location where it is going

11   to be moved from later, what is the reason that your company

12   doesn't want to do that?

13   A.    We don't -- We want to know where the end destination of

14   the product will be so we understand where it will be used at.

15   For example, in this FedEx shipping hub, you can pick that up

16   and it could be re-transferred and we won't have the end

17   knowledge where it will end up, so we put it within our policy

18   not to ship to FedEx hubs.

19          MR. JACKS:  Ms. Christensen, could you publish

20   Government's Exhibit No. 339?  And would you go to the second

21   page of that exhibit?  And if you would, the upper half of the

22   page, if you could enlarge that.  Yes.

23   Q.    (BY MR. JACKS)  Mr. Whitaker, is this page, does it

24   represent a copy of, among other things, what you described as

25   your good neighbor policy?
```

```
 1   A.   Yes, sir.

 2           MR. JACKS:  And if you would, Ms. Christensen, if

 3   you could highlight and perhaps enlarge that portion of the

 4   page.  Thank you.

 5   Q.   (BY MR. JACKS)  Would you mind just reading that for us,

 6   Mr. Whitaker?

 7   A.   Certainly.  "Good neighbor policy.  For your safety,

 8   Cole-Parmer has adopted a good neighbor policy for items that

 9   may have hazardous characteristics or be used for illicit drug

10   use, such as chemicals.  To help keep chemicals from getting

11   out in the open, we do not ship packages to residential areas.

12   We would rather lose some business than be an unwilling

13   partner to an accident or malicious act.  Cole-Parmer

14   regulatory affairs."

15   Q.   And is this statement directed at customers or potential

16   customers of Cole-Parmer?

17   A.   Yes, sir.

18           MR. JACKS:  And Ms. Christensen, if you could back

19   out.  And there are I believe like five bullet points.  If you

20   could highlight the second bullet point.  Yes.

21   Q.   (BY MR. JACKS)  And if you would, just read the first

22   sentence of that first -- or that bullet point, Mr. Whitaker.

23   A.   "Chemicals will only be sold to businesses, institutions,

24   full-time educators, and other professionals with valid

25   Cole-Parmer accounts."
```

```
1            MR. JACKS:  If you could go to the first page of

2    this exhibit, No. 339.  And if you could enlarge it.

3    Q.   (BY MR. JACKS)  Mr. Whitaker, what is represented by this

4    page of this exhibit?

5    A.   This here is an email from one of our customer service

6    reps, Olivia, sending it to a gmail account, and it is

7    basically saying -- the subject is "web order regulatory

8    hold," and then the reference number of the order.  And it

9    goes on to say that "The item that you have purchased we

10   cannot sell to you because it does not meet our good neighbor

11   policy."  And then it also specifies the policy farther down,

12   and it does have instructions in there that "if you need to

13   call us for further questions, please call us at the 800

14   number."

15   Q.   And the date and time this email was sent from Ms. Huerta

16   to K. Aldawsari?

17   A.   It would have been February 23rd, Wednesday, at 4:01 p.m.

18           MR. JACKS:  And I apologize, Ms. Christensen.  Would

19   you go back to No. 338, and I believe it is going to be the

20   second page of that exhibit.  Try the first page, please.

21   Q.   (BY MR. JACKS)  I apologize, Mr. Whitaker, but in terms

22   of when this order came in, the date, can you tell us what

23   this record reflects in terms of the date that this phenol

24   order came in?

25   A.   It appears to be 2/23/2001.
```

1   Q.   2011?

2   A.   I am sorry.  2011.

3   Q.   That is okay.  So this is -- So the order came in and was

4   rejected the same date?

5   A.   Yes, sir.

6   Q.   Do you know when you were contacted by anyone with the

7   government regarding these transactions?

8   A.   Yes.  I was contacted on the 24th, February 24th, 2011.

9   Q.   The day after this attempted transaction took place?

10  A.   Yes, sir.

11  Q.   And that is the day -- What agency contacted you?

12  A.   I believe it was the FBI.

13  Q.   And that is the day that you printed out these records

14  and preserved them?

15  A.   Yes, sir.

16          MR. JACKS:  May I have a moment, Your Honor?

17          THE COURT:  You may.

18          MR. JACKS:  Thank you, Mr. Whitaker.

19      I pass the witness, Your Honor.

20          THE COURT:  Do you have any questions?

21          MR. DOYLE:  Briefly.

22          THE COURT:  Briefly and then we will take our break.

23                      CROSS EXAMINATION

24  By Mr. Doyle:

25  Q.   Mr. Whitaker, my name is Paul Doyle.  We haven't met,

1    have we?

2    A.    No, sir.

3    Q.    You went through some steps in terms of this particular

4    purchase, and Mr. Aldawsari was attempting to obtain phenol.

5    Correct?

6    A.    Yes, sir.

7    Q.    He failed at pretty much every step of it.  Correct?

8    A.    He was able to place the order, then the order was

9    cancelled.

10   Q.    Well, in terms of what you used to vet it, the ship to,

11   bill to, that wasn't going to pass.  Right?

12   A.    The ship to would not pass.

13   Q.    The address he used, because it went to a FedEx, that

14   wasn't going to pass.  Correct?

15   A.    Yes, sir.

16   Q.    And this is policy that is standard in your industry.

17   Correct?

18   A.    Yes, sir.

19   Q.    Do you guys sell picric acid?

20   A.    Picric acid?

21   Q.    Picric acid, yes.

22   A.    I would assume we do.

23   Q.    You do?  Okay.  So that is something we would be able to

24   find on your website?

25   A.    Possibly.

1  Q.    Okay.  Do you know what it is?

2  A.    Offhand, no.

3  Q.    Okay.  Okay.

4        MR. DOYLE:  No further questions, Your Honor.

5        THE COURT:  Do you have anything, Mr. Jacks?

6        MR. JACKS:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8  By Mr. Jacks:

9  Q.    Mr. Whitaker, do you know what picric acid is and how it

10 is created?

11 A.    I have heard of it, but I do not know what it is or how

12 it is created.

13 Q.    Okay.  So do you know if it is available in -- In other

14 words, can you buy it already put together, or does it have to

15 be put together from other chemicals?

16 A.    I do not know that offhand.

17 Q.    Okay.  So is it fair to say that you do not know if it

18 can be purchased in ready-made form?

19 A.    That is correct.  I do not know.

20 Q.    Okay.

21        MR. JACKS:  That is all I have.

22        THE COURT:  All right.  You may step down.  Thank

23 you, sir.

24    Let's take our break.  Fifteen minutes, ladies and

25 gentlemen.

1          (Whereupon, the jury left the courtroom.)

2          THE COURT:  Okay.  Fifteen minutes.

3                    (Brief recess.)

4          THE COURT:  Anything before we bring in the jury?

5          MR. CORA:  Nothing from the Government, Your Honor.

6          THE COURT:  Call your next witness.

7          MR. CORA:  Your Honor, the Government's next witness

8   is Mr. Robert Mothershead.

9          THE COURT:  All right.

10          (Whereupon, the jury entered the courtroom.)

11          THE COURT:  All right.  You may be seated.  And if

12   you will raise your right hand and be sworn, please.

13          (Whereupon, the oath was administered by the Clerk.)

14                    ROBERT MOTHERSHEAD,

15   Testified on direct examination by Mr. Cora as follows:

16   Q.   Sir, would you introduce yourself to the members of the

17   jury, and would you spell your last name for the court

18   reporter?

19   A.   Yes.  My name is Robert Mothershead;

20   M-O-T-H-E-R-S-H-E-A-D.

21   Q.   Who do you work for?

22   A.   I work for the Federal Bureau of Investigation.

23   Q.   And what do you do for them?

24   A.   I am a forensic chemist examiner in the FBI's laboratory

25   at Quantico, Virginia.

1  Q.   To become a forensic chemist examiner, did you have to go

2  to school?

3  A.   Yes.

4  Q.   Let's talk.  Did you get a BA in a certain

5  specialization?

6  A.   Yes.  I have a Bachelor's degree in chemistry.

7  Q.   And after that what did you get a degree in?

8  A.   I have a Master's degree in marine science from the

9  College of William & Mary.

10  Q.   And after you got your Master's degree what area -- what

11  professional job did you have next?

12  A.   I have been a practicing analytical chemist for over 20

13  years now.

14  Q.   Before you worked for the FBI, did you have a job in

15  private practice or somewhere else other than the FBI?

16  A.   Yes.  I had a job as an analytical chemist at two

17  different locations.  University of West FLORIDA in Pensacola,

18  Florida as well as the College of William & Mary's School of

19  Marine Science.

20  Q.   After that, did you take your practice of analytical

21  chemistry to the FBI?

22  A.   Yes, I did.

23  Q.   And when was that?

24  A.   It was in 1996.

25  Q.   And what did you do for the FBI when you started in 1996?

1   A.   The first job I had was in the laboratory's research

2   unit, Forensic Research Unit.  I spent two and a half years

3   there, and my job was to help develop test methods for testing

4   forensic evidence for the remaining part of the lab, as well

5   as to train other forensic chemists in either instrumental

6   equipment techniques in the lab or specific forensic

7   applications.

8   Q.   And after you did that job for a number of years, did you

9   get a second job also at Quantico--probably not at Quantico,

10  but also with the lab at the FBI?

11  A.   Yes.  After two and a half years, I transferred into the

12  caseworking portion of the lab, which at the time was at the

13  FBI headquarters in Washington, D.C.  This was in the

14  Chemistry Unit, and this was a bench chemist conducting

15  analytical chemistry on evidence that was submitted to the

16  lab.

17  Q.   And did you have any specialization when you were a bench

18  chemist?

19  A.   Yes.  My area of specialty was in explosives analysis as

20  well as in ignitable liquids items such as gasoline, kerosene,

21  diesel fuel, as well as some general unknown "what is it"

22  types of chemistry examinations.

23  Q.   And after your job as a bench chemist, did you graduate

24  or get a next job?  When I say graduate, was it an

25  advancement?

1  A.   Yes.  After three and a half years as a bench chemist, I

2  took a promotion into the forensic chemist examiner position.

3  The examiner position does the same work as a bench chemist,

4  will actually do hands-on testing, but the examiner is also

5  responsible for writing the forensic report that states the

6  results of what the testing is, the opinion of what those

7  results are, and then that is the person that is responsible

8  for testifying in court to that report.

9  Q.   How long did you do that for?

10  A.   I have been in the examiner position since 2002, so going

11  on ten years for that.

12  Q.   Now, when you started as an examiner, did you work in a

13  specific area or a general area?

14  A.   My first area of specialty as an examiner was more in

15  that general unknown, so it wasn't immediately doing

16  explosives analysis but was focused on solids and liquids,

17  identifying what those chemicals are, drug analysis, this type

18  of area.

19  Q.   And after that, did you move on to another

20  specialization?

21  A.   After four years of doing that, I had an opportunity to

22  transfer over to the Explosives Unit where I was back at

23  analyzing explosives and the ignitable liquids, and I have

24  been there ever since, for six years now.

25  Q.   Now, in your work as both prior to it and in your present

```
 1    position, does part of your job require you to study not only

 2    commercial and military explosives but more non-commercial or

 3    non-military explosives--improvised items?

 4    A.    Yes, yes.

 5    Q.    And how do you study those?

 6    A.    We study both the materials themselves from an analytical

 7    standpoint, I analyze them in the lab, I study the literature

 8    on the explosives and how they are made--again, all three

 9    categories, but the commercial, the military explosives, as

10    well as what we refer to as improvised, sometimes called

11    homemade explosives, and that practice in doing the analysis,

12    as well as in some cases actually following the recipes for

13    making some of those explosives.  In addition, I have studied

14    the instrumental techniques I use in the lab for that.  I have

15    visited manufacturing facilities for commercial and military

16    plants as well.

17    Q.    Now, when you study improvised or homemade explosives,

18    what sort of things do you look at or what do you -- What

19    sources do you pull from?

20    A.    Well, there is a variety of sources.  A lot of what we

21    refer to the improvised explosives are materials -- they are

22    explosive, but they are not used by the military or in

23    commercial applications, usually for safety reasons or some

24    other reasons, and so we study the literature that is out

25    there, the mechanisms.  The recipes for making them are often
```

1   in publications that are not found in the regular library down

2   the street.  These have been either -- Some of the older ones

3   from back as early as the 1970s were from the anarchist

4   literature, what we refer to sometimes as the underground

5   literature.  And in the past, before computers and the

6   internet, you would have to go out and buy these books and

7   they were very difficult to get.

8        Now, with the advent of the internet, a lot of this

9   information has been scanned in and is readily available, so

10  it can be found simply by searching certain locations.  It has

11  been copied and transmitted and placed in various forms, et

12  cetera.

13           MR. CORA:  Your Honor, at this time I would like to

14  proffer Mr. Mothershead as an expert as a forensic chemical

15  examiner with a specialization in explosives.

16           MR. DOYLE:  No objection, as long as he doesn't go

17  into what Mr. Aldawsari can or can't do.

18           THE COURT:  He may opine.

19  Q.   (BY MR. CORA)  Mr. Mothershead, let's talk about a couple

20  of chemicals that have come up in this case.  The jury has

21  heard about up to now.  What is picric acid?

22  A.   Picric acid is an explosive.  We refer to it in explosive

23  terms as a secondary explosive.  We tend to classify

24  explosives as primary, which are very sensitive explosives

25  that can be easily detonated or set off with heat or friction

```
 1   or temperature or pressure.  Secondaries are more stable but

 2   have more power.  And then there can be additional tertiary or

 3   blasting explosives; very, very stable but also very powerful.

 4   Q.   Picric acid, when you say it is powerful, is there a

 5   gradation system for explosives?

 6   A.   One of the common ways of sort of measuring explosives

 7   uses a benchmark of TNT--Trinitroluene.  Everybody is

 8   typically familiar with that.  You have seen the abbreviation

 9   of TNT.  So they will talk about how this rate compared to

10   TNT.

11   Q.   And how does picric acid compare to TNT?

12   A.   Picric acid is slightly more powerful than TNT.

13   Chemically they are very close to each other.  They are

14   chemical cousins.

15   Q.   Now, when you say chemically, is picric acid made up of

16   chemicals?

17   A.   Yes.

18   Q.   What chemicals is it made up of?

19   A.   As far as how is it made?

20   Q.   That is correct.

21   A.   Okay.  There are a couple of different routes for making

22   it.  One of the routes -- The most common route uses the

23   compound phenol as the starting point, and then, as in with

24   many explosives, there are some sort of nitrogen in the form

25   of nitrate groups that are added onto that chemical to create
```

1    a knew material that is the explosive.

2         So in the case of picric acid, the official chemical name

3    for that is trinitrophenol, also abbreviated sometimes as TNP.

4    And as that indicates, you have got three nitrogens or nitrate

5    groups.  That usually comes from nitric acid.  That is the

6    most common way.  And a lot of explosives have nitric acid

7    used to make the explosive product.  In this case, the other

8    component that is needed is sulfuric acid, and that is one of

9    the critical steps before using the nitric acid.  That is the

10   most common route of synthesis.

11   Q.    So there are three items?

12   A.    Three main precursor ingredients to make the picric acid.

13   Q.    Briefly can you tell us about the chemical phenol?

14   A.    Phenol is a chemical that has been around for a long

15   time.  Again, it is used -- In addition to a precursor for

16   something like picric acid, it has a lot of other various uses

17   as a starting chemical for making other products--resins.  It

18   has been used in the past as a disinfectant, but it is highly

19   corrosive, it has some other toxicity issues, so it tends to

20   be limited in its use.  But it usually can be found in

21   laboratories, chemistry labs as well.

22   Q.    Nitric acid?

23   A.    Nitric acid is a very strong acid.  The most common place

24   we find it tends to be in laboratories in universities, high

25   schools, and chemistry, but it is one of the most common

1    chemicals out there as far as use in industry and for making

2    other chemicals.

3    Q.    And sulfuric acid?

4    A.    Sulfuric acid, again very strong acid.  This one is a

5    little bit easier to find down the street at the local

6    hardware store because it can be used in various household

7    products.  But it is very strong acid, very corrosive.  It is

8    used in battery.  It is -- The battery acid is sulfuric acid.

9    Again, it has a lot of uses in chemical laboratories and a

10   very common industrial chemical.

11   Q.    For a moment I am going to ask you a couple of more

12   questions about picric acid.  You said it was an explosive?

13   A.    Yes.

14   Q.    And can you tell us when it was developed as an

15   explosive?

16   A.    As actually a lot of explosives, it was back in the mid

17   1800s it was started to be developed and used, and really it

18   came into favor at the end of the 1800s, and around the time

19   of World War I it was fairly popular.

20        The problem with picric acid itself -- It is a secondary

21   explosive, but if it comes in contact with a lot of metals it

22   will actually form a primary explosive called metal picrates,

23   depending upon the metal it is in contact with.

24        So, as I mentioned earlier, primary explosives are those

25   very sensitive explosives that can detonate with just the

1    least little amount of energy put into them.  That is not

2    favorable if you are using picric in a hand grenade or in a

3    munition, as the military was using it in World War I.  So

4    with the advent of TNT, they were able to replace the picric

5    acid with TNT and get away from those safety hazards into

6    something that was more stable.

7    Q.    As part of your work on this case, were a number of

8    items, both physical, paper, or electronic paper, and video

9    and photographs submitted from the case agents and from the

10   FBI to you and the Quantico lab?

11   A.    Yes, it was.

12   Q.    And did you -- And have you observed all of those things

13   as part of your investigation?

14   A.    As part of my analysis and evaluation, yes.

15   Q.    Okay.  I am going to ask you -- We are going to talk

16   about some of these things now.  With Ms. Christensen's help,

17   I am going to ask that you bring up what is in evidence as a

18   video that is numbered No. 170.  You have seen that before.

19   Is that right?

20   A.    Yes.  That is correct.

21   Q.    Okay.  What we are going to do is we are going to talk

22   about that and we are going to stop at certain places and have

23   you comment on it.

24          MR. CORA:  If you would start Exhibit No. 170.  It

25   is actually -- Well, No. 170.

```
 1           MR. DOYLE:  I would like to object to part of this,
 2   if I could approach briefly.
 3           THE COURT:  Do you want it on the record?
 4           MR. COGDELL:  Yes.
 5           THE COURT:  All right.
 6           (The following was had outside the presence of the
 7           jury.)
 8           MR. HESTER:  This was raised in our motion in
 9   limine.  It has to do with the sword hitting the cross and the
10   cross exploding, and we just wanted our objection noted for
11   the record.
12           THE COURT:  All right.  Once objected it is always
13   objected.  No problem.
14           MR. CORA:  Your Honor, let me clarify that ruling.
15   I think I know what the ruling is.
16           THE COURT:  Showing the sword and whacking one time.
17           MR. CORA:  Not at the beginning and the end in one
18   video, but one time.
19           THE COURT:  One time.
20           MR. CORA:  I can ask the witnesses if they saw it on
21   the other video?
22           THE COURT:  Why?
23           MR. CORA:  Because it ties them all together.
24           THE COURT:  I don't think so.
25           MR. CORA:  Very well.
```

1          MR. HESTER:  What about asking what the

2     interpretation is, that they are called "Lessons of

3     destruction of the cross"?

4          MR. CORA:  It is going to come out on the first

5     video.  I am not going to ask -- These are chemists.

6          (The following was had in the presence and hearing

7          of the jury.)

8          MR. CORA:  Can we start it from the beginning?

9          THE COURT:  Yes, sir.

10          MR. CORA:  No. 170, Ms. Christensen.

11          (Whereupon, Government's Exhibit No. 170 was played

12          in open court.)

13     Q.   (BY MR. CORA)  Okay.  Let's stop that for a moment now.

14     Now, Mr. Mothershead, first of all, this video that came from

15     the Lacie thumb drive that we introduced earlier, the language

16     in it, do you understand that language?

17     A.   No.

18     Q.   Do you even know what language it is?

19     A.   Not for certain.

20     Q.   What do you think it is?

21     A.   I believe it is Arabic, or a dialect thereof.

22     Q.   There are some words in there that you hear that kind of

23     match up with the transcript and you recognize as chemical

24     words.  Is that right?

25     A.   During the part where they are talking about the

1    chemicals, the word phenol seems to come up, nitric, sulfuric

2    seem to be heard.

3    Q.   And as a chemist, what we have seen and what you have

4    reviewed in the transcript up to now, what has that told you?

5    A.   This part of --

6    Q.   This part.

7    A.   -- this part of the video so far, this is a summation, a

8    summary of the steps that were taken to make picric acid using

9    phenol, sulfuric acid, and nitric acid.

10   Q.   And is this a familiar process to you and would this have

11   been successful?

12   A.   This is the basic -- a summary of the basic steps that

13   are used to make it using those three chemicals.

14           MR. CORA:  Okay.  Now, let's start the video again

15   and go to about 3:15.  I am sorry.  We stopped at about 2:44

16   or something.  If we start it again there and run it until

17   3:15.  I apologize for not being clear.

18           THE COURT:  For some reason the translation is not

19   following.

20           MR. CORA:  So the translation is not tracking

21   exactly with what is happening.  Can we have a moment, Your

22   Honor?

23           THE COURT:  Yes.

24       It is still not tracking.

25           (Whereupon, Government's Exhibit No. 170 continued

```
 1                    to be played in open court.)

 2              THE COURT:  It is simply not tracking.

 3              THE WITNESS:  It seems to be moving slowly now.

 4   Q.  (BY MR. CORA) Okay.  Mr. Mothershead, because of my

 5   inability to stop it, we are going to break it up into little

 6   portions.  So I am going to ask Ms. Christensen to go to that

 7   part and not play it but just so we have it on the screen.

 8        Up to about four minutes and five seconds we are going to

 9   talk about what has happened up there.

10              MR. CORA:  If you can just put that item, that piece

11   4:05 up on the screen.  Four minutes and five seconds.  Just

12   stop it there.

13   Q.  (BY MR. CORA)  What have we seen up to there,

14   Mr. Mothershead?

15   A.   The phenol was put into that glass cone-shaped flask.

16   Phenol is a white crystalline material, so that looked to be

17   consistent.  And then at this point the sulfuric acid, which

18   is a clear, colorless acid, is being added into the container

19   with that and that is the first step of the process.

20              MR. CORA:  And move to five minutes and three

21   seconds.

22   Q.  (BY MR. CORA)  And what do we see during this part?

23   A.   So once you have added the sulfuric acid to the phenol

24   and stirred it up to dissolve all of the phenol crystal into

25   the acid, then the next step is to heat it so that those two
```

1    chemicals will react together to form an intermediate

2    chemical.  And that heating is usually done in some form of a

3    controlled fashion, so a water bath, for example, will allow

4    you to heat the water in the port, sort of like a double

5    boiler for melting chocolate.  And it just stays at that sort

6    of temperature of boiling water, and this is done for about a

7    half an hour, as the recipe says.

8    Q.   When you say it is controlled, is there a reason it needs

9    to be controlled?

10   A.   Well, if you put someone on a direct flame, you will get

11   hot spots, so this is a little bit way in an improvised manner

12   of controlling the temperature of water.  So all that water is

13   at the same temperature as it boils, and then you have the

14   flask sitting in that.

15          MR. CORA:  And then we are going to move up to five

16   minutes and 50 seconds.  Just stop it there.  Stop at 5:38.

17   Q.   (BY MR. CORA)  Can you tell us what we have seen up to

18   there?

19   A.   I lost a little bit of track.  After the heating with the

20   acid, the sulfuric acid and the phenol, that is taken off the

21   heat, then the nitric acid is added in a little bit at a time.

22   I am not quite sure at this point if we have already added the

23   nitrate and started to heat that or not.  Probably not.  This

24   may be taking it off the heat prior to the nitric acid

25   addition.

```
 1              MR. CORA:  And six minutes and 29 seconds.

 2              THE WITNESS:  Okay.  So at this point is where we

 3   are starting to add the nitric acid.  And as soon as you add

 4   this nitric acid, it starts to create these red fumes that are

 5   nitrogen oxides, sort of noxious gasses coming off as a

 6   side -- a reaction product.  So you do this a little bit at a

 7   time in small batches, not pouring the whole acid in at once

 8   wait until the fumes die down, add a little bit more until you

 9   have added all of the nitric in.

10   Q.   So when you say it is noxious, does it smell?

11   A.   It will have a smell, it is corrosive.  You don't want to

12   be breathing, getting this into your lungs or nasal passages.

13              MR. CORA:  And then six minutes and 29 seconds.

14              THE WITNESS:  Okay.  So this is an example showing

15   as you add that nitric, the brownish reddish fumes coming off.

16              MR. CORA:  Eight minutes and 37 seconds.

17              THE WITNESS:  Okay.  So here is at the point where

18   all of the nitric has been added, it has been then put back

19   onto the water bath and heated for another hour and half, per

20   the recipe, to make that final reaction to create that picric

21   acid, which is in this acid mix right now.

22   Q.   (BY MR. CORA)  Now, this portion of the video that was

23   submitted to you from the Lubbock FBI, comparing it to the

24   earlier part of the video, can you tell us what the difference

25   is?
```

1   A.   Well, the first segment of the video is simply the

2   summary of these are the steps that are going to be taken,

3   these are the chemicals you will need.  This is a detailed

4   description in the latter part of the video that goes through

5   each of the steps and actually shows how that is done and then

6   how you get the final product out--the picric acid.

7   Q.   I am sorry.  I didn't mean to interrupt you.  If you

8   followed these step-by-step procedures with these chemicals,

9   what would you make?

10  A.   Following these steps you would make picric acid.

11  Q.   Now, you also reviewed notes in this case.

12  A.   Yes.

13  Q.   Is that right?  From books?

14  A.   Handwritten notes from a notebook.

15  Q.   That was submitted to you by the FBI in Lubbock.

16  A.   Correct.

17  Q.   Okay.  From the Defendant.

18  A.   Correct.

19          MR. CORA:  Let's go to Exhibit No. 121.

20  Q.   (BY MR. CORA)  Do you recognize this is one of the books?

21  A.   Yes.

22  Q.   Okay.  And on page 4 of that of this notebook, what do

23  you see?

24  A.   This is the text that basically gives a summary of the

25  video that we have just seen or the steps that were detailed

1    in that video that we have just.  Seen so, again taking

2    the -- You see the numbers that are written up there for the

3    three ingredients, similar to what was on the dry erase board

4    in the video, and then the steps of starting with the phenol,

5    adding the sulfuric, heating for half an hour, adding the

6    nitric acid slowly until all of it is added with the smoke

7    emanating, then proceeding to heat that solution for another

8    hour and a half, and then that is getting powered into a cold

9    water bath, and the picric acid that is formed at the end,

10   once it is poured into the water, it solidifies to that yellow

11   solid that is seen.  Then that material is filtered to trap it

12   onto some filter material, like filter paper, and then it is

13   usually washed with water to rinse away any residual acids.

14   Acids that are left behind could break down and make the

15   product unstable and explosive, so they are always rinsed to

16   get all of that off.

17   Q.   Now, there are numbers in the top of this cut of the

18   document.  Is that right?

19   A.   Yes.  There is some numbers listed there above the names

20   of phenol, sulfuric, nitric, and particularly the sulfuric and

21   the nitric, and those are recognized as referring to the

22   concentration of the acid.  So the sulfuric is 98 pure

23   sulfuric acid.  The nitric acid is around 69 or 70 percent

24   pure nitric, the rest of that being made up by water.  And

25   that is commonly how these acids can be found and purchased.

1  Q.   Below the words phenol, sulfuric, and Nitric, what else

2  do we see?

3  A.   We see numbers down there for the recipe.  So just like

4  at home you would have a recipe for how much of each

5  ingredient to put in, essentially these are numbers for how

6  much of each of these three ingredients to use, and it is my

7  opinion that these numbers are in weight values for each of

8  these.

9  Q.   Now, you also -- You named some chemicals as you reviewed

10  items 1 through 6 on this page.  Is that correct?  You recall

11  you mentioned chemical names.

12  A.   Yes.

13  Q.   Okay.  There is something under No. 1 which is a bunch of

14  letters and numbers.

15  A.   Correct.  So that is the chemical shorthand that we use

16  for sulfuric acid.  It basically tells you what are the

17  chemical elements that make up that and how much of each are

18  in there.

19         MR. CORA:  And just for the record, the court

20  reporter, that is H2SO4.

21  Q.   (BY MR. CORA)  And also in item No. 3 there is also a

22  chemical abbreviation?

23  A.   Correct.  HNO3.  And that is the chemical formula for

24  nitric acid.

25         MR. CORA:  Okay.  Now, can we just draw out so we

1    can see the handwriting on the left side?  And just highlight

2    that part of it.  Can you bring in the numbers?  And just zoom

3    out again.

4    Q.    (BY MR. CORA)  Okay.  Now, you also were submitted some

5    emails to examine in this case.  Is that correct?

6    A.    That is correct.

7    Q.    We will look at item in evidence No. 267.  Can you tell

8    who this is from?

9    A.    I can read it for you.

10   Q.    Just read it for us, yes.  I am sorry.

11   A.    I says under "from" Abu-Zidan Al-Najdi.

12   Q.    And the date of it?

13   A.    2/11/2011.

14   Q.    Okay.  And could you examine the first page?  And when

15   you -- Just look at me when you are done with the first page.

16         Can we move to the next page?

17   A.    Yes.

18   Q.    Have you been able to examine No. 267 down to the bottom?

19   A.    Yes.

20   Q.    And what does that tell you as a chemist?

21   A.    Again, it is basic recipe, similar to what we saw before,

22   for making picric acid from nitric acid, sulfuric acid, and

23   phenol; the same basic steps with a few minor differences in

24   the description.

25   Q.    These steps, approximately how long would this take to

1    complete if you had all the chemicals?

2    A.   It is going to vary.  We saw some of the times that were

3    listed there for the heating process.  That totaled up to

4    about two hours for the heating.  Then going through the other

5    steps, probably another couple of hours.  The more you do it

6    the more comfortable you are and probably the more efficient

7    you would be.  But probably around four hours would probably

8    be sufficient to produce the product at the end.

9    Q.   And what are some of the techniques we have seen to

10   do -- to complete this process?

11   A.   I am not sure I understand.

12   Q.   We have seen things demonstrated in the video and

13   explained on the emails about things you actually have to do

14   with your hands to complete the process.

15   A.   Well, at the end, again, you have to -- when you have the

16   solid material, you have got to filter it, and then you are

17   going to want to, as I said, wash it, and then you are going

18   to want to dry that water off, so you may have to spread that

19   out somewhere on some paper or something to allow that to dry.

20   Q.   And have we seen stirring in it as well?

21   A.   So part of the process, again when you start first adding

22   the sulfuric, you want to dissolve all of the phenol.  There

23   was stirring going on to make sure it was dissolved in there.

24   Q.   Pouring things?

25   A.   There was pouring from one container into another and

1    then adding the ingredients.

2    Q.    Measuring things?

3    A.    Some of those containers that had the acids in there were

4    what we refer to as graduated cylinders, so they have marks, a

5    scale on the side that tells you how much.  Most of that is

6    usually in metric, but think of it as in ounces, like a

7    measuring cup.

8    Q.    What sort of skills are these?

9    A.    These are basic skills.

10   Q.    Okay.  Would you use them in a cooking class?

11   A.    The basic concepts are in a cooking class, yes.

12   Q.    Showing you -- Now, we are going to go to another

13   notebook here.  It is the blue Mead notebook, which is Exhibit

14   No. 121 in evidence.  And pages -- starting at page 16.  Take

15   a look at that.  And page 17.  Page 18.  And page 19.  And

16   page 20.

17         Okay.  Let's go back.  Have you looked at these?

18   A.    Yes, I have.

19   Q.    And you have seen these before?

20   A.    Yes, I have.

21   Q.    Let's go back to page 16, and tell the jury as a chemist

22   what you see on that page?

23   A.    In particular, from the chemistry standpoint, at the

24   bottom where the asterisks are it talks about using gloves at

25   various steps and also using a mask to cover the mouth and

1    nose.

2    Q.   The following page, page 17.

3    A.   Again, at the top with the asterisk it talks about

4    protective eyewear, goggles to be worn when carrying out

5    experiments, and then proceeds into a definition of what hot

6    cold ice baths are and what that means, and then goes into

7    direct flame, and then talks about the two most important

8    acids to be used, mentions them, mentions their concentration,

9    and then proceeds to describe where you may be able to find

10   sulfuric acid locally.

11   Q.   And the hot and cold ice baths, is this consistent with

12   what we saw on the videos and the emails?

13   A.   Yes.

14   Q.   And is this a correct -- Is this correct information as

15   far as chemistry goes or creating these items?

16   A.   Well, yeah.  Certainly the hot with the boiling water we

17   talked about, that is one way of having a source of heat to

18   warm something, and the ice water certainly is one way of

19   getting something cold, so.

20   Q.   Okay.  Moving on to the bottom, the bottom of page 17

21   talks about sulfuric acid.  Is that correct?

22   A.   Correct.

23   Q.   And what does it say?

24   A.   It mentions that there are sources for sulfuric, talks

25   about car batteries, but mentions that that is diluted.  Again

1    it emphasized you needed concentrated sulfuric acid in the

2    paragraph above that, so a need to try to focus on getting the

3    concentrated sulfuric acid.

4    Q.   And further down?

5    A.   It says centers and wholesale stores are available for

6    it.

7    Q.   And is that a correct statement?

8    A.   Yes.  Sulfuric acid can be bought in concentrated form

9    locally at hardware stores and automotive stores.

10   Q.   Now, moving to page 18, is this talking about nitric acid

11   now?

12   A.   Right.  So the first asterisk up there starts talking

13   about concentrated nitric, mentions some of the color with it,

14   and can be obtained at schools, universities, hospitals in

15   small quantities, and nitric is harder.  It mentions about

16   maybe being able to get it from automotive stores that use it

17   from flushing radiators.  It gives the chemical symbol for it,

18   HNO3, talks about the odor.  And it mentions where it is used

19   in some agriculture, manufacturing, and then also starts to

20   describe how if you can't purchase or find nitric acid, how

21   you can make your own from concentrated sulfuric acid and a

22   source of a nitrate, the chemical terms, things like potassium

23   nitrate, ammonium nitrate, lead nitrate.

24   Q.   And there is a little diagram on that page as well.  Is

25   that right?

1  A.  That is correct.

2  Q.  Do you recognize that as being related to the text?

3  A.  To me it appears to be an automobile, and looks like an

4  arrow coming off the radiator, which is right next to the

5  translation there discussing flushing radiators with nitric

6  acid.

7  Q.  Going onto the next page now, page 19.

8  A.  So this is a continuation of that discussion of how to

9  generate nitric acid from concentrated sulfuric acid in a

10  chemical nitrate form, so it goes through and talks about the

11  ratios that you need for each, and then describes the

12  glassware and the equipment that you would need to generate

13  essentially a still to create this and then collect the nitric

14  acid at the end.

15  Q.  Now, when you say a still, are you talking about

16  something we commonly think of to make alcoholic beverages or

17  something?  Right?

18  A.  Well, in general principles, you are adding two

19  ingredients together, you are heating them, you are creating

20  this product in this case under temperature that forms a gas,

21  so the nitric acid actually comes in as a gas at that point,

22  and then in order to trap it as a liquid you have to cool it

23  off, so you create a linkage between that hot container and a

24  cool cold receptacle on the other side, and as it moves -- the

25  gas moves into that area, it hits that cold spot, it condenses

1    into a liquid, just like steam will condense into water when

2    it is cooled down.

3    Q.   I assume that there are chemical or supply houses that

4    sell stills.  Is that right?

5    A.   Well, you can buy the laboratory grade equipment to

6    generate this process, or you can make your own from available

7    items--two being beakers and glassware.

8    Q.   And as a matter of fact, the notes here -- the

9    Defendant's notes talk about that to some degree, don't they?

10   A.   Talks about using tubes and wrapping them with tape to

11   create this container.

12   Q.   And they use a certain type or brand of bottle?  What

13   does it say about what sort of bottles you could use in the

14   middle of the page?

15   A.   I see it mentioning about the tubes.

16   Q.   Let me ask you to go -- Do you see on the left side of

17   the page it says "method"?

18   A.   Yes.

19   Q.   Could you just read what it says after that?

20   A.   It says, "Bring two large tubes the size of the large

21   Pepsi bottles."

22   Q.   Okay.  You read better than I do.  I am sorry.

23        Okay.  We are going to now talk -- We are going -- You

24   were submitted a series of photographs of items that were

25   seized from the Defendant in this case.  Is that right?

1   A.   Correct.

2   Q.   We are going to -- basically we are going to show you

3   those on the screen, we are just going to put them up, and

4   then we will talk about them at the end.  We will do them one

5   after the other.  They are in evidence already.

6        Starting with No. 106, and then 108, and 109, and 110,

7   and 112, can you tell us what these are?

8   A.   Throughout this are laboratory grade flasks and beakers.

9   The flasks are the cone-shaped containers; the beakers are the

10  wide mouth opened containers.  The one item that was wrapped

11  in it appears to be a bubble wrap that zoomed in appears to be

12  a glass rod, also referred to as a stirring rod.

13  Q.   And are these similar to the items we have seen on the

14  videos, on the emails, and the notes?

15  A.   Yes.

16  Q.   Okay.  And would these be used to create, as is shown on

17  the videos, picric acid?

18  A.   This is laboratory glassware that could be used for that

19  purpose.

20  Q.   And many others.

21  A.   And many other purposes.

22  Q.   No. 113.  Do you recognize No. 113?

23  A.   Yes.

24  Q.   What is No. 113?

25  A.   No. 113 is a collection of glassware it looks like from a

1    laboratory equipment kit, including -- You see some flasks,

2    some more beakers, some plastic, some glass, graduated

3    cylinders are the tall tubes, it looks like clamps, there is a

4    filter in the lower left side, glass filter with a long stem

5    on it, and some other -- A mortar and pestle would be used for

6    grinding.  There is thermometers on the right hand side,

7    little droppers on the lower right, some clamps that are used

8    for clamping and holding those beakers onto that metal stand

9    on the left hand side, and in the back there appears a box for

10   an electronic scale.

11          MR. CORA:  Can we just highlight or blow up the

12   bottom right corner of this?

13   Q.   (BY MR. CORA)  And can you -- There is now in the central

14   part of the top of this display there is something that looks

15   like a tea kettle, or it is a round device.

16   A.   Correct.

17   Q.   Can you tell us what that is?

18   A.   I am not 100 percent sure.  To me it looks like, from my

19   experience, an alcohol lamp that is often used as a heat

20   source in labs, so you fill it with something like rubbing

21   alcohol, it has a wick, and you light it like you would a

22   kerosene lamp, and it would have a source of flame.  And that

23   cap lower would be how you snuff out the flame.

24   Q.   Moving onto Government Exhibit No. 118, and No. 120.

25          MR. CORA:  Can you blow up No. 120?

```
 1    Q.   (BY MR. CORA)  No. 118 and No. 120, what are they?

 2    A.   No. 118 was a hazardous chemical suit, including a

 3    head -- I mean a helmet and mask area as well as gloves and

 4    full suit.  And then No. 120 is a container with a surgical

 5    mask.

 6    Q.   When you say -- This No. 118 mask on the top, what would

 7    that do?

 8    A.   In a full suit like that it is a barrier, so it will

 9    present items obviously from splashing or getting onto your

10    face.  Also in that full suit capacity prevents any gasses

11    from getting in around your face area as well.  So it is a

12    protectant.

13    Q.   I assume it makes you uncomfortable, too.  Is that

14    correct?  It is hot?

15    A.   It can certainly be warm in there.  You don't want to be

16    in there very long.

17    Q.   Moving to Government's Exhibit No. 136 and No. 137 and

18    No. 138.  Can you tell the jury what the significance of these

19    are, in your opinion?

20    A.   No. 136 was a portable propane heater, like a camp stove.

21    It can be taken out.  No. 137 was propane cylinders that would

22    be used to connect to that.  No. 138 is a pot; similar, you

23    know, what you use at home for cooking in, but also similar to

24    what we saw in the video for a water bath.

25              MR. CORA:  Okay.  Moving now to another notebook
```

1    that was seized from the Defendant, which is now Government

2    Exhibit No. 123.  I would like to go to page -- That is a

3    notebook, and I would like to go to page 44 of that.  If you

4    can make it bigger so everyone can see it.

5    Q.   (BY MR. CORA)  What does this indicate to you in the

6    first paragraph?

7    A.   First, comments in there discuss about close to obtaining

8    the phenol substance to be used in manufacturing picric acid.

9    Just as we have seen, phenol is the ingredient for making

10   picric acid.

11        The remaining part of the paragraph discusses glycerin,

12   acetone, and hydrogen.  From an explosives chemist standpoint,

13   glycerin is a chemical that can be used to make the explosive

14   nitroglycerin, again using nitric and sulfuric acids is in

15   their concentrated forms.  Acetone is a solvent, so it is used

16   a lot in labs for dissolving material, but from an explosives

17   standpoint as an ingredient, it is used as one of the key

18   ingredients for making the improvised sensitive primary

19   explosive triacetone triperoxide, also abbreviated TATP.

20        Hydrogen by itself is a gas.  That is what this is

21   referring to.  It is a flammable gas, but it doesn't really

22   have any use in making explosives.  The only comment I would

23   have on that is an association with the acetone, the recipe

24   for TATP uses hydrogen peroxide, but there is no mention of

25   peroxide here in this statement.

1    MR. CORA:  Now let's go to -- to the blue Mead

2   notebook, which is No. 121, that is the front of it, and to

3   page 4.

4   Q.  (BY MR. CORA)  I think we have seen this already.  Is

5   that correct?

6   A.   That is correct.

7    MR. CORA:  Okay.  Back then to the black Mead, which

8   is No. 123, page 38.  And go to the third paragraph that

9   begins with the word "What."

10   Q.  (BY MR. CORA)  Can you read that to the members of the

11   jury?

12   A.   "What I mean is my victory and my gaining paradise, the

13   beautiful ones and houris, and the approval of God, which is

14   my whole hope and desire.  Praise to God, I bought lab

15   instruments, protective clothing, and the chemicals, materials

16   necessary for jihad, except for one material which is the

17   phenol substance.  I will be able to buy it sooner and not

18   later, with the help, might, and success of God."

19   Q.   And then does he talk about memorizing things as well?

20   A.   Discusses about memorizing chapters from the Quran, to

21   learn its interpretation, discusses other texts.

22   Q.   Now, would you read to them the last -- Read the last

23   sentence on that page as well.

24    MR. DOYLE:  Judge, I am going to object to the

25   relevance.

```
 1                THE COURT:  Sustained.  Proceed.

 2                MR. CORA:  And page -- Let's go to Exhibit No. 173,

 3      and this is a video.  We are just going to play a clip of this

 4      and we are going to play C-3.

 5                (Whereupon Government's Exhibit No. 173, Clip C-3

 6                was played in open court.)

 7      Q.    (BY MR. CORA)  Regarding C-3, what is this -- Do you

 8      understand this video with its translation?

 9      A.    Yes.

10      Q.    And what is it -- What is it showing you in the video?

11      A.    This is showing a preparation for the triacetone

12      triperoxide, the TATP, using key ingredients, which are the

13      acetone and a concentrated peroxide, and then you need a

14      strong acid as a catalyst to help create that final product.

15      Typically concentrated sulfuric acid is used, but you could

16      also use concentrated nitric or concentrated hydrochloric, or

17      what we sometimes refer to as muriatic acid.  All three of

18      those acids were shown in the videos.

19      Q.    And in the procedures in the video, how would you compare

20      them to the procedures that you observed in video 170?

21      A.    Well, it is slightly different procedures, but again,

22      fairly basic of mixing ingredients.  In this case there is no

23      heating done.  There is simply cooling with an ice bath or

24      something to keep the temperature down so that the reaction

25      doesn't overheat and have a potential explosion.
```

 1              THE COURT:  It is noon, when you reach a place to

 2    conveniently stop.

 3              MR. CORA:  Yes, sir.

 4         Okay.  Let's show No. 269.

 5    Q.    (BY MR. CORA)  Have you seen No. 269 before?

 6    A.    Yes, I have.

 7    Q.    Okay.  And who is it from and who is it to?

 8    A.    It is cited here as from Abu-Zidan Al-Najdi to Abu-Zidan

 9    Al-Najdi, the same email address in both.

10    Q.    And the date on it?

11    A.    The date on it is 2/12/2011.

12    Q.    Okay.  And what does this talk about?

13    A.    This is how to make picric acid from aspirin, which is

14    another source of material.

15    Q.    And have you seen this sort of information in your

16    research on improvised explosives?

17    A.    Yes, I have.

18    Q.    Can you tell us about that a bit?

19    A.    Actually the verbatim text and spelling and everything of

20    this particular email text in here is in some publications

21    that I have seen in what we call the underground literature.

22    So this is basically cut and paste from some of that.  Again,

23    if you can't get your hands on phenol, one of the ingredients

24    that you could use is aspirin, and there is some additional

25    steps, then, to get basically to phenol from aspirin, and then

1   from that point proceed, as we saw in the other videos and

2   emails, to make picric acid.

3   Q.   So what would the ingredients be in this process?

4   A.   In this particular case the recipe is also assuming you

5   are not easily able to get nitric acid, so it uses aspirin, it

6   uses sulfuric acid, and then it uses one of those nitrate

7   salts that we talked about earlier.  So you basically create

8   your own nitric acid in the middle of the mix and then proceed

9   on to heat those components together, cool it at appropriate

10   times, and get your final picric acid yellow powder at the

11   end.

12        MR. CORA:  And can we zoom out again on this one?

13   And go to the next page.  Zoom in on this.

14        THE WITNESS:  So this particular recipe, the title

15   was called plastique or plastic explosives.  So once they made

16   the picric acid, then this recipe goes further and tells how

17   you can blend it with, in this case, wax or vaseline to make a

18   moldable material that can then be used in a substitute

19   plastic explosive.

20   Q.   (BY MR. CORA)  And there is some warnings at the bottom

21   as well.  Is that correct?

22   A.   There are.  There are warnings about avoid handling it

23   bare handed, breathing the dust and fumes, any chance of

24   ingestion or taking it in through the mouth, basically retire

25   or get rid of utensils that are used, and store it in a safe

1    place, and that it should actually be used up as quickly as

2    possible; and more importantly, at the end, avoid contact with

3    all metals except aluminum and tin.  Remember I mentioned

4    earlier that picric acid will react with some metals to create

5    those very sensitive primary explosives, so this is warning

6    you to try to avoid that.

7    Q.   Thank you, Mr. Mothershead.

8              MR. CORA:  Your Honor, this is a good place.

9              THE COURT:  Okay.  Ladies and gentlemen, let's break

10   for lunch.  Five after 1:00.  All rise for the jury.

11             (Whereupon, the jury left the courtroom.)

12             THE COURT:  The Court is in recess for an hour.

13                        (Lunch recess.)

14             THE COURT:  Okay.  Anything before we bring the jury

15   in?

16             MR. CORA:  Yes, Your Honor, there is.

17             THE COURT:  What is that?

18             MR. CORA:  I don't know if you want to take it up

19   now.  It deals with the next witness that is going to be

20   testifying, Mark Whitworth, but maybe we should talk about it

21   now.

22             THE COURT:  Sure.  Go ahead.

23             MR. CORA:  You issued a motion in limine telling us

24   that regarding the demonstrations that were taking place in

25   this case, two of them by the bomb technicians, that we

1   couldn't play the video and that we had to approach the Court

2   before we addressed that.  I would -- We will -- I would

3   propose the following.  Instead of playing the video, I would

4   like to play -- show the photographs of the before and after

5   of that, of these two explosions.  I think the reason we

6   should be allowed to show those are as follows.  First of all,

7   of course, we have the burden of proof.

8        Second, we have to prove interstate commerce, and I

9   think, although it is probably not going to be in the jury

10  instruction and it is probably not an element of the crime, I

11  think that given that the charge is a weapon of mass

12  destruction and a destructive device, we have to prove that it

13  is a destructive device as opposed to an M-80, an unimportant

14  thing, an airhorn, or anything else.  So I think we have to

15  prove destruction.

16        THE COURT:  Everybody can sit down.

17        MR. CORA:  Furthermore, I think that the Defense is

18  at least -- they may not have used these exact words, but I

19  think they have been arguing basically that Mr. Aldawsari is a

20  small person, he is not very good at things, but I think that

21  this would show that there is a real magnitude to what would

22  have happened had he built a picric acid bomb.  Also I don't

23  think it is very prejudicial.  I will show you --

24        THE COURT:  If it is not prejudicial, it is probably

25  not relevant.

1          MR. CORA:  Well, it is not prejudicial under the

2     analysis that it is not unfairly prejudicial.  I am sorry to

3     use the shorthand.

4          THE COURT:  All right.

5          MR. CORA:  But if you look at the photographs, there

6     is no flash in the photographs, there is no bodies in the

7     photographs, there is no blood in the photographs.  What you

8     will see is you will see a picture of a standard U.S. or

9     foreign sedan, then you will see a picture of the amount of

10    the charge, you will see a picture of the charge in the back

11    seat, and you will see a number of pictures of what I would

12    propose is tremendous destruction of an automobile.  And you

13    will see the distance that the items were flung.

14         Once again, there is no flash, there is no blood, there

15    is no bodies, there is no dummies set up, so as far as

16    unfairly prejudicial, I would say it is not.

17         Also, I think it fits the facts of the case because the

18    amount of the picric acid that they put into these things was

19    calculated based on the amounts of phenol that the Defendant

20    ordered on the first occasion that you heard of at the start

21    of the case and the last occasion you heard of from the

22    Cole-Parmer witnesses at the end -- just before -- the first

23    thing this morning I think, or the second thing this morning.

24         SO that is my argument, and I would ask you to allow us

25    to show these photographs to the jury.  And what they are,

1    they are photographs.

2              THE COURT:  Mr. Cogdell?

3              MR. COGDELL:  The photographs --

4              THE COURT:  Is the Defense willing to stipulate that

5    the --

6              MR. COGDELL:  Interstate commerce?

7              THE COURT:  No.

8              MR. COGDELL:  We already have on that, Your Honor.

9              THE COURT:  No, I am thinking in terms of the

10   compound, if created as designed would have been a strong

11   explosive.

12             MR. COGDELL:  Absolutely.

13             MR. CORA:  May I have a moment, Your Honor.

14             THE COURT:  Yes.

15             MR. CORA:  The jury is entitled to know the facts of

16   this case, Your Honor, and I think as usual --

17             THE COURT:  And counsel is willing to stipulate it.

18   You just want the excitement of the explosion.

19             MR. CORA:  No.  We are not going to get the

20   excitement of the explosion.  We are going to get photographs

21   of the damage done by this device.  So I would like the

22   excitement of the explosion, but when Mr. Cogdell says they

23   are exactly the same, they are significantly different.  If

24   you saw the videos, you would see a flaming wreck with a smoke

25   ball issuing after the explosion.  You are not going to see

1    that.  So I think the Government's evidence is significantly

2    diminished.  And the power of it, I mean, you don't -- In

3    movies you don't see before and afters of a bomb case unless

4    it is a kiddies movie.  In every single adult movie we see

5    giant flashes of fire and moving parts.  What I am

6    proposing --

7              THE COURT:  Okay.  No.  You are not going to do it.

8    But I am ruling that way because Mr. Cogdell has stipulated

9    that the -- How did I put it last time?  Just a second.  That

10   the picric acid, if created as instructed, would have been a

11   strong explosive.  You are willing to stipulate that?

12             MR. COGDELL:  We are.

13             THE COURT:  Then I am excluding it.  That is all you

14   got?

15             MR. CORA:  My fallback position would be, can we

16   have testimony of this; in other words, having it described?

17             THE COURT:  No.  Okay?  Just going to stipulate to

18   that.  I wish -- Draw that up so I can read it to the jury

19   later.

20       Bring the jury in, please.  All rise for the jury.

21             (Whereupon, the jury entered the courtroom.)

22             THE COURT:  All right.  You may be seated.

23       You understand you are still under oath.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  All right.  Have a seat.

1    Q.   (BY MR. CORA)  Mr. Mothershead, before we broke for

2    lunch, you had told us about some of these substances.  Let me

3    talk to you for a minute about some of the substances we

4    talked about before lunch.  Glycerin.  Can you tell us where

5    glycerin is commonly available?

6    A.   One of the more common areas is in drug stores.  Glycerin

7    is used for a variety of medical uses.  It can also be, you

8    know, easily purchased online as well.

9    Q.   And acetone?

10   A.   Acetone, while it is a chemical solvent, it actually can

11   be found at hardware stores, so they carry it as a stripper or

12   a solvent for use around the house.

13   Q.   And hydrogen peroxide?

14   A.   Hydrogen peroxide can be found in various places,

15   depending upon the concentration and the strength.  From an

16   explosive standpoint, we talk about using hydrogen peroxide

17   that is at least 30 percent strength, so what you find down at

18   the drug store on the shelf for wounds is around three

19   percent.  The 30 percent requires you to go to places -- Some

20   pool stores might have it, beauty supply places, it can be

21   found there, and also, again, online for places like

22   hydroponics and similar applications.

23   Q.   And we also -- you saw videos about sulfuric and nitric

24   acids before lunch.  Is that right?

25   A.   Correct.

1  Q.   And can you tell us the concentrations were of the

2  sulfuric and nitric acid that we saw on the videos and what

3  you observed?

4  A.   The references in the text and the videos were referring

5  to sulfuric at the 98 percent concentration level and the

6  nitric in the 69 to 70 percent concentration level.

7  Q.   Now, you were aware that there were two -- that some of

8  the evidence in this case was that the Defendant on two

9  occasions tried to get phenol.

10  A.   Correct.

11  Q.   Right?  And have you reviewed the invoices and the

12  shipping materials regarding those attempted purchases?

13  A.   I reviewed the invoices for each of those two purchases,

14  attempted purchases.

15  Q.   And based on the first one from the Carolina Biological

16  Supply, did you do some calculations for that amount of phenol

17  plus some other substances and come to a determination as to

18  what amount of the explosive picric acid that would produce?

19  A.   I did.

20  Q.   Can you tell us how you went about doing that?

21  A.   I did two calculations.  The first is I started with how

22  much phenol there actually was, so based on the invoice, the

23  purchase.  So to determine the concentration, which was listed

24  as 88 percent concentrated as pure picric acid, the amount or

25  volume that was added to the math to come up with a weight of

1      how much phenol, I should say, was in there at the beginning.

2          And then I did two calculations.  The first was a maximum

3      amount from a chemist standpoint.  So if every bit of the

4      phenol was converted into picric acid with absolutely no

5      losses, how much picric acid could be made.  And based on the

6      amount of phenol that was listed, I calculated 25 pounds of

7      picric acid.  Now, this is the absolute max.  Even in

8      chemistry labs you are rarely going to achieve that 100

9      percent efficiency with no losses.

10         So then I looked for a recipe that would give me some

11     indication of what is a practical yield, somebody that has

12     done this, following similar steps and procedures, and what

13     did they get as a result, and I found a recipe that gave an

14     actual final amount that was measured based on how much they

15     started with, and they had about a 70 percent recovery.  So

16     instead of that 100 percent maximum, they only came up with

17     about 70 percent of that.

18         So I used that calculation, that ratio, as an estimation

19     of practically following the steps that were outlined in the

20     emails and the video what was a likely ballpark area of

21     material to be recovered.  So then going back to the amount of

22     phenol he had and applying that 70 percent recovery to the 25

23     pounds, I got somewhere around 16 pounds as a practical yield

24     of material.

25     Q.   That is 16 pounds of picric acid.

1   A.   Correct.

2   Q.   Now, you also did the same sorts of calculations for the

3   final order that came from -- that the Defendant made to

4   Cole-Parmer.

5   A.   Correct.

6   Q.   Can you tell us how you went about doing that?

7   A.   So again, I started with how much phenol was actually

8   ordered.  This was 99 percent pure material.  So again, doing

9   the math on the number of units, times that purity, and then

10  using those two calculations I talked about earlier, the

11  maximum amount that could be made would have been around ten

12  pounds.  Seventy percent of that as a practical yield would be

13  around seven pounds of picric acid.

14  Q.   And that amount of picric acid, in your opinion, would

15  that create a destructive device?

16  A.   I am not a device expert.

17  Q.   Right.

18  A.   But --

19           MR. DOYLE:  Judge, we will stipulate to that, and I

20  think we did.

21           MR. CORA:  He is not qualified, so I will withdraw

22  it.

23           THE COURT:  Let's go back.  He is not a destructive

24  device expert.  Next question.

25  Q.   (BY MR. CORA)  And explosion of that amount of picric

1   acid, can you tell us about that?

2   A.   That is quite a bit of material.  We think of TNT, as I

3   mentioned earlier.  That is usually packaged in either a

4   quarter pound or pound blocks of TNT for individual use.  So

5   this would be -- seven pounds would be seven times the one

6   pound, so it is quite a bit.

7   Q.   Okay.  Actually -- Okay.

8        Now, in your review of the evidence that has been

9   submitted to you, what did the Defendant do in his

10  attempt -- when he was trying to make picric acid?

11  A.   I am sorry.  I couldn't quite understand the question.

12  Q.   What other steps did you find in the evidence that he had

13  accumulated things to make picric acid?

14  A.   Well, there was -- two of the three components were

15  present, the nitric and the sulfuric acid; the instructions

16  for using those; the attempted acquisition of phenol, which

17  would be appropriate for using that and following those

18  recipes; the laboratory equipment that would help in that

19  regard; there was some protective eyewear, goggles, the

20  protective suit that would be useful when you with working

21  with strong acids so you don't spill them on you and cause

22  burns.  So there was material, there was information, and

23  there was at least two compounds present in addition to the

24  attempted acquisition of the third.

25            MR. CORA:  May I have a moment, Your Honor?

1              THE COURT:  You may.

2              MR. CORA:  Your Honor, the Government passes the

3    witness.

4              THE COURT:  Your witness, Mr. Doyle.

5                        CROSS EXAMINATION

6    By Mr. Doyle:

7    Q.   Good afternoon.

8    A.   Good afternoon.

9    Q.   Let's talk about your role first as a forensic chemistry

10   analyst for the FBI.  Your role is not to be an advocate.  Do

11   you agree?

12   A.   Correct.

13   Q.   Your role is to evaluate the facts as they are presented

14   to you.

15   A.   Correct.

16   Q.   You are sort of like a pathologist of chemistry.  Right?

17   A.   You flatter me somewhat, but I think I understand what

18   you are saying, yes.

19   Q.   You look at it objectively and you make a determination

20   what chemicals are there, what chemicals aren't, if you mix

21   certain chemicals together what happens.  Right?

22   A.   Correct.

23   Q.   And in this particular case you were provided a number of

24   pieces of paper, chemicals, and the different items found in

25   Mr. Aldawsari's house.  Correct?

1   A.   Correct.

2   Q.   And with this you generated a report.  Correct?

3   A.   Correct.

4   Q.   And it is a seven-page report.

5   A.   Correct.

6   Q.   And you want to be as thorough as you can in the report.

7   Correct?

8   A.   Correct.

9   Q.   You certainly also want to be fair.  You want to identify

10  all the evidence.  Correct?

11  A.   Correct.

12  Q.   In the report you list the receipt from CBS, Carolina

13  Biological Supply.  Correct?

14  A.   The invoice.

15  Q.   The invoice.

16  A.   Yes, sir.

17  Q.   You also list the invoice from Cole-Parmer.  Correct?

18  A.   Correct.

19  Q.   But there is some things you don't list in there.  You

20  don't list the email saying this purchase was rejected.

21  Correct?

22  A.   I did not see that email.

23  Q.   They didn't provide you that email?

24  A.   I did not see that as part of the material I reviewed.

25  Q.   Would that have been helpful?

1    A.    Not necessarily.

2    Q.    To know he didn't get the phenol?

3    A.    Again, my evaluation was if he had phenol would you be

4    able to use the other ingredients to make picric acid.

5    Q.    And so you are making an assumption on if.  Right?

6    A.    In that case, if he had the phenol.

7    Q.    But he didn't.

8    A.    It is my understanding he did not have the phenol in

9    possession.

10   Q.    And nowhere in your report did you put he did not have

11   phenol, did you?

12   A.    No.  That was not the purpose of my report.

13   Q.    Nowhere in your report did you say he unsuccessfully

14   attempted to obtain phenol, did you?

15   A.    No, my report does not say that.

16   Q.    Don't you think as an objective observer of all the

17   elements that that would be an important thing to put in

18   there?

19          MR. CORA:  Objection; argumentative.

20          THE COURT:  Do you think it would have been

21   important to put in your report?

22          THE WITNESS:  That was not the point of my report,

23   so I didn't see that as an essential item.

24   Q.    (BY MR. DOYLE)  The fact that he didn't have all the

25   chemicals?

```
 1              THE COURT:  Asked and answered.  Proceed.
 2    Q.   (BY MR. DOYLE)  When you said to the jury and you were
 3    doing your analysis of how much phenol there actually was,
 4    there actually was none.  Right?
 5    A.   To my understanding, there was none in his possession;
 6    only the attempted order of that material, and that is what I
 7    based my calculations off of.
 8    Q.   And we saw -- One thing you could agree with me with
 9    certainty is Mr. Aldawsari had instructions.  Correct?
10    A.   I saw video instructions as well as email instructions.
11    Q.   And you certainly can't testify to his aptitude, can you?
12    A.   No.
13    Q.   You did not see any evidence that he attempted to mix the
14    chemicals, did you?
15    A.   I did not see that.
16    Q.   You didn't see any evidence that he attempted to cook any
17    chemicals.  Correct?
18    A.   No.
19    Q.   You didn't see any evidence that he attempted to cool the
20    chemicals, did you?
21    A.   No.
22    Q.   You didn't see any evidence of aspirin, did you?
23    A.   None was submitted to me.
24    Q.   And would you agree with me that aspirin is probably a
25    little bit easier to obtain than phenol?
```

1    A.   Aspirin is easier to obtain, yes.

2              MR. DOYLE:  No further questions, Your Honor.

3              THE COURT:  Redirect?

4                      REDIRECT EXAMINATION

5    By Mr. Cora:

6    Q.   From the videos that you have seen and the emails and the

7    Defendant's notes, can you tell the members of the jury what

8    sort of aptitude it would take to create picric acid?

9    A.   It is very basic.

10             MR. DOYLE:  Speculation, Your Honor.

11             THE COURT:  Wait.  I am going to permit it.

12   Q.   (BY MR. CORA)  You may answer.

13             THE COURT:  If you know the answer to the question.

14             THE WITNESS:  Can you repeat the question?

15             THE COURT:  What sort of aptitude would it take to

16   create picric acid?

17             THE WITNESS:  Very basic.  You can follow

18   instructions, pour materials out, heat it at the appropriate

19   time, pour it into cold water, cool, that is all that is

20   essentially you need.  If you have additional experience with

21   chemicals that is helpful, but cautionary notes as well as

22   instructions were provided that should be easily able to be

23   followed.

24   Q.   (BY MR. CORA)  You talked about aspirin, making picric

25   acid from aspirin.  How much aspirin would you need to make

1    about 15 grams of picric acid?

2    A.    Well, you would have to determine how much you wanted at

3    the end and then back calculate, so you would essentially

4    probably need -- For 15 grams, you would need 10 grams or so

5    of aspirin perhaps to get to that point.

6    Q.    And Mr. Doyle asked you about your report a little bit.

7    Do you put in things that you don't think are relevant into

8    your report?

9    A.    I do not.

10   Q.    And if you don't know something, do you speculate about

11   them in your report?

12   A.    No.

13   Q.    If it is not submitted to you, you just don't cover it?

14   A.    That is correct.

15   Q.    If you were asked what chemicals he had and what

16   chemicals he didn't, if the FBI had asked you that would you

17   have answered that question?

18   A.    Yes.

19   Q.    If anyone else -- Well, let me withdraw that question.

20         MR. CORA:  No other questions.

21         THE COURT:  You may step down.  Thank you, sir.

22    Call your next witness.

23    Ladies and gentlemen, it has been stipulated by the

24   Defense that picric acid, if created as instructed in the

25   video, would be a strong explosive or destructive device.  No

1   further proof on that issue need be made.

2       Call your next witness.

3           MR. JACKS:  Your Honor, there is a stipulation that

4   has been entered into between the parties regarding four

5   witnesses that were originally expected to testify, but now we

6   have stipulated as to --

7           THE COURT:  Pause for a second.  You are going to

8   read the stipulation?

9           MR. JACKS:  Yes, sir.

10          THE COURT:  Again, both sides have stipulated to

11  this, and no further proof on these facts need be put before

12  you.

13      Go ahead sir.

14          MR. JACKS:  Yes, sir.  The stipulation bears the

15  label as Government's Exhibit No. 431, and it reads as

16  follows:

17      "The parties stipulate that if Daniel Huerta were called

18  as a witness, he would testify that he is the executive

19  general manager of Fair Park and Community Services for the

20  City of Dallas, Texas, and is qualified to provide the

21  following testimony.

22      "The Cotton Bowl stadium is owned by the City of Dallas

23  and is part of the Fair Park complex located within the City

24  of Dallas.

25      "The Cotton Bowl hosts many events, including the annual

1   Ticket City Bowl and the Texas/Oklahoma football game.

2   Patrons attending events at the Cotton Bowl come from numerous

3   locations outside of the state of Texas.  Participants in

4   events occurring at the Cotton Bowl come from many different

5   locations outside of the state of Texas.

6       "Many of the events occurring at the Cotton Bowl are

7   broadcast across the United States via television and radio.

8   As such, the activities occurring at the Cotton Bowl involve

9   both interstate and foreign commerce.

10       "The parties further stipulate that if the Honorable Mark

11   Langdale was called as a witness, he would testify that he is

12   president of the George W. Bush Presidential Center in Dallas,

13   Texas, and is qualified to provide the following testimony.

14       "The George W. Bush Institute is a part of the George W.

15   Bush Presidential Center.  The George W. Bush Institute is,

16   among other things, a policy institute which has six main

17   areas of engagement, those being education reform, human

18   freedom, global health, economic growth, women's initiatives,

19   and military service initiatives.

20       "In support of these initiatives, President Bush often

21   travels outside the United States in foreign commerce to

22   promote and support the initiatives of the Institute.  The

23   president also frequently travels around the United States in

24   furtherance of the initiatives of the Bush Institute.  As such

25   the activities of President Bush and the Bush Institute

1    involve both interstate and foreign commerce.

2        "The parties further stipulate that if Sally Williams was

3    called as a witness, she would testify that she is a deputy

4    county clerk in the Office of the County Clerk of Lubbock

5    County, Texas, and is the custodian of records of that office

6    and qualified to provide the following testimony and records.

7        "She would testify that the Office of the County Clerk of

8    Lubbock, Texas conducted a search of its assumed name records

9    for the names Disinfectants, Limited and Disinfectants',

10   Limited, and that search revealed that no record of any

11   entities of those names are in the records of the County Clerk

12   of Lubbock County, Texas.

13       "The parties further stipulate that if Carmen Flores was

14   called as a witness, she would testify that she is an employee

15   of the Office of the Secretary of State for the State of

16   Texas, and is an authorized custodian of the records of that

17   office, and is qualified to provide the following testimony

18   and records.

19       "The Office of the Secretary of State conducted a

20   diligent search of the records of that office for the names

21   Disinfectants, Limited, as referenced in Government's Exhibit

22   No. 421, and Disinfectants', Limited, as referenced in

23   Government's Exhibit No. 422, which searches revealed no

24   record of that name as specified in the certificate of facts

25   contained within Government's Exhibit No. 421 and Government's

1  Exhibit No. 422, respectively."

2      This stipulation has been signed by the United States

3  Attorney by her designated assistant Mr. Haag, by Mr. Cogdell

4  as attorney for Mr. Aldawsari, by Mr. Doyle as attorney for

5  Mr. Aldawsari, and by Mr. Aldawsari.

6      If I may, Your Honor, if I could just -- I don't believe

7  Government's Exhibit No. 421 and 422 have been admitted.  I

8  believe they are self-proving as public records of the Office

9  of the Secretary of State of the State of Texas, and if I

10  could simply summarize --

11      First of all, I would move their admission as public

12  records, and then I would ask the Court to summarize them

13  since they are referenced in the stipulation.

14          THE COURT:  No. 421 and 422 are offered.  Objection?

15          MR. COGDELL:  No objection, Your Honor.

16          THE COURT:  They are received.

17          MR. JACKS:  In summary, Your Honor, the Government's

18  Exhibit No. 421 states that the Secretary of State of the

19  State of Texas has searched her records, and after a diligent

20  search has determined that there is no record of any domestic

21  corporation, professional corporation, association, limited

22  partnership, limited liability partnership, and no other

23  records regarding a company by the name Disinfectants,

24  Limited, and that is a certified record.

25          Government's Exhibit No. 422 is the same type of

1  certificate of fact from the Texas Secretary of State's

2  Office, and it likewise certifies that an identical search was

3  done under the name Disinfectants', Limited and there were no

4  records found for that corporation.

5          THE COURT:  Thank you.

6          MR. JACKS:  Judge, there is a legal stipulation that

7  we would like to enter into with the Court regarding the

8  sufficiency of this stipulation that we can do at the next

9  break or outside the presence, just to read into the record.

10          THE COURT:  All right.

11          MR. JACKS:  Thank you.

12          MR. JACKS:  If I didn't, Your Honor, I would move

13  the admission of No. 431, the stipulation itself.

14          THE COURT:  No. 431 is received without objection.

15          THE CLERK:  Your Honor, I don't show a 430 exhibit.

16          MR. CORA:  We will use it with the next witness.

17          THE COURT:  No. 431 is received without objection.

18      Next witness?

19          MR. CORA:  Yes.  The Government's next witness is

20  Mr. W. Mark Whitworth, Special Agent W. Mark Whitworth.

21          (Whereupon, the oath was administered by the Clerk.)

22                     W. MARK WHITWORTH,

23  Testified on direct examination by Mr. Cora as follows:

24  Q.  Sir, would you introduce yourself to the members of the

25  jury?  And just spell your last name for the court reporter.

```
 1    A.    I am supervisory Special Agent Mark Whitworth,

 2    W-H-I-T-W-O-R-T-H.

 3    Q.    Pull the mic a little closer to you.

 4          Who do you work for?

 5    A.    I work for the Federal Bureau of Investigation.

 6    Q.    And what do you do for them?

 7    A.    I am a hazardous devices and explosives expert.

 8    Q.    Where do you work?  Do you have a base of operations for

 9    the FBI?

10    A.    I am with the FBI's lab at Quantico, Virginia.

11    Q.    What does a hazardous device explosives examiner do?

12    A.    We examine forensic evidence that is submitted to the

13    laboratory in regard to bombing investigations.  Our job is to

14    determine how the device would function, how it would have

15    functioned, if it did function, from the components that are

16    recovered, and what damage that device could do based on the

17    type of explosive that is used.

18    Q.    Are you -- You are also a special agent or a supervisory

19    special agent with the FBI?

20    A.    Yes, sir.

21    Q.    How long have you been doing that?

22    A.    It will be 24 years tomorrow.

23    Q.    And how long have you been in the Explosive Unit?

24    A.    A little over 15 years.

25    Q.    Have you had any training to work in the Explosives Unit?
```

1    A.    Yes.  I am a device examiner, but I am also a special

2    agent bomb technician with the FBI; have been a special agent

3    bomb technician since 1995.  For that you go to the Hazardous

4    Devices School at Redstone Arsenal at Huntsville, Alabama

5    where all civilian bomb technicians of the United States are

6    trained.

7    Q.    Very briefly, at Redstone what do you learn, and tell us

8    a little bit about the hands-on things you learn.

9    A.    You learn a basic introduction to explosives, what they

10   are, how they function, their different classifications; you

11   learn what is in an improvised explosive device, what

12   switches, power sources, how they are functioned; you learn

13   how to diagnose what an improvised explosive device is, if it

14   is hidden in a container how to run an X-ray system, how to

15   interpret those X-rays to determine what type of device it is

16   and how it would function; and you also learn how to render

17   safe that device with remote tools, or if you had to do a hand

18   entry how you could go in and defeat the device.

19   Q.    After completing the course at Redstone, did you get

20   further training for this job?

21   A.    For the bomb technician skills, you have to go through

22   recertification every three years, so every three years you

23   have to return back to Redstone Arsenal and demonstrate that

24   you have the basic skillsets still needed to be a certified

25   bomb technician in the United States.

```
 1   Q.   Any other training regarding your profession?

 2   A.   As part of being a hazardous devices examiner in the

 3   laboratory, after you come into the laboratory, you go through

 4   about a two-and-a-half-year training process where you go

 5   through a set of oral boards on devices, how they function,

 6   explosives, exactly how the explosives are made, what

 7   components are used to make those explosives, what those

 8   explosives will do as far as what type of damage they will do,

 9   how the laboratory functions, and how you do forensic

10   examinations on cases.

11        And you go through a series of casework where you are

12   basically an apprentice for other qualified examiners in the

13   unit, learn how they work their cases, how they write their

14   reports.

15        And you go through a series of moot courts where you

16   actually work a fake case that is set up as a real case,

17   through its entirety, and then present that in a mock

18   courtroom environment.

19   Q.   You talked about a lot of things you do kind of in the

20   lab and stuff, and on paper.  Do you also do practical things

21   out in the field for your training?

22   A.   Yes.  As part of the training, you go to the range, use

23   explosives, look at damage as -- Over the years that I was in

24   the unit, I ran the Bureau's post blast investigations

25   training program for about 12 years.  So for that time frame I
```

1    taught the basics to all the bureau evidence response teams on

2    how to conduct a post-blast investigation as far as the crime

3    scene goes, and state and local, federal investigators that

4    want to go through that training also.

5             MR. CORA:  Your Honor, at this time I would ask that

6    this witness be allowed to enter an expert opinion in the area

7    of explosives and hazardous devices.

8             MR. COGDELL:  No objection.

9             THE COURT:  The witness may opine.

10   Q.   (BY MR. CORA)  Did you handle any cases of note as

11   lately?

12   A.   Cases of note as lately?

13            MR. COGDELL:  I Object.  He has already established

14   and we agreed that he is an expert, so object to relevance.

15            THE COURT:  Let's proceed.

16   Q.   (BY MR. CORA)  What -- I am going to show -- We are going

17   to talk a little bit about what a destructive device is.  All

18   right?  Have you brought kind of a checklist with you that

19   would kind of help to check things off?

20   A.   Yes, sir.

21            MR. CORA:  Okay.  And I have showed it to counsel.

22   I would like to use it as a demonstrative exhibit.  It is No.

23   430.

24            MR. COGDELL:  I have seen it.  No objection.  You

25   are talking about No. 430, Mr. Cora.

1          MR. CORA:  Yes.

2     Let's put No. 430 up on the screen.  It is a pretty basic

3     checklist.

4     Q.   (BY MR. CORA)  What is an improvised explosive device?

5     A.   An improvised explosive device is an item either made

6     through military, commercial, or improvised explosives by the

7     skill of the individual who is the maker of the device, that

8     is used to cause damage and destruction through an explosion,

9     and it has certain components to it that make it a destructive

10    device.

11    Q.   How many -- Go ahead.  What components does it have?

12    A.   The two basic things that it needs are a main charge and

13    a fusing system which would contain a detonator.  You could

14    also have a container.  Most times when you build an

15    improvised explosive device you are trying to hide it in some

16    fashion so they put it in something, so you would have a

17    container, but that would, you know, be optional.  It does not

18    affect how the device functions unless it is used in a certain

19    type of explosive for it.

20    Q.   Can you give us some examples of what an explosive main

21    charge would be?

22    A.   Explosive main charge could be anything from improvised

23    explosives like triacetone triperoxide, hexamethylene

24    triperoxide diamine, which is also called HMTD, which are some

25    homemade explosives.  Your traditional explosives you have

1  probably seen before--TNT, dynamite, C-4, which is plastic

2  explosives, those are main charges.  And you could also have

3  low explosive main charges, like smokeless powder or black

4  powder that need to be confined in a pipe to get them to

5  detonate.  So that is where pipe bombs come from.

6  Q.    You know we have been talking here about a certain type

7  of explosive.  Is that correct?

8  A.    Correct.

9  Q.    What type of explosive have we been talking about in this

10 case?

11 A.    In this case another secondary explosive or main charge

12 explosive is picric acid.

13 Q.    You also talked about an initiator or a detonator.  Can

14 you explain what that is?

15 A.    An initiator or detonator in an explosive device is used

16 to set off the device.  It could be improvised, something that

17 the bomber makes themselves, or it could be a purchased

18 product like a commercial detonator used in the blasting

19 industry or by the military.

20     Inside of that detonator are, in most cases, for a

21 commercial product or a military product three different

22 energetic materials, and these energetic materials convert a

23 source of heat or flame into a shockwave that causes the

24 explosion to happen.  For those there is usually what we call

25 a first fire mixture or primary mixture, and when they light

1   the fuse on the bomb it burns down to that layer and it

2   accepts that flame from the fuse--or it could be from a hot

3   wire from an electric blasting cap--it accepts that heat,

4   converts that into a flame, and that flame starts to burn.

5       The second layer most detonators is what we call a

6   primary explosive, and that primary explosive converts that

7   flame very quickly into a detonation or a shock wave.  So it

8   goes over from burning to actually exploding very quickly.

9   That is then transferred into what we call the base charge

10  mixture, and that is usually a secondary explosive, something

11  that is less powerful -- I mean more powerful but less

12  sensitive than the primary explosive, and that shock is

13  initiated into that from the primary explosive and it causes a

14  chemical decomposition in the base charge which causes another

15  shock wave, and that shock wave --

16          MR. COGDELL:  At some point -- Excuse me.

17  Objection; assuming a narrative.  If we could keep it in

18  question and answer, Your Honor.

19          MR. CORA:  Your Honor, I am happy to do it that way,

20  but he is still on my question which is what is a detonator --

21          THE COURT:  Excuse me.  I will let him proceed.  He

22  is describing what happens.  Go ahead.

23          THE WITNESS:  So the base charge detonates and

24  causes the main charge of the explosive to detonate.

25  Q.   (BY MR. CORA)  You have used two common words here that

1    we are just going to explain for a second.  You talked about

2    something called a bomb.  All right?  When you mean a bomb,

3    what are you talking about?

4    A.   A bomb is an improvised explosive device.  It is

5    something that is designed to cause damage by functioning by

6    explosion.

7    Q.   And when you said "very quickly," when I talk to some

8    people and I say, "I may be here very quickly," I might mean

9    two minutes, can you tell the jury when you say very quickly

10   in relation to a detonator, what do you mean?

11   A.   That is kind of my Alabama colloquialism coming in

12   there--very quickly.  Basically it is in milliseconds.  That

13   reaction is in milliseconds there.

14   Q.   And there is a third thing we have up on the screen

15   called the fuzing system, and it is spelled with a Z.  Can you

16   explain what a fuzing system is, and just make sure that we

17   haven't typed it wrong.

18   A.   Okay.  There are two different ways to set off a

19   device--what we call a non-electric system and an electric

20   system.  A non-electric system is like time fuse, which is

21   spelled with an S, F-U-S-E.  You light it and it has black

22   powder in it and it burns.  So it burns down to the detonator

23   and initiates the detonator with the flame source.

24        The other type of IED is an electric initiated fuzing

25   system.  That requires a power source, wires, and some type of

1    electric initiator, either improvised or bought, and it

2    converts the heat from the electrons traveling through the

3    wire into a small bridge wire inside the detonator which it

4    turns into heat, like the filament lighting in a lightbulb,

5    and it converts that heat source into the source of flame that

6    initiates the detonator.  So that would be electric fuzing

7    system, and that is spelled with a Z.  And a Z, the fuzing

8    system, is any electrical or mechanical system that is used to

9    set off an improvised explosive device or a piece of military

10   ordnance, like a bomb you drop from a plane would have a

11   mechanical system you get to detonate.

12   Q.   Okay.  You were asked in this case to review information

13   and exhibits, photographs, and videos submitted to you by the

14   FBI in this case.  Is that right?

15   A.   Yes, sir.

16   Q.   And can you just generally tell us, without naming

17   everything, what types of things you got?

18   A.   We received reference materials in the forms of videos,

19   emails, and notebooks.  We also received physical items of

20   evidence that were submitted to the lab, and photographs.

21   Q.   When you got those items, did you photograph those items

22   of evidence?

23   A.   My technician would photograph those items of evidence,

24   yes.

25   Q.   And have you reviewed those photographs?

1    A.    Yes, sir.

2    Q.    And does each of them fairly and accurately represent

3    either the physical item you saw or a portion of a video or

4    really a snapshot of the video?

5    A.    Yes, sir.

6              MR. CORA:    Okay.    At this time the Government would

7    move into evidence Exhibits No. 340 to 386.

8              MR. COGDELL:    Can I have just a minute, Your Honor?

9              THE COURT:    No. 340 to 387?

10             MR. CORA:    To 386.

11             THE COURT:    No.  340 to 386.    Is there an objection?

12             MR. COGDELL:    May I have just a moment with

13   Mr. Cora?

14             THE COURT:    Yes.

15             MR. COGDELL:    The only objection I have, Your Honor,

16   is No. 368 and 369 appear to be cumulative or repetitive.

17             THE COURT:    No. 368 and 369?

18             MR. COGDELL:    Yes, sir.    I think they are both sell

19   phone detonator videos and we don't need two.

20             MR. CORA:    Judge, they are different and they show

21   different -- May I speak?

22             THE COURT:    Yes.

23             MR. CORA:    They show different parts of that

24   process, so I think we do need them.    And just so the Court

25   knows, they are cut-downs of the actual videos that we

1    submitted, so they are shorter.

2         THE COURT:  Okay.  340 through 368 are received

3    without objection, and 370 through 386 are received without

4    objection.  And I am going to permit 368 and 369 with

5    objection.

6    Q.   (BY MR. CORA)  Okay.  The witness before you, You work

7    with him.  Right?  Mr. Mothershead?

8    A.   Yes.

9    Q.   You work in the same lab?

10   A.   Yes, sir.

11   Q.   We are going to talk very briefly about picric acid.  Can

12   you tell us how picric acid would--correct me if I am

13   wrong--would explode?  What would initiate the explosion of

14   picric acid as a main charge?

15   A.   Picric acid is a secondary explosive, much like TNT, so

16   it needs impetus of a shock to get it to detonate.  You can't

17   just light it to get it to burn and detonate.  You have to

18   introduce shock into it with a blasting cap of some sort to

19   get it to detonate.

20   Q.   And picric acid -- We talked a moment ago about a

21   detonator.  Could picric acid have any relationship to a

22   detonator as well?

23   A.   Picric acid could be used as the base charge in a

24   detonator, that more powerful but less sensitive small amount

25   of explosive in the detonator to transfer that shock into the

1   secondary explosive, yes.

2   Q.   Okay.  We are going to go -- You said you have been

3   submitted some videos in this case, and you have looked at

4   those videos?

5   A.   Yes, sir.

6   Q.   You have looked at them in your lab; you looked at them

7   before you came to court today?

8   A.   Yes, sir.

9   Q.   And we have made some clips of those.  Is that right?

10  A.   Correct.

11  Q.   Okay.  I am going -- And I am going to show you -- Was

12  one of those clips No. 368 regarding rigging a cell phone?

13  A.   Yes, sir.

14  Q.   Okay.  And just so you remember, is it a clip of No. 175?

15  A.   Yes, sir.

16          MR. CORA:  Okay.  I ask to play at this point

17  what -- So No. 175 is in evidence I ask to play the portion of

18  No. 368.

19          (Whereupon, Government's Exhibit No. 368 was played

20          in open court.)

21  Q.   (BY MR. CORA)  Now, this video that was submitted to you

22  from the seizure from the Defendant is some words -- First of

23  all, the language, is that something you added to it, that

24  speaking?

25  A.   No, sir.

1    Q.    That is how it came to you?

2    A.    Yes, sir.

3    Q.    And there is a word in there called connectivity.  Can

4    you explain to the jury what that is?

5    A.    Connectivity or conductivity there, when you take apart

6    the cell phone and put the lightbulb into the system you have

7    to make sure that you get good continuity between the contacts

8    on the wires for the lightbulb and whatever portion of that

9    cell phone you are going to exploit to get current out of.  So

10   in that video they talk about either using the speaker or the

11   vibrator motor as a contact point.  So you would take out the

12   speaker or you would take out the vibrator motor and then you

13   would use the contacts for that as your connectivity for the

14   power source to supply power to the lamp.

15   Q.    And did you hear a ringing in that video?

16   A.    Yes, sir, you do hear a ringing in that video.

17   Q.    And when does it relate to a lightbulb -- How does it

18   relate to a lightbulb lighting in the video?

19   A.    In the video when the ringer rings a lightbulb also

20   lights.

21          MR. CORA:  Next we are going to play a second video

22   that is a portion of No. 176 that was seized from the

23   Defendant.  It is No. 369.

24          (Whereupon, Government's Exhibit No. 369 was played

25          in open court.)

1    Q.    (BY MR. CORA)   Okay.   Special Agent Whitworth, what have

2    we seen in No. 369?

3    A.    In this video they take apart the Okie -- what is

4    identified as a Nokia cell phone and wire into where the

5    vibration motor is for it and connect that to a lightbulb.

6    Now, for that lightbulb, what they are doing is initially they

7    are checking it with a multimeter to make sure there is

8    continuity, that the filament inside it is still in tact, then

9    they take that lightbulb and they heat it with a heat source,

10   a torch or a lighter, dip it in cold water, and that makes the

11   glass brittle.   Then they can break it.   To get it to light

12   the energetic material, in this case a match head.   You have

13   to expose that filament so that you can actually get those

14   match heads, the powder from the match heads in close contact

15   with that filament.   So they show him loading the match heads

16   into the lightbulb, putting a piece of wax over the end of it

17   to hold it in place, and then taking that lightbulb and

18   hooking it up to the multimeter again to make sure they

19   haven't broken that filament inside the lightbulb.   Then they

20   wire that back into the phone where the vibration motor is.

21   And according to the video, because a lot of this occurs kind

22   of off camera, when they call the phone then it lights the

23   lightbulb and initiates the match heads mixture in the inside

24   of it.

25   Q.    This -- Let me ask you, the lightbulb, would you tell

1    the -- Tell the members of the jury and for the record, what

2    type of lightbulb was it?

3    A.   In this case the first video they just show like a lamp

4    from a flashlight.  In the second video it is an ornamental or

5    Christmas style lightbulb.

6    Q.   You mean the lights you put on or someone would put on

7    your Christmas tree at Christmas?

8    A.   Yes.

9         MR. CORA:  Now we are going to go to another video

10   that was seized from the Defendant, No. 177, and we are going

11   to play a series of clips on that.  The first one is going to

12   be C-1.

13            (Whereupon, Government's Exhibit No. 177, clip C-1,

14            was played in open court.)

15        MR. COGDELL:  Excuse me.

16        THE COURT:  Stop.  Pause.

17        MR. COGDELL:  We have seen this.

18        THE COURT:  And?

19        MR. COGDELL:  Objection; repetitive.

20        THE COURT:  Well, overruled.  Proceed.

21            (Whereupon, Government's Exhibit No. 177, Clip C-1,

22            continued to be played in open court.)

23   Q.   (BY MR. CORA)  Special Agent Whitworth, No. 368, 369, and

24   this one, C-1, with these directions being followed would this

25   be the proper way to make an improvised detonator?

1   A.   Yes, sir.  That is correct.

2   Q.   What do we see in C-1 as far as making of the detonator

3   or the instruction there?  What is that?

4   A.   That is a practical or theoretical lesson in how a

5   detonator is constructed.  It shows the detonator body and

6   then the three different layers that we talked about as far as

7   how you make a detonator.  The top layer would be your first

8   fire mixture--your match head, something that is very

9   energetic will start to burn.  The second layer would be your

10  primary explosive--something that is very sensitive to heat,

11  shock, or friction, and will detonate.  And then the third

12  layer there of the base charge or your secondary explosive.

13  And he also shows and they talk about a tungsten filament in

14  the translation.  A tungsten filament is the filament in an

15  incandescent lightbulb, so it shows that being inserted into

16  the end of the detonator, the open end, secured into place,

17  and then being tested with a multimeter which is used to make

18  sure that you still have an intact filament inside the

19  detonator.

20          MR. CORA:  C-3, if we can play C-3 of No. 177.

21          (Whereupon, Government's Exhibit No. 177, Clip C-3,

22          was played in open court.)

23  Q.   (BY MR. CORA)  What do we see in C-3?

24  A.   In C-3 you have a practical lesson there as far as how to

25  make the detonator using, in this case, aluminum tubes,

1    syringe bodies.  We have also seen rolled up newspaper being

2    used for detonator bodies.  And then the three layers there

3    being physically shown in that syringe body, they are

4    identified through the video and the translation as being

5    picric acid, in this case they say hexamine peroxide, which is

6    the same thing as HMTD, and the top layer being the first fire

7    mixture which are the ground match heads, potassium

8    perchlorate sulfur-based match heads.

9              MR. CORA:  Play C-4.

10             (Whereupon, Government's Exhibit No. 177, Clip C-4,

11             was played in open court.)

12   Q.   (BY MR. CORA)  C-4, what have we observed as an explosive

13   expert?

14   A.   In this he is showing the beginning of making an

15   improvised detonator by adding that bottom layer of the base

16   charge layer, which is identified through the translation as

17   being tetrol, which is a secondary explosive like picric acid

18   or TNT, and then packing that into place inside the syringe

19   body.

20             MR. CORA:  C-5.

21             (Whereupon, Government's Exhibit No. 177, Clip C-5

22             was played in open court.)

23   Q.   (BY MR. CORA)  In C-5, what have you observed?

24   A.   In this part of the video he is adding the primary

25   explosive layer, in this case through the translations they

1    are identifying it as acetone peroxide or triacetone

2    triperoxide would be the proper name for it, and packing that

3    in place, as it says in the video, very cautiously with a

4    stick to pack that in place in the detonator body.

5    Q.    Now, you said he says "cautiously" in this regard.

6    A.    Yes.

7    Q.    Is there danger in this process?

8    A.    Yes.  The triacetone triperoxide is a primary -- homemade

9    primary explosive mixture, and, as such, would be very

10   sensitive to heat, shock, or friction.  So while you are

11   loading it in the detonator, you would want to be very

12   cautious with it.

13   Q.    And in your experience reviewing not this case but other

14   cases, do you often come -- get presented with evidence where

15   people have blown themselves up going through these processes?

16   A.    Yes, sir.

17   Q.    Hands?

18   A.    Hands, and even death from trying to grind triacetone

19   peroxide.

20   Q.    And the level of experience of those people, what sort of

21   experience has it been, that you know?

22   A.    High school, just beginning college, that level of

23   experience.

24   Q.    And some of that has to do with the fact of their age, I

25   assume.

1    A.   Yes, sir.

2              MR. CORA:  Okay let's show C-6.

3              (Whereupon, Government's Exhibit No. 177, Clip C-6

4              was played in open court.)

5    Q.   (BY MR. CORA)  What do we see in C-6?

6    A.   He is showing the first fire mixture that was obtained

7    from grinding the heads off of kitchen matches to obtain the

8    match head mixture, which is potassium chlorate and sulfur

9    usually, to add as the top layer of the detonator.

10   Q.   And finally for this exhibit which is out of No. 177,

11   would you observe and comment on C-7?

12             (Whereupon, Government's Exhibit No. 177, Clip C-7,

13             was played in open court.)

14   Q.   (BY MR. CORA)  What is demonstrated in C-7?

15   A.   Adding the match head mixture to the top of the detonator

16   so you have the first fire mixture to accept the flame source.

17   Q.   If these steps were followed you wouldn't be finished

18   yet?

19   A.   No, sir.  You still have to introduce some type of

20   mechanism to put the flame source into the detonator.

21   Q.   But these steps up to this point, would this be a correct

22   way to make a detonator?

23   A.   Yes, sir.

24   Q.   We are going to go to another numbered exhibit, No. 179,

25   and play some clips from that.  Once again, you submitted this

1    as seized from the Defendant.  Let's go to No. 179, C-1.

2              (Whereupon, Government's Exhibit No. 179, Clip C-1,

3              was played in open court.)

4    Q.   (BY MR. CORA)  What do we see in C-1?

5    A.   The beginning of the video shows three lightbulbs.  Two

6    are incandescent lightbulbs that are cut from an ornamental

7    Christmas tree light strand, and another one is a longer

8    length of wire attached to a lamp like from a flashlight.  The

9    individual is then shown taking these two ornamental

10   lightbulbs out of their sockets, removing them from the socket

11   and then testing one of them with a nine volt battery to show

12   that nine volt would light the lightbulb.

13             MR. CORA:  And C-2.

14             (Whereupon, Government's Exhibit No. 179, Clip C-2,

15             was played in open court.)

16   Q.   (BY MR. CORA)  And in C-2, what do we see?

17   A.   The beginning of the video shows two lamps, one

18   ornamental Christmas tree lightbulb and one incandescent

19   lightbulb that are hooked to a length of what we call duplex

20   wire, and duplex wire, just like lamp cord or wire joined

21   together but is insulated in between.  Then he shows the

22   breaking of the globe, the glass globe on the incandescent

23   lightbulb to expose the filament so you can use it as the hot

24   wire initiator.

25          And then in the second part of the video or the last part

1    of the video, he is breaking the globe on an ornamental

2    lightbulb by dipping it in water -- heating it and then

3    dipping it in the water and then breaking the edge off of it.

4         And then the end of the video they are showing an

5    ornamental lightbulb where they have actually added the match

6    head mixture.  According to the translation, he said the

7    sulfur material has been added and we have sealed the end with

8    tissue paper, so showing the energetic material being

9    introduced into the lightbulb to make it an initiator.

10              MR. CORA:  C-3.  Can you play C-3 now?

11              (Whereupon, Government's Exhibit No. 179, Clip C-3

12              was played in open court.)

13   Q.   (BY MR. CORA)  Okay.  What does C-3 depict?

14   A.   C-3 -- In the previous clip he uses a multimeter to check

15   for the resistance in the filament to make sure he still has

16   an intact filament.  So in this part of the video they are

17   just showing a multimeter and how you read it to make sure

18   that you know that you have an intact filament still left in

19   the bulb after you break the globe off of it.

20        So you put it in the ohms range.  Actually in the video

21   they say ampere range, which is a measure of current, not

22   ohms.  I think it is just a mistake by whoever is doing the

23   narration.  And all they are looking for when they put the

24   probes to the wires that have been connected to the globe is a

25   change in resistance.  They really aren't looking for a

1    number.  They don't care exactly what the number is.  They are

2    just looking for a change, and if they get a change they know

3    they didn't break the filament when they were taking the

4    lightbulb apart or when they are adding the energetic material

5    into the lightbulb.

6    Q.    Okay.  Special Agent Whitworth, you say the words "they

7    say on the video or at least in the translation."  Is voltage?

8    A.    They say ampere.

9    Q.    Amperage?

10   A.    Which is amperage, which is a measure of current.

11   Q.    Do you see an indicator of a finger or an indicator of a

12   probe on the face of the multimeter at some point indicating

13   where the speaker is interested in, though?

14   A.    Yes.  Where the dial is turned at this portion is in

15   between these green lines, and you have from I think it is

16   around 200-K down to 200.  That is ohms measurements.  That is

17   resistance measurements.

18   Q.    Now, you have a pointer up there, and you are probably

19   more adept at this stuff than I am.  Can you show the members

20   of the jury which range of the multimeter you are talking

21   about?

22   A.    It would be from about this range here to this range

23   here.  That is all for measuring how much resistance you are

24   getting out of a component in a circuit.

25   Q.    So if the multimeter was a regular -- I guess it is an

1    analog clock, a dial clock, it would be from about 5:00 to

2    about 9:00.  Is that fair to say?

3    A.    Yes, sir.

4    Q.    Okay.  And -- Okay.

5              MR. CORA:  C-4.

6              (Whereupon, Government's Exhibit No. 179, Clip C-4

7              was played in open court.)

8    Q.    (BY MR. CORA)  What are we seeing in C-4?

9    A.    An ornamental lightbulb with the globe broken off of it

10   is being placed into what is purported to be a loaded

11   detonator body, taped into position, and then checked with the

12   multimeter to make sure that they haven't broken the filament

13   in the process of constructing the improvised detonator.

14   Q.    Can you tell us why or what would be the purpose of

15   continually testing this stuff with the multimeter?

16   A.    The tungsten filament is very fragile.  The more you

17   handle it, the more you move the wires, the more you do things

18   to that lightbulb, the bigger chance you have of breaking it.

19   So they are repeatedly going in as a quality assurance to make

20   sure that they are making good detonators, because if you have

21   bad detonators then it is not going to function the device.

22   Q.    And finally for this -- I think this may be our last

23   video, C-5 from No. 179.

24             MR. CORA:  Would you please play that,

25   Ms. Christensen?

```
 1              (Whereupon, Government's Exhibit No. 179, Clip C-5,

 2              was played in open court.)

 3   Q.   (BY MR. CORA)  And that last clip of No. 179, what do we

 4   see?

 5   A.   We see a syringe body being used for the improvised

 6   detonator, and then an incandescent lamp being placed in it

 7   and taped into position inside of the improvised detonator.

 8   Q.   When you take clips from No. 177 and clips from No. 179,

 9   what would that -- would that properly teach a person to do

10   something?

11   A.   Yes.  It gives a practical and a theoretical lesson,

12   both, in making an improvised detonator from start to finish.

13   Q.   Okay.  We are going to talk now about some other things

14   that you were presented with in this case that were seized

15   from the Defendant.  I am going to go to the blue Mead journal

16   which is in evidence already.  It is Government Exhibit

17   No. 121.  First I am going to ask you to look at pages 23 to

18   27.  Is that the blue Mead you looked at?

19   A.   I had looked at translations from it, yes.

20   Q.   Translations.  Let's go through this pretty fast.  Page

21   23.  Now page 24, 25, and 26 and 27.  What would this show

22   you?

23   A.   Those are instructions on how to make the primary

24   explosive TATP.

25              MR. CORA:  And 31 through 36.  Can we go back to 35?
```

```
1    And go back one more to 34.  All right.  I apologize for going

2    backwards.  Let's go back again to 33.  And 32.  And 31.

3    Okay.

4    Q.   (BY MR. CORA)  And 32 to 36, what does that -- are those

5    drawings of?

6    A.   Those are lessons in preparing and making an improvised

7    detonator.

8    Q.   Did you see the drawings in those?

9    A.   Yes, sir.

10   Q.   Can you comment on those drawings and the drawings you

11   have seen earlier in the videos and what you have seen in the

12   videos?

13   A.   Yes.  They are very similar.  They show the three layers

14   of the detonator, the base charge, the primary explosive, the

15   first fire mixture layers, and so they are very similar to

16   those from the video.

17   Q.   Now let's go to the Defendant's black Mead notebook,

18   which is marked and in evidence as No. 123.  And let's look at

19   pages -- Start with page 24.  Okay.  Go to page 25.  Go to

20   page 44.  You have commented on this so I will move on.

21       Exhibit No. 269, which is in evidence.  Have you looked

22   at this?

23   A.   Yes.

24   Q.   And would this be a component of a bomb or an improvised

25   explosive device if you followed this recipe?
```

1    A.    If you were able to obtain the picric acid, from

2    following the recipe you could use it as the base charge of

3    the detonator or the main charge of explosives.

4    Q.    And did you review some physical evidence that had been

5    presented to you by the FBI that was seized from the

6    Defendant's apartment?

7    A.    Yes.

8    Q.    Okay.  Let's go to Exhibit No. 90 and 91.  What is

9    No. 90?

10   A.    No. 90 is not a great representation, but it is a

11   representation of some wire stripping, and I believe there are

12   two incandescent lightbulbs in that exhibit also that were

13   submitted to the laboratory.

14   Q.    I will move on.  We will get them at the break.  Let's

15   look at photos No. 363 and 365.  What is No. 363?

16   A.    No. 363 are the actual evidence contents from the

17   previous photograph, the bag of evidence that was submitted,

18   and in the lower left hand corner you have insulation

19   strippings from brown wire with some copper wire attached, you

20   have two sockets from a lightbulb string, like an ornamental

21   lightbulb.  One of those has the wires cut fairly close to it

22   and still has the bulb inside the socket; the other one, the

23   bulb is outside the socket and you have two lengths of wire

24   that extend from it.  And there are also some miscellaneous

25   small screws at the bottom of the photo.

1    Q.   I didn't mean to cut you off.

2        Let's go to the bottom below the 13.  Can we see what

3    that is?  There is kind of a mark there or a logo.  Can you

4    tell us what that is?

5    A.   Yes.  That is called a Q tab.  It is just a way that we

6    mark the evidence when we bring it in the laboratory, and it

7    provides a scale for us to use to see how big something is.

8    So it gives the laboratory number that it is submitted under

9    and that is based on the date it is submitted into the

10   laboratory, that will be the long number in the middle, and

11   the item number of that individual item is on the left.  And

12   in this case it is called K4.5.

13   Q.   So this photograph, does it relate to No. 90 that I

14   showed you a couple of minutes ago?

15   A.   Yes, sir.  This is the photograph of the evidence removed

16   from that evidence bag.

17   Q.   Okay.  This photograph was taken by your lab?

18   A.   Yes, sir.

19   Q.   And the other photograph came to you?

20   A.   Yes, sir.

21   Q.   From the field?

22   A.   Yes, sir.

23   Q.   Okay.  And now No. 365.  What do you see here in No. 365?

24   A.   This is also one of the lightbulbs that has been cut from

25   a string of Christmas tree lightbulbs, and it is attached by

```
 1    simple twisting of the bare wires to a length of brown duplex
 2    wiring, call it lamp cord or speaker cord, either one, so it
 3    is much like the cords that are used to plug in lamps or to
 4    wire speakers together.
 5    Q.    Okay.  Now, looking here to the lower piece of copper
 6    wire or something, do you see that?  Right in the middle of
 7    the photograph a little bit to the right?
 8    A.    Yes, sir.
 9    Q.    Okay.  That kind of looks like why my wife --
10          THE COURT:  Just ask a question.
11    Q.    (BY MR. CORA)  Okay.  Can you tell us what -- Okay.  You
12    have some background in electricity.  Is that right?  You
13    understand the basics of electricity?
14    A.    From my bomb tech training, yes, sir.
15    Q.    Okay.  Can you comment on how those wires look like they
16    are piled up together?
17    A.    I think it is just the way the photograph was taken.
18    They are actually apart, so each individual leg of the
19    Christmas tree lightbulb is attached to an individual wire
20    from the lamp cord, so it is -- They are not touching.  They
21    are touching each other in that photograph, but they could be
22    separated, and it would form a loop or a circuit.
23    Q.    Okay.  So just so we got the record right, you observed
24    this with your own eyes?
25    A.    Yes, sir.
```

1    Q.   And I think we may show you this, with the Court's

2    indulgence, at a point in a couple of minutes.  But when you

3    observed it, are you telling us that one of the green wires

4    from the lightbulb is attached -- Tell us about that.  What

5    was each of the green wires attached to in relation to the

6    brown wire?

7    A.   Each leg of the lamp socket, the insulation has been

8    stripped from it exposing bare copper wire.  That copper wire

9    has been twisted into contact with bare copper wire at the end

10   of the lamp cord or the speaker cord.  And that is about a

11   28-inch length of cord that has been cut there, that brown

12   cord.

13   Q.   And I now point you to Exhibit No. 235.  Have you seen

14   this before?

15   A.   Yes, sir.  I saw translations of it.

16   Q.   And what is No. 235?

17   A.   It looks like an email with photos of Nokia cellular

18   phones on the front.

19   Q.   And the date of the email?

20   A.   12/8/2010.

21   Q.   And who is it to and who is it from?

22   A.   It is to Abu-Zidan Al-Najdi and it is to Abu-Zidan

23   Al-Najdi.

24   Q.   And you see there is some language in the middle of it?

25   A.   Yes, sir.

```
 1   Q.   Can you understand that language in the middle of it?

 2   A.   No, sir.

 3          MR. CORA:  Let's look at No. 236.  The next page.

 4   Q.   (BY MR. CORA)  And was this what you examined, No. 236?

 5   A.   I initially examined the email without the photographs,

 6   just the translations, and have seen it later -- a subsequent

 7   time I saw the complete email.

 8          MR. CORA:  Okay.  Let's go through this.  Go to the

 9   next page.  Go to the next page.

10   Q.   (BY MR. CORA)  What are we seeing so far that is of

11   significance to you?

12   A.   You have a soldering iron shown there and solder which

13   would be used to connect wire together or to electronic

14   circuits, you have a small screwdriver tool set, and you have

15   a multimeter which would be used to check for continuity of

16   the circuit.

17          MR. CORA:  The next page.

18   Q.   (BY MR. CORA)  What do we have here?

19   A.   These are incandescent lightbulbs like used for lamps and

20   flashlights, things of that nature.

21          MR. CORA:  And the following page, page 7?

22          THE WITNESS:  These are screen captures from the

23   video on removing -- taking apart a cell phone and using it as

24   a remote detonator.

25          MR. CORA:  And page 8?
```

1          THE WITNESS:  Again, these are screen captures from

2     a video on how to use the cell phone as a remote detonator.

3     Q.   Now, there is some thumbs or fingers that look like they

4     are in that photograph.  Is that right?

5     A.   Yes, sir.

6     Q.   And it looks like there is something on them.  What do

7     you see on there?

8     A.   It looks like latex type gloves.

9     Q.   And the background of the photograph, you have seen that?

10    A.   Yes, sir.

11    Q.   Does that look like anything else that you were submitted

12    in this case?

13    A.   Yes, sir.  It looks like the two videos that were

14    submitted on how to rig a remote cell phone to use as a

15    detonator and that we showed earlier.

16    Q.   But they are now in this one and this email there are

17    some red arrows.  Is that correct?

18    A.   Yes, sir.

19    Q.   Can you tell us about those red arrows?

20    A.   I am not sure exactly what portion of the circuit board

21    they are pointing to there, but they are pointing to some

22    portion of the circuit board.

23          MR. CORA:  The following page.  And the following

24    page.

25    Q.   (BY MR. CORA)  What are we seeing in these three pages,

1    pages 9, 10, and 11?

2    A.   It would appear that they are showing the vibration motor

3    in the cell phone, and attaching two wires to the contacts for

4    the vibration motor for the cell phone.

5          MR. CORA:   The next page.   The following, page 13.

6    Page 14.

7    Q.   (BY MR. CORA)   And what are we seeing here?

8    A.   In the first photograph they are showing a piece of black

9    electrical tape covering the two wires so that you don't

10   produce a short in the system when you are reassembling the

11   cell phone, and then the subsequent screen captures are

12   showing them reassembling the cell phone with the wires

13   extended from the side of the cell phone body.

14         MR. CORA:   And the following, page 15 now.   Page 16.

15   Q.   (BY MR. CORA)   What are we seeing in page 15 and 16?

16   A.   It shows an incandescent lightbulb being attached to the

17   two wires that are extended through the body of the cell phone

18   and being lit and, according to the video, by a cell phone

19   being called.

20   Q.   I am going to now show you a photograph of No. 378.   No.

21   Let's do -- Let's get to the end of this first.   I apologize.

22         MR. CORA:   That is 16.   Let's go to 17.   That is the

23   end.   Okay.

24        Now let's go to a photograph that is in evidence,

25   No. 378.

```
 1   Q.   (BY MR. CORA)  And what do you see there?

 2   A.   This is -- are two auto load screwdrivers that you can

 3   change the tips by just sliding them in and out.

 4   Q.   Okay.  Now, on the email we saw a different type of

 5   screwdriver.  Is that correct?

 6   A.   A different type of screwdriver set, yes, sir.

 7   Q.   How would this screwdriver function, especially the

 8   smaller one?

 9   A.   They would both function in similar fashion.  The one in

10   the email shows just A standard Phillips head and flat head

11   screwdrivers, and this also would have standard Phillips head

12   and flat head screwdrivers in it.

13   Q.   Did you observe No. 378?

14   A.   Yes, sir.

15   Q.   And did you -- Looking at the devices in No. 378, how

16   could they be used in conjunction with the cell phones that

17   you saw?

18   A.   They could be used to take apart some cell phones that

19   have Phillips head screws in the cell phone.

20              MR. CORA:  No. 379.

21   Q.   (BY MR. CORA)  Was this item submitted to you seized from

22   the Defendant?

23   A.   Yes, sir.

24   Q.   And what is No. 379?

25   A.   It is a soldering iron kit.
```

1    Q.    And what would No. 379 be used for in relation to the

2    videos you have seen and in relation to constructing an IED?

3    A.    As shown in the video, solders of wiring connections for

4    the wires being connected to the cell phones.

5             MR. CORA:  Let's go to an email now.  No. 227.  This

6    is in Arabic.  Let's go to No. 228.

7    Q.    (BY MR. CORA)  Did you look at No. 227?

8    A.    I looked at a translation of No. 227, yes, sir.

9             MR. CORA:  Let's go to No. 228.  Oh, let's go back

10   to the first page of No. 228.  The second page.  I am sorry.

11   Q.    (BY MR. CORA)  Okay.  Can you tell who this is to and

12   from?

13   A.    It is to Abu-Zidan Al-Najdi from Abu-Zidan Al-Najdi.

14   Q.    And what is the subject of it?

15   A.    "Clock."

16   Q.    And what is the date of it?

17   A.    The 2nd of December, 2010.

18             MR. CORA:  Okay.  Now let's go to the next page.

19   And the next page.

20   Q.    (BY MR. CORA)  Oh, the fourth paragraph, can you tell us

21   about that?  Okay.  What does this have to say?

22   A.    "So, my Muslim brothers in the Land of the West, don't

23   let any among you neglect this duty and say I didn't receive

24   training in Khost or Kandahar and I didn't go to Waziristan

25   and I didn't fight in Iraq."

1    Q.    Are you familiar with training camps in Afghanistan?

2              MR. COGDELL:  Objection; relevance.

3              THE COURT:  Sustained.

4    Q.    (BY MR. CORA)  Let's go up one paragraph.

5              MR. COGDELL:  And for the record, we have seen this

6    before.  Objection; repetitive.

7              THE COURT:  I agree with you.  Let's move on to the

8    next exhibit.

9    Q.    (BY MR. CORA)  Let's go to the black Mead notebook,

10   No. 123, page 5.  Page 6.

11             MR. COGDELL:  Same objection, Your Honor.

12             MR. CORA:  Page 7.

13             THE COURT:  Hold on a second.  I am going to sustain

14   the objection.  Let's move on to the next topic that fits in

15   with this witness' expertise.

16             MR. CORA:  Okay.

17             MR. CORA:  Let's go to Exhibit No. 380.

18   Q.    (BY MR. CORA)  Was this submitted to you?

19   A.    Yes.

20   Q.    Seized from the Defendant?

21   A.    Yes, sir.

22   Q.    And what was this?  What is No. 380, first of all?

23   A.    No. 380 are several items, including a couple of receipts

24   from amazon.com, some packaging for a clock, some packaging

25   for a battery, and a travel alarm clock.

1   Q.   Was there anything of note in this travel alarm clock?

2   A.   An examination of the travel alarm clock revealed that it

3   appeared to have been disassembled at some point and

4   reassembled.  There are wires -- I mean there are screws

5   missing internal from the clock that hold the motor in place,

6   and some of the arms on the clock free swing, so as they were

7   pulling it apart, they pulled off of the center post of the

8   clock so now they just swing back and forth freely.

9   Q.   Did you try -- Did you buy a copy or what you thought

10   were copies of this clock?

11   A.   Yes, sir.

12   Q.   As part of your analysis of this clock?

13   A.   Yes, sir.

14   Q.   And did you make some observations of those items that

15   you bought?

16   A.   Yes, sir.

17   Q.   What was unusual -- Not unusual.  Tell us about the

18   differences in those clocks.

19   A.   The main difference in the clock was the way the motor

20   was mounted in the back of it, but they are very similar to

21   it.  And the problem with trying to take apart these clocks to

22   try to figure out how they function on the inside is the

23   minute you try to pull them apart, if you are not very careful

24   you pull the motor with you, which has the post that swings

25   the hands on the clock and then you break them off of the

```
 1    front of the clock when you do that.

 2             MR. CORA:  Let's go to No. 381.

 3    Q.   (BY MR. CORA)  What was No. 381 submitted to you as?

 4    A.   An alarm clock.  An Elgin alarm clock.

 5    Q.   Is Elgin a brand name?

 6    A.   Yes, sir.

 7    Q.   Okay.  It looks like a cell phone.

 8    A.   Yes, sir.  It is a travel alarm clock that you open up

 9    and you can set up on your stand after you open it up.

10    Q.   I understand.  Okay.  Tell us what you observed about

11    No. 381, the Elgin alarm clock?

12    A.   The clock had been disassembled at some point and was

13    submitted to the laboratory in the disassembled state.  The

14    wires had been removed from the speakers and from the circuit

15    board, so the wires that lead from the circuit board on the

16    clock to the speakers, they had been removed at both

17    connections.

18             MR. CORA:  And No. 382.

19             THE WITNESS:  This shows the back of the clock as it

20    was submitted to the laboratory.  The battery compartment with

21    the two AAA batteries are down in the bottom.  The top portion

22    is the circuit board, and that would be where the two wires

23    for the speakers should be connected if they were still in

24    tact, and they were not submitted with the specimen.  Those

25    wires were not submitted as part of the evidence.
```

1          MR. CORA:  And No. 383.

2     Q.  (BY MR. CORA)  What did you -- What is No. 383?

3     A.   This is a Sharp brand alarm clock, electronic alarm

4     clock.

5     Q.   And what did you observe about No. 383?

6     A.   The screws have been removed from the battery compartment

7     allowing you access to the inside of the clock, but no other

8     observations or alterations could be observed.

9          MR. CORA:  No. 384.

10    Q.  (BY MR. CORA)  What is No. 384?

11    A.   This is an A.T.E. brand travel alarm clock also or alarm

12    clock.

13    Q.   Was there anything -- Was it in a state that you would

14    expect to buy it at a store?

15    A.   No, sir.  It had -- The hands had been removed at some

16    point.  There are pry marks on the battery compartment.  One

17    of the screws in the battery compartment for taking the clock

18    apart had been stripped so you couldn't actually get it to

19    back out of the back of the clock to gain access to the

20    inside, and it has pry marks on the side of it, the right hand

21    side, and it had a switch in that location that had been

22    destroyed because of the pry marks to get the clock open.

23         One of the hands of the clock, I believe it was the hour

24    hand, and some wire strippings from inside the wires inside

25    the clock, the insulation was stripped off of them, are found

1    under the face of the clock there, the paper face.  And then

2    when you go into the clock body itself, after we accessed

3    that, we found the other two hands of the clock, actually

4    other three--the minute, the second, and the alarm hand inside

5    the clock.  So it had been put back together at some point.

6              MR. CORA:  And No. 385.

7              THE WITNESS:  This shows the back of the alarm

8    clock.  To the right hand side of the battery compartment you

9    can see the pry marks where someone had tried to access the

10   clock through the back of the clock.  And inside the battery

11   compartment is the head of the screw that was stripped so you

12   couldn't actually gain good access inside the clock.

13   Q.   (BY MR. CORA)  After looking -- How many clocks do we

14   have here?

15   A.   I believe I looked at four.

16   Q.   Okay.  Do you have an opinion as to what was going on

17   with these clocks?

18             MR. COGDELL:  Objection; conjecture, speculation.

19             THE COURT:  Do you know?  Do you know what is going

20   on in these clocks?

21             THE WITNESS:  I know they are being disassembled for

22   some reason, sir.

23             THE COURT:  Next question.

24   Q.   (BY MR. CORA)  No. 80 and 85.  Or look at 80 and 85.

25   Let's go back to 80.  Do you see something in there of

1   significance to this investigation other than the clocks?

2   A.   Yes, sir.  You also have the ornamental lightbulbs there,

3   and you have power sources, nine volt, in the bubble wrap

4   packaging for AA batteries.

5   Q.   And did you make any observations as to the green

6   miniature lights?

7   A.   Yes, sir.  That string of miniature lights, three of them

8   had been cut from the string, which is consistent with the

9   three that are recovered that are separate from a string of

10  lights.  So out of that string of 100, there is 97; there is 3

11  missing from that.  And there is also a multimeter in that

12  box, too, with its back to the camera.

13  Q.   Having reviewed the report of Mr. Mothershead about the

14  picric acid, having reviewed the evidence that was submitted

15  to you in this case, and both the physical evidence, the

16  Christmas lights, the clocks, cell phones, and everything, and

17  the technology that you reviewed--that is, the videos and the

18  emails--do you have an opinion as to what was being created

19  here?

20       MR. COGDELL:  Objection; conjecture, speculation,

21  Your Honor.

22       THE COURT:  Overruled.  You may answer.

23       THE WITNESS:  Based on the evidence that was

24  submitted, from the reference material that was submitted and

25  the active steps that were taken, an individual would be able

 1    to follow the reference material and make an improvised

 2    explosive device.  As part of active steps that have been

 3    taken in that regard, the Christmas tree lights were

 4    purchased --

 5              MR. COGDELL:  Non-responsive.  This part of the

 6    answer is non-responsive, Judge.

 7              THE COURT:  All right.  Ask another question,

 8    please.

 9    Q.   (BY MR. CORA)  What were the steps, in your opinion, to

10    making that device?

11    A.   The active steps that were taken were the purchase of the

12    Christmas tree lightbulbs, the disassembly of them from the

13    string of lightbulbs, them being cut from that and stripped,

14    the acquisition of the lamp cord to be used to lengthen the

15    leg wires for those lightbulbs, a soldering iron purchased,

16    multimeters purchased, and the screwdriver set purchased.

17    Q.   Okay.

18    A.   The other active steps would involve for making the

19    picric acid, the sulfuric acid, the nitric acid, and the

20    attempts to purchase phenol.

21              MR. CORA:  Your Honor, we have a couple of more

22    questions, but the item I want to show the witness I need a

23    moment to get it.

24              THE COURT:  This is a good time for our 15-minute

25    afternoon recess.  All rise for the jury.

```
 1              (Whereupon, the jury left the courtroom.)

 2         THE COURT:  Fifteen-minute recess.

 3                   (Brief recess.)

 4         THE COURT:  Anything before we bring the jury in?

 5         MR. JACKS:  Judge, I wanted to read something into

    the record and have the Defense counsel and the Defendant

 7  affirm it regarding the stipulation.

 8         THE COURT:  Okay.  Go ahead.

 9         MR. JACKS:  Pursuant to U.S. versus Reveles,

10  R-E-V-E-L-E-S, and that is at 190 F.3d, 678, Fifth Circuit

11  case from 1999, the Defendant hereby --

12         THE COURT:  Everybody can sit down.

13         MR. JACKS:  The Defendant hereby intentionally

14  waives, relinquishes, and abandons his Sixth Amendment right

15  to confront the witnesses named in the stipulation through

16  live testimony and cross examination by Defense counsel, he

17  doesn't dissent from his Defense counsel's decision to admit

18  the witnesses named in the stipulations, their testimony

19  through written stipulation, and agrees that his Defense

20  counsel's decision was a legitimate trial tactic and part of a

21  prudent trial strategy.  And this is to address the Crawford

22  issues that might arise.

23         THE COURT:  Did you understand, Mr. Aldawsari, what

24  was just said?  Did you understand that?

25         THE DEFENDANT:  Actually no.
```

 1                    THE COURT:  Okay.  You do understand or you do not?

 2                    MR. COGDELL:  He does not understand what Mr. Jacks

 3       just read.

 4                    THE COURT:  Okay.

 5                    MR. COGDELL:  Now, to be fulsome, I have gone

 6       through the option of calling the witnesses to testify, those

 7       named in the stipulation, I have explained to Mr. Aldawsari

 8       that he has the right to cross examine and confront those

 9       witnesses in lieu of a stipulation, I have advised him that I

10       believe it is in his best interest to waive or give up the

11       live testimony in exchange for the stipulation, and I think

12       Mr. Aldawsari--correct me if I am wrong, sir--I think he

13       understands that part.

14                    THE COURT:  Do you understand that, sir?

15                    THE DEFENDANT:  I agree with my counsel.

16                    THE COURT:  And do you agree with it?

17                    THE DEFENDANT:  Yes, sir.

18                    THE COURT:  You consent to the waiver?

19                    THE DEFENDANT:  Yes.

20                    THE COURT:  All right.  Thank you.

21                    MR. CORA:  Your Honor, I have one question.

22                    THE COURT:  Yes.

23                    MR. CORA:  I would like to show the jury Exhibit

24       No. 91 and 134.  No. 91 is the Christmas light with the green

25       wire coming out of it and the speaker wire connected.  I would

1     like to just walk it up and down.  And No. 134 is the actual

2     role of speaker wire.

3             THE COURT:  It is your case.  Just hold it up.

4     Don't walk it up and down.

5         Bring them in, please.

6             (Whereupon, the jury entered the courtroom.)

7             THE COURT:  All right.  You may all be seated.

8         Mr. Cora?

9     Q.  (BY MR. CORA)  Special Agent Whitworth, did you observe

10    some telephones submitted to you in this case?

11    A.    No, sir.  Telephones?

12    Q.    Telephones or cell phones.

13    A.    No, sir.

14    Q.    Okay.  Let me show you No. 99, Government Exhibit No. 99.

15    Did you see this?

16    A.    No, sir.

17    Q.    Okay.  Let me show you No. 366.  What is No. 366?

18    A.    It is a digital multimeter, DT 830B model.

19    Q.    Was this submitted to you as part of the evidence in this

20    case?

21    A.    Yes, sir.

22    Q.    For the record, where the dial on the multimeter?

23    A.    The dial is in the middle of the multimeter.  It is a

24    black dial.

25    Q.    And where is the dial set to on the multimeter face?

 1   A.   At the time it was submitted to the laboratory it was

 2   submitted to the 200-k ohm resistance setting.

 3   Q.   Now, you have No. 91 and 134 up there in the witness box.

 4   Is that right?

 5   A.   Yes.

 6   Q.   Will you just take No. 91, pick it up and walk it up and

 7   down --

 8           THE COURT:  Well, no.  Just hold it up and I will

 9   see if the jury can see it.  Can you all see that and what it

10   is?  Okay.

11   Q.   (BY MR. CORA)  Put that one down.  And No. 134.  Do the

12   same with No. 134.

13           THE COURT:  Can you all see that?  Okay.

14           MR. CORA:  Pass the witness.

15           THE COURT:  Your witness, Mr. Cogdell.

16           MR. COGDELL:  Thank you.

17                      CROSS EXAMINATION

18   By Mr. Cogdell:

19   Q.   All right, Special Agent Whitworth.  I chatted you up

20   briefly outside the presence of the jury on just some personal

21   issues, but you and I have never seen each other before.  Do

22   you agree with me?

23   A.   Yes, sir.

24   Q.   In your -- Early on in your examination with Mr. Cora, he

25   had you talk about the four parts of an IED, and I want to go

1    to this one, the main charge.  Okay?

2        Would you agree with me that insofar as your

3    investigation and your observations in this case, the main

4    charge that you believe to be being generated was a

5    combination of phenol, sulfuric acid, and nitric acid?  Right?

6    A.   Yes, sir.

7    Q.   And it is also your understanding, is it not, Special

8    Agent Whitworth, that there was no phenol recovered from the

9    search of Mr. Aldawsari's apartment?  Correct?

10   A.   Yes, sir.

11   Q.   So without the phenol, there can be no main charge in

12   this instance.  Correct?

13   A.   There was none recovered.

14   Q.   So would you agree with me that, at least from the items

15   that you are aware of that were recovered from Mr. Aldawsari's

16   apartment, there could not have been a destructive device that

17   could have been readily assembled from the combination of

18   parts recovered from his apartment?  You were missing one.

19   Correct?

20   A.   Correct, sir.

21   Q.   And the one that you were missing was phenol.  Correct?

22   A.   Correct, sir.

23   Q.   You are aware that in this case, Special Agent Whitworth,

24   that despite the fact that there were attempts to recover

25   phenol or to obtain phenol from Mr. Aldawsari, in fact he

1    never obtained them.  Right?

2    A.    Yes, sir.

3    Q.    Mr. Cora asked you questions about whether or not the

4    procedure was dangerous--that is, mixing the phenol with

5    sulfuric acid and nitric acid.  Do you recall that line of

6    questioning?

7    A.    That might have been with the forensic chemist, but --

8    Q.    Would you agree with me that that process could be

9    dangerous?

10   A.    Yes, sir, it would be dangerous.

11   Q.    It could be fatal.  Right?

12   A.    Yes, sir.

13   Q.    In fact, I believe that you indicated to us you have been

14   a part of investigations where individuals who were attempting

15   to mix phenol, sulfuric acid, and nitric acid have blown

16   themselves up.  Right?

17   A.    I believe the testimony was in regard to triacetone

18   triperoxide where people have blown themselves up.

19   Q.    Have you been involved in investigations where

20   individuals have been harmed, injured, or killed in the mixing

21   of picric acid?

22   A.    No, sir.

23   Q.    Okay.  Would you agree with me, Special Agent Whitworth,

24   that there were a number of items, I think that you have given

25   us testimony about beakers, strainers, mixing tools, and the

 1   like, that were recovered that you examined in this case.

 2          MR. CORA:  Objection.  That is not his testimony.

 3   Q.   (BY MR. COGDELL)  Did you look at any of the glassware,

 4   the beakers, the mixers, the strainers, and the like?

 5   A.   No, sir.  That was the forensic chemist.

 6   Q.   Okay.  And do you know whether or not -- I mean, you and

 7   the forensic chemist work together, do you not?

 8   A.   Yes, sir.

 9   Q.   You have reviewed his report?

10   A.   Yes, sir.

11   Q.   Assumedly he has reviewed your report?

12   A.   Yes, sir.  He has to.

13   Q.   He has to?

14   A.   Yes, sir.

15   Q.   Okay.  Are you higher up the food chain than him?

16   A.   No, sir.  It is just a peer review process we both have

17   to go through.

18   Q.   In reviewing his, that is the chemist report, Special

19   Agent Whitworth, would you agree with me that there was no

20   indication that any phenol was detected as trace evidence on

21   any item that was recovered or obtained from Mr. Aldawsari's

22   apartment?

23          MR. CORA:  Objection.

24          THE COURT:  Do you know the answer to that question?

25          THE WITNESS:  I am not aware of that answer, sir.  I

1    am not the chemist.

2              THE COURT:  Okay.

3              MR. COGDELL:  May I have just a minute, Your Honor?

4              THE COURT:  Yes, sir.

5              MR. COGDELL:  Pass the witness.  Thank you, sir.

6    Appreciate it.

7              THE COURT:  Redirect?

8                    REDIRECT EXAMINATION

9    By Mr. Cora:

10   Q.   What steps were taken to get the main charge in this

11   case?

12   A.   The nitric acid was purchased, the sulfuric acid was

13   purchased, and there were attempts for the phenol purchase.

14             MR. CORA:  No other questions.

15             THE COURT:  All right.  You may step down.  Thank

16   you, sir.

17        Call your next witness.

18             MR. HAAG:  Your Honor, the United States calls

19   captain David Parker.

20             (Whereupon, the oath was administered by the Clerk.)

21                    DAVID PARKER,

22   Testified on direct examination by Mr. Haag as follows:

23   Q.   Would you please state your name?

24   A.   My name is David Parker.

25   Q.   How are you employed?

1    A.    I am employed with the Texas Tech Police Department.

2    Q.    If you would, you need to slow down just a little bit so

3    the court reporter can capture your testimony.

4    A.    Sure.

5    Q.    What is your position with the Texas Tech Police

6    Department?

7    A.    I am a detective assigned to the Criminal Investigations

8    Division, and I hold the rank of captain, which means I

9    supervise that division.

10   Q.    Which Texas Tech campus are you stationed at?

11   A.    Lubbock, Texas.

12   Q.    How long have you served with the Texas Tech Police

13   Department?

14   A.    Twelve and a half years.

15   Q.    Are you a member of the Joint Terrorism Task Force?

16   A.    I am.

17   Q.    Are you also Special Deputy United States Marshal?

18   A.    Yes, I am.

19   Q.    Before joining the Texas Tech Police Department, did you

20   own a business?

21   A.    I did.

22   Q.    What was the name of that business?

23   A.    The name was Tsunami Computer Services International.

24   T-S-U-N-A-M-I.

25   Q.    Would you please describe for the jury what that business

1    provided?

2    A.   I provided a host of turnkey computer solutions.  I built

3    custom desktops and laptops, installed network equipment --

4            MR. DOYLE:  Judge, I am going to object to

5    relevance.

6            THE COURT:  On what basis?

7            MR. DOYLE:  I don't know what the relevance of this

8    is.

9            MR. HAAG:  Your Honor, I am establishing him as a

10   computer expert.  He is talking about the computer business

11   where he basically built computers.

12           THE COURT:  Are you going to submit him as an

13   expert?

14           MR. HAAG:  Yes, sir.

15           THE COURT:  Okay.  Proceed.

16   Q.   (BY MR. HAAG)  Please continue, sir.

17   A.   I built custom desktop and laptop computers, installed

18   and maintained network equipment, wrote computer software,

19   performed data recovery services and computer forensics for

20   private industry.

21   Q.   How long did you own and operate this business?

22   A.   From 1996 until 2003.

23   Q.   When did you begin working as a computer forensic

24   examiner?

25   A.   In private business it was around 1997 and 1998, and law

1    enforcement it began in 2002.

2    Q.   Have you continually done computer forensics work since

3    that time?

4    A.   Yes, I have.

5    Q.   Do you currently do computer forensics work?

6    A.   Yes, I do.

7    Q.   Do you hold a certification in computer forensics?

8    A.   I do.

9    Q.   Who do you hold certifications from?

10   A.   One is called a CCE or certified computer examiner, that

11   is through the ISFCE or International Society of Forensic

12   Computer Examiners.

13   Q.   Do you hold any other certifications?

14   A.   I do.  One is called a CEECS or certified electronic

15   evidence collection specialist, and that is issued from an

16   organization called IACIS, I-AC--I-S, International

17   Association of Computer Investigative Specialists.

18   Q.   Are you a member of any computer forensics professional

19   associations?

20   A.   I am a member of about a dozen associations.  A couple of

21   examples of those would include HTCC or High Tech Crime

22   Consortium.  Another example would be CDFS, Consortium of

23   Digital Forensic Specialists.

24   Q.   Have you performed computer forensic examinations for

25   other law enforcement agencies than Texas Tech University?

1    A.    Yes, I have.

2    Q.    Who are some of those agencies?

3    A.    A host of federal, state, and local agencies; on the

4    federal side, the Federal Bureau of Investigation, Secret

5    Service, Immigration and Customs Enforcement, U.S. Postal

6    Inspection Service; on the State side, Texas Department of

7    Public Safety; then locally, Lubbock County Sheriff's Office

8    and for some surrounding communities, Littlefield, Borger

9    Police Department, et cetera.

10   Q.    Have you attended any specialized training in computer

11   forensics?

12   A.    I have.

13   Q.    Approximately how many courses have you attended?

14   A.    As a law enforcement officer, approximately eight, larger

15   courses that are generally between a week and two weeks long,

16   followed by other in-service type training.

17   Q.    Do you supplement that training with any self-study?

18   A.    Yes, I do.

19   Q.    Have you presented training to others regarding computer

20   forensics?

21   A.    Yes, I have.

22   Q.    Since 2002, approximately how many pieces of digital

23   evidence have you analyzed?

24   A.    I would estimate between 130 to 150.

25           MR. HAAG:  Your Honor, at this time I tender Captain

 1    Parker as an expert in computer forensics.

 2              MR. DOYLE:  No objection.

 3              THE COURT:  Without objection.

 4    Q.   (BY MR. HAAG) Let's turn to your analysis of the

 5    evidence in this case.  Please describe for the jury the

 6    evidence that you have reviewed in this case.

 7    A.   I have reviewed the report and findings of Mr. Mike

 8    Morris the computer forensics examiner for the North Texas

 9    Regional Forensics Center in Dallas.

10    Q.   If you would keep your voice up just a little bit.

11    A.   Yes, sir.  I have reviewed emails that were provided to

12    me by the FBI subsequent to search warrant, I have reviewed

13    Google search history that was provided by subpoena and search

14    warrant to Google, as well as journal entries and other

15    documents recovered from the Defendant.

16    Q.   Let's go ahead and talk first about Government's Exhibit

17    No. 402.  What is this exhibit?

18    A.   No. 402 is a copy of a blog posted on the internet at a

19    Google site called blogspot.com.

20    Q.   How did you obtain Government's Exhibit No. 402?

21    A.   Through an open source internet search conducted on

22    February the 7th of 2011.

23    Q.   Is this time and date printed on that document?

24    A.   Yes, it is.

25    Q.   Is the website address printed on that document?

1    A.    Yes, it is.

2    Q.    To the best of your knowledge, is this website still up

3    and available to the public?

4    A.    Yes, it is.  I double checked last night and it is still

5    available on the internet.

6              MR. HAAG:  At this time move to admit Government's

7    Exhibit No. 402.

8              MR. DOYLE:  No objection, Your Honor.

9              THE COURT:  Without objection.

10   Q.    (BY MR. HAAG) Let's now turn to Government's Exhibit

11   No. 410.  Are you familiar with this exhibit?

12   A.    Yes, I am.  This is a CD that contains a summary

13   demonstrative exhibit of the blog itself and some of the

14   contents of that blog.

15             MR. HAAG:  Your Honor, at this time move to admit

16   Government's Exhibit No. 410.

17             MR. DOYLE:  Do you have a copy of it?

18        No objection.

19             THE COURT:  It is received.

20   Q.    (BY MR. HAAG)  Let's talk now about Government's Exhibit

21   No. 413.

22   A.    Yes, sir.

23   Q.    What is Government's Exhibit No. 413?

24   A.    No. 413 is a spreadsheet that was compiled from my

25   analysis of the data submitted by Google pursuant to search

1    warrant.

2    Q.    And what, if any, conversions did you do with regard to

3    that data?

4    A.    The data originally provided by Google was in the form of

5    a PDF document, and the text of that document contained

6    internet searches and click-throughs of sites that

7    Mr. Aldawsari visited.

8    Q.    Did you convert any figures in those documents from the

9    Google search warrant onto Government's No. 413?

10   A.    Yes, I did.

11   Q.    What figure did you convert?

12   A.    The internet search terms that were used by Mr. Aldawsari

13   were conducted in a combination of English and Arabic.  The

14   return that was given to us by Google represented the Arabic

15   instead of an Arabic script and a computer code called Octel.

16   I provided services to the FBI to convert the Octel back into

17   Arabic so it could be translated.

18   Q.    Does this exhibit fairly and accurately reflect the

19   conversion from Octel?

20   A.    Yes, it is.

21          MR. HAAG:  Your Honor, at this time move to admit

22   No. 413?

23          MR. DOYLE:  No objection, Your Honor.

24          THE COURT:  Without objection it is received.

25   Q.    (BY MR. HAAG)  Let's move to Government Exhibit No. 415.

1    Are you familiar with this exhibit?

2    A.    Yes, I am.

3    Q.    What is Government's Exhibit No. 415?

4    A.    This is a CD that contains a PowerPoint that is a

5    demonstrative summary of research conducted by Mr. Aldawsari

6    that we believe to be targets.

7    Q.    Does this exhibit fairly and accurately summarize the

8    information that you obtained from this investigation?

9    A.    Yes, it does.

10          MR. HAAG:  Your Honor, at this time move to admit

11   Government's Exhibit No. 415.

12          MR. DOYLE:  No objection.

13          THE COURT:  Without objection.

14   Q.    (BY MR. HAAG)  Let's go ahead and we are going to play a

15   portion or look at a portion of Government's Exhibit No. 415,

16   please.

17   A.    Okay.

18          MR. HAAG:  Ms. Christensen, if you can queue up that

19   portion.  Let's go ahead and go to the first slide.

20          THE WITNESS:  Yes, sir.

21   Q.    (BY MR. HAAG)  Where is this information compiled from?

22   A.    This is a list of the exhibits that cover the next few

23   slides in the PowerPoint where I extracted information to make

24   the demonstrative exhibit.

25   Q.    Okay.  If you could please keep your voice up, sir?

1    A.   Yes, sir.

2              MR. HAAG:   Let's go ahead and go to the next slide,

3    please.   And the next slide.

4    Q.   (BY MR. HAAG)   What is the first thing that you looked at

5    here on this slide?

6    A.   Between October the 19th, 2010 and February the 19th of

7    2011, there were a number of queries conducted by

8    Mr. Aldawsari using Google where he entered the query in

9    Arabic.   Those queries were provided to Atef Shafik of the FBI

10   for translation, and those are the translation of those Arabic

11   queries.

12   Q.   Let's just read the first one.   What is the first query

13   that is done here?

14   A.   The first query, "Is it permissible to target the

15   civilian infidels?"

16   Q.   Do you see any other entries consistent with that first

17   line and continuing on?

18   A.   Yes, I do.

19             MR. HAAG:   Let's go to the next slide, please.

20   Let's go ahead and go to the next slide, please.

21   Q.   (BY MR. HAAG)   Please describe what information is listed

22   here.

23   A.   This screen shows queries conducted on April 1st, 2010

24   through April the 2nd of 2010.   As we go through those search

25   terms, there are a number of entries looking at Dallas

1   stadiums, the Dallas Cowboys Stadium, and the Cotton Bowl,

2   AT&T Red River Rivalry.

3            MR. HAAG:  Next slide, please.

4            THE WITNESS:  These three entries here are

5   click-throughs from these three previous searches conducted on

6   April the 2nd.  These are click-throughs from those searches

7   for three different Google maps that bring up content related

8   to those searches.

9   Q.   (BY MR. HAAG)  When you say "click-through," would you

10  describe for the jury what you are talking about?

11  A.   Yes.  Whenever a person goes to Google and enters in a

12  search term, a number of results are returned for that search.

13  Sometimes those results contain Google maps that can be

14  clicked on that bring up a map for the respective search term.

15  Q.   And were each of these three click-throughs that

16  Mr. Aldawsari did on his computer?

17  A.   Yes, they are.

18           MR. HAAG:  Please continue.

19           THE WITNESS:  On the next slide we see the URL that

20  was represented previously as the first item up here.  This is

21  the Google map that was clicked and opened up by Mr.

22  Aldawsari.  It shows the Dallas stadium.  The second URL opens

23  an aerial view of the Cowboys stadium, and the third URL opens

24  up a map that when we zoom into it we see it is the Cotton

25  Bowl stadium for the AT&T Red River Rivalry in Dallas.

```
 1              MR. HAAG:  Go to the next slide, please.

 2   Q.   (BY MR. HAAG)  And what was the next portion of the

 3   search that you looked at?

 4   A.   We see a number of searches between April 2nd and April

 5   the 9th.  One of interest on April 2nd was an address, 2395

 6   Stemmons Trail in Dallas, Texas.  There is an associated click

 7   through to a Google map at the same address.  When that URL is

 8   followed, we receive a map of 2395 Stemmons Trail, and when we

 9   zoom in on that map we see that the point represented is

10   Studio 6 Northwest, which is a hotel in Dallas.

11   Q.   Was there any other reference to that hotel in this

12   investigation?

13   A.   Yes, there was.

14   Q.   What was that?

15   A.   There were some additional searches involving this

16   address.  There were also -- There was also a receipt that was

17   found in an automobile by FBI Special Agent Keith Quigley.

18              MR. HAAG:  Please continue.

19              THE WITNESS:  On this next slide we see that on

20   April the 2nd there was a search again for 2395 Stemmons

21   Trail, and we also see another address, 1300 Robert B. Cullum

22   Boulevard in Dallas.  This particular search brought up

23   another Google map that is directions between these two

24   points.  When this URL is opened, it produces a map with Point

25   A being 2395 Stemmons Trail and Point B being 1300 Robert B.
```

1    Cullum Boulevard.

2    Q.   (BY MR. HAAG)  What are at -- What is at Point A and what

3    is at Point B?

4    A.   Point A is the Studio 6 Hotel in Dallas, Texas that was

5    represented by the 2395 address.  Point B is the Cotton Bowl

6    stadium.

7           MR. HAAG:  Please continue.

8           THE WITNESS:  This is a copy of the receipt that was

9    found in Mr. Aldawsari's vehicle by Special Agent Keith

10   Quigley.  When we look at that receipt it shows Studio 6

11   dallas Northwest at 2395 Stemmons Trail, and it shows that Mr.

12   Aldawsari stayed there on April the 5th to April the 6th of

13   2010.

14          MR. HAAG:  Go to the next one.

15   Q.   (BY MR. HAAG)  Did you see any journal entry that was

16   consistent with this as well?

17   A.   Yes, I did.  In the tan steno book, page 52 and the

18   associated FBI translation, there is an entry that talks about

19   the Dallas game.  There is also an entry that says, "buy a

20   ticket that is higher than the extent tickets.  This ticket

21   must be very far, the seat, in case of being questioned and

22   stopped by a policeman.  It can be shown to him to mislead."

23   Q.   What is the entry below that?

24   A.   The entry below states "Studio 6 in Dallas, Texas,

25   because it has a kitchen."

1          MR. HAAG:  Okay.  Next, please.

2          THE WITNESS:  Next is a loose leaf piece of paper

3     that was again found by Special Agent Keith Quigley in the

4     hallway outside of Mr. Aldawsari's apartment after the staff

5     at the center were moving out abandoned property.  This

6     receipt or this piece of paper had information written in both

7     Arabic and English on it, but the translation, provided again

8     by Atef Shafik of the FBI, says "To blow up a stadium

9     explosives can be placed in the popcorn," followed by, "This

10    is done before entering the stadium as the explosives are

11    inside the clothes.  We go to the restroom or to the car and

12    we put them in the popcorn."

13         MR. HAAG:  Next, please.

14         THE WITNESS:  Between April the 9th and April 14th

15    we see a number of additional searches related to Dallas,

16    Texas, Dallas, Texas Subway, Cowboys Stadium, Longhorn

17    Stadium, and again the Cotton Bowl AT&T Red River Rivalry.

18         MR. HAAG:  Next slide, please.

19         THE WITNESS:  This is from Government's Exhibit

20    No. 253.  It is a copy of an email sent from Abu-Zidan

21    Al-Najdi to Abu-Zidan Al-Najdi on December the 16th, 2010, and

22    it contains a link or a URL to a website.  The website is

23    www.dallasarboretum.org.

24    Q.   (BY MR. HAAG)  Did you have an opportunity to see what

25    was at that website dallasarboretum.org?

1   A.   Yes, I did.

2          MR. DOYLE:   Judge, I am going to object.   This is a

3   little bit cumulative on top of what Mr. Morris already

4   testified to.

5          THE COURT:   I will let him proceed at this point.

6   Q.   (BY MR. HAAG)   Please describe what the information is at

7   this website, www.dallasarboretum.org.

8   A.   Yes.   When you follow the link to that website, this is

9   the web page of the Dallas Arboretum, and within that web page

10  there is a tab for "public events."   Within the public events

11  there is a page that describes concerts that are held at the

12  Dallas Arboretum.   These are open air concerts during the

13  spring and summer where there is large assemblies of people.

14         MR. HAAG:   Next slide, please.

15         THE WITNESS:   Next we see between -- On January 14th

16  2011 and on February the 19th, 2011, a number of searches

17  conducted via Google for public concerts in Texas, parties in

18  Dallas, can you take a backpack to a nightclub, and Dallas

19  nightclubs.

20  Q.   (BY MR. HAAG)   And to give the jury some context in terms

21  of the time frame, on what date was Mr. Aldawsari arrested?

22  A.   On February the 23rd of 2011.

23  Q.   So in relation to that, how close were they to the date

24  of his arrest?

25  A.   The February 19th date is within four days of that

1    arrest.

2         MR. HAAG:  Go ahead and go to the next slide,

3    please.

4    Q.   (BY MR. HAAG)  What is the next group of searches that

5    you looked at?

6    A.   The next group of searches were determined to involve

7    former president George W. Bush.  These searches occurred on

8    February the 5th, 2011.  The first web query of interest

9    initially didn't stand out, but upon following up it is a web

10   query for Prime Minister Blanco.  There was a click-through

11   associated with that query, the URL of which is represented in

12   the top right corner.  This click-through occurred on February

13   the 5th, 2011 at 8:33 p.m.  It opens a wikipedia.org article

14   about Luis Carrero Blanco.  The article contains a paragraph

15   about the 1973 assassination of this individual by a group of

16   Bosque members who carried out the bombing by placing

17   explosives in a tunnel they had excavated under the street.

18   Q.   After reading this Wikipedia article, what is the search

19   that Mr. Aldawsari does next?

20   A.   His next searches are how to excavate a street.

21   Q.   What are some of the searches that he does after that?

22   A.   The next searches are for the George W. Bush farm, George

23   W. Bush book signing tour and dates, and George W. Bush's

24   house in Dallas, Texas.

25   Q.   Are any of those queries with regard to a map?

1    A.    Some of them do include a map.  There is one that

2    precedes the map.

3              MR. HAAG:  Please go on.

4              THE WITNESS:  This next slide, just to give

5    reference, is the search history that was recovered on

6    Mr. Aldawsari's ASUS laptop computer.  In reviewing the

7    examination by Mike Morris at the North Texas Regional

8    Forensics Center, I exported out the history from that report

9    and found an entry for the same date on February the 5th for a

10   website that was viewed.  This website was at

11   hotairpundit.com, and it reflects that the website contains an

12   article and a video that was viewed.

13   Q.    (BY MR. HAAG)  And what is the article and video that was

14   viewed by clicking through to this hotairpundit.com?

15   A.    It is a news article about Dallas budget cuts affecting

16   George Bush's security.

17             MR. HAAG:  And would you please play the video Mr.

18   Aldawsari watched and clicked through?

19             (Whereupon, the video was played in open court.)

20             MR. HAAG:  Next slide, please.

21             THE WITNESS:  The next slide shows the search that

22   was conducted immediately after this website was viewed.  The

23   query was an image query on Google for George W. Bush's house

24   in Dallas.

25   Q.    (BY MR. HAAG)  And what did that reveal when clicked

1    through on that?

2    A.   The click-through was to a website at www.zillow.com.

3    Zillow is spelled Z-I-L-L-O-W.  This was an article entitled

4    "A gate for the Bush estate to be paid by you and

5    me."  Looking at the map on that page it actually provides an

6    aerial view of the former president's house.

7            MR. DOYLE:  Judge, could I object and could we have

8    a sidebar briefly, please?

9            MR. COGDELL:  Let me address the issue even though

10   it is his witness.  It is my understanding that the Court

11   accepted the three individuals from the invocation of the

12   Rule.  This witness was not among them, from my memory.  This

13   witness has been in and out of the courtroom or in the

14   courtroom the majority of the time of the testimony.

15           THE COURT:  He has been.

16           MR. HAAG:  He is an expert witness and exempted from

17   the Rule, Your Honor.

18           MR. COGDELL:  No, you excepted three.

19           MR. HAAG:  Case agents, not expert witnesses.

20           MR. COGDELL:  I don't --

21           THE COURT:  I am not following you.  What?

22           MR. HAAG:  We exempted case agents, three case

23   agents.  Experts are always exempted from the Rule.

24           MR. COGDELL:  That is -- I didn't agree that he

25   would be excepted from the Rule, Your Honor.

1           THE COURT:  But he is testifying as an expert

2    looking at things, so I am going to let it continue.  The

3    objection is noted.

4           MR. COGDELL:  Fair enough.  For purposes of the

5    record, I object to this witness' testimony as being a

6    violation of Rule 103.  I think it is 106.  In any event, the

7    rule against sequestration.

8    Q.   (BY MR. HAAG)  Please continue.

9    A.   The map that was contained on the Zillow website contains

10   an aerial photograph with the location of George W. Bush's

11   residence in Dallas.  This map had been highlighted with red

12   marks and indicating where Bush's home was, a cul-de-sac on

13   the street, and a location of a proposed gate.  The notations

14   here were not added to my exhibit for demonstrative purposes.

15   These are actually embedded on the photograph on that page in

16   relation to the news article.

17          MR. HAAG:  Okay.  Next slide, please.

18   Q.   (BY MR. HAAG)  And what is the next email that we see

19   here, the next slide?

20   A.   The next slide is Government's Exhibit No. 266.  It is an

21   email where the subject was "tyrant's house."  It was sent on

22   February the 5th at 8:55 p.m. from Abu-Zidan Al-Najdi to

23   Abu-Zidan Al-Najdi, and it contains the address 10141 Daria

24   Place in Dallas, Texas, which is the home of former President

25   George W. Bush.

1           MR. HAAG:  Next slide, please.

2           THE WITNESS:  And that is the end of that

3    presentation.

4    Q.   (BY MR. HAAG)  Thank you.

5         Let's now talk about Government's Exhibit No. 417 through

6    420.  Are you familiar with these exhibits?

7    A.   Yes, I am.

8    Q.   What are these exhibits?

9    A.   No. 417 is a microphone overhear from a microphone that

10   was installed in Mr. Aldawsari's apartment by the FBI.  This

11   audio was recorded on February the 18th of 2011.

12   Q.   And with regard to the remaining exhibits, are they all

13   synchronized transcripts with the microphone audio overhears?

14   A.   Yes, they are.

15   Q.   And do these exhibits fairly and accurately reflect the

16   information that has already been admitted limited into

17   evidence as Government's Exhibit No. 282 and 283, 284, 285,

18   290, and 291 and 292 and 293?

19   A.   Yes, sir, they do.

20          MR. HAAG:  Your Honor, at this time move to admit

21   Government's Exhibit No. 417 through 420.

22          MR. DOYLE:  No objection, Your Honor.

23          THE COURT:  Without objection.

24          MR. HAAG:  Now, the jury has already heard a couple

25   of those so we are just going to play the two that the jury

1    hasn't heard.  Let's first play Government's Exhibit No. 417,

2    please.

3              (Whereupon, Government's Exhibit No. 417 was played

4              in open court.)

5              MR. HAAG:  Let's go ahead and now play Government's

6    Exhibit No. 418, please.

7    Q.   (BY MR. HAAG)  Is this going to be from the day before

8    Mr. Aldawsari's arrest?

9    A.   Yes, it is.

10             (Whereupon, Government's Exhibit No. 418 was played

11             in open court.)

12             MR. HAAG:  Pass the witness, Your Honor.

13             THE COURT:  Your witness.

14                         CROSS EXAMINATION

15   By Mr. Doyle:

16   Q.   Good afternoon, Mr. Parker.

17   A.   Good afternoon.

18   Q.   First of all, what we just heard, that was a microphone

19   in Mr. Aldawsari's kitchen.

20   A.   Yes, sir.

21   Q.   And we could hear him moving around.  We could hear

22   pretty clearly.

23   A.   Yes, sir.

24   Q.   If he were to be cooking something in there or doing

25   something in there, you would hear him banging around.

1    Correct?

2    A.    I would assume that might be correct, yes, sir.

3    Q.    And, you know, you show the Texas/OU game, Cotton Bowl.

4    That search was done in April of 2010.  Correct?

5    A.    Yes, sir.

6    Q.    April of 2010.  The game, my understanding, was October

7    8th, 2010.  Correct?

8    A.    Yes, sir.

9    Q.    And he never bought a ticket.  Correct?

10   A.    I don't know that, sir.

11   Q.    You don't see any searches or purchases of tickets.

12   Correct?

13   A.    Not online, no, sir.

14   Q.    And you were in here.  The forensic accountant went

15   through all of his Visa statements, and she agreed with me

16   that all of his purchases were done on his credit card.

17   Correct?

18   A.    I don't know about that, sir.

19   Q.    You were in here listening to the testimony.  Right?

20   A.    Yes, sir, I was, but I can't speculate as to every

21   purchase being done with a debit card.

22   Q.    Okay.  Well, you didn't see any purchases on his debit

23   card, did you?

24   A.    No, sir.

25   Q.    You didn't hear any testimony to that.

1          He didn't go to Dallas during the time of the game.

2     Correct?

3     A.   Not to my knowledge, sir.

4     Q.   In fact, nothing happened at the game.  Correct?

5     A.   I don't know.

6     Q.   Well, there wasn't any bomb detonated at the Texas/OU

7     game, was there?

8     A.   No.

9     Q.   And along those lines, you have no evidence that he ever

10    had phenol.  Is that correct?

11    A.   No, sir, I do not.

12    Q.   You have no evidence that he detonated a weapon of mass

13    destruction or attempted to detonate a weapon of mass

14    destruction.  Is that correct?

15    A.   No.  That is correct.

16    Q.   You have no evidence that he settled on a target.

17    Correct?

18    A.   No, sir.  I can't speculate as to what he had settled on.

19    Q.   You have no evidence that he had any previous experiences

20    with a weapon of mass destruction.  Correct?

21    A.   No, sir.

22    Q.   The words that we just heard, the recordings are

23    incredibly offensive.  Correct?

24    A.   Yes, they are.

25    Q.   But words are different than actions.  Would you agree

1    with me?

2    A.    In some circumstances, yes.

3    Q.    We convict people in the United States on actions and not

4    words.  Correct?

5    A.    Yes, sir.

6           MR. DOYLE:  No further questions.

7                      REDIRECT EXAMINATION

8    By Mr. Haag:

9    Q.    Following up on Mr. Doyle's last point, do words provide

10   any context as far as the direction of an action?

11   A.    Yes.

12          MR. HAAG:  No further questions, Your Honor.

13          THE COURT:  You may step down.  Thank you, sir.

14      Call your next witness.

15          MR. HAAG:  Your Honor, the United States of America

16   rests.

17          THE COURT:  All right.  The Government having

18   rested, let's take a short break, ladies and gentlemen.  All

19   rise for the jury.

20          (Whereupon, the jury left the courtroom.)

21          THE COURT:  Okay.  You may be seated.

22      With the Government done, the Defense motion for judgment

23   under Rule 29 is denied.

24          MR. COGDELL:  Sir?

25          THE COURT:  It is denied.

1           MR. COGDELL:  I haven't made it yet.

2           THE COURT:  I am doing it for you.

3           MR. COGDELL:  I don't have to be the Amazing Kreskin

4    to understand where the Court is going.

5        For purposes of the record, Your Honor, we misspoke.  It

6    is Rule 615 that concerns the exclusion of witnesses.

7    Mr. Haag indicated that 702 applies for an automatic exclusion

8    of experts.  It does not, in my opinion.

9           THE COURT:  If error there was, it was harmless.  He

10   was a summary witness.

11          MR. COGDELL:  Fair enough.  I am just trying to make

12   my record.

13          THE COURT:  I understand.

14          MR. COGDELL:  Now I will move for the previously

15   denied Rule 29.

16          THE COURT:  All right.  It is still denied.

17       Now, are you going to put on any evidence?

18          MR. COGDELL:  No, sir.

19          THE COURT:  All right.  I need to ask

20   Mr. Aldawsari --

21          MR. COGDELL:  Could I have a couple of minutes

22   before the Court makes that inquiry, Your Honor?

23          THE COURT:  Okay.

24          MR. COGDELL:  It has been presented all along, but I

25   would like to do it myself.

```
 1              THE COURT:  Go ahead.  Do you want to take about a
 2   ten-minute recess?
 3              MR. COGDELL:  Sure.  That would be great.
 4              THE COURT:  Ten-minute recess.
 5                          (Brief recess.)
 6              THE COURT:  You may be seated.
 7         Ready for me to talk to your client now?
 8              MR. COGDELL:  Yes, sir.
 9              THE COURT:  Mr. Aldawsari, you have -- Your lawyer
10   tells me that you have elected not the testify, which is your
11   right.  You also have a right to testify, should you choose to
12   do so.  And I want to know whether you have decided that you
13   will not testify.
14              THE DEFENDANT:  No, I am not going to testify, sir.
15              THE COURT:  Okay.  And you understand you can if you
16   want to?
17              THE DEFENDANT:  Yes, I understand.
18              THE COURT:  Okay.  Thank you, sir.
19              THE DEFENDANT:  Thank you.
20              THE COURT:  All sides having rested --
21              MR. COGDELL:  Actually we haven't rested in the
22   presence of the jury yet, but we will, obviously.
23              THE COURT:  Okay.  And then I am going to let them
24   go.  That will be fine.
25              MR. COGDELL:  Yes, sir.
```

1          (Whereupon, the jury entered the courtroom.)

2          THE COURT:  All right.  You may be seated.

3      Mr. Cogdell?

4          MR. COGDELL:  Yes, sir.  Mr. Aldawsari, Your Honor,

5  stands on the presumption of innocence and rests.

6          THE COURT:  All right.  All sides having rested,

7  ladies and gentlemen, I am going to ask you to go home.  Put

8  this out of your mind until tomorrow morning at 9:00.  At 9:00

9  we will begin with closing arguments, and then I will instruct

10  you and then you can begin your deliberations.  But please

11  don't discuss the case, not even with your nearest and

12  dearest, and please all be here in the morning at 9:00.  Thank

13  you very much.

14          (Whereupon, the jury left the courtroom.)

15          THE COURT:  You may all be seated.

16      Anybody wants to leave can leave right now.  I just need

17  to talk to the lawyers for a while.

18      The first question that I have for everybody is, do we

19  have a list of the admitted exhibits?

20          MR. HAAG:  Yes, Your Honor, we do.

21          THE COURT:  And I will tell you why.  My thought is

22  that I will give that to the jury so that if they want to ask

23  for a particular exhibit, we can send it in.  Otherwise, I

24  will try to send them all in.

25          MR. COGDELL:  I agree with the Court's process--that

1   is to reserve unless they ask for it.  My only problem is some

2   of these exhibit descriptions are a little bit hot, shall we

3   say.

4           THE COURT:  Well, you know what?  I suspect that

5   they have taken such good notes that they can probably tell us

6   at least what the exhibit does, if not the exact number, so we

7   will pass that.

8       Okay.  Are we ready to do the jury instructions, the jury

9   conference?

10          MR. COGDELL:  I believe so.

11          MR. HAAG:  Yes.

12      Yes, Your Honor and Mr. Matt Kacsmaryk with our office

13   will be doing that.

14          THE COURT:  Again, this is boring.  If anybody wants

15   to leave they can go ahead and leave.

16      And is there any reason why Mr. Aldawsari can't leave

17   now?

18          MR. COGDELL:  No, sir.

19          THE COURT:  Okay.  The Marshals can take

20   Mr. Aldawsari out.

21          MR. COGDELL:  We certainly waive his presence during

22   the talking about the jury instructions.

23          THE COURT:  All right.  Appreciate that.

24      Is there a problem with the first page?

25          MR. COGDELL:  No, sir.

1              THE COURT:  Second page?

2              MR. KACSMARYK:  No, Your Honor.

3              THE COURT:  Third page?

4         Fourth page?

5              MR. COGDELL:  No, sir.

6              THE COURT:  Fifth page?

7         Sixth page?

8              MR. COGDELL:  Yes, sir.

9              THE COURT:  All right.

10             MR. KACSMARYK:  Yes, Your Honor.

11             THE COURT:  Tell me your objection, Mr. Cogdell.

12             MR. COGDELL:  My objection is on the middle of the I

13   guess second full paragraph beginning with the words "On the

14   other hand, some preparations" through the culmination of the

15   finish of that sentence.  Could I use this, Your Honor?

16             THE COURT:  Yes; certainly.

17        You are objecting to "On the other hand" through "the

18   crime"?

19             MR. COGDELL:  Yes, sir.  "On the other hand" -- For

20   purposes of the record, "On the other hand, some preparations

21   when taken together with intent" --

22             THE COURT:  I guess we don't need this taken down,

23   do we?

24             MR. COGDELL:  I don't need it.  I need the rulings

25   down, but I don't need --

```
 1              MR. KACSMARYK:  Your Honor, I would prefer it be

 2    done on the record.

 3              THE COURT:  A little more slowly, please.

 4              MR. COGDELL:  I am objecting to the inclusion of the

 5    language on I guess what is the latest copy of the jury

 6    instructions on page 6.

 7              THE COURT:  Right.

 8              MR. COGDELL:  I object to the following language.

 9    "On the other hand, some preparations, when taken together

10    with intent may amount to an attempt.  The question for you to

11    decide is whether the acts of the Defendant you are

12    considering clearly indicate a willful intent to commit the

13    crime and whether those acts are a substantial step and a

14    course of conduct planned to culminate in the commission of

15    the crime."  I do not believe that is a correct statement of

16    the law.  It is my understanding --

17              THE COURT:  I am looking at the U.S. versus Redd

18    case.

19              MR. COGDELL:  Is that the district court opinion

20    from my friend Judge Smith?

21              THE COURT:  No.  That is 355 F.3d, 866.  I suppose

22    it is Walter's.  It is not?  It is not -- Because that hasn't

23    been appealed yet, has it?

24              MR. COGDELL:  It has not, at least from my

25    understanding.
```

1        THE COURT:  This is a Fifth Circuit case, and the

2   challenge portion of the instructions in that case -- This is

3   the *Redd* case instruction.

4        MR. COGDELL:  Could I have Mr. Hester address it,

5   Your Honor?

6        THE COURT:  Just a second.  Okay.  Tell me what your

7   objection -- Do you have an objection?  Does the Government

8   have an objection to this?

9        MR. KACSMARYK:  No, Your Honor.  I think that is an

10   accurate reflection of the cases stated in the pattern and the

11   notes to the pattern.  I think specifically this --

12        THE COURT:  Okay.  So you have no objection?

13        MR. KACSMARYK:  No objection.  I think it is a good

14   overview of *Mandujano*, in fact.

15        THE COURT:  Have a seat.

16      Mr. Hester, tell me what the problem is.  It seems to me

17   that that is the language that has been used over and over

18   again, including by Judge Smith.

19        MR. HESTER:  Well, Your Honor, I think we will run

20   the risk of confusing the jury because in the sentence before

21   we say, "Mere preparation is not an attempt."  Then in the

22   very next sentence --

23        THE COURT:  I say, "Mere preparation without more is

24   not an attempt."

25        MR. HESTER:  Correct.  And then the next sentence we

1    are saying, "Some preparations, when taken together with

2    intent, may amount to an attempt."  So I think we are just

3    swinging back and forth between whether preparation is an

4    attempt, and I think under the law preparation can't be an

5    attempt, mere preparation.

6                MR. COGDELL:  Intent can't be preparation.

7                MR. HESTER:  And furthermore, Judge, I think if we

8    look at the jury instruction that was upheld in *Mandujano*, it

9    says, "Mere preparation, which may consist of planning the

10   offense, or devising, obtaining, or arranging a means for its

11   commission, is not sufficient to constitute an attempt."  We

12   would request similar language, or that language exactly.

13               THE COURT:  No.  I think I am right, and I think

14   that the sentence that you complain about is a -- well, two

15   sentences, is a fair distillation of where we are with this

16   particular case.  Your objection is noted.

17          Is there anything else on page 6?

18               MR. COGDELL:  No, sir, not on page 6.

19               THE COURT:  Anybody got a problem with page 7?

20               MR. KACSMARYK:  Your Honor, I am sorry.  The

21   Government does have a problem with the interruption

22   instruction that follows immediately thereafter.

23   Specifically, the line that reads, "In other words, liability

24   for attempt attaches if the Defendant's actions have preceded

25   to the point where, if not interrupted, would culminate in the

 1    commission of the underlying crime."  We just filed a reply

 2    trial brief restating our objection to that language.

 3              THE COURT:  And it is directly taken from *U.S. v.*

 4    *Polk*, 18 F.3d, 286.

 5              MR. KACSMARYK:  As argued in  the Government's

 6    papers, *Polk* is a misstatement of Fifth Circuit law.  It pulls

 7    from a pattern jury instruction that was given before the

 8    *Mandujano* ruling, and necessarily can't apply the law moving

 9    forward.  And so that particular instruction was upheld on a

10    sufficiency challenge on a very -- under a very favorable

11    standard of review.  It has only appeared in the *Polk* opinion

12    and later again in the *Caldwell* opinion.  It has never been

13    affirmed in a case deciding the appropriate jury charge

14    language generally, and for WMD case specifically.

15         Our recent reply brief also points out that this

16    interruption language, while common in the Ninth Circuit,

17    represents an outlier, suggesting an urgency or an immediacy

18    that is not required in the Fifth Circuit or a majority of

19    circuits that have drafted opinions on this.

20              MR. HESTER:  And, Your Honor, if I could respond

21    briefly?

22              THE COURT:  Actually I am responding in my head for

23    you.

24              MR. HESTER:  Okay.

25              THE COURT:  No.  The Court feels that its

```
 1    instruction beginning at the first complete paragraph on page

 2    6, "To find that the Defendant attempted," all the way down to

 3    the lines that you object to ending with "...underlying

 4    crime," is a fair instruction to the jury and that they should

 5    consider in this particular case, so the Government's

 6    objection is overruled.

 7        Anything else on page 6?

 8            MR. COGDELL:  No, sir.

 9            MR. KACSMARYK:  No, sir.

10            THE COURT:  How about page 7?

11            MR. COGDELL:  Shockingly, we agree with one on page

12    7, Your Honor.

13            THE COURT:  What's that?

14            MR. COGDELL:  That is the second paragraph, the

15    first sentence, "The fact" --

16            THE COURT:  You both want it out?

17            MR. COGDELL:  Yes, sir.

18            MR. KACSMARYK:  Yes, Your Honor.

19            THE COURT:  It is out.

20        All right.  Anything else on page 7?

21            MR. COGDELL:  No, sir.

22            THE COURT:  Page 8?

23            MR. COGDELL:  I don't believe so.

24            THE COURT:  Page 9?

25            MR. COGDELL:  No, sir.
```

1           THE COURT:  You have the jury instructions.

2       Okay.  How long --

3           MR. JACKS:  Your Honor, do we need an instruction on

4       stipulation as far as telling them what --

5           THE COURT:  I think I have told them that twice now,

6       that I can recall.  I don't think so.

7           MR. JACKS:  Okay.

8           MR. COGDELL:  Given the nature of these

9       stipulations, they are pretty benign.

10          THE COURT:  All right.  How long does the Government

11      want, and you can do it two thirds/one third, or you can do it

12      all at once, but you can't reserve more than one third of your

13      time.  So tell me, Mr. Haag, how much time do you think is

14      proper for the Government for closing arguments?

15          MR. HAAG:  Your Honor, we would ask for an hour.  We

16      probably will end up giving a portion of that at least back,

17      but we would ask for an hour just to err on the side of

18      caution.

19          THE COURT:  Is an hour sufficient for you,

20      Mr. Cogdell.

21          MR. COGDELL:  I think it is too much.  I think 45

22      minutes is fine.

23          THE COURT:  I am going to give each of you an hour.

24      Use it or lose it.

25       Mr. Haag, you cannot reserve more than 20 minutes.  Okay?

```
 1              MR. HAAG:  Thank you Your Honor.

 2              MR. COGDELL:  So in other words, just so I am

 3    understanding the Court's math--it is obviously I am not the

 4    sharpest tool of the shed--they have to open with at least 40

 5    minutes.

 6              THE COURT:  They can go past it but they are eating

 7    into their time.

 8         Now, I want to tell you both, I am not very good at this,

 9    but if you want some sort of warning that your time is about

10    to expire, I will try to remember to give it to you.  Do you

11    want any, Mr. Haag?

12              MR. HAAG:  No, thank you, Your Honor.

13              THE COURT:  Mr. Cogdell?

14              MR. COGDELL:  No, sir.

15              THE COURT:  Is there anything else we need to

16    discuss?

17              MR. COGDELL:  I can't think of anything today, Your

18    Honor.

19              MR. HAAG:  No, sir, Your Honor.

20              THE COURT:  Let's see what time it is, but my

21    present inclination -- What time it is tomorrow, my present

22    inclination would be after closing arguments go immediately

23    instruct them.  And Elodia, can we have lunch ordered for the

24    jury?

25              THE CLERK:  Yes, sir, I am sure we can arrange that.
```

1    I will double check that.

2              THE COURT:  So I would like to have lunch waiting

3    for them about 12:30.

4              MR. COGDELL:  That is fine.

5         What is the Court's practice in terms of a written

6    charge?  Do you give one?  Do you give 12?

7              THE COURT:  I am sorry.

8              MR. COGDELL:  How many jury charges do you give;

9    just one.

10             THE COURT:  No, I am going to give everybody a copy.

11             MR. COGDELL:  Twelve.

12             THE COURT:  And then we will keep our two alternates

13   out, and I will instruct them they are not to discuss the case

14   because it could be that somebody could get sick during and we

15   would bring them back in.

16             MR. COGDELL:  Yes, sir.

17             THE COURT:  Okay.  Anything else I should know or

18   guess at?

19             MR. HAAG:  No, thank you, Your Honor.

20             THE COURT:  This has been -- I love to watch good

21   lawyers work, and you all have been really, really good.

22             MR. HAAG:  Thank you, Your Honor.

23             MR. COGDELL:  Thank you.

24             (The proceedings were concluded at 4:30 p  m.)

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              07/25/2012

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25