1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
2              LUBBOCK DIVISION

3    UNITED STATES OF AMERICA      )  CAUSE NO. 5:11-CR-015
                                   (
4    vs.                           )
                                   (  JUNE 27, 2012
5                                  )  AMARILLO, TEXAS
     KHALID ALI-M ALDAWSARI        (  9:00 A.M.
6    _____

7

8                       VOLUME 5 OF 5

9    _____

10                    TRIAL ON THE MERITS

11

12          BEFORE THE HONORABLE DONALD E. WALTER
                 UNITED STATES DISTRICT JUDGE
13                      and a jury
     _____

14

15

16

17

18

19

20

21

22          SHAWN M. McROBERTS, RMR, CRR
           1100 COMMERCE STREET, RM. 1654
23             DALLAS, TEXAS  75242
                 (214) 753-2349

24

25

A P P E A R A N C E S

FOR THE GOVERNMENT:    UNITED STATES ATTORNEY'S OFFICE
                       1205 TEXAS AVENUE, 7TH FLOOR
                       LUBBOCK, TEXAS  79401
                       (806) 472-7351
                       BY:  MR. JEFFREY HAAG
                            MS. DENISE WILLIAMS
                            MR. MATTHEW KACSMARYK

                       UNITED STATES ATTORNEY'S OFFICE
                       1100 COMMERCE STREET, 3RD FLOOR
                       Dallas, TEXAS  75242
                       (214) 659-8725
                       BY:  MR. JAMES JACKS

                       U.S. DEPARTMENT OF JUSTICE
                       NATIONAL SECURITY DIVISION
                       950 PENNSYLVANIA AVENUE, NW
                       ROOM 1538
                       WASHINGTON, DC 20530
                       (202) 514-7259
                       BY:  MR. DAVID CORA

FOR THE DEFENDANT:     COGDELL LAW FIRM, PLLC
                       1401 McKINNEY STREET
                       SUITE 1625
                       HOUSTON, TEXAS  77010
                       (713) 426-2244
                       BY:  MR. DAN COGDELL
                            MR. J. DAVID HESTER

                       PAUL DOYLE & ASSOCIATES
                       600 TRAVIS, SUITE 4700
                       Houston, TEXAS  77002
                       (713) 228-9200
                       BY:  MR. PAUL DOYLE

OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                            1100 COMMERCE STREET, RM. 1654
                            DALLAS, TEXAS  75242
                            (214) 753-2349

## INDEX

**Closing Arguments**                                                           **Page**
MR. HAAG                                                                        4
MR. COGDELL                                                                     17
MR. DOYLE                                                                       29
MR. COGDELL                                                                     34
MS. WILLIAMS                                                                    42

**Charge Read**                                                                 **Page**
                                                                                53

**Verdict**                                                                     **Page**
                                                                                69

```
1              THE COURT:  Good morning.  Are we all set to go?

2              MR. HAAG:  Yes, Your Honor.

3              THE COURT:  Anything before we bring the jury in?

4              MR. HAAG:  No, Your Honor.

5              THE COURT:  Bring them in, please.

6              (Whereupon, the jury entered the courtroom.)

7              THE COURT:  You may be seated.
```

8      Good morning ladies and gentlemen.  Thank you again for

9  being so prompt.  I appreciate it.

10      We are going to start with the closing arguments now.  By

11  the Government, Mr. Haag?

12              MR. HAAG:  Thank you, Your Honor.

13      May it please the Court, counsel.

14      In just a moment the Court is going to give you your

15  instructions, and they are going to talk to you about the

16  elements of the crime in this case.  They are going to give

17  you two elements--the first element, that the Defendant

18  knowingly attempted to use a weapon of mass destruction; the

19  second element, that the Defendant knowingly attempted to use

20  a weapon of mass destruction, and knowingly did so against a

21  person or property within the United States, and that the mail

22  or any facility of interstate commerce was used in furtherance

23  of the offense, or the offense, or the result of the offense,

24  if it had succeeded, would have affected interstate commerce.

25      We believe the Court will go on to instruct you as to

```
 1    what an attempt is.  We believe the Court is going to instruct
 2    you that to find that the Defendant attempted to use a weapon
 3    of mass destruction, you must find beyond a reasonable doubt
 4    that the Defendant both intended to commit the offense and did
 5    an act constituting a substantial step towards the commission
 6    of that crime which strongly corroborates the Defendant's
 7    criminal intent and amounts to more than mere preparation.
 8         Before we talk in depth about attempt or substantial
 9    steps, let's talk about a few things that this case is not
10    about.  This case is not about whether Mr. Aldawsari was a
11    failure in his relationships or a failure academically.  From
12    the evidence you can see that he was not a failure
13    academically.  From the evidence you can see out of 130,000
14    people that graduated from high school the year Mr. Aldawsari
15    did, 5,000 were eligible for the SABIC scholarship.  And of
16    those 5,000 students, only 100 got a SABIC scholarship.
17    Mr. Aldawsari was one of those.  If anything he was
18    academically gifted.
19         But at the time frame of these events, strong and
20    resounding jihadist operations were on his mind.  He was
21    focused on one thing and one thing only, and that was
22    detonating a weapon of mass destruction in the United States.
23    And so academics at that point became completely unimportant
24    to him.
25         Similarly, relationships.  He may have talked over the
```

1    web with other persons who encouraged him, who motivated him,

2    who strengthened his desire for jihad, but beyond that

3    Mr. Aldawsari had no need for relationships.

4        This case is not about whether Mr. Aldawsari could have

5    hidden his crime better.  This case is not about whether the

6    mail or any facility of interstate commerce was used in

7    furtherance of the offense or whether the offense, if it had

8    succeeded, would have affected interstate commerce.  You have

9    heard stipulations about the effect on interstate commerce and

10   you have seen tons of evidence with regard to Mr. Aldawsari's

11   use of the email, his use of the computer, his use of the

12   internet, his use of FedEx, his use of Con-Way.

13       This case is also not really, or at least not factually,

14   about whether Mr. Aldawsari intended to use a weapon of mass

15   destruction or whether he intended to do so against a person

16   or property of the United States.  The evidence on that is

17   very, very clear.  You know beyond any doubt exactly what his

18   intent was, and so factually that part of it is not relevant.

19   But it is relevant with regard to one thing--substantial step;

20   as Mr. Cogdell pointed out in his opening--the heart of the

21   case.

22       We believe the Court will instruct you that mere

23   preparation, without more, is not an attempt.  On the other

24   hand, some preparations--and this is the key phrase here--when

25   taken together with intent, may amount to an attempt.  The

1    question for you to decide is whether the acts of the

2    Defendant you are considering clearly indicate a willful

3    intent to commit the crime, and whether those acts are a

4    substantial step in a course of conduct planned to culminate

5    or end in the commission of the crime.

6        Before we talk about the substantial steps in this case,

7    let's talk about a few observations on what substantial step

8    is.

9        First observation, each step that you have seen during

10   the course of this trial is composed of several other steps,

11   and let me give you an example.

12       If we can go to Government's Exhibit No. 305, please.

13   Thank you, Ms. Christensen.

14       Let's take as an example the nitric acid order.  It is

15   not just a matter of going out and wishing for nitric acid to

16   appear.  There has to be steps done to acquire that product.

17   It requires downloading the video.  It requires watching the

18   video.  It requires taking notes.  It requires Google queries

19   as to where to buy nitric acid.  It requires clicking on the

20   Boiler and Water Cooling website and looking at the

21   information on nitric acid.

22       Scroll down, please.

23       It requires making the purchase, spending money to buy

24   the product.  It requires the use of emails; that when

25   Mr. Zajac emails Mr. Aldawsari and says, "I can't ship to a

1  residence, I need an updated address," it requires doing a

2  query on Google maps and finding a place where he can have the

3  nitric acid shipped.

4      Next page please.

5      It requires telephone calls and emails to Mr. Zajac.  It

6  requires calls to Con-Way Freight to coordinate for the

7  pick-up of the nitric acid.  It requires getting in the car.

8  It requires driving to Con-Way Freight.  It requires picking

9  the nitric acid up.

10     So as you hear and as we talk about these substantial

11 steps, understand it is just not one step.  There are several

12 steps that you have to take in order to even get to that step.

13     Next slide, please.

14     Another observation.  The time frame of Mr. Aldawsari's

15 plan.  If you look at Government's Exhibit No. 123, page 28,

16 it is a three-page entry where Mr. Aldawsari sets forth the

17 reasons for why he is doing what he is doing.  And he lays it

18 all out there in the journal.  He tells you that when he was

19 about ten years old he saw a movie about the Palestinian cause

20 and he tells you the joy and the happiness that he experienced

21 at 9/11 when he was 11 years old.  And he tells you that as he

22 researched, as he listened to the teachings of Osama bin

23 Laden, of Ayman Al-Zawahiri, and he came to understand the

24 truth of what the jihadists were saying, that is when he

25 decided what he was going to do.  That is when he decided that

1     he was going to study, to come to this country, and to commit

2     jihad here in America.

3         And he tells you he studied diligently in high school in

4     order to earn that SABIC scholarship.  And he tells you when

5     he had the choice between the SABIC scholarship and the Aramco

6     scholarship, he chose the SABIC scholarship for two reasons.

7     No. 1, SABIC sends its students directly to the United States

8     of America.  No. 2, SABIC pays its students a higher monthly

9     support or monthly stipend than Aramco did, and he can use

10    that money to further his jihadist operations here.

11        So when you look at the time frame, when you think about

12    these steps, it didn't just happen overnight.  It wasn't

13    something that was done on impulse.  This is something that

14    Mr. Aldawsari has been planning for a very, very long time.

15        This may be the most important slide you see.  Intent and

16    substantial step.  You cannot separate intent from substantial

17    step.  Let me say it again.  You cannot separate intent from

18    substantial step.  The Court is going to instruct you that the

19    law says you are looking for a substantial step that strongly

20    corroborates the Defendant's criminal intent, and that some

21    preparations, when taken together with intent, may amount to

22    an attempt.  The law tells you you have to consider them

23    together.  In other words, where is Mr. Aldawsari headed?

24    Where is Mr. Aldawsari going?  Because you have to know the

25    answer to that question before you can look at any of these

1    steps.

2        Let me give you an example of how it applies here.  When

3    you heard Mr. Whitaker testify about the Cole-Parmer purchase

4    of phenol, did you even ever think for a second that it was

5    for any other purpose but the building of a picric acid bomb?

6    Absolutely not.  Probably didn't even give it a second

7    thought.  You knew immediately because you had heard the

8    journals.  You had seen what Mr. Aldawsari had written.  You

9    knew exactly why he ordered phenol.  He ordered it for one

10   purpose and one purpose only--to make a picric acid bomb.

11       Let's talk about the substantial steps.  The first series

12   of substantial steps are the chemical orders.  Mr. Aldawsari

13   orders and obtains sulfuric acid from Amazon.  Mr. Aldawsari

14   orders and obtains nitric acid from QualiChem.  Mr. Aldawsari

15   places an order for phenol with Carolina Biological.  The

16   phenol makes its way all the way to Lubbock.  Thankfully

17   Con-Way Freight doesn't release that phenol to Mr. Aldawsari.

18   Undeterred, Mr. Aldawsari orders phenol again from

19   Cole-Parmer.

20       Another series of substantial steps--obtaining and

21   watching the videos.  Mr. Aldawsari downloads to his Lacie

22   thumb drive a series of videos.  These are going to be

23   reflected in Government's Exhibits No. 170 through 186.  And

24   these are going to be the videos that you saw with the masked

25   chemist who spoke in Arabic.  These videos are complete and

1   detailed instructions for how to make a bomb.  No other

2   purpose to them.  That is the only thing they do.

3       Mr. Aldawsari watches the videos.  You heard from Special

4   Agent Mike Morris, the computer forensic examiner, that Real

5   Media--that is the software that plays those videos--was run

6   198 times in the short time period between January 2011 and

7   when Mr. Aldawsari is arrested on February 23rd, 2011.  So

8   approximately a month and a half, almost two-month period, 198

9   times that Real Player is run.

10      How do you know what he is watching and how do you know

11  that the majority, if not all, of those 198 times is watching

12  those videos?  Because he writes them all down.  When you get

13  back to the jury room and you begin your deliberations, I

14  invite you to take a look at Government's Exhibit No. 51.

15  This is Mr. Aldawsari's blue Mead notebook.  There will also

16  be with it Government's No. 121, an English translation of

17  this notebook.  But as you look through here, there is over 50

18  pages, over 50 pages of nothing but notes, diagrams, and

19  instructions for how to make a bomb.

20      Another series of substantial steps--emailing himself the

21  instructions.  Mr. Aldawsari emails himself two sets of

22  instructions.  He emails himself instructions for making

23  picric acid in the traditional manner using nitric, sulfuric,

24  and phenol, and emails himself instructions for making picric

25  acid from aspirin.  He emails himself the orders of the

1    components, and he uses the email to converse with the people

2    that he orders the components and the tools needed to make the

3    bomb using the email.

4         Computer searches.  Special Agent Mike Morris and Captain

5    David Parker talked to you about his use of the computer.

6    They talked to you about the search that -- searches

7    Mr. Aldawsari did for picric acid.  They talk to you about the

8    numerous searches for phenol.  Special Agent Mike Morris

9    testified 134 times phenol came up in the Defendant's

10   searches.  And he walked you through all the different

11   websites that Mr. Aldawsari visited trying to obtain

12   phenol--Fusing, Grainger, QualiChem.

13        And finally, he researched targets.  And recall Captain

14   David Parker's testimony about what all that entailed.  Recall

15   that search where it comes up with Prime Minister Carrero

16   Blanco, the prime minister of Spain, and how he is

17   assassinated in 1973 with a bomb that is planted underneath

18   the street.  And what is the next search that Mr. Aldawsari

19   does?  How to excavate a street.  What is the next series of

20   searches that he does?  George W. Bush, the former president.

21        Finally he begins the fuse.  You heard Special Agent Mark

22   Whitworth talk about the disassembled alarm clocks.  He talked

23   to you about and he showed you the Christmas tree light that

24   was spliced to the speaker wire and talked about how those

25   components are used to make a weapon of mass destruction.

1          Tools and components.  If we can go to the chart, please.

2          Let's take a look at what all Mr. Aldawsari had.

3          I am sorry.  First, what is needed to make picric acid?

4   Sulfuric, nitric, phenol, heat source, thermometer.

5   Mr. Aldawsari had every one of them.  The only thing he didn't

6   have, not for lack of effort, was the phenol.  He had ordered

7   it twice but he did not yet acquired it.  Moving down,

8   container for the warm water bath and the cold water bath and

9   the filters.  He had it.

10         Next slide.

11         What was needed to make a fusing system and a detonator?

12  Small lightbulbs.  Mr. Aldawsari had Christmas tree lights.

13         Please go down.

14         Wire.  Mr. Aldawsari had it.  Alarm clocks.

15  Mr. Aldawsari had four of them.  All four were disassembled.

16  Multimeter.  Mr. Aldawsari had it.  Power source.  In the

17  video they use a nine volt battery.  He had not only a nine

18  bolt battery but other types of batteries as well.  Tube for a

19  detonator body.  Mr. Aldawsari had it.  The match heads, the

20  hydrogen peroxide, and the acetone.  He hadn't acquired it yet

21  but he writes about it.

22         Government's Exhibit No. 123, page 44.  He talks about

23  "The only other things I need to get--phenol, acetone," and he

24  calls it hydrogen.  I think from the context of the writing he

25  is referring to hydrogen peroxide.  Finally, strong acid.

1    Mr. Aldawsari had it.

2         Lab equipment, protective gear, needed scale.

3    Mr. Aldawsari had it.  Needed graduated beakers, and in his

4    notes he writes "Pyrex is the best brand."  Mr. Aldawsari had

5    them.  Flasks and stir rods.  Mr. Aldawsari had them.

6    Droppers.  Mr. Aldawsari had them.  Protective clothing.

7    Mr. Aldawsari had them.

8         If we can go back, please.

9         I am going to confess that for this next slide I borrowed

10   from Mr. Cogdell's opening.  You may recall the first slide

11   that he had in his opening was "prevented," and I believe this

12   best captures the essence of what you are going to hear the

13   Court instruct you with this next definition.  We believe the

14   Court is going to instruct you that, "In other words,

15   liability for attempt attaches if the Defendant's actions have

16   proceeded to the point where, if not interrupted, would

17   culminate in the commission of the underlying crime."

18        So let's take a look at just a smaller time frame.  Let's

19   just look at the 24 to 36 hours before Mr. Aldawsari is

20   arrested and let's see what is happening just in that short

21   span of time.

22        Let's first pull up Government's Exhibit No. 123,

23   page 58.

24        February 22nd, 2011, Mr. Aldawsari writes in his journal,

25   "I am, to God be the praise and gratitude, close to

1    manufacturing and producing the combustible picric acid,

2    whereas all that is left for me to do is to buy the pure

3    phenol substance, which I will buy today, with the help of God

4    and His will, His success, and His direction."

5         Go back to the slide, please.

6         Government's Exhibit No. 274, please.

7         February 23rd, 2011.

8         Scroll down, please.  Thank you.

9         Mr. Aldawsari places an order with Cole-Parmer for two

10   one-kilogram bottles of phenol.

11        Go back to the slide, please.

12        Government's Exhibit No. 419, please.  And before we play

13   it, let me set this up.

14        He has just ordered phenol from Cole-Parmer.  You will

15   recall what happened with the Carolina Biological order.  He

16   placed it.  It got sent to Con-Way, and Jay Gibson,

17   thankfully, said he wasn't going to release it and he told

18   Mr. Aldawsari he had shipped it back.  So for this next order,

19   he needs to make sure that it doesn't happen again, and what

20   you are going to hear in this overhear is him rehearsing for

21   what he is going to tell FedEx that next morning.

22        Go ahead and play that exhibit, please.

23             (Whereupon, Government's Exhibit No. 419 was played

24             in open court.)

25             MR. HAAG:  Go back to the slide, please.

1       The next exhibit you are going to hear is the morning of

2   his arrest and he is going to be praying.  I want you to

3   listen carefully to what he prays for the morning of his

4   arrest.

5       Please play Government's Exhibit No. 420.

6           (Whereupon, Government's Exhibit No. 420 was played

7           in open court.)

8       MR. HAAG:  "Provide us martyrdom.  Provide us

9   killing."

10      Finally, Exhibit No. 418.  Shortly before he is arrested,

11  and what you are going to hear here is Mr. Aldawsari

12  rehearsing what the media is going to be saying about him.

13  This is how the news media is going to report on what he is

14  about to do.

15      Please play No. 418.

16          (Whereupon, Government's Exhibit No. 418 was played

17          in open court.)

18      MR. HAAG:  Ladies and gentlemen, Mr. Aldawsari, he

19  tells you exactly how this all has to end for him.  He tells

20  you that he never, ever, would have stopped until he had

21  detonated a weapon of mass destruction on American soil.

22      The evidence, the evidence tells you he took a

23  substantial step towards accomplishing that goal.  I ask that

24  you please follow the law and that you please return a verdict

25  that the evidence compels you to return, and that is guilty.

1          Thank you.

2               THE COURT:  Thank you, sir.

3          Mr. Cogdell?

4               MR. COGDELL:  May I use the white paper?

5               THE COURT:  Yes, sir.

6               MR. COGDELL:  Good morning.  No, no, no.  Good

7    morning.

8          Hundreds of agents, thousands of man hours, time after

9    time the Government witnesses told you it was the biggest case

10   of their career, fancy exhibits, sophisticated PowerPoints,

11   24/7 surveillance, secret overhears, computer tapping the

12   likes of which most have never seen before.  But let me go old

13   school with you for a minute, because some of our grandmothers

14   told us if we don't know who, what, where, when, or how, we

15   don't know much.

16         All that evidence, all those witnesses, all those charts.

17   Who?  Who was the target?  You don't know.  You certainly

18   don't know beyond a reasonable doubt.

19         When?  When was it going to happen?  Soon.  One day.

20         Where?  Where was it going to happen?  And where was he

21   going to make the bomb?  Certainly couldn't have made it with

22   the FBI watching 24/7, 365.

23         How?  How was he going to make this weapon of mass

24   destruction without phenol?

25         And what was the method of the bombing going to be?  I

1    told you in the beginning that the Government was going to

2    show you horribly offensive videos.  They did.  I told you in

3    the beginning they were going to show you things that would

4    upset any of us.  They did.  I told you in the beginning that

5    the Government was going to show you journals and writings

6    that would offend you to their very -- your very core.

7        But really what the Government has done is not answered

8    these questions.  They have played the game of fear factor.

9    "Forget about answering the obvious questions.  Let's scare

10   them.  Let's show them time, after time, after time, after

11   time, things that never happened.  Let's give them

12   misinformation.  Let's not tell them about what happened.

13   Let's tell them about what could have happened.  If we scare

14   them enough, if we anger them enough, they will disregard the

15   law and they will convict."

16       A lawyer--and I will tell you who he is at the end of my

17   summation--far better than me--and you may remember him from

18   history when I give you the tickle--but a lawyer many, many

19   years ago said the following:  "Facts are stubborn things, and

20   whatever may be our wishes our inclinations or the dictates of

21   our passions, they cannot alter the state of the facts and the

22   evidence.  No matter what our passions, they cannot alter the

23   state and the facts of the evidence."

24       Let's look at the facts.  Let's look at the facts.  The

25   Government started off, and they did it again in their

1  closing, the alpha and the omega are not the facts but fear.

2  The very first witness from CBS, and with all due deference to

3  Mr. Haag -- And he is a fine -- he is a heck of a lawyer.

4  Okay?  So he has done a great job.  They have all done a great

5  job.  They are all decent, hard-working, great prosecutors.

6  But that doesn't change the facts.  So rather than hitting the

7  facts, he started off with this kind of dark and stormy night.

8  It was a snowy day on February 13th, or whatever that was, and

9  he talked about the phenol.  "The phenol was going to be

10  delivered, the phenol was going to be delivered, the phenol

11  was going to be delivered."

12      The phenol was never delivered.  How did they close the

13  very last piece of evidence they closed with?  Another fear

14  factor moment.  This overhear of Aldawsari that they played

15  again in final about this fake interview.

16      Now, let's go sideways for just a second.  We know that

17  it never happened.  Why do they keep hitting us with things

18  that they know didn't happen?

19      Let me go even further sideways.  Half the time he is

20  going to be the martyr; Mr. Aldawsari is going to be a martyr

21  in their theories.  He is going to blow himself up.  He is

22  going to achieve martyrdom.  And yet at the same time they are

23  playing this overhear to you over and over again where he is

24  being interviewed.  Which is it?  Is he a martyr or is he

25  going to be interviewed by Barbara Walters?  One more time, it

1    is fear factor, not fact factor.

2        The Judge tells you, or is going to tell you, whether or

3    not --

4        May I have the overview, Ms. Christensen?  Thank you,

5    ma'am.

6        I think that the Judge is going to tell you, in fact, I

7    think it is going to be on page 1.  A little tidbit of secret,

8    we have actually discussed this before you will take the

9    charge from the Judge.  And again, this is the last time WE

10   are going to throw this out, he has been a terrific judge and

11   handled this courtroom as good as you can handle it.  But more

12   importantly, what he is going to tell you is whether or not

13   you can be guided by fear.  No.  "It is your duty to base your

14   verdict solely upon the evidence without prejudice or

15   sympathy.  That was the promise you made and the oath that you

16   took before being accepted by the parties as jurors, and they

17   have the right to expect nothing less."

18       I looked at everyone of you in the eye in opening

19   statement and told you I was going to be asking you for a

20   verdict of not guilty.  I am not for a second going to suggest

21   to you it is an easy verdict.  It is not.  It is not an easy

22   verdict at all, but it is the right verdict if you base your

23   evidence on what the facts are and not what the passions are.

24   It is a verdict of not guilty.  It may offend you to your core

25   to see him get on a plane and go back to Saudi Arabia, and you

1    know exactly what is going to happen, but that is the verdict,

2    the law calls for.

3        We may not like him a bit.  He may disgust us.  He may

4    revile us to our core, but that isn't proof beyond a

5    reasonable doubt of the crime they charged him with, which is

6    attempted use of a weapon of mass destruction.

7        Who, when, where, how, and what.  Seriously.  They are

8    required to prove those elements to you.  The elements I am

9    going to get into in a minute, beyond a reasonable doubt, they

10   can't tell us the basics.  Forget Mr. Haag, or whomever is

11   going to close, and let them answer those questions.  They

12   can't do it because the evidence isn't there.  No matter how

13   many agents, no matter how many fancy charts, no matter how

14   many thousands of man hours.  We have a former U.S. Attorney

15   in the room, Jim Jacks, and he is a fine lawyer.  He was in

16   charge of stipulations in this case.  That gives you some idea

17   of how much horsepower is in this room to prosecute this case

18   and they can't answer those questions?

19       I am not asking you to like me.  I am not asking you

20   -- Stand up, Khalid.  I am not asking you to like him.  But

21   what I am asking you to do is follow the law.  Hate him to his

22   core, hate him to his dying day, but don't convict him when

23   they haven't proven the offense that they chose to bring

24   beyond a reasonable doubt.

25       Time and time again, it was misinformation and

1  misdirection.  I apologize.  I get a little wound up in final

2  argument.  And I hope you will excuse my passion for

3  commitment.  But time after time they brought you

4  misinformation.  They talked about what a fine student he

5  was--in high school.  They talked about his success in

6  chemistry, about the A that he got--not to mention the fact

7  that it was a swinging 1.6 grade point average that semester,

8  or something along those lines.  He neglected to tell you that

9  the reason he got an A was not because he was any good at it,

10  but because he had a lab partner who hated him because he

11  wasn't any good at it.

12      Time, after time, after time they talked about phenol.

13  He didn't get it.  He didn't receive it.

14      The speeding car?  It is almost comical.  Special Agent

15  Orndorff, bless his soul, has worked his fingers as hard as

16  you can work them, but on the one hand he is trying to tell us

17  that one of the reasons they had to arrest Mr. Aldawsari was

18  because he was in a speeding car.  Seriously?  They had a

19  transponder on his vehicle.  They had airplanes in the air.

20  They had devices that were watching his every move.  They had

21  100 agents that were in play in those days.  He lived alone in

22  the apartment with one way in and one way out.

23      Over, and over, and over, and over, and over we saw the

24  lab equipment.  Okay?  We saw pictures of the lab equipment.

25  Mr. Haag wants to talk to you about substantial step?  There

1    is a difference--and we will get into it--between mere

2    preparation, which is what this is, and a substantial step,

3    which would occur when he was mixing, arguably, the chemicals.

4    Look at this.  It has not been touched.  It has not been used.

5    It was in its original shipping container when the FBI got it.

6         Over and over again they don't tell you that he never got

7    the phenol.  We have got to bring that out on cross.  They

8    don't tell you that without the phenol you can't construct a

9    weapon of mass destruction.  We have to bring that on cross.

10   They don't tell you he never attempted to assemble a weapon of

11   mass destruction.  We have to bring that on cross.  They don't

12   tell you that there was no detonation that has ben assembled,

13   no specific target, and no date.  Why don't they tell you

14   those things?

15        Why don't they tell you -- Looking through here, why

16   don't they readily admit it has never been used.  I think it

17   was Agent Quigley.  Over and over, "Well, I can't confirm

18   whether it has been used or not.  I am just not sure whether

19   it has been used or not.  I just can't tell you for certain

20   whether it has or it hasn't."  Seriously?  If they weren't

21   playing to your prejudices and to your fears, why don't they

22   admit to you the obvious, and the obvious is as clear as this

23   liquid.

24        The obvious is that Mr. Aldawsari was planning.  Okay?

25   He was preparing.  There is a difference--and we will get into

1    it--between mere preparation and a substantial step.  One more

2    picture of mere planning.  Why didn't they tell you?  Why

3    didn't they admit to it?  Because, quite simply, they wanted a

4    guilty verdict.

5         It was a telling moment during the cross examination of

6    one of their witnesses when they talked about the Shahzad

7    case.  And if you want to know what an attempted use of a

8    weapon of mass destruction case looks like, I literally have a

9    picture.  That is a picture of what an attempted use of a

10   weapon of mass destruction looks like.

11        Let me move this out of the way.  Let me put this back,

12   Your Honor.

13             THE COURT:  Sure.

14             MR. COGDELL:  Sorry.

15        That, that is what an attempted weapon of a mass

16   destruction case looks like right there--a bomb in a car on

17   its way to be detonated.  In that case that the Government

18   introduced, we know who, when, where, how, and what.  That is

19   what an attempted use of a weapon of mass destruction looks

20   like.

21        Another exhibit from another picture from the

22   Government's exhibit showing where the bomb was, how it was

23   detonated and so forth.

24        In this case the Judge is going to tell us, I believe, he

25   will give you the definition of a weapon of mass destruction,

1    and a definition of a weapon of mass destruction is this:  "A

2    weapon of mass destruction includes a destructive device which

3    is any explosive, incendiary, or poison gas, and any

4    combination of parts for use into any destructive device, and

5    from which a destructive device may be readily assembled."

6    You don't need to take notes.  You will actually get a copy of

7    that charge.  "...any combination of parts intended for use

8    into any destructive device, and from which a destructive

9    device may be readily assembled."

10         Mr. Whitworth, the bomb fellow yesterday, I asked him

11   very few questions, but one of the questions that I asked him,

12   if you will follow the law, defeats their case.  Here is the

13   question that I asked Mr. Whitworth.  And it is this.  "So

14   would you agree with me that, at least from the items that you

15   are aware of that were recovered from Mr. Aldawsari's

16   apartment, there could not have been a destructive device that

17   could have been readily assembled from the combination of

18   parts recovered from his apartment?  You were missing one.

19   Correct?"

20         "Correct, sir."

21         "And the one that you are missing was phenol."

22         "Correct, sir."

23         One more time.  "...and from which a destructive device

24   may be readily assembled," and the answer is no such device

25   could have been readily assembled.

1        I told you on opening and I will tell you again, law

2    enforcement prevented this crime from happening.  They

3    literally stopped Mr. Aldawsari from committing this crime.  I

4    don't blame them.  You get to an analysis, and Special Agent

5    Orndorff admitted it, it is a very difficult time when you are

6    trying to guess what can happen and what might happen and what

7    might not happen.  But he also told you that the standard for

8    arresting someone is preponderance of the evidence.  Repeat

9    that again.  The standard, the legal standard for arresting

10   someone is preponderance of the evidence, or probable cause,

11   rather.  Probable cause.  That is several steps down from

12   proof beyond a reasonable doubt.

13       The Judge tells you what reasonable doubt is.  Reasonable

14   doubt a this.  No, reasonable doubt is not that.  Sorry.

15   Reasonable doubt is this.  "A reasonable doubt is based upon

16   reason and common sense after careful and impartial

17   consideration of all the evidence in the case.  Proof beyond a

18   reasonable doubt, therefore, is proof of such a convincing

19   character that you would be willing to rely and act upon it

20   without hesitation in the most important of your daily or most

21   important of your own affairs.  In the most important of your

22   own affairs."

23       Let's take a silly one.  Would you try to make

24   reservations at a restaurant if you didn't know where it was,

25   if you didn't know who the chef was, if you didn't know when

1    the hours were open, if you didn't know what they served, if

2    you didn't know what the ingredients were?  No.

3        If you were choosing an oncologist for your wife that may

4    have cancer and you didn't know anything about the credentials

5    of the oncologist, where he went to school, what his

6    experience was, whether or not he had ever performed any of

7    these surgeries before, how many of these surgeries he

8    performed before, what his skill set was, how often he

9    performed them, and the like, would you let your wife go under

10   the knife, gentlemen, of an oncologist like that?

11       Ladies, the other way.  If your husband was diagnosed

12   with a serious or terminal disease and that physician couldn't

13   answer the most basic questions about your husband's

14   condition, would that cause you to hesitate to act as to

15   whether or not to engage that position?  You bet it would.

16   You bet it would.

17       Why is this lawyer asking me about physicians or

18   restaurants or whatever?  Because that is what the definition

19   of reasonable doubt guides us to do.  Would it cause us to

20   hesitate to act in the most important of our own affairs?

21   Hesitate to act.  How can it not cause you to hesitate to act

22   in this case when they can't answer the most basic questions?

23       All the prejudice and all the venom and all the anger and

24   all the resentment and all the dislike and all of the distaste

25   and all of the disgust that we may have for those journals,

1    for those videos -- I don't need to see another masked person

2    talking in Arabic about how to make a bomb.  The fact is, he

3    never attempted to make the bomb.  He never constructed the

4    bomb.  He never set up the detonator and attached it to the

5    bomb.  You cannot attempt to use that which does not exist.

6         Go the other way.  If this was an attempted murder

7    prosecution and you didn't know who the victim was, when it

8    was supposed to happen, how it was supposed to happen, or

9    where it was supposed to happen, they would be laughed out of

10   court.  They would have never brought the charge.  It would

11   never have gotten to this point.

12        If it was an attempted rape case and they couldn't tell

13   you who the victim was, how it was supposed to happen, when it

14   was supposed to happen, they would be laughed out of court.

15        If it was an attempted narcotics distribution case,

16   didn't know what the narcotics were, what the distribution

17   network was, what the quantity and so forth, same answer.

18        But what has literally been happening day, after day,

19   after day and witness, after witness, after witness is the

20   Government is expecting you to substitute facts for prejudice;

21   to substitute facts for prejudice.  And frighteningly, that is

22   easy to do when there is so much prejudice, when there is so

23   much resistance.  But prejudice does not make up for the

24   absence of facts.

25        I am going to let Mr. Doyle talk to you about the

1    witnesses he covered, and then I am going to come back and

2    close about the witnesses that I covered.

3              MR. DOYLE:  I would like to follow up on what Dan is

4    telling you and that there is some tells in the way the

5    evidence has been presented to you which I suggest to you is

6    an admission by the Government that they do have a severe

7    problem in this case.

8         They chose to charge him with what they charged him with.

9    There is a penal code right there, pages and pages, but they

10   chose attempted use of a weapon of mass destruction.

11        Now, as a prosecutor your role is to provide the jury all

12   of the evidence; not parts of the evidence, but all of it.

13   And certainly if you don't have a factual problem with your

14   case, you show the jury the good, the bad, and the ugly.  You

15   don't try and lead the jury to believe one thing and then make

16   us bring it out on cross.

17        And an admission of a trivial matter, who cares how smart

18   he is.  Really?  He is charged with attempted use of a weapon

19   of mass destruction.  Why are they fighting about his grades?

20   What does that have to do with it?  I mean, if you think about

21   just the grade portion, they show us his Saudi transcript.

22   They show us this Vanderbilt like he was in Vanderbilt.  We

23   have to bring out, "Well, that was an English language

24   orientation."  Why didn't they tell you that?

25        So then what do I bring out?  I showed his entire report

1    card, because I can tell you one thing. We were not going to

2    be caught misleading this jury in this courtroom under these

3    facts because we don't have to. They have a fundamental flaw

4    with their case, so I showed you guys the whole report card.

5        They bring out the lab thing. Dan addressed this a

6    little bit. But then they don't call the lab partner. It

7    makes no sense. Why do they need to mislead you on just

8    trivial things like that if they don't have a fundamental

9    problem with their case? It doesn't make sense.

10       Why -- For example, let's talk about the fake phenol.

11   There is a lot of unanswered questions related to that. They

12   sent an agent up -- You heard from Tim Dallas. They sent an

13   agent up the next day. CBS basically shut down the company

14   and created the fake phenol. Right? They had it ready. And

15   he said, Agent Norris told them, "If I have to drive

16   overnight, I am going to get it to the lab."

17       And then what happened? What happened? And they act

18   like it is not an issue. Orndorff acted like it is not an

19   issue, but it doesn't make sense, because even after Aldawsari

20   cancelled his order, on the 15th they had Ms. Wirbelauer call

21   him again to see if she could get him to deliver that. But

22   they say, "We don't know anything about this."

23       What happened with the fake phenol? Why go through the

24   trouble of that? Why go through the trouble of that follow-up

25   phone call? It doesn't make sense. It doesn't add up.

1      And then when you listen to the charging decision and the

2   date and time in which they made that decision, it is

3   disingenuous.  A good friend of mine calls it sort of it -- he

4   calls them stretchers, where maybe you are not telling us

5   everything.  It doesn't make sense.  They say, "Well, we

6   didn't know what he was doing in his apartment," and they have

7   got the secret refrigerator, this refrigerator they don't know

8   about.  But what they don't show you -- I mean, think about

9   this.  This is basic.  We just saw the video of the overhead.

10  We know they had a video camera of his room.  Right?  We know

11  that was there.  Look.  That is where the refrigerator was.

12  If he was going to get something out of that refrigerator, and

13  they were truly and honestly concerned that there was

14  something in that refrigerator, which we know there wasn't,

15  they would have seen him take it out.  If they were truly and

16  honestly concerned that he was going to start making

17  something, they would have been able to see him starting

18  opening these boxes.

19      And that microphone in the kitchen is pretty darn good,

20  as if they wouldn't have seen it.  I mean, they are making

21  something up to try and cover up a severe and critical problem

22  they have in this case.

23      They put on the Immigration agent to show he had a visa

24  here.  Not sure what they were trying to insinuate to you all

25  with that.  Fear?  Then we have to bring out revoked.  If they

1    have got such a strong case, why do they have to throw so many

2    stretchers at you guys?  It doesn't add up.  We have owned and

3    eaten all the bad journals, but all the bad journals don't add

4    up to using it.

5         And, you know, let's go to the journals in terms of full

6    disclosure.  Okay?  To show you that they are not telling you

7    the whole story, he reads you in his opening an entry saying,

8    "Before I came here I was going to be a terrorist."  Now, this

9    is in Exhibit No. 131, page 62.  "America, wait.  I'm coming.

10   I will live in the U.S., I will study hard, I will create my

11   own PC game, I will study at MIT, I will marry an American

12   beautiful girl, live a good life in the U.S.  Wait, America.

13   I'm coming."  There is a lot of bad stuff, but, I mean, you

14   know, there is some other stuff, too, they didn't choose to

15   show you.

16        I will read you another one.  This is in No. 127-7 in his

17   journal before he came here.  "I will go to Miami for seven

18   days.  I will go to New York for seven days.  I will go to Las

19   Vegas for five days.  I will go to Tennessee.  I will buy a

20   Chrysler 300.  I will marry a beautiful American woman.  I

21   will get American nationality.  I will authorize a famous book

22   by English.  I will write great poems.  I will save $9,000

23   from my income.  I will be more attractive and charming.  I

24   will make my family visit here in America."

25        I mean, look.  Why aren't they giving you all the full

1    story?  They were three weeks into this investigation.  It

2    seems like the Roger Clemmons investigation took five years.

3    It doesn't make sense.  They knew what he had and he didn't

4    have.  Their reason for ending it when they did doesn't add

5    up.  This current administration and the FBI goes all the way

6    up to the top, to the President of the United States, makes

7    some decisions that just doesn't make sense.  This doesn't

8    make sense.

9         The targets.  Let's be fair.  The targets they talked

10   about, the two they focus on is Dallas and George W. Bush.

11   That is a little bit transparent in terms of fear for you all.

12   We know there is 20 others, and they don't even want to

13   acknowledge that he has said the same things about the Saudi

14   king and the Saudi royal family.

15        The risk of losing Khalid if he got out because of

16   speeding, let's think about that.  They said, "Well, maybe the

17   transponder won't work in a garage."  This is the FBI.  We

18   could go to Radio Shack and get a GPS monitor.  That is just

19   not sincere.  The risk of losing him?  Doesn't add up.  Why

20   lie?  If you got the facts, why?

21        Dan -- Their bomb expert gutted their case, that one

22   statement alone.  They know it is a problem.

23        Another example, they put in the forensic accountant.

24   She says there is $23,000 from an unknown source.  That is a

25   little bit misleading.  That is not fair.  So I got to get her

1    on the stand and say, "Well, wait.  That came from his

2    parents."

3         "Yeah, that is correct."

4         As if he is being funded.  They know that is not true.

5         In terms of fear, and I am going to turn it over to Dan

6    after this, but I want you to think about this, how they

7    finish the case in terms of transparency.  In my opinion, this

8    is a mission by them of a severe problem they have with their

9    case.  They put on a computer expert.  Okay?  Who has spent

10   thousands of hours creating charts and Google searches and

11   everything.  Charts and Google searches, that is not evidence

12   of attempted use of a weapon of mass destruction, No. 1.  But

13   if you recall, earlier in the trial they put on Agent Hughes,

14   who was the overhear expert.  Right?  But they didn't play the

15   overhears for you through her, and that was her job.  They put

16   the computer forensic guy on, who wouldn't admit the obvious

17   that Khalid didn't go to the Cotton Bowl, the game came and

18   went, he didn't purchase any tickets, he was sitting in here

19   just like you all, the same guy, but they use him to finish

20   their case to play the audio overhears and he is not the audio

21   overhear guy.  It is pure fear factor.  It is pure fear

22   factor.  And you don't have to play on fear if you have the

23   facts.

24             MR. COGDELL:  Let me kind of draw our attention to

25   what he is not charged with.

1    MR. HAAG:  Your Honor, I am going to object to that

2    line right there.  That is not an issue in this case.

3    MR. COGDELL:  It is argument, Your Honor.

4    THE COURT:  I think I will permit.  Go ahead, sir.

5    MR. COGDELL:  What he is not charged with is

6    attempted possession of a weapon of mass destruction.  If he

7    was charged with that, he might well be guilty.  He is not

8    charged with possession of a component material.  If he was

9    charged with that, he might well be guilty.  He is not even

10   charged with possession of dangerous or prohibited chemicals.

11   If he were charged with that, he is guilty.

12   What he is charged with is attempted use of a weapon of

13   mass destruction.  And in the weeds on substantial step--and I

14   want to go with you where Mr. Haag stopped--you must

15   distinguish between mere preparation and the actual doing of

16   the criminal deed.  The actual doing of the criminal deed.

17   Not buying the precursor chemicals, not buying a Bunsen

18   burner, not looking at these videos, not journal entries; the

19   actual doing of a criminal deed.  Mere preparation without

20   more is not an attempt.  Liability for attempt attaches if the

21   Defendant's actions would have proceeded to the point where,

22   if not interrupted, would culminate in the commission of the

23   underlying crime.

24   Let's go there.  Time after time we saw the match heads

25   being ground in the video.  Match heads ground in the video?

1   No.  Time after time in the video they talked about -- showed

2   him watching these videos where the chemicals were being mixed

3   together.  Chemicals becomes mixed together?  No.  Talked

4   about the Bunsen burner and how you might use a Bunsen burner

5   outside when you don't have a place to cook it inside?  That

6   look like it has been used?  No.

7        Instead, they go back again, and again, and again and

8   talk about W., talk about 43, bringing some search of

9   something that happened in ancient history, and go back to the

10  OU/Texas game.  Is it a coincidence that we keep hearing about

11  an act they know that didn't happen when one of our jurors,

12  and I am not going to point at you, and I am not the sharpest

13  knife in the drawer but occasionally I wake up, and I have

14  seen one of our jurors wear a burnt orange hat with the

15  Longhorns on it.  Do you think that is a coincidence that we

16  keep hearing about the OU/Texas game when they know it never

17  happened?  No.  No.  In a case with hundreds of agents and

18  thousands of man hours, you think that is a coincidence?  No.

19  That ain't a coincidence.  That is a cheap ploy to get you to

20  substitute judgment for passion; fact for rage.  That is

21  exactly what that is.

22       Special Agent Covey, why in the Good Lord's name couldn't

23  he just admit, "Mr. Cogdell, none of that stuff had been used

24  before"?  It is obvious that none of that stuff had been used

25  before.  I am sorry.  Not Covey.  He was candid about that.

1    Quigley.

2        You do have to wonder how in the world these hundreds of

3    agents with the overhears and the video recorders and all

4    that, how in the search of the house they missed handcuffs and

5    cell phones.  That is one for the ages.

6        Special Agent Morris, and I know, bless your hearts, you

7    are tired of my charts, I am tired of showing them to you, but

8    they are important because they are not about emotion, they

9    are not about passion, they are not about hyperbole; they are

10   about what he told us and what the facts are.  He had not

11   acquired the phenol.  There was no proof he acquired -- It is

12   a moving target now--blasting caps, aspirin, phenol.  You get

13   dizzy trying to follow the prosecutorial trail.  No proof he

14   acquired the acetone peroxide.  No proof that he had attempted

15   assembly.  No proof he tested.  No proof he selected a target.

16   No proof he selected a date--the who, the when, the where, the

17   how, and the why.

18       Special Agent Smitherman, same thing.  She was quite

19   candid.  No proof that he had acquired phenol, no proof of the

20   blasting caps, the acetone peroxide, any attempted assembly,

21   any testing, any target, or any date.

22       Special Agent Orndorff, he told you what his concerns

23   were.  Maybe the only case I will stand in front of a jury of

24   where they actually had less chance -- Let me stay away from

25   that and phrase it another way.

1      I told you about the probable cause and how that is a

2  smaller standard.

3      Here is where his concerns were.  Whether or not he had

4  phenol, whether or not he was working with others, whether or

5  not he had attempted to assemble a weapon of mass destruction,

6  whether or not he had made any attempts to detonate a weapon

7  of mass destruction.  I hope none of you all drank last night

8  because you will get dizzy with that.  Whether or not he had

9  identified a specific target, and whether or not he decided

10  upon a specific date.  Those are rational, reasonable, and

11  proper concerns.  Special Agent Orndorff told you he had those

12  concerns.

13      And on redirect what he also told you is that in a

14  post-9/11 world, the single biggest objective, the most

15  important objective of the FBI, is to prevent a terrorist act.

16  Okay?  Let's say that again.  The most important objective is

17  to prevent a terrorist act or a potential terrorist act.  They

18  did that.  They did exactly that.  They arrested him before he

19  committed this act.  In this kind of case as a citizen in this

20  country, can I unusually, given my job description say, "Yeah,

21  yeah, I am fine with that"?  While it is my job to uphold the

22  Constitution, that is the sort of thing would generally get my

23  blood boiling, not yours.  But in a case like this where the

24  potential is so large, I can understand why he did that.  I

25  can understand why he did that.

1       There is a difference between what he did and him

2   committing the act, because we know after the arrest, don't

3   we, that he hadn't acquired the phenol, that he hadn't been

4   working with others, that he hadn't attempted the assembly of

5   a weapon of mass destruction, that he hadn't attempted to

6   detonate the weapon of mass destruction, he hadn't selected a

7   date, and he hadn't settled on a target.

8       Did they have probable cause to arrest him?  You bet.

9   You bet they did.  Absolutely.  Is probable cause to arrest

10  the same thing as proof beyond a reasonable doubt that he

11  committed the offense charged?  Absolutely not.  And we know

12  that based upon Special Agent Orndorff's own testimony.  There

13  is the difference.  And once again, you need to go where the

14  law takes you and not where they want your emotions to blind

15  you.

16      Here is what we don't know.  Whether it would have ever

17  been made, who was the target, how it was going to happen,

18  when it was going to happen.  The deficiencies I talked about

19  in my opening I won't bother you with again, at least from a

20  display, but we know now that he had no experience with a

21  weapon of mass destruction, that he had no prior assembly of a

22  weapon of mass destruction, no known effort at assembling it,

23  and no assistance with anyone else.

24      Execution deficiencies?  You bet.  He had no place to

25  assemble it without detection, no methodology or place to

1    store it, and no known methodology of transportation.  Just

2    kind of glide over those issues when we are playing fear

3    factor.

4        Here is the punchline.  Without phenol he could not have

5    attempted to use a weapon of mass destruction.  Without the

6    construction of it he could not have attempted to use a weapon

7    of mass destruction.  Without the assembly, the detonation,

8    and so forth, he could not have attempted to use.  But in

9    terms of the phenol, it is kind of like you can't play for a

10   BCS championship unless you have a football.  You can't bake

11   bread unless you have yeast.  You can't make wine without

12   grapes.  You can't have a running engine without a crankshaft.

13   The phenol is the crankshaft.  The phenol is the grapes.  The

14   phenol is the yeast.  The phenol is the football.

15       That man I told you about--I gave you the quote early

16   on--was John Adams.  John Adams was the second president of

17   the United States and he was a lawyer that when he argued

18   don't substitute passion and prejudice for facts, he was

19   defending British soldiers who were on trial in the Boston

20   massacre.  He asked that jury to do what I am asking you to

21   do.  He asked that jury to set aside your passions and their

22   anger and to follow the law.  I am asking you -- And they did

23   that, if you may remember your history.  And I am asking you

24   to do exactly the same thing.

25       It ain't easy.  It ain't easy.  I know it's not easy.  I

1    know it's hard.  I know it's very hard.  But I'm asking you to

2    do it, least of all for him and most of all for you, because

3    it is your job to uphold the integrity of this system and to

4    follow the law, no matter how unpopular, no matter how

5    anxious, no matter how difficult that might be.

6        And in that process, I want each of you to deliberate,

7    and I want each of you to vote your own conscience and your

8    own verdict.  You have a duty to deliberate.  You do not have

9    a duty to capitulate.  It is your obligation to follow the law

10   to your satisfaction.  They have to prove it to you beyond a

11   reasonable doubt individually and collectively.  It is not a

12   majority wins.  It is not "It's 3:30 and I want a cup of

13   coffee," or "It is 5:00 and I'm tired."  It is the most

14   important decision you will probably ever make, given what is

15   at stake.  And what is at stake is nothing more or less than

16   the integrity of this process.  It is not a popularity contest

17   and it is not quick and easy.

18       I am almost done.  I have done everything I can do.  I

19   never claimed to be the greatest lawyer.  You probably walked

20   away with that conclusion without question in this case.  But

21   I have been straight with you, and I have been straight with

22   you, and you, and you, and you.  I haven't mislead, I haven't

23   deceived, I haven't been tricky, I haven't even be creative.

24   I have taken you where the evidence takes you.  I am asking

25   you to follow the law.  I asked you in opening and I am asking

1   you again--follow the law.

2       The law is in this case that Khalid Aldawsari is not

3   guilty.  He is not guilty.  It doesn't mean you agree with

4   what he did.  It doesn't mean he shouldn't be sent away,

5   whatever.  But what it means is he is not guilty of what he is

6   charged with in this case--nothing more and nothing less.

7       Thank you for your time.  Thank you for your attention.

8   Thank you for your courtesy.  God bless you.

9           THE COURT:  Thank you, Mr. Cogdell.

10  Ms. Williams?

11          MS. WILLIAMS:  You know, those three crimes he put

12  up on the screen awhile ago and said Mr. Aldawsari is not

13  charged with any of those crimes?  Well, guess what.  Because

14  those crimes aren't in this book.

15          MR. COGDELL:  Actually that is a misstatement of the

16  law, Your Honor.  One is.

17          MS. WILLIAMS:  One is.  Okay.  One is.  The man that

18  has stood here for the last 40 or 45 minutes and when he ended

19  said, "I have not lied to you, I have been straight with you,

20  I have been honest with you," and yet he has the audacity to

21  put up two things on that screen--really three--that aren't

22  even crimes against the laws of the United States.

23          MR. COGDELL:  Actually what I said was, Your Honor,

24  they weren't charged.

25          THE COURT:  The jury will recall, Mr. Cogdell.

1            MS. WILLIAMS:  There are a number of things that

2    Mr. Cogdell talked to you about that have absolutely nothing

3    to do with this case, have absolutely nothing to do with the

4    law that the Judge will give you when he reads these

5    instructions to you in just a few minutes.

6        One of those things -- One of the last things he said,

7    without phenol, without assembly, without the detonator, he

8    could not have attempted to use a weapon of mass destruction.

9    That is not in here.  That is not going to be a part of what

10   the Judge tells you is the law in this case.  It is just not

11   in here.

12       Here is what is in here.  "To find that the Defendant

13   attempted to use a weapon of mass destruction, you must find

14   that the Defendant both intended to commit the offense"--I

15   give you the table loaded down with evidence, loaded with the

16   Defendant's own writings, loaded with the things that the

17   Defendant amassed; we know what he intended to do, but here is

18   the next part--"intended to commit the offense, and did an act

19   constituting a substantial step towards the commission of that

20   crime which strongly corroborates the Defendant's criminal

21   intent and amounts to more than mere impression."

22       As Mr. Haag told you on his opening part, and as

23   Mr. Cogdell and Mr. Doyle talked about at length, really what

24   we are talk about is a substantial step.  And you will notice

25   that in the Judge's instructions when he reads them to you and

1    when you take them back to the jury room, it doesn't say that

2    he did a whole lot of acts constituting substantial steps.  It

3    says all he has to do is commit an act, one act, constituting

4    a substantial step in order to corroborate the Defendant's

5    criminal intent.

6         And who gets to decide which of the acts which of the

7    numerous acts that he committed amounted to a substantial

8    step?  Well, that is you.  You get to decide that.  I can't

9    stand here and tell you "At this point he committed a

10   substantial step."  The Judge does not tell you in his

11   instructions.  Mr. Cogdell and Mr. Doyle, they did not tell

12   you at what point would he have committed or taken the

13   substantial, a substantial step.

14        And I ask you to look at this.  And I want to make sure I

15   read this right.  Fancy exhibits.  That was one of the first

16   things that Mr. Cogdell said when he stood up here.  Fancy

17   exhibits that the Government brought you.  Well, guess where

18   we got all those fancy exhibits.  From the Defendant.  We got

19   every bit of the stuff on that table from the Defendant.  All

20   those fancy exhibits that we had, the ones where Captain

21   Parker showed us the clip through, guess who amassed all of

22   that stuff.  It was the Defendant.  We just brought it to you

23   to show you that as he was sitting at his computer, this is

24   what he was doing.  These were the steps that he was taking in

25   order to blow people up in the United States of America.  So

1  when he talks about fancy exhibits, you remember who chose

2  those fancy exhibits.  It was Khalid Aldawsari.

3      A game of fear factor?  Who wants to instill fear?  Well,

4  let's think.  I see him.  It's Mr. Aldawsari, by his own

5  words, Khalid the terrorist.  It's not a word we chose.  He

6  chose it for himself.

7      We have not asked you to disregard the law.  We have

8  asked you to follow the law.  Do you find it interesting when

9  Mr. Cogdell stands here and looks over at this table and says,

10  "They are liars," or Mr. Doyle stands here and says, "Why

11  didn't they bring you all the stuff?"  But when there is a

12  little nugget that they want to bring out that they think is

13  good, for example, Agent Smitherman, she was candid.  On the

14  one hand he calls us liars except when it is convenient for

15  him to use that.

16      He has accused the Government, agents, lawyers, everyone

17  involved in this case, of asking you to disregard the law, but

18  he has asked you to disregard the law and the facts.  The who,

19  when, where, how, what, all of those things he wrote on his

20  board, guess what.  Not in here.  Nowhere in the Court's

21  instructions does he say in order for you to find Khalid

22  Aldawsari guilty of attempted use of a weapon of mass

23  destruction, we must know who he was going to kill.  Well,

24  actually we do.  It was American citizens.  It does not say we

25  have to prove to you when he was going to do it, where he was

1  going to do it, how he was going to do it, or what he was

2  going to do, or what he was going to use to do it.

3      Well, the answers to those questions are who was he going

4  to kill?  A lot of people in the United States.  And how do we

5  know that?  Because Mr. Aldawsari was so helpful to the

6  Government in letting us know what his plans were through his

7  journal writings.

8      I have to stop right here and answer the allegation that

9  we haven't shown you everything.  Oh, it's possible that we

10  could have shown you everything.  We could have gone through

11  all of those journals and read every single one of those

12  entries in those journals about what all he had planned to do,

13  but you were given a representative sample.  If you want to

14  know what he said in all of his journals, you may take those

15  back with you and you may read every single word that he wrote

16  to your satisfaction to know that nothing was hidden from you.

17      All right.  Where was I?  Oh, yeah.  Who he was going to

18  kill.  American citizens.  When?  At the time of his choosing.

19  We know that he didn't have the phenol.  No one has tried to

20  hide that that he didn't have the phenol.  But did you notice

21  that when Mr. Cogdell was making all of his allegations about

22  us, he forgot to mention the part about the Defendant's

23  alternative plan.  Of course, you know the very morning, 12:42

24  in the morning of the day that he was arrested, later that

25  day, he makes the Cole-Parmer order trying yet again, taking

1   another substantial step to add to the pile of the substantial

2   steps he has already taken, the very morning he makes that

3   Cole-Parmer order.  But he is already researching, because he

4   has failed at getting the phenol once, but he is researching.

5       What is the back-up plan?  Well, it is the phenol from

6   aspirin plan.  Did Mr. Cogdell talk to you about that?  No, I

7   don't think he did.

8       Where?  At the location of his choosing.  Yeah, we are

9   not saying he wrote down -- Mr. Aldawsari wrote a lot of stuff

10  in his journals, but we arrested him, remember, before he had

11  time to kill anyone, so where was going to be the location of

12  his choosing?

13      How?  By blowing people up with a picric acid bomb.

14      And what?  It was that bomb.

15      So those questions are answered, although they are not

16  even put to you in the Court's instructions.

17      Mr. Cogdell made sure that he pointed out that you should

18  not -- that you should base your decision not based on

19  sympathy or anything else, and yet he basically invites you to

20  find the Defendant not guilty in complete disregard of the law

21  and the evidence because Mr. Aldawsari will be sent back to

22  Saudi Arabia.  Knowing what you know right now about

23  Mr. Aldawsari, is that okay with you--that he would just go

24  back to Saudi Arabia?  Do you have more of a responsibility

25  than to just say, "Well, you know, this case might be a little

1    hard to decide.  He is going back to Saudi Arabia anyway.

2    What difference does it make?"  Who is going to keep him

3    there?  Where will he go next?  We don't know that.

4         And I am just trying to go in order here and answer some

5    of these things Mr. Cogdell and Mr. Doyle said.  That the

6    Government hid things from you, that we told you that

7    Mr. Aldawsari was a fine student in high school.  Well, he

8    was.  If you do the math, of the 130,000 male high school

9    graduates for that year in Saudi Arabia, only 100 got that

10   SABIC scholarship.  When you do the math, that is .07 percent.

11   That is not even -- I mean, good night.  .07 percent.  He was

12   one of those, and he was a fine student in high school.

13        Okay.  But let's see what Mr. Cogdell didn't tell you.

14   Remember when we got out the student records and we showed the

15   grades that he made when he was at Tech?  And Mr. Cogdell,

16   while Agent Orndorff was on the stand, read that 302 about the

17   lab partner for I believe it was fall 2009, about the lab

18   partner, she didn't really like him and he didn't really carry

19   his weight and that is why he made an A?  What information did

20   they give you about the spring of 2010?  A great big zero.

21   You know why?  Because he made an A in lab that semester, too.

22   Did they tell you that?  Nope.  They didn't tell you that.

23        They have made a really, really big deal about all of

24   these items being unused.  They were unused.  Yeah, they were

25   unused.  He didn't have the phenol yet.  He didn't have the

1    phenol yet.  So is Mr. Cogdell suggesting to you that there in

2    his kitchen he should open one of those bottles of sulfuric

3    acid and pour it in a beaker and throw in a little nitric acid

4    and see what that does?  "That stinks.  I am going to throw

5    that down the drain."  What a ridiculous, ridiculous thing.

6    How offensive to try to get you all to believe that.  How

7    ridiculous.

8         Oh, yes.  One of the things they talked about, there were

9    several things in his journals that we didn't show you.  I

10   invite you, if you want to sit here for the next two weeks and

11   read all those journals, just go right ahead.  But one of the

12   things they pointed out was that he had written in there that

13   he wanted to create his own PC game.  Well, guess what.  There

14   aren't any how-to videos of how to create your own PC game.

15   There is a whole stinking room full of videos on how to create

16   picric acid, how to create a detonator, how to create the

17   fusing source, but there aren't any on how to create your own

18   video game.  There are not any on how to go to Antarctica.

19   There aren't any on how to buy a BMW.  And what he has, what

20   he looked at on YouTube, was how to make picric acid.  Took

21   great notes in his journals.

22        He said he wanted to go to Miami, New York, Los Angeles.

23   Well, guess what.  There aren't any tickets to Miami, New York

24   or Los Angeles.  There weren't any found when he searched his

25   entire place.  There aren't any records in any of the bank

1    records or credit card records of him doing that, because, as

2    he said, his focus, as Mr. Aldawsari said, his focus was on

3    jihad and he was marching down that road.

4        Now, I want to make sure I get this right, too.  I

5    believe one of Mr. Cogdell's statements was, "You get dizzy

6    trying to follow the prosecutorial trail."  Well,

7    Mr. Aldawsari's trail won't make you dizzy.  Let me just give

8    you a few samples of that.

9        First of all, we know that before he ever stepped foot on

10   American soil he had planned to kill Americans.  By his own

11   words.  We didn't make that up.  Those were his own words.

12       And on his March down the road to jihad, he was marching.

13   He has been marching since he was 11 years old, studying hard

14   to get that scholarship, getting over into the United States,

15   going and learning English at Vanderbilt University,

16   transferring to Texas Tech.  And in December, at least

17   December of 2010, we have records between the bank records,

18   the Amazon records, he starts marching much more quickly down

19   that road to jihad.  December 3rd, 2010 he gets an alarm

20   clock.  December 6, 2010, sulfuric acid.  December 6, 2010

21   screwdriver set.  December 12th, 2010, the soldering iron kit.

22   And the same day yet another alarm clock.  And the same day he

23   gets the baby scale for weighing materials.  December the 14th

24   he gets the nitric acid.  December the 30th, the ornamental

25   lightbulbs that he would need.

1          January 14th, 2011, the professional chemistry set that

2     you see here, including the Bunsen burner for heat source.

3     The thermometer, the glassware, the mortar and pestle are

4     ordered.  He nearly got here.  He got up and he showed you the

5     mortar and the pestle and it was unused because he hadn't

6     ground any match heads yet.  Really?  Of course he hasn't

7     ground any match heads yet.  He hadn't gotten those last few

8     things he needs.  I will get to that in just a minute.

9          January the 14th he gets additional beaker, flasks, and

10    stir rods.  January 22nd, protective clothing, hazmat suit,

11    hoods, surgical mask.  February the 23rd, the day that he was

12    arrested, in his possession were the wire, the lamp cord,

13    mounting bracket, speaker wire, AAA and nine volt batteries,

14    three mobile phones, two additional alarm clocks, camp stone

15    and propane, cooking pot, filters, both the strainer and a

16    coffee filters, and two six-gallon water containers.

17         Did you get dizzy following Mr. Aldawsari's trail

18    marching right down that road to jihad?  Remember, a, one,

19    singular, a substantial step.  And I submit to you that the

20    substantial step could have been, based on his writings, based

21    on what we know about his intent, the day he set foot in the

22    United States of America.

23              MR. COGDELL:  Judge, I object to that as being a

24    clear misstatement of the law.  That is not even close.

25              THE COURT:  Well, I will tell them what the law is.

1          MS. WILLIAMS:  And when he reads you the law, he

2    will tell you that he did an act constituting a substantial

3    step towards the commission of the crime.  And by

4    Mr. Aldawsari's own words, he prepared himself in order to get

5    to the United States to kill Americans.

6          Not one time, not one single time in all of his writings,

7    in all of the how-to videos, in all of the emails, in all of

8    the microphone overhears, not one time did he evidence an

9    intent to stop what he was doing.  He was marching down that

10   road to jihad.

11         Also in these instructions it says, "In other words,

12   liability for attempt attaches if the Defendant's actions have

13   proceeded to the point where, if not interrupted, would

14   culminate in the commission of the underlying crime."

15         THE COURT:  You have time for one more sentence,

16   Ms. Williams.

17         MS. WILLIAMS:  Thank you, Your Honor.

18         Thank God the FBI stopped him when they did.  We would

19   have a lot of dead people.  And I am asking you to find him

20   guilty as charged.

21         THE COURT:  All right.  Ladies and gentlemen, let's

22   take a 15-minute recess and then I will instruct you on the

23   law that you must apply in this case.

24         (Whereupon, the jury left the courtroom.)

25         THE COURT:  The Court is in recess for 15 minutes.

1          (Brief recess.)

2          THE COURT: Okay. Bring the jury in, please.

3          (Whereupon, the jury entered the courtroom.)

4          THE COURT: All right. You may be seated.

5     Ladies and gentlemen, in your chair you have a copy of

6     the jury instructions that I am required to read to you. You

7     don't have to follow along with me, but it is not deathless

8     prose, so you may be able to better follow what I am saying if

9     you kind of read along with me, but that is entirely up to

10    you.

11        Well, ladies and gentlemen, in any jury trial there are,

12    in effect, two judges. I am one. You are the other. It is

13    my duty to preside over the trial and to decide what evidence

14    is proper for your consideration. It is also my duty at the

15    end of the trial to explain to you the rules of law that you

16    must follow and apply in arriving at your verdict.

17        First, I am going to give you some general instructions

18    that apply in every case, for example, instructions about the

19    burden of proof and how to judge the believability of

20    witnesses. Then I am going to give you the specific rules of

21    law about this particular case. And finally I will tell you

22    about the procedures that you should follow in your

23    deliberations.

24        You, as jurors, are judges of the facts. But in

25    determining what actually happened--that is, in reaching your

1   decision as to the facts--it is your sworn duty to follow all

2   of the rules of law as I explain them to you.

3       You have no right to disregard or give special attention

4   to any one instruction, or to question the wisdom or the

5   correctness of any rule that I may state to you.  You must not

6   substitute or follow your own notion or opinion as to what the

7   law is or what the law ought to be.  It is your duty to apply

8   the law as I explain it regardless of the consequences.  It is

9   also your duty to base your verdict solely upon the evidence,

10  without prejudice, without sympathy.  That is the promise you

11  made and the oath you took before being accepted by the

12  parties as jurors, and they, and the public that you

13  represent, have the right to expect nothing less.

14      The indictment or formal charge against a defendant is

15  not evidence of guilt.  Indeed, a defendant is presumed by law

16  to be innocent.  The law doesn't require a defendant to prove

17  his innocence or produce any evidence at all, and no inference

18  whatsoever may be drawn from the election of a defendant not

19  to testify.  It is the Government that has the burden of

20  proving the Defendant guilty beyond a reasonable doubt, and if

21  it fails to do so, you must acquit the defendant.

22      While the Government's burden of proof is a strict or

23  heavy one, it is not necessary that the Defendant's guilt be

24  proven beyond all possible doubt.  What is required is that

25  the Government's proof exclude any reasonable doubt concerning

1    the Defendant's guilt.

2        A reasonable doubt is a doubt based upon reason and

3    common sense after careful and impartial consideration of all

4    of the evidence in the case.  Proof beyond a reasonable doubt,

5    therefore, is proof of such a convincing character that you

6    would be willing to rely and act upon it without hesitation in

7    the most important of your own affairs.

8        As I told you earlier, it is your duty to determine the

9    facts.  In doing so, you must consider only the evidence

10   presented during the course of trial, including the sworn

11   testimony of the witnesses and the exhibits.  Remember,

12   statements, objections, arguments made by lawyers are not

13   evidence.  It is the function of the lawyer to point out those

14   things that are most significant or most helpful to their side

15   of the case, and in so doing to call your attention to certain

16   facts or inferences that might have otherwise escaped your

17   notice.  But in the final analysis it is your recollection and

18   your interpretation of the evidence that controls in the case.

19   What the lawyers say is not binding on you.

20       During the trial I have sustained objections to certain

21   questions and exhibits.  You must disregard those questions

22   and exhibits entirely.  Don't speculate as to what the witness

23   would have said if permitted to answer the question or as to

24   the contents of an exhibit.  Also, certain testimony and other

25   evidence was ordered stricken from the record and you have

1    been instructed to disregard this evidence.  Do not consider

2    any testimony or other evidence stricken by me in reaching

3    your decisions.  Your verdict must be based solely on legally

4    admissible evidence and testimony.

5         Also, please do not assume from anything I may have done

6    or said during the course of this trial that I have any

7    opinion concerning any of the issues in the case.  Except for

8    instructions to you on the law, you should disregard anything

9    I may have said during the trial in arriving at your own

10   findings as to the facts.

11        While I said you should consider only the evidence, you

12   are permitted to draw reasonable inferences from the testimony

13   and exhibits that you feel are justified in the light of your

14   common experience.  In other words, you may make deductions

15   and reach conclusions that reason and common sense lead you to

16   draw from the facts that have been established by the

17   evidence.

18        Don't be concerned about whether evidence is direct or

19   circumstantial.  You should consider and weigh all of the

20   evidence that was presented to you.

21        I remind you, it is your job to decide whether the

22   Government has proven the guilt of the Defendant beyond a

23   reasonable doubt.  In doing so, you must consider all the

24   evidence.  That doesn't mean you have to accept it all as true

25   or accurate.

1          You are the sole judges of the credibility or

2     believability of each witness and the weight to be given the

3     witness's testimony.  An important part of your job is making

4     judgments about the testimony of the witnesses who testified

5     in this case.  You should decide whether you believe all or

6     any part of what each person had to say and how important that

7     testimony was.  In making that decision, I suggest you might

8     ask yourself questions like did the person impress you as

9     honest?  Did the witness have a particular reason not to tell

10    the truth?  Did the witness have a personal interest in the

11    outcome of the case?  Did the witness have a relationship with

12    either the Government or the Defense?  Did the witness seem to

13    have a good memory?  Did the witness clearly see or hear

14    things about which he testified?  Did the witness have the

15    opportunity and ability to understand the questions clearly

16    and answer them directly?  Did the witness's testimony differ

17    from the testimony of other witnesses?  Those are just a few

18    considerations that might help you determine the accuracy of

19    what each witness said.  Your job is to think about the

20    testimony of each witness you heard and decide how much you

21    believe of what each witness had to say.

22         In making up your mind and reaching a verdict, don't make

23    any decisions simply because there were more witnesses on one

24    side than the other.  Don't reach a conclusion on a particular

25    point because there were more witnesses on one side than the

1    other.

2         The testimony of a witness may be discredited by showing

3    the witness testified falsely concerning a material matter, or

4    by evidence that at some other time the witness said or did

5    something or failed to say or do something which is

6    inconsistent with the testimony the witness gave at trial.

7         If you believe that a witness has been discredited in

8    this manner, it is your exclusive right to give the testimony

9    of that witness whatever weight you think it deserves.

10        If scientific, technical, or specialized knowledge might

11   assist you in understanding the evidence or in determining a

12   fact at issue, a witness qualified by knowledge, skill,

13   experience, training, or education may testify and state an

14   opinion concerning such matters.

15        Merely because such a witness has expressed an opinion

16   doesn't mean that you have to accept it.  You judge such

17   testimony like any other testimony.  You can accept or reject

18   it.  You can give it as much weight as you think it deserves,

19   considering the witness's education and experience, the

20   soundness of the reasons for the opinion, and all of the

21   evidence in the case.

22        Count one of the indictment alleges that from no later

23   than on or about September 20th, 2008, and continuing through

24   on or about February 23rd, 2011, in the Lubbock Division of

25   the Northern District of Texas, and elsewhere, Khalid Ali-M

1    Aldawsari did knowingly and unlawfully attempt to use a weapon

2    of mass destruction as defined in Title 18, United States

3    Code, Sections 2332a(c)(2)(A); that is, a destructive device

4    as defined in Section 921 of Title 18, meaning an explosive

5    bomb or similar device, against any person or property within

6    the United States; and the mail and a facility of interstate

7    commerce was used in furtherance of the offense; and the

8    offense and the results of the offense, if succeeded, would

9    have affected interstate commerce, all in violation of Title

10   18, United States Code, Section 2332a(a)(2)(A) and (D).

11        Section 2332 makes it a crime for anyone to use,

12   threaten, or attempt to use a weapon of mass destruction

13   against any person or property within the United States.

14        In order for you to find the Defendant guilty of this

15   crime you must be convinced that the Government has proven

16   each of the following beyond a reasonable doubt:

17        First, that the Defendant knowingly attempted to use a

18   weapon of mass destruction.

19        Second, that the Defendant knowingly attempted to use a

20   weapon of mass destruction, and knowingly did so against a

21   person or property within the United States, and that the

22   mail, or any facility of interstate commerce, was used in

23   furtherance of the offense, or the offense, or the result of

24   the offense, had it succeeded, would have affected interstate

25   commerce.

1    In order to find that the Defendant attempted to use a

2 weapon of mass destruction, you must find that the Defendant

3 both intended to commit the act and did an act constituting a

4 substantial step towards the commission of that crime which

5 strongly corroborates the Defendant's criminal intent and

6 amounts to more than mere preparation.

7    In determining whether the Defendant's actions amounted

8 to a substantial step toward the commission of the crime, you

9 must distinguish between mere preparation on the one hand and

10 the actual doing of the criminal deed on the other.  Mere

11 preparation without more is not an attempt.  On the other

12 hand, some preparations, when taken together with intent, may

13 amount to an attempt.  The question for you to decide is

14 whether the acts of the Defendant you are considering clearly

15 indicate a willful intent to commit a crime, and whether those

16 acts are a substantial step in a course of conduct planned to

17 culminate in the commission of the crime.

18    In other words, liability for attempt attaches if the

19 Defendant's actions have proceeded to the point where, if not

20 interrupted, would culminate in the commission of the

21 underlying crime.

22    The term weapon of mass destruction includes a

23 destructive device which is any explosive, incendiary, or

24 poison gas, bomb, grenade, rocket having a propellant charge

25 of more than four ounces, missile having an explosive or

1    incendiary charge of more than one quarter ounce, mine, or

2    similar device or any type of weapon which will, or may be

3    readily converted to, expel a projectile by the action of an

4    explosive or other propellant, and which has any barrel with a

5    bore of more than one and a half inches, and any combination

6    of parts intended for the use of converting any device into a

7    destructive device and from which a destructive device may be

8    readily assembled.  That really has no application, No. 6,

9    here.

10        The word knowingly, as that term has been used from time

11   to time in these instructions, means that the act was done

12   voluntarily and intentionally, and not because of mistake or

13   accident.

14        Commerce includes travel, trade, transportation, and

15   communication.

16        Interstate commerce means commerce or travel between one

17   state, territory, or possession of the United States and

18   another state, territory, or possession of the United States,

19   including the District of Columbia.

20        Foreign commerce means commerce or travel between any

21   part of the United States, including its territorial waters,

22   and any other country, including its territorial waters.

23        You will note, the indictment charges that the offense

24   was committed on or about a specified date.  The Government

25   doesn't have to prove that the crime was committed on that

1    exact date, so long as the Government does prove beyond a

2    reasonable doubt that the Defendant committed the crime on a

3    date reasonably near September 20th, 2008 and February 23rd,

4    2011, the dates stated in the indictment.

5        You are here to decide whether the Government has proven

6    beyond a reasonable doubt that the Defendant is guilty of the

7    crime charged.  The Defendant is not on trial for any act,

8    conduct, or offense not alleged in the indictment.  Neither

9    are you to be concerned with the guilty of any person or

10   persons not on trial as a defendant in this case.

11       If a defendant is found guilty, it is my duty to decide

12   what the punishment will be.  You are not to be concerned with

13   the punishment in any way.  It should not enter into your

14   consideration or discussion.

15       Any notes that you have taken during trial are only aids

16   to your memory.  If your memory differs from your notes, you

17   should rely on your memory and not on the notes.  Your notes

18   are not evidence.  A juror who has not taken notes should rely

19   on his or her independent recollection of the evidence and

20   should not be unduly influenced by the notes of other jurors.

21   Notes are not entitled to any greater weight than the

22   recollection or impression of each juror about the testimony.

23       Certain exhibits have been identified as typewritten

24   transcripts and translation from Arabic into English of the

25   oral conversations which can be heard on the tape recordings

1    and other writings received in evidence.  The transcript also

2    purports to identify the speakers engaged in such

3    conversation.

4         I have admitted the transcript for the limited and

5    secondary purpose of aiding you in following the content of

6    the conversation as you listen to the tape recording and other

7    writings, particularly those portions spoken in Arabic, and

8    also to aid you in identifying the speakers.

9         You are specifically instructed that whether the

10   transcript correctly or incorrectly reflects the contents of

11   the conversation or identity of the speakers is entirely for

12   you to determine based on your own evaluation of the testimony

13   you have heard concerning the preparation of the transcript,

14   and from your own examination of the transcript in relation to

15   your hearing of the tape recording itself and examining the

16   writings as the primary evidence of its own contents; and, if

17   you should determine the transcript is in any respect

18   incorrect or unreliable, you should disregard it to that

19   extent.

20        Certain charts and summaries have been received into

21   evidence.  Charts and summaries are valid only to the extent

22   that they accurately reflect the underlying supporting

23   evidence.  These charts and summaries are shown to you in

24   order to make the other evidence more meaningful and to aid

25   you in considering the evidence.  They are no better than the

1    testimony and documents upon which they are based.  Therefore,

2    you are to give no greater consideration to these schedules

3    and summaries than you would give to the evidence upon which

4    they are based.

5         It is for you to determine the accuracy of summary

6    charts.  You are entitled to consider the charts, schedules,

7    and summaries if you find they are of assistance to you in

8    analyzing the evidence and understanding the evidence.

9         Some of the evidence that you heard in this case consists

10   of videos that the Government alleges were taken from the

11   Defendant's electronic media or obtained from internet media

12   providers.  You are to consider these videos only in

13   determining the Defendant's intent.  Moreover, you are to

14   consider these videos dispassionately, and even if there is

15   material that you find personally distasteful, you cannot let

16   your personal opinions, your fears, your biases, enter into

17   your consideration.

18        In order to reach a verdict, whether guilty or not

19   guilty, all of you must agree.  Your verdict must be unanimous

20   on the count of the indictment.  Your deliberations will be

21   secret.  You will never have to explain your verdict to

22   anyone.

23        It is your duty to consult with one another to deliberate

24   in an effort to reach an agreement, if you can do so.  But

25   each of you must decide the case for yourself, but only after

1    an impartial consideration of the evidence with your fellow

2    jurors.

3         During your deliberations don't hesitate to re-examine

4    your own opinions and change your mind if you are convinced

5    you are wrong, but don't give up your honest beliefs as to the

6    weight or effect of the evidence solely because of the opinion

7    of your fellow jurors or for the mere purpose of returning

8    your verdict.

9         Remember, at all times you are judges--judges of the

10   facts.  Your sole duty is to decide whether the Government has

11   proven the Defendant guilty beyond a reasonable doubt.

12        When you go to the jury room, the first thing you should

13   do is select one of your number as foreman, male or female, to

14   help to guide your deliberations and will speak for you here

15   in the courtroom.  A form of the verdict has been prepared for

16   your convenience.  The foreman will write the unanimous answer

17   of the jury in the space provided for in the charge of the

18   indictment, either guilty or not guilty.  At the conclusion of

19   your deliberations the foreman should date and sign your

20   verdict.

21        If you need to communicate with me during your

22   deliberations, the foreman should write the message and give

23   it to the Marshal.  I will rely in writing or bring you back

24   to answer your question here in court.

25        Should you wish to examine any piece of evidence, please

1    send a message to the Court indicating what you would like to

2    see.

3         Bear in mind, you are not to reveal to any person, not

4    even to the Court, how the jury stands, numerically or

5    otherwise, on any count of the indictment until after you have

6    reached a unanimous verdict.

7         You may now retire --

8              MR. COGDELL:  Your Honor, before you excuse, I need

9    one matter with the Court.

10             THE COURT:  Yes.

11             MR. COGDELL:  You can finish that.  I didn't want to

12   stop you mid-sentence, but I do need the Court's attention

13   before --

14             THE COURT:  You may retire to the jury room to begin

15   your deliberations.

16        I will ask Mr. Grieve and Ms. Swapp to remain.  Okay?

17        Yes, sir?

18             (Discussion at the bench, out of the hearing of the

19             reporter.)

20             THE COURT:  Go back to the page on where I defined a

21   destructive device, particularly No. 6.  I said it doesn't

22   apply here but it does.  I didn't read it all the way through.

23   So let me once again tell you that a weapon of mass

24   destruction includes a destructive device which is to include

25   No. 6, assembling a device or any type of weapon which will,

1   or may be readily converted to, expel a projectile by the

2   action of an explosive or another propellant, and which has a

3   barrel of more than one and a half inch in diameter, and any

4   combination of parts intended for the use in converting any

5   device into a destructive device, or from which a destructive

6   device may be readily assembled.

7           MR. COGDELL:  Thank you.

8           THE COURT:  Okay.  All right.  Thank you.

9       Again, I will ask Mr. Grieve and Ms. Swapp to stay.

10      You all can go into the jury room.  I will just go in

11  there.

12          (Whereupon, the jury left the courtroom.)

13          THE COURT:  You all be seated, please.  And

14  everybody else can be seated.

15      You are, as you may have suspected, you are the

16  alternates here.  I am going to ask a favor of you.  Please

17  don't discuss the case with anyone until you hear what the

18  verdict is.  It could be that one of them will get sick and I

19  would ask you to come back and be a part of the jury.

20      I want to thank you for your attention.  You have been --

21  All of you have been a very, very good jury, and you all have

22  paid attention to everything, and I greatly appreciate it.

23  And wait until you see on the news what happened.  Okay.

24      Thank you both very much.  You are free to go.

25          THE COURT:  Now, other than the objections that have

1    previously been made on the record, are there any objections?

2         MR. COGDELL:  Yes, sir.  Just so I am not criticized

3    later on, I think I am required to move for a mistrial based

4    upon the Court's statements regarding the reading on page 7 of

5    the similar device language when the Court originally told the

6    jury it doesn't have any application here.  That is clearly

7    erroneous.

8         THE COURT:  Tell me, why you think it does?

9         MR. COGDELL:  Because that is the heart of the case.

10   No. 6, in my opinion, that is what the Government is arguing

11   that we constructed, and a focal point of my argument was that

12   the weapons expert for the Government stated that there was

13   not a combination of parts intended for use to convert a

14   device into a destructive device.

15        THE COURT:  And I think No. 6 really deals with

16   pistol bores.  But regardless, I came back and said it did

17   apply.

18        MR. COGDELL:  You did.

19        THE COURT:  And your motion is noted and denied.

20        MR. COGDELL:  Thank you.

21        THE COURT:  And your motion for a judgment of

22   acquittal is denied.

23        You all can be seated, if you want to.

24        My experience is if we have a question from the jury, it

25   is going to occur very early or very late.  What I will ask

1  you to do is to give Elodia your cell phones.  I would like

2  for you to stay around for, say, 20 minutes, and then you can

3  go anywhere you want to, but I want you to go no further than

4  15 minutes away by cell phone.  Okay?

5          MR. COGDELL:  Yes, sir.

6          MR. HAAG:  Yes, Your Honor.

7          THE COURT:  And once again, I got to tell you,

8  better lawyers than you all have shown I haven't seen.

9          MR. COGDELL:  Thank you, Your Honor.

10              (Jury deliberates.)

11                  V E R D I C T

12          THE COURT:  You may all be seated.

13      I understand we have a verdict.

14      Remember, I signed an order making everybody custodian of

15  their own exhibits.

16      And I am informed that the foreman is Ms. Godsey.  And I

17  don't want any --

18      Let me take care of that first.  The gag order is now

19  lifted, as it has been since the jury took over.

20      I am going to bring the jury in now.  No reaction,

21  please.

22      All rise.

23              (Whereupon, the jury entered the courtroom.)

24          THE COURT:  Ms. Godsey, I see you holding the

25  verdict forms.  I assume you are the foreman.

1           THE PRESIDING OFFICER:  Yes, sir.

2           THE COURT:  Have you reached a verdict?

3           THE PRESIDING OFFICER:  Yes, sir, we have.

4           THE COURT:  Would you hand it to the Marshal,

5    please?

6        As to Count 1 in the indictment we the jury unanimously

7    find the Defendant, Khalid Ali-M Aldawsari, guilty, signed and

8    dated by the foreman.

9        Ms. Godsey, is that your verdict?

10          THE PRESIDING OFFICER:  Yes, sir.

11          THE COURT:  And Ms. Burrell, is that your verdict?

12   I am sorry.  Have I got that wrong?  I can't read my own hand.

13   Ms. Barrett, is that your verdict?

14          JUROR BARRETT:  Yes, sir.

15          THE COURT:  Ms. Nicholson, is that your verdict?

16          JUROR NICHOLSON:  Yes.

17          THE COURT:  Mr. Billstrom, is that your verdict?

18          JUROR BILLSTROM:  Yes, Your Honor.

19          THE COURT:  Ms. Arroyos, is that your verdict?

20          JUROR ARROYOS:  Yes, Your Honor.

21          THE COURT:  Mr. White, is that your verdict?

22          JUROR WHITE:  Yes, sir.

23          THE COURT:  Mr. Simpson, is that your verdict?

24          JUROR SIMPSON:  Yes, sir.

25          THE COURT:  Mr. Florer, is that your verdict?

```
 1                JUROR FLORER:  Yes, sir.

 2                THE COURT:  Ms. Weisgerber, is that your verdict?

 3                JUROR WEISGERBER:  Yes, sir.

 4                THE COURT:  Ms. Brownlow?

 5                JUROR BROWNLOW:  Yes, sir.

 6                THE COURT:  Mr. Combs?

 7                JUROR COMBS:  Yes, sir.

 8                THE COURT:  Who did I miss?  Mr. Brewer, is that

 9    your verdict?

10                JUROR BREWER:  Yes.

11                THE COURT:  All right.  If you all will step back in

12    the jury room, I will be with you in just a minute.

13                (Whereupon, the jury left the courtroom.)

14                THE COURT:  You may all be seated.

15           I am going to set sentencing for October 9th, whether it

16    is here or Lubbock -- What is the most convenient?

17                MR. COGDELL:  I prefer here, but I am sure they

18    prefer Lubbock.

19                MR. HAAG:  Lubbock would be easier, but whatever the

20    Court would like.

21                THE COURT:  All right.  Here in the U.S. District

22    Court for Amarillo.

23                MR. HAAG:  Thank you, Your Honor.

24                THE COURT:  Mr. Aldawsari, I am going to ask the

25    Probation Office to do a presentence report.  Please cooperate
```

1    with them.  It will be very important in determining what your

2    sentence will be.  Do you understand, sir?

3           THE DEFENDANT:  Yes, sir.

4           THE COURT:  Thank you.

5       All right.  Thank you.  Court is adjourned.

6           (The proceedings were concluded at 1:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I HEREBY CERTIFY THAT THE FOREGOING IS A

2      CORRECT TRANSCRIPT FROM THE RECORD OF

3      PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4      I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5      FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6      COURT AND THE JUDICIAL CONFERENCE OF THE

7      UNITED STATES.

8

9      S/Shawn McRoberts                07/21/2012

10     _____DATE_____
       SHAWN McROBERTS, RMR, CRR
11     FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25