1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                 LUBBOCK DIVISION

3   UNITED STATES OF AMERICA      )  CAUSE NO. 5:11-CR-015
                                  (
4   vs.                           )
                                  (  NOVEMBER 13, 2012
5                                 )  AMARILLO, TEXAS
    KHALID ALI-M ALDAWSARI        (  9:00 A.M.
6   _____

7

8

9   _____

10                      SENTENCING

11

12         BEFORE THE HONORABLE DONALD E. WALTER
               UNITED STATES DISTRICT JUDGE

13

14  _____

15

16

17

18

19

20

21

22          SHAWN M. McROBERTS, RMR, CRR
           1100 COMMERCE STREET, RM. 1654
23              DALLAS, TEXAS  75242
                 (214) 753-2349

24

25

1                     <u>A P P E A R A N C E S</u>

2

3

         FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
4                              1205 TEXAS AVENUE, 7TH FLOOR
                               LUBBOCK, TEXAS  79401
5                              (806) 472-7351
                               BY:  MR. JEFFREY HAAG
6                                   MS. DENISE WILLIAMS

7                              U.S. DEPARTMENT OF JUSTICE
                               NATIONAL SECURITY DIVISION
8                              950 PENNSYLVANIA AVENUE, NW
                               ROOM 1538
9                              WASHINGTON, DC 20530
                               (202) 514-7259
10                             BY:  MR. DAVID CORA

11        FOR THE DEFENDANT:   COGDELL LAW FIRM, PLLC
                               1401 McKINNEY STREET
12                             SUITE 1625
                               HOUSTON, TEXAS  77010
13                             (713) 426-2244
                               BY:  MR. DAN COGDELL
14                                  MR. J. DAVID HESTER

15                             PAUL DOYLE & ASSOCIATES
                               600 TRAVIS, SUITE 4700
16                             Houston, TEXAS  77002
                               (713) 228-9200
17                             MR. PAUL DOYLE

18   OFFICIAL COURT REPORTER:  SHAWN M. McROBERTS, RMR, CRR
                               1100 COMMERCE STREET, RM. 1654
19                             DALLAS, TEXAS  75242
                               (214) 753-2349
20

21

22

23

24

25

1          THE COURT:  Good morning.  You may be seated.

2       Mr. Aldawsari, you have received a copy of the

3    presentence report, I believe?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And you have reviewed it with your

6    counsel?

7          THE DEFENDANT:  Yes, I did.

8          THE COURT:  And I have noted the objections that

9    have been filed--the first one on the obstruction of justice,

10   and the rest on the question of following the Guidelines or

11   not.  Is that right, Mr. Cogdell?

12         MR. COGDELL:  That is right, Your Honor.

13         THE COURT:  Is that correct, Mr. Aldawsari?

14         THE DEFENDANT:  Yes.

15         THE COURT:  All right.  You may be seated.

16      Mr. Haag, I have read your report and sentencing

17   memorandum, as I have read Mr. Cogdell's.  Is there anything

18   else you want to say to me?

19         MR. HAAG:  Yes, Your Honor.  We do have one witness,

20   and we do have brief argument.

21         THE COURT:  Put on your witness.

22         MR. HAAG:  Yes, Your Honor.

23         MR. DOYLE:  Judge, if I could, this witness is the

24   bomb expert, and I believe what he is going to try and

25   introduce is that video that you have already excluded at

1    trial, and I would object to the video --

2              THE COURT:  Is that right?

3              MR. HAAG:  Your Honor, yes, we intend to play --

4              THE COURT:  I am fairly aware of what roughly 15

5    pounds of plastique can do.  Do you really want to do that?

6              MR. HAAG:  Your Honor, we do believe it will give

7    the Court a full picture of the object of Mr. Aldawsari's

8    crime.

9              THE COURT:  As I say, 12, 15 pounds, isn't that what

10   your expert said was recoverable at a minimum?

11             MR. HAAG:  Seven pounds and fifteen pounds; yes,

12   Your Honor.

13             THE COURT:  Okay.  I think not.  I don't think it

14   will add anything.

15        Anything else you want to say?

16             MR. HAAG:  Just brief argument and response, Your

17   Honor.

18             THE COURT:  All right.  Well, have a seat.

19             MR. HAAG:  Your Honor, if I could, like to put the

20   two videos into evidence, even though we don't play them, just

21   for appeal purposes.

22             THE COURT:  Sure.

23             MR. HAAG:  Those would be Government's Exhibit

24   No. 387 and 395.

25             THE COURT:  All right.  They are received.

1        All right.  Mr. Cogdell, who wants to talk to me first?

2              MR. COGDELL:  Sure, Your Honor.  Good morning, Your

3     Honor.

4              THE COURT:  Good morning, sir.

5              MR. COGDELL:  Judge, as you know, we filed a rather

6     extensive sentencing memorandum last week.  I apologize to

7     some extent for the timing of it.  I know it was filed

8     somewhat late, but it was filed in response to the

9     Government's.  I had surgery last week, and on a more helpful

10    and positive note, Mr. Hester, who did the lion's share of the

11    work, he was otherwise occupied, so for the timing of it I

12    apologize.

13             THE COURT:  Not to worry.

14             MR. COGDELL:  I am going to be brief, Judge.  In the

15    landscape of attempted use of a weapon of mass destruction,

16    there are really three sources of categories, as the

17    memorandum points out.

18        The first are the types of cases where a life sentence is

19    generally warranted, and those types of cases is where the

20    Defendant attempts to use or does use a fully constructed

21    weapon of mass destruction.  As the memo points out, the *Reid*

22    case which is the Shoe Bomber case, the *Shahzad* case which is

23    the Times Square bombing, and I am not going to pronounce the

24    name, I won't do it justice, the *Abdulmattab* case was the

25    Christmas Day Bomber, in each of those cases where a life

1    sentence was warranted there was an actual weapon of mass

2    destruction, there was no question an attempted detonation of

3    that weapon of mass destruction, and there were generally

4    aggravating factors beyond that.

5              THE COURT:  Mr. Cogdell, in many ways that is what

6    happened here.  The cases that you cited, and in particular I

7    see you cited one I just read about in the New York Times that

8    took place in Boston, there were whiffs of entrapment, and

9    they never were going to set off -- They were going to be

10   stopped from setting it off.

11             MR. COGDELL:  Yes, sir.

12             THE COURT:  But for the grace of God, luck, fate,

13   whatever you want to call it, that is what would have happened

14   here.

15             MR. COGDELL:  Well, two responses.  The first is, in

16   the life cases there were -- There are really three

17   categories--the life cases, the sort of 20- to 30-year cases,

18   and then the cases below 20 years.  In the 20- to 30-year

19   cases, which I believe the Court is noting, those cases dealt

20   with where an inert bomb or inert weapon of mass destruction

21   was delivered to the defendant, the defendant believed that --

22             THE COURT:  Pushed the button.

23             MR. COGDELL:  He was going to activate it.  There

24   was the one in Dallas where he drove a van parked it -- or

25   SUV, parked it beneath --

```
1              THE COURT:  Went around the block.

2              MR. COGDELL:  Went around the block and went for a

3    safe distance.  The other was where an individual was going to

4    fly a remote controlled airplane into the Pentagon.

5              THE COURT:  That is the Boston case.

6              MR. COGDELL:  -- and the state capitol.  They drove

7    from Boston, he did surveillance, he actually believed and

8    pushed the button --

9              THE COURT:  In this case, oddly enough--I am going

10   to ask the Government about this--they recommended 17 years.

11             MR. COGDELL:  They did.  They did.  And I don't want

12   to run afoul of any rulings.  I think 17 years is an

13   appropriate resolution in this case.  Had we been offered

14   something in that zip code, we wouldn't have been here for a

15   week.  But be that as it may, it is self-evidence that the

16   Government didn't recommend that in this case.

17        But in those cases -- And we are not claiming entrapment,

18   and we are not disavowing our responsibility here or the

19   finding of the jury, but in those 20- to 30-year cases, it is

20   unquestionable that there was an attempted or belief on the

21   part of the defendant, unlike here, that a bomb would be

22   detonated.  And unlike here, in those 20- to 30-year cases,

23   there was a specified target.  And unlike here in those 20- to

24   30-year cases, there was every reason on the part of the

25   defendant in those cases to believe that when he was pushing
```

1    the button it would actually detonate.

2         I understand the Court's "but for the grace of God,

3    go we all," and this type of analysis, but I still think it is

4    paramount and critical that we distinguish between the mens

5    rea and the actus rea--that is, the evil intent and the

6    actuality of it.  I am not condoning for a second what

7    Mr. Aldawsari was convicted of doing, but when you look at the

8    cases similar to and parallel to his conduct -- And again,

9    Judge, we pointed out in the brief, but I believe that the

10   best example is the *Polk* case where, in fact, I think the

11   facts are more egregious in the *Polk* case, because there was a

12   specified target, that being the IRS building in Austin, and

13   that case, like this case, there was not a completed bomb, he

14   didn't possess an actual weapon of mass destruction, although

15   he had many of the precursor --

16        THE COURT:  Mr. Cogdell, not to cut you off, I read

17   those, but what has troubled me most in this case is

18   20-year-olds don't have a great deal of sense.  That is a

19   proven fact.

20        MR. COGDELL:  I have a 20-year-old.  I agree.

21        THE COURT:  He was 20 years old.  He apparently

22   behaved well for a year in Vanderbilt where, according to the

23   pictures that you sent me, he had friends, and things seemed

24   to be going along just fine.  And then he seems to have come

25   to Texas Tech, gotten into a quarrel with at least one of his

1  friends, and, for whatever reason, he appears to have divorced

2  himself from society, busted out of Texas Tech, came over to

3  school--I have forgotten the name of the school right now--and

4  apparently spent most of his time watching television programs

5  designed to carry on attacks against the United States.  He

6  continued to watch them.

7       MR. COGDELL:  Yes, sir.

8       THE COURT:  He then planned to make plastique, and

9  he had plans, for once it was made, places to use it.

10      MR. COGDELL:  Yes, sir.

11      THE COURT:  What is giving me the trouble is his

12  history until he started watching all that stuff.  Tell me

13  what happened.  I am going ask him what happened.  I don't

14  know whether he is going to answer me or not.

15      MR. COGDELL:  I think what happened, Judge, is

16  fairly well detailed in Doctor Atiq's reports and Doctor

17  Brown's findings.  I think he assimilated himself well at

18  Vanderbilt, he was surrounded by a social network that gave

19  him some support and gave him a reason to believe that he

20  could succeed.  When he transferred or was transferred to

21  Texas Tech, for whatever reason, that community and he was a

22  literal disconnect.

23      THE COURT:  I don't like that argument at all that

24  the fundamentalist Texas Tech helped convert him.

25      MR. COGDELL:  I am not disparaging either Lubbock or

1    Texas Tech.  It wasn't a fit.  I think, for whatever reason,

2    Judge, and I am not disparaging the folks in Lubbock or the

3    people at Texas Tech, or any group of people, I am saying the

4    fit--psychologically, academically, socially, whatever--at

5    Vanderbilt was a far better fit than the one that he

6    experienced in Lubbock and, as a result of that disconnect, I

7    believe it is pretty well documented that he slipped into a

8    major depressive episode that caused him literally a

9    psychological break with reality.  And watching the jihadist

10   films and watching -- getting on the internet was -- an escape

11   is too mildly put, but I think it gave him a very misguided

12   path and a very misguided focus.

13        I can't explain it any better than Doctor Brown or Doctor

14   Atiq did, but I believe that both of those psychiatrists tell

15   us that with the proper medication and psychological

16   intervention, that his risk of threat ultimately is far, far

17   lower than the Government believes it to be.

18        So from a 3553 factor, I do believe that the Court should

19   take into consideration that disconnect he experienced there,

20   and I do believe that the 20 or year less cases are a better

21   fit and a more apropos sentence in this case than the life

22   cases--for the psychological effects, for the assimilation

23   effects, and for again, Judge, the difference between the mens

24   rea and the actus rea--the difference between what he thought

25   about doing and then what was ultimately done.  I don't think

1  we can divorce those factors at all.  I think the

2  individuals that --

3          THE COURT:  Aren't there -- Don't you suspect that

4  there are a few Aldawsaris out there?

5          MR. COGDELL:  I have no doubt that there are a few

6  Aldawsaris out there, but they are not before this --

7          THE COURT:  That is true.  But one of the things I

8  have to consider is the deterrent effect.

9          MR. COGDELL:  Fair and agreed.  But two responses,

10 Judge.  One, I have never -- And I have never worn the black

11 robes and sentenced people, so it is easier for me to say this

12 than perhaps --

13         THE COURT:  When I was a prosecutor it was real

14 easy.

15         MR. COGDELL:  It is perhaps easier for the Court

16 and/or prosecutor to do it.  But I have never believed in sort

17 of the general deterrent if we sentence this Aldawsari, if you

18 will, to a 30 or above sentence, it is going to deter the next

19 Aldawsari from similar conduct.  I don't think that when they

20 are engaged in that conduct either, A, if they are truly

21 jihadist and they truly believe that there is an afterlife

22 that will benefit them, I don't think a sentence -- an earthly

23 sentence, if you will, is going to deter it.

24     The other part of that is that I do not believe that they

25 believe that they are going to get caught or that the same

1    thing will happen to them.

2        So I understand the need for general deterrence.  I also

3    understand the need for specific deterrence.  But most of all,

4    I believe that he should be punished for what he did and not

5    for what somebody else might do in the future, and for what he

6    did being different than people who the Government wishes him

7    to be similarly situated against or sentenced against whose

8    conduct was far more egregious than that of Mr. Aldawsari.

9            THE COURT:  Thank you, sir.

10           MR. COGDELL:  Yes, sir.

11       And in closing, I know, Judge, how difficult a sentencing

12   situation this is.  I think everyone of us in this room gets

13   that.  I appreciate more than you know the trial without

14   -- And we will not be representing Mr. Aldawsari on appeal, I

15   don't believe, but without eroding the appellate issues that

16   might present themselves on appeal, I appreciate more than you

17   know this Court's conduct during the trial of Mr. Aldawsari.

18   He does, too.  Mr. Hester does too.  Mr. Doyle does, too.

19   Thank you.

20       But most of all, Judge, I ask you for a sentence that is

21   reasonable and that fits this conduct, this individual, and

22   this case.

23       But thank you again.  And it is always a pleasure to

24   appear in front of you, Judge.  Thank you.

25           THE COURT:  Thank you, sir.

1        Mr. Haag, I cannot remember a case in 27 years that has

2   given me the difficulty that this case is giving me.  Anybody

3   can believe it or not.  I at this moment do not know what I am

4   going to do.  I know what the parameters are.

5        On the side -- Well, let me ask you about -- what about

6   the 17-year sentence recommended by the Government up in

7   Massachusetts?  When I saw that in the paper, I immediately

8   called the judge and said, "What the hell is going on?"  What

9   makes this case so different?

10            MR. HAAG:  Your Honor, I can't speak to the

11   rationale behind the 17-year recommendation.  My guess would

12   be that because that was a plea agreement situation, there

13   must have been some sort of mitigating factors in terms of

14   entrapment, the Defendant's mental condition, something that

15   gave the Government in that case pause to believe that at a

16   jury trial situation they might not receive a favorable

17   verdict, or that the Defendant's conduct warranted that

18   sentence.  I don't think any of the factors that were at play

19   in this case are at play in this case.

20            THE COURT:  He was ready to fly his plane into the

21   capitol.

22            MR. HAAG:  He was, Your Honor, but in that case the

23   Government had control of the situation the entire time.

24            THE COURT:  Yeah.

25            MR. HAAG:  In this case, as the Court pointed out,

1   but for the grace of God this would have ended up with a

2   completed explosion, deaths, casualties.  The only thing that

3   prevented this from occurring was a report from private

4   citizens and the action of law enforcement, and that is it.

5   There was nothing on Mr. Aldawsari's part that shows this

6   Court that he had any intention at all of turning back from

7   the course that he set for himself in his journals.

8           THE COURT:  The two bookends are he was 20 years old

9   and he slipped away from everything that he had been, although

10  he was highly educated, into this obsession.  He was 20 years

11  old.  No trouble before.  Family letters from them.

12      On the other end of the bookend is he would have done it.

13  I listened to the evidence.  Without a doubt in my mind, had

14  he gotten the phenol there would be dead people as a result.

15  Is there a middle ground?

16          MR. HAAG:  Your Honor, I think in a situation such

17  as this, there is not.  And I think that is what the

18  Guidelines -- I think that is what the Guidelines understand

19  is the special problems that terrorists pose in terms of

20  rehabilitation, recidivism.  When you have --

21          THE COURT:  But in let me ask you this.  In any

22  event, whether he gets 10 years or he gets life imprisonment,

23  at some time he is going back to Saudi Arabia under the

24  treaty.  Right?

25          MR. HAAG:  Your Honor, in this case if he received a

1    life sentence, I would hope the United States would fight to

2    keep him in jail for his entire life.  And as we have pointed

3    out, our position is that he poses a threat to American

4    citizens not only here but especially to American citizens who

5    are stationed abroad.

6              THE COURT:  All right.  Anything else?

7              MR. HAAG:  I would just like to comment just briefly

8    on the Defense's argument about the *Polk* case and talk a

9    little bit about how that is readily distinguishable from what

10   we have here.

11             THE COURT:  Yes, sir.

12             MR. HAAG:  In the *Polk* case, the Guideline range in

13   that case was 168 to 210 months, and the Court in that case

14   imposed a sentence of 189 months.

15       If this Court were to look at the Guidelines, then, in

16   order to get that Sentencing Guideline range, the district

17   court in that case, for whatever reason, must have determined

18   that the terrorism enhancement in Section 3A1.4 did not apply.

19       So we have two distinguishing factors.  Number one, the

20   terrorism enhancement in that case was deemed not to apply

21   where here it clearly does.  And the second is the Sentencing

22   Guideline range in that case is much, much lower.  And the

23   court sentenced within the Guidelines in that case.  Here the

24   Guideline range is life imprisonment, and that is what we

25   believe distinguishes the *Polk* case.

1    I have a couple of more points, Your Honor.  They,

2  frankly, do reiterate the Sentencing Guidelines memorandum, so

3  if --

4        THE COURT:  I have read it twice.

5        MR. HAAG:  But we believe that based upon the nature

6  and circumstances of the offense, the deterrent effect, and,

7  most importantly, to prevent Mr. Aldawsari from committing

8  future crimes, that a life sentence is mandated in this case.

9    Thank you.

10       THE COURT:  Mr. Aldawsari, do you want to come up

11 with your counsel?

12   What do you have to say to me, sir?

13       THE DEFENDANT:  Shortly, I really would like to

14 apologize for what has happened.  Hopefully no harm or injury

15 was caused to the United States.  I believe that, like -- I do

16 not have any criminal history in the United States or

17 elsewhere.

18   I think in this time I am only thinking about my family

19 only, especially that I was separated from my family since I

20 was arrested February 23, 2011.

21   I am sorry again, and I am sorry for the conduct and

22 everything that happened.  I apologize.  I thank you.

23       THE COURT:  What happened, Mr. Aldawsari?  What

24 happened between Vanderbilt and Texas Tech?

25       THE DEFENDANT:  Well, I cannot recall the events

1   that took place at that time.  I think I was very happy at

2   that time at Vanderbilt in Nashville, Tennessee.  I was social

3   and I didn't have that much of social issues.  I missed that

4   good life that I had in Nashville, Tennessee.

5       When I was transferred to Texas Tech, my life had

6   changed.  I went under 80 percent, 180 degrees.  Everything

7   was changed.  I didn't have the same chances and the same good

8   life that I used to have.  It was something very different for

9   me to experience.

10      At the end, I think maybe there was something wrong that

11  just did happen when I was in Texas Tech in Lubbock, and that

12  did not appear before that time.  Maybe all that time period I

13  missed my family, I missed my relatives, and my friends.

14      The only thing I can say is that I apologize.  I am

15  sorry.  I am happy that I did not commit the crime that could

16  cause harm or injury to anyone.  I am sorry.

17      Actually what happened at Texas Tech was exactly that

18  there were only some bad writings.  These bad writings did

19  happen and took place at Texas Tech only in 2010.

20      The only thing that I can say, I did not have the weapon

21  of mass destruction that can cause the harm or injury to the

22  United States.  In West Texas I couldn't practice my faith, I

23  didn't have that much of friends, I was alone, I was isolated

24  for a long time.  Then some bad writings started to appear

25  because of watching TV programs all that time.

1    I know maybe some of these bad writings translate to some

2    actions.  I am sorry for these bad actions, but at the end

3    none of these bad actions did cause harm or injury to the

4    United States.

5         THE COURT:  Mr. Aldawsari, I still remember your

6    phone calls, how angry you were that they had messed up on the

7    phenol order.

8         THE DEFENDANT:  Yes.  I did cancel the phenol order

9    I think sometime in February 20th or the 21st.

10    The thing is I think I have struggled with myself maybe

11    because I had some mental issues at that time.  I did seek

12    some mental help.  I tried to communicate with psychologists

13    before February 23.  The thing is I think I was a bit

14    depressed at that time, and because of my depression and

15    social issues I couldn't make good decisions.  And I am sorry

16    again.

17         THE COURT:  All right, sir.

18    I am going to adopt the factual findings of the Probation

19    Office as set out in the presentence report.

20    I have considered all the factors of 3553.  I have

21    considered your youth at the time.  I have considered the

22    self-induced attitude, for want of a better word, that you got

23    there, and I can even kind of understand the progression.  I

24    think -- I think you were self-willed into the attitude that

25    you took, but I think you believed it.

1          All those factors would indicate that there is some

2     reason to depart downward, but the bottom line is but by the

3     grace of God there would be dead Americans everywhere, you

4     would have done it, and you were doing it all by yourself.  No

5     one was encouraging you.  Every step of the way it was you and

6     you alone.

7          Accordingly, it is the judgment of the Court that you be

8     sentenced to the custody of the Bureau of Prisons for the rest

9     of your life.

10         The usual conditions of supervised release, which will be

11    a term of five-years, will apply, including mental health

12    treatment as necessary.

13         $100 assessment of the crime victim fund is required.

14         There will be no fine.  None will be paid.

15         You have the right to appeal, and should you appeal the

16    Clerk will send the presentence report and presentence

17    memorandums to the Court of Appeals under seal.

18         Thank you very much.  Thank you.

19             MR. COGDELL:  In terms of recommendation, it is my

20    recollection, and I could be wrong, but I do not believe that

21    the Government objected to our request or will not object to

22    our request of Springfield because it provides for

23    psychological care and treatment, Your Honor.

24             THE COURT:  I will certainly recommend that.  The

25    Bureau of Prisons is the Executive Branch, but they have been

1    very good about following my recommendations.

2              MR. COGDELL:  Yes, sir.

3              THE COURT:  Gentlemen, you all did a very good job

4    of representing your client.  I appreciate it, and I enjoyed

5    it.

6         All right.  Anything else before I --

7              MR. COGDELL:  For the record, Your Honor, and I

8    think -- And I am not sure how it played in the Northern

9    District, but we will be filing a motion to withdraw.  It is

10   my belief that Patton Boggs is a firm that will file a notice

11   of appearance and assist Mr. Aldawsari from henceforth.

12             THE COURT:  If you will send me a courtesy copy, I

13   will sign it and email it.

14             MR. COGDELL:  Yes, sir.

15             THE COURT:  Thank you.

16                       (End of hearing.)

17

18

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts                    12/4/2012

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25