1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
2                         LUBBOCK DIVISION

3
    UNITED STATES OF AMERICA        )   NO. 5:11-CR-015-C
4                                   )
    VS.                             )   AMARILLO, TEXAS
5                                   )
    KHALID ALI-M ALDAWSARI          )   JUNE 22, 2012
6

7

8      --------------------------------------------------------

9                         **TRANSCRIPT OF TRIAL**
            **BEFORE THE HONORABLE DONALD E. WALTER,**
10          **UNITED STATES DISTRICT JUDGE, AND A JURY.**

11                           **VOLUME 2**

12     --------------------------------------------------------

13

14

15

16

17

18

19

20

21

22

23  OFFICIAL COURT REPORTER:  MECHELLE DANIEL, 1205 TEXAS AVENUE,
    LUBBOCK, TEXAS 79401, (806) 744-7667.
24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

1                        **A P P E A R A N C E S**

2    **FOR THE GOVERNMENT:**
     UNITED STATES ATTORNEY'S OFFICE
3    1205 TEXAS AVENUE, SUITE 700
     LUBBOCK, TEXAS 79401
4    BY:  JEFFREY R. HAAG
          DENISE B. WILLIAMS
5
     U.S. DEPARTMENT OF JUSTICE
6    NATIONAL SECURITY DIVISION
     950 PENNSYLVANIA AVENUE, N.W.
7    WASHINGTON, DC 20530
     BY:  DAVID P. CORA
8
     UNITED STATES ATTORNEY'S OFFICE
9    BURNETT PLAZA, SUITE 1700
     801 CHERRY STREET, UNIT 4
10   FORT WORTH, TEXAS 76102
     BY:  MATTHEW KACSMARYK
11

12   UNITED STATES ATTORNEY'S OFFICE
     1100 COMMERCE STREET, SUITE 300
13   DALLAS, TEXAS 75242
     BY:  JAMES T. JACKS
14

15   **FOR THE DEFENDANT:**
     COGDELL LAW FIRM LLC
16   ATTORNEYS AT LAW
     1401 McKINNEY STREET, SUITE 1625
17   HOUSTON, TEXAS 77010
     BY:  DAN COGDELL
18        DENNIS HESTER

19
     PAUL DOYLE & ASSOCIATES
20   ATTORNEYS AT LAW
     600 TRAVIS, SUITE 4700
21   HOUSTON, TEXAS 77002
     BY:  PAUL H. DOYLE

22

23
                            *  *  *  *  *
24

25

1                              **INDEX**
                            **VOLUME 2**

2

3   OPENING STATEMENT BY THE GOVERNMENT                    137
    OPENING STATEMENT BY THE DEFENDANT                     150

4

5            **WITNESSES FOR THE GOVERNMENT:**
    **JAY GIBSON**
6       DIRECT EXAMINATION BY MS. WILLIAMS                 157
        CROSS-EXAMINATION BY MR. DOYLE                     178
7       REDIRECT EXAMINATION BY MS. WILLIAMS               182
        RECROSS-EXAMINATION BY MR. DOYLE                   183
8   **TIMOTHY DALLAS**
        DIRECT EXAMINATION BY MR. HAAG                     184
9       CROSS-EXAMINATION BY MR. DOYLE                     197
        REDIRECT EXAMINATION BY MR. HAAG                   203
10      RECROSS-EXAMINATION BY MR. DOYLE                   205
    **DEBRA WIRBELAUER**
11      DIRECT EXAMINATION BY MR. HAAG                     207
        CROSS-EXAMINATION BY MR. DOYLE                     224
12      REDIRECT EXAMINATION BY MR. HAAG                   228
        RECROSS-EXAMINATION BY MR. DOYLE                   228
13  **JOSEPH ZAJAC**
        DIRECT EXAMINATION BY MR. HAAG                     230
14      CROSS-EXAMINATION BY MR. DOYLE                     246
    **MARCUS JORDAN**
15      DIRECT EXAMINATION BY MS. WILLIAMS                 247
        CROSS-EXAMINATION BY MR. DOYLE                     258
16      REDIRECT EXAMINATION BY MS. WILLIAMS               260
    **JOE WHITE**
17      DIRECT EXAMINATION BY MS. WILLIAMS                 261
        CROSS-EXAMINATION BY MR. COGDELL                   273
18      REDIRECT EXAMINATION BY MS. WILLIAMS               277
    **ANTHONY CLAYTON**
19      DIRECT EXAMINATION BY MS. WILLIAMS                 279
        CROSS-EXAMINATION BY MR. DOYLE                     296
20  **AARON COVEY**
        DIRECT EXAMINATION BY MR. HAAG                     303
21      CROSS-EXAMINATION BY MR. COGDELL                   336
        REDIRECT EXAMINATION BY MR. HAAG                   353
22      RECROSS-EXAMINATION BY MR. COGDELL                 354

23

24                          (CONTINUED)

25

1                         <u>INDEX (CONTINUED)</u>
                                <u>VOLUME 2</u>
2
<u>KEITH QUIGLEY</u>
3          DIRECT EXAMINATION BY MR. HAAG                    355
           EXAMINATION BY MR. COGDELL                        360
4          DIRECT EXAMINATION CONTINUED BY MR. HAAG          362
           CROSS-EXAMINATION BY MR. COGDELL                  369
5          REDIRECT EXAMINATION BY MR. HAAG                  386

6          <u>WITNESSES FOR THE DEFENSE:</u>
    NONE
7
                              * * * * *
8
<u>GOVERNMENT EXHIBITS</u>
9   <u>NO.</u>          <u>DESCRIPTION</u>                  <u>OFFERED</u>    <u>ADMITTED</u>
    1, 2          Audio recording, transcript      169        169
10
    25-28         Business records of Carolina      187        187
11                Biological

12  3-10 and      Recordings and transcripts        212        212
    13-24         of telephone calls
13

14  33, 34        Business records of QualiChem     235        236
                  Technologies
15
    35            Delivery receipt                  252        252
16
    166           Student visa documents            266        266
17
    36-39         Business records of Centre at     283        284
18                Overton Park
                  (38 NOT ADMITTED)
19
    40-133 and    Items seized from apartment       309        311
20  426-428       (40 NOT ADMITTED)

21  134-141       Items seized from apartment       357        358

22  429           Document seized from apartment    357        361

23  142, 143      Documents seized from vehicle     366        366

24  <u>DEFENSE EXHIBITS</u>
    None
25                            * * * * *

```
 1                    P R O C E E D I N G S

 2               THE COURT:  I understand the jury is here and they

 3     have decided they do not want to work on Saturday, so we will

 4     have tomorrow and Sunday off.

 5               All right.  You may be seated until the jury comes

 6     in.

 7               MR. COGDELL:  Just one quick question, Your Honor.

 8     Mr. Haag and I were both asking, how far can we stray from the

 9     lectern in opening?

10               THE COURT:  See that black line right there?

11               MR. COGDELL:  We can go to here?

12               THE COURT:  You can get as far as that line.

13               MR. COGDELL:  Okay.  Thank you.

14               THE COURT:  Okay?

15          (THE JURORS ARE SEATED IN THE JURY BOX)

16               THE COURT:  All right.  Everybody may be seated.

17               Good morning.  Thank you so much for being here so

18     timely.  I appreciate it.  As you know, we can't start without

19     you.

20               All right.  We will have opening statements now.

21     Mr. Haag?

22               MR. HAAG:  Yes, Your Honor.  Thank you, Your Honor.

23               THE COURT:  If y'all move very far from the

24     microphone, you're going to have to bring your voice up so that

25     the court reporter can be sure and get it.  Okay?  Thank you.
```

1          MR. HAAG:  Yes, Your Honor.  May it please the

2     court, counsel.

3          It was snowing on February 1st, 2011, and because of

4     that, only two employees could make it in to Con-way Freight

5     that day.  One of those employees was Jay Gibson.  As

6     Mr. Gibson was at work, Fed Ex showed up and it delivered ten

7     boxes.  Mr. Gibson walks over and examines the boxes and

8     discovers that inside each of those boxes is a substance called

9     phenol.  He also discovers from the shipping information that

10    the intended recipient of the phenol is the defendant in this

11    case, Khalid Aldawsari.

12         Mr. Gibson is puzzled for two reasons.  First of

13    all, Con-way Freight, nor he, ordered phenol.  And second, he

14    didn't know a Khalid Aldawsari.  He looks at some research on

15    phenol on the Internet and he discovers that phenol is a toxic

16    substance, so he contacts the company that shipped them the

17    phenol, Carolina Biological Supply Company, and there, he talks

18    to a woman named Miriam, and he says, "Miriam, I've got some

19    boxes of phenol here.  I don't know what they're for.  I didn't

20    order them, and I don't know a Khalid Aldawsari."  And he says,

21    "It's just--it's a real strange deal."

22         And later on in the conversation, Miriam--as she's

23    looking at the order, she says, "Yeah, that is kind of weird."

24    Little did they know at that time just what they had stumbled

25    into.

1               Begin by giving you an overview of the case.   In

2     this case, the indictment alleges that the defendant attempted

3     to use a weapon of mass destruction.   And below that--   The

4     court is going to instruct you on what "attempt" means, and at

5     this point, neither myself nor Mr. Cogdell can tell you with

6     any certainty how the court will instruct you on that.   But two

7     things that come up in pretty much every attempt case is this:

8     First, there must be an attempt to commit the underlying

9     offense, which, in this case, means the defendant attempted to

10    use a weapon of mass destruction against persons or property in

11    the United States.

12              The second element is a substantial step that

13    strongly corroborates the defendant's criminal intent.   In this

14    case, the United States is alleging that the defendant intended

15    to use a picric acid explosive device.   You are going to hear

16    testimony that there are three components to picric acid.   One

17    is sulfuric acid; two is nitric acid; and three is phenol.

18              You are also going to--   The United States in this

19    case is alleging for every improvised explosive device, there

20    needs to be a detonator or an initiator.   In this case, the

21    United States is alleging that the detonator would have been

22    composed of acetone peroxide, match heads, and picric acid.

23    The United States is alleging in this case that the fuse that

24    was going to be used in the improvised explosive device was

25    going to be manufactured either from a cell phone or from an

1    alarm clock.

2            So this gives you an overview of the allegations of

3    what we are going to prove in this case.   In proving those

4    allegations, there are about ten blocks or categories of

5    evidence that you're going to hear during this trial, and we

6    will go through each of those ten blocks of evidence in order.

7            One block of evidence that you're going to hear is

8    the defendant's chemical orders.   As you examine and listen to

9    the testimony on these chemical orders, the tone and the tenor

10   of the exchange between Mr. Aldawsari and the companies is just

11   as important as the content, and you will have an opportunity

12   to hear him as he talks to the representatives at Carolina

13   Biological Company, and you will have a chance to see the

14   emails that Mr. Aldawsari exchanges with the companies.

15           The first chemical order in this case was through

16   Amazon, and Mr. Aldawsari orders sulfuric acid through Amazon,

17   and he obtained that sulfuric acid.

18           The second chemical order in this case was through

19   QualiChem Technologies Group, and Mr. Aldawsari ordered nitric

20   acid from QualiChem, and he obtained that nitric acid.

21           The third chemical order in this case was from the

22   Carolina Biological Supply Company, and he ordered phenol.

23   When I first started talking, I mentioned to you about

24   February 1st, 2001, and I talked to you about Jay Gibson at

25   Con-way Freight.   You're going to hear evidence that Jay Gibson

1    talked to Mr. Aldawsari and he told Mr. Aldawsari on

2    February 1st, "I sent that phenol back to Carolina Biological

3    Supply Company."

4              You are then going to hear Mr. Aldawsari as he talks

5    to the representatives at Carolina Biological Supply Company,

6    and you're going to hear during those conversations on

7    February 1st, he asked them, "Is there any way I could track

8    that package so that if it's still in Lubbock, I can get it?"

9              You're going to hear another conversation.  He tells

10   Carolina Biological, "I need it as soon as possible."

11             You're going to hear yet another conversation, "I

12   can get the phenol from other companies.  I've already

13   contacted other companies about getting the phenol."

14             The last order in this case is from Cole-Parmer,

15   where Mr. Aldawsari again orders phenol.  And he orders that on

16   February 23rd, 2011.  Hours later, he was arrested.

17             Another block of evidence that you will hear is

18   background information.  You are going to hear that

19   Mr. Aldawsari is a citizen and national of Saudi Arabia.  He

20   was in the United States on what's known as an F-1 or a student

21   visa, and that is where the United States allows persons from

22   foreign countries to come to the United States in order to

23   study.

24             You're going to hear evidence that Mr. Aldawsari was

25   in the United States on a scholarship from the Saudi Arabian

1    Basic Industries Corporation, and the acronym for that is

2    SABIC.  And SABIC sent Mr. Aldawsari to the United States to

3    study chemical engineering.  You are going to hear evidence

4    that Mr. Aldawsari was formerly a student at Texas Tech

5    University, where he was studying with a major in chemical

6    engineering.  You're going to hear, at the time of his arrest,

7    he was studying at South Plains College.

8            Another block of evidence that you will hear is the

9    physical evidence in this case, and these items of physical

10   evidence were all recovered from Mr. Aldawsari's apartment in

11   Lubbock, Texas, which was located at 2400 Glenna Goodacre in

12   Lubbock, Texas, Apartment Number 2303.

13           You're going to hear that in Mr. Aldawsari's

14   apartment, he had a screwdriver, a soldering kit, a speaker

15   wire that had been spliced onto a Christmas tree light.  He had

16   a set of Christmas tree lights, a Sinometer multimeter.  And

17   what that is, is it's a device that can be used to check the

18   electrical current that flows through a circuit.  Batteries,

19   electrical items, speaker wires, alarm clocks that were

20   partially disassembled, cellular telephones, notebooks

21   containing Mr. Aldawsari's writings, sulfuric acid, as I

22   mentioned before; nitric acid, a two-burner camp stove with

23   propane tanks, glass beakers, flasks, a glass stir rod.  I put

24   up here Hazmat suit.  Hazmat is short for hazardous materials,

25   and it's a--almost a full-body suit that protects the user from

1    chemicals when working with them.

2              A surgical mask, scales, a full chemistry set, and

3    it's sold as a professional chemistry set.  A strainer, a

4    filter, cooking pot, and goggles.  The significance of these

5    items are going to be explained a little later on in the

6    testimony.

7              Another block of evidence is Mr. Aldawsari's

8    writings, and these come from notebooks that were recovered

9    from his apartment.  And you can take those writings and group

10   them into about six different categories.  One category of

11   writings that you will hear about is where Mr. Aldawsari

12   expresses his allegiance to al-Qaeda.  Another category of

13   writings is where Mr. Aldawsari writes of his intention to

14   engage in Jihad and his wish for martyrdom.  And in this

15   context, what "Jihad" means is a violent arms struggle on

16   behalf of one's religion.  "Martyrdom" in this context means a

17   wish to die for one's God, a wish for someone to die in service

18   to God.

19             You're going to hear Mr. Aldawsari write about his

20   rationale for Jihad and why he's going to engage in Jihad.

21   You're going to see writings, detailed lengthy writings where

22   Mr. Aldawsari writes out the instructions for making an

23   improvised explosive device.  You're going to hear writings

24   where Mr. Aldawsari writes out his plans to attack various

25   targets in the United States.  And finally, you will see

1    writings where he talks about the timing of those attacks.

2            To give you a sample of some of those writings and

3    the rationale for Jihad, Mr. Aldawsari writes, "This came to be

4    when I watched a Syrian movie discussing the tyranny of the

5    Zionist Jews and their oppression of the Palestinians.  It is

6    natural that whoever hates Israel hates America, its main

7    supporter, to a point where I wished the Mujahideen"--and you

8    will hear that "Mujahideen" simply means holy warrior--"can

9    reach her and destroy her head.  It did not take long for me to

10   see the two blessed assaults, New York and Washington, so I

11   tasted joy and happiness as the infidel Americans and their

12   supporters tasted sorrow and terror."

13           Continuing in that same entry, Mr. Aldawsari writes,

14   "So it became evident to me the truth of what the Jihad people

15   said from the Shaykh Usama Bin Laden, so I planned and decided

16   to go to America for Jihad for many reasons, also that striking

17   the head of the infidels, America, on her own ground has a

18   special taste, whereas it will show to them that the Mujahideen

19   are capable of reaching them and killing them like they kill

20   Muslims around the world."

21           In writing about his plans to attack targets,

22   Mr. Aldawsari writes, "The second idea is about blowing up the

23   Dallas stadium on the 2nd of October of this year when Texas

24   plays against Oklahoma.  It is expected that there will be more

25   than that 80,000 spectators."

1            In another entry, Mr. Aldawsari writes, "Strong and

2    resounding Jihadist operations in the United States of America

3    are on my mind.  Amongst these operations is targeting the huge

4    human gathering in the streets and squares of the big cities

5    like New York."

6            In writing of the timing of attacks, Mr. Aldawsari

7    writes, "Praise to God, I bought lab instruments, protective

8    clothing, and the chemical materials necessary for Jihad,

9    except for one material, which is the phenol substance; I will

10   be able to buy it sooner and not later with the help, might,

11   and success of God."

12           On February 11, 2011, just about two weeks before

13   he's arrested, Mr. Aldawsari writes, "I am close to obtaining

14   the phenol substance which I will use in manufacturing the

15   picric acid."

16           And finally, on the very day before he's arrested,

17   Mr. Aldawsari writes, "I am, to God be the praise and

18   gratitude, close to manufacturing and producing the combustible

19   picric acid, whereas all that is left for me to do is to buy

20   the pure phenol substance which I will buy today, with the help

21   of God and His will, His success, and His direction."

22           Another block of evidence that you will hear are

23   Mr. Aldawsari's videos, and you're going to hear evidence that

24   there was a series of videos that were on what's called a LaCie

25   thumb drive, and that's just a thumb drive that you can stick

1    into the computer, and you're going to hear evidence that

2    Mr. Aldawsari accessed the videos on those computer that are on

3    the hard drive--or, excuse me, or the LaCie thumb drive.  The

4    thumb drive was found in Mr. Aldawsari's apartment.  It was

5    hidden inside a book on one of his bookshelves.  And those

6    videos are a serious of videos that give detailed explanations

7    and instructions on how to make an improvised explosive device.

8         Another block of evidence that you will hear is

9    Mr. Aldawsari's emails.  You're going to see three categories

10   of emails.  You're going to see emails where Mr. Aldawsari

11   orders the components and the various tools that he would need

12   to make an improvised explosive device.  You're going to see

13   two emails that have formulas for the manufacture of picric

14   acid.  You're going to see one email that tells the person--

15   that tells the follower of the email--that writes, "How to make

16   picric acid using nitric acid, sulfuric acid, and phenol."

17   There's another email that instructs the user on how to make

18   picric acid using aspirin.

19        You're also going to see emails about

20   Mr. Aldawsari's research of targets.  One of those emails is

21   going to be a listing of the names and the addresses of the

22   American soldiers who were guards at the Abu Ghraib prison, and

23   he lists out their names and their addresses.

24        You're going to see an email, and there's going to

25   be, in the header of the email:  Nice Targets, 01, and Nice

1   Targets.  And in that email with the header, Nice Targets, he

2   lists a nuclear reactor and information about a nuclear

3   reactor, and he lists several hydroelectric dams in the

4   United States.

5           You're going to see an email that has all--a listing

6   or a map of all the New York City street cameras in New York

7   City.  And finally, you're going to see an email, and the

8   subject header of that email was, "Tyrant's House," and it had

9   the address for the former President of the United States,

10  George W. Bush.

11          Another block of evidence that you will hear is

12  microphone overhears.  In this case, the United States obtained

13  a court order for the FBI to install audio listening devices in

14  Mr. Aldawsari's apartment, and they installed those devices.

15  And the audio recording devices captured what Mr. Aldawsari was

16  saying inside his apartment.  On one occasion, as Mr. Aldawsari

17  is talking out loud--  And this is paraphrasing.  You will have

18  a chance to hear him.  He states when he went to New York and

19  saw how people behaved and talked, he said to himself, maybe

20  they deserved 9/11 and maybe it should happen again and again,

21  because these people, they actually deserve it.

22          On February 22nd, 2011, the day before

23  Mr. Aldawsari's arrest, you're going to hear a microphone

24  overhear of Mr. Aldawsari talking out loud.  And from the

25  context of the conversation, it's consistent with what someone

1    in the media might be saying out loud.   And Mr. Aldawsari

2    states, "Yes, well, it was obvious that the terrorist, Khalid

3    Aldawsari, was so satisfied with the attacks that he had

4    accomplished and done.   Actually, he was so proud, even proud

5    enough to smile to our faces.   We tried to understand why

6    he--he was doing that, and he said, because you people deserve

7    it, this is why.   He said, you kill us, we kill you."   This is

8    the ideology that he follows.

9              Another block of evidence that you will hear is

10   computer evidence in this case.   You're going to see the

11   numerous searches that Mr. Aldawsari did for picric acid.

12   You're going to see the numerous searches that he did for

13   phenol and the numerous searches that he did for where he could

14   obtain that phenol.   And you're going to see that he searched

15   several different companies, such as Gallade Chemical, eBay,

16   QualiChem, Amazon, and Grainger.

17             You're also going to see his searches for blasting

18   caps.   Blasting caps is another way that people refer to a

19   detonator or an initiator.   And with those searches for

20   blasting caps, he does searches for acetone peroxide and how to

21   obtain acetone peroxide.   Finally, you're going to see evidence

22   that Mr. Aldawsari searches the terrorist watch list about

23   three days before he's arrested.

24             Another block of evidence that you'll hear is expert

25   testimony.   You're going to hear expert testimony from computer

1    experts Captain David Parker with the Texas Tech University
2    Police Department and laboratory director Michael Morris.  And
3    Mike Morris, he is the lab director at the North Texas Regional
4    Computer Forensics Laboratory in Dallas, Texas.  They're going
5    to talk to you about that computer evidence that I mentioned on
6    the previous slide.
7              You're also going to hear from Mark Whitworth and
8    Robert Mothershead.  Mark Whitworth is an agent with the FBI,
9    and he is an expert in explosives in Quantico, Virginia, at the
10   FBI laboratory.  Robert Mothershead is a chemist with the FBI,
11   and he is also at the FBI laboratory in Quantico, Virginia.
12   And what they are going to talk to you about is, they are going
13   to talk to you about those three elements of an improvised
14   explosive device that I mentioned when I started talking to
15   y'all this morning.  He is going to tell you there's three
16   components: the main charge, the initiator or the detonator,
17   and the fuse.
18             They are also going to tell you that they examined
19   the notebook, the video, and the email instructions that
20   Mr. Aldawsari had and that, if followed, those instructions
21   would have produced an improvised detonator; a fuse, using a
22   cell phone or an alarm clock; and a picric acid main charge.
23             The final block of evidence that you will hear is
24   interstate nexus.  And in this case, we have to establish an
25   interstate nexus, and there's two ways that you can do it.  You

1    can show that either a facility of interstate or foreign

2    commerce was used to further the offense, or you can show that

3    the results of the offense, if it had been completed, would

4    have affected interstate or foreign commerce.

5              On the first way to prove that, the facility of

6    interstate or foreign commerce used to further the offense, you

7    will hear testimony that Federal Express, Fed Ex, and Con-way

8    Freight delivered a substantial majority of the products that

9    Mr. Aldawsari needed to complete his improvised explosive

10   device.  You are also going to hear testimony that

11   Mr. Aldawsari extensively, if not exclusively, used the

12   Internet and the email, both facilities of interstate commerce,

13   to obtain components that he would need to build his improvised

14   explosive device.

15             You are also going to hear from the Honorable Mark

16   Langdale.  Mr. Langdale is the former Ambassador to Costa Rica,

17   and he is the president of the George W. Bush Institute and

18   Foundation.  Ambassador Langdale is going to talk to you about

19   the interstate and, indeed, international efforts that the

20   George W. Bush Foundation and Institute do.

21             Mr. Huerta.  Mr. Huerta is from the Cotton Bowl, and

22   Mr. Huerta is going to talk to you about the interstate

23   activities and, indeed, the foreign activities that the Cotton

24   Bowl hosts in Dallas, Texas.

25             Ladies and gentlemen, at the conclusion of all ten

1    blocks of those evidence, I'm going to ask you to return the

2    verdict that that evidence demands, and that is that

3    Mr. Aldawsari is guilty of attempting to use a weapon of mass

4    destruction against the United States.

5           Thank you.

6           THE COURT:  Thank you, sir.  Mr. Cogdell?

7           MR. COGDELL:  Just a moment to set up, Your Honor?

8           THE COURT:  Yes, sir.

9        (PAUSE)

10          MR. COGDELL:  Good morning.  There was no weapon.

11   There was no attempt to use a weapon.  Let me say that again.

12   There was no weapon.  There was no attempt to use a weapon.

13          Mr. Haag went through a detailed and excellent

14   discussion about the evidence that had been recovered, about

15   the efforts of law enforcement, about the searchings of

16   Mr. Aldawsari's emails and writings and videos.  And I suggest

17   to you that the evidence will show you those writings, those

18   emails, those bloggings were unbelievably offensive,

19   horrifically offensive.

20          But what the evidence is not going to show you is

21   that there was a bomb and there was an attempt to use a bomb.

22   Law enforcement in this case actually and literally prevented

23   the commission of this crime.  Let me say that again.  Law

24   enforcement prevented the commission of the crime alleged.  Is

25   that a good thing?  You bet it is.  That doesn't mean it was a

1    bomb, and that doesn't mean it was an attempt to use it.

2            The government showed you, in summary, these emails,

3    the bloggings, the words of Mr. Aldawsari, but they didn't talk

4    much about the law to you.  And as the judge told you

5    yesterday, as I'm going to probably be reminded throughout

6    this, the law, you're going to get from Judge Walter.  Okay?

7    He's going to tell you what the law is.  I think I know where

8    we're going with the law, and I want to discuss the law with

9    you and how the law applies to the facts in this case.

10           You will get, at some point, a jury charge saying

11   that the verdict is going to be based solely on the evidence,

12   without prejudice or sympathy, according to the law.  What I

13   believe that means is, no matter how horribly offended you are

14   and how big of a pile of prejudice that he deserves, that pile

15   of prejudice isn't evidence, isn't proof beyond a reasonable

16   doubt of a bomb that doesn't exist and of an attempt to use a

17   bomb that doesn't exist.

18           The jury charge--probably hard for you to see that,

19   but it says that he knowingly attempted to use a weapon of mass

20   destruction and that if he succeeded or if he attempted to use

21   it, that it had to affect interstate commerce.  Let me break

22   that down.  Two things: knowingly attempted to use a weapon of

23   mass destruction and knowingly--attempt to use a weapon of mass

24   destruction--  Out of sync a bit.  Sorry.

25           This "knowingly attempted to use," you can't attempt

1    to use a bomb that doesn't exist.  The weapon of mass

2    destruction, it didn't exist.  The substantial step--and I

3    suggest to you that is really the heart of this case.  I

4    believe the judge is going to tell you that in order to commit

5    the offense, you've got to believe beyond a reasonable doubt

6    that he intended to commit the offense.  And I suggest to you

7    there was a lot of intent, okay, and I'm not going to argue for

8    a second at closing argument that he had some horrific intent.

9    Okay?  He did.  The question is whether he did an act

10   constituting a substantial step towards the commission of the

11   crime.

12           What does that mean?  I believe that you're going to

13   get charged that you may only find the defendant guilty if you

14   find beyond a reasonable doubt that the defendant's actions

15   proceeded to the point where, if not interrupted, he would have

16   committed the underlying crime.  Proceeded to the point where,

17   if not interrupted, he would have committed the underlying

18   crime.

19           What's the reality?  The reality is, there was no

20   bomb that had ever been constructed.  There was no specific

21   target that had been selected.  There was no bomb placed at a

22   target area, there was no button to push, there was no cell

23   phone to detonate.  Intent?  Yes.  Substantial step?  No.  They

24   prevented the substantial step.  God bless them.  God bless

25   them.

1          Weapon of mass destruction.  You're going to get a
2    definition of what the definition of a weapon of mass
3    destruction is.  You can't see that, so let me go in:  A
4    combination of parts intended for use in converting any device
5    into any destructive device from which a destructive device may
6    be readily assembled.  Let me say that again.  From which a
7    destructive device may be readily assembled.
8          Mr. Haag showed you a laundry list of a bunch of
9    different things, but from that laundry list, there was not a
10   destructive device that may be readily assembled.  The evidence
11   will show you that.
12         Let me pull back for a second.  We'll get into this
13   in a minute.  But during the period that law enforcement was
14   observing Mr. Aldawsari, they were literally watching every
15   move he made.  They were watching every move he made inside his
16   apartment, inside his computer, inside Lubbock.  He wasn't
17   doing anything that they weren't on realtime awareness of.
18   They were literally in the house with him.  They knew he
19   couldn't have assembled or readily assembled a destructive
20   device and arrested him before he could have.
21         There was no weapon of mass destruction.  There was
22   no phenol.  You cannot assemble this bomb without the phenol.
23   You're going to hear more about phenol than you probably ever
24   dreamed about hearing, and more about the assembly of bombs
25   than you ever dreamed about hearing.  But in this case, the

1    government arrested him before he had the necessary

2    ingredients.  One more time.  He didn't have the wherewithal to

3    create the bomb.  What we will show you is the 24-7

4    surveillance they had of Mr. Aldawsari and how he was missing

5    the phenol, the necessary ingredient, and how the government

6    was aware of that when he was arrested.

7              There's a word.  There's a word that comes to mind

8    to describe, in my opinion, what Mr. Aldawsari was and is.

9    He's a failure.  He's a failure.  He's a failure academically,

10   he's a failure in his relationships, and he failed in this

11   case.  Academically, he flunked chemistry.  This person that

12   they suggest to you was going to assemble this weapon of mass

13   destruction flunked chemistry.  He couldn't get into the school

14   that he wanted to get into.  The school that he ultimately got

15   into was Texas Tech.  Flunked out of there.  He was going to a

16   smaller college in the area in Lubbock; didn't even attend

17   class there.  Let me remind you, failed chemistry.

18             Personal.  Once again, the word to describe

19   Mr. Aldawsari is failure.  He couldn't make friends easily.

20   Couldn't keep the friends that he made.  Couldn't find a woman

21   to date.  Couldn't continue to date the few that he did meet.

22             He's a terroristic failure.  He didn't have the

23   ingredients.  He didn't have the plan.  He didn't have the

24   wherewithal and the knowledge.

25             The ingredients.  No phenol, no weapon of mass

1    destruction.  No weapon of mass destruction, no attempt to use

2    a weapon of mass destruction.

3         Plan.  You will see from the evidence his mind about

4    the object or the exercises planned.  It changed the way a

5    lawyer might change his suits.  It was George W. Bush, it was

6    the Saudi king, it was the people of New York, it was the

7    Hoover Dam.  There was no plan.  There was no plan.  There were

8    thoughts.  There were horrific thoughts.  But a specific plan,

9    articulate design for success, it didn't happen.  There was no

10   practice run.  There was no escape hatch or route.  There was

11   no person to help him get away.  There was nothing.  There were

12   thoughts, horrific thoughts, but not a plan.

13        Ability?  He watched a bunch of videos, and like I

14   said, to any American, those videos are offensive.  To me as

15   his lawyer, they are offensive.  But watching videos doesn't

16   translate into the ability to accomplish something.  He had

17   never conducted a test.  He had never assembled the pieces

18   together.  The lab equipment, the Hazmat suit, and the various

19   chemicals, they had never been used.  Let me say that again.

20   The chemicals, the Hazmat suit, the beakers, the containers,

21   chemicals, they had never been used.

22        Didn't have any associates coaching him through, no

23   one on the phone, the email that he's communicating with,

24   telling him, here's--  He's watching videos, he's reading some

25   horrific stuff.  He has no mentor.  He has no--whatever the

1    phrase is, no--no--no one to guide him through the process.

2            One of their expert witnesses I think you will hear

3    from is going to talk about Mr. Aldawsari being a lone wolf.

4    Was he a lone wolf or was he a loser alone?  I think the

5    evidence is going to show you he was a loser alone that failed.

6            This orchestrator, in the government's view, this

7    person who is going to attempt to use a weapon of mass

8    destruction, how is he buying some of these chemicals, some of

9    these ingredients?  With his own credit card.  Whose name is he

10   using when he's purchasing these chemicals?  His own name.

11   What telephone number is he using?  His own telephone number.

12   What email address is he using?  His own email address.

13   Seriously?  This genius is going to use a weapon of mass

14   destruction and change the world?  No.  He's a failure.  He's a

15   failure.

16           I'm not going to do anything more, nor am I going to

17   do anything less, than ask you to follow the law.  The law in

18   this case, when you apply the evidence to it, no matter how

19   offensive, no matter how upsetting, no matter how outrageous,

20   it is that you do not substitute emotion for facts.  You do not

21   substitute anger for evidence.  And the law in this case, if

22   you follow it--and I'm going to ask each and every one of you

23   to do it.  The law in this case, if you follow it, will result

24   in a verdict of not guilty.  Thank you.

25           THE COURT:  Thank you, sir.

1              Call your first witness.

2              MS. WILLIAMS:  The United States calls Jay Gibson.

3              THE COURT:  If you'll stand and raise your right

4    hand and be sworn, please.

5         (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

6              THE COURT:  Please be seated.

7              MS. WILLIAMS:  May it please the court.

8                        JAY GIBSON,

9    GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

10                     DIRECT EXAMINATION

11   BY MS. WILLIAMS:

12   **Q.**   Mr. Gibson, please state your name.

13   **A.**   Jay Gibson.

14   **Q.**   How are you employed?

15   **A.**   Con-way Freight.

16   **Q.**   What type of business is Con-way Freight?

17   **A.**   It's a freight business, a less-than-truckload freight

18   business.

19   **Q.**   Now, when you tell us "less-than-truckload freight

20   business," what does that mean?

21   **A.**   We're not a small package company and we're not a

22   truckload company.  We're in between the two.  We take medium

23   to large packages or parcels--not parcels, but, say, skids of

24   freight, put them together, and move them across the country.

25   **Q.**   So when you say you're not a small freight company, would

1    one of those type companies be like Fed Ex or UPS?

2    **A.**    Fed Ex Express and UPS Parcel.

3    **Q.**    So, like, the people that would actually bring something

4    to my house?

5    **A.**    Yes, ma'am.

6    **Q.**    Would Con-way Freight actually generally bring something

7    to my house?

8    **A.**    Not often, but we would, but. . .

9    **Q.**    And you say you're not the large, like, over-the-road

10   kind of trucks.   Right?

11   **A.**    No, ma'am.

12   **Q.**    What is your position with Con-way Freight?

13   **A.**    I'm the manager.

14   **Q.**    How long have you been with that company?

15   **A.**    A little over 20 years.

16   **Q.**    And is your office in Lubbock?

17   **A.**    Yes, ma'am.

18   **Q.**    Have you always worked in the Lubbock office?

19   **A.**    Not always, but most of the time.

20   **Q.**    All right.   Does Con-way Freight ship hazardous

21   materials?

22   **A.**    Yes, ma'am.

23   **Q.**    And we already said that you generally handle larger

24   items, but not the large items that would be in the great big

25   trucks?

1  **A.**    Correct.

2  **Q.**    If I may, as an example, might you pick up product at a

3  supplier and deliver it to, for example, the Wal-Mart

4  Distribution Center?

5  **A.**    Yes, ma'am.

6  **Q.**    All right.  Does Con-way Freight have offices in all

7  50 of the United States?

8  **A.**    Yes, ma'am.

9  **Q.**    Does Con-way Freight also have offices in foreign

10 countries?

11 **A.**    Yes, ma'am.

12 **Q.**    Does Con-way Freight deliver goods to all 50 states?

13 **A.**    Yes, ma'am.

14 **Q.**    Do the trucks of Con-way Freight and the people that

15 drive them frequently cross state lines in delivering those

16 goods?

17 **A.**    Yes, ma'am.

18 **Q.**    Is Con-way Freight required to comply with federal

19 regulations issued by the United States Department of

20 Transportation and other federal agencies?

21 **A.**    Absolutely.

22 **Q.**    I want to turn your attention to February 1st of 2011.

23 Do you specifically remember that day?

24 **A.**    Yes, ma'am.

25 **Q.**    Now, before we talk about the events of that day, do you

1   remember what the weather was like?

2   **A.**   It was icy.

3   **Q.**   Now--

4   **A.**   Cold.

5   **Q.**   --had the ice fallen--the snow fallen and melted and

6   turned into ice later, or do you remember?

7   **A.**   Actually it was--it was--it was icy and melted off that

8   day.  In between Lubbock and Abilene, where we get our freight,

9   was extremely icy, and we didn't get any product in that day,

10  or any--

11  **Q.**   So if I understand what you're saying, the road was icy

12  between Lubbock and Amarillo?

13  **A.**   And Abilene.

14  **Q.**   Excuse me.  Abilene.

15  **A.**   Yes, ma'am.

16  **Q.**   And so your trucks were not running on that highway that

17  day?

18  **A.**   No, ma'am.

19  **Q.**   Now, you said Abilene is where you get your freight.

20  Would you explain that to us, please?

21  **A.**   Yes, ma'am.  That is a freight assembly center for us.

22  Freight comes in from all over the--all over Texas and

23  Oklahoma.  The freight assembly center--the packages--say, you

24  know, two skids from Oklahoma City, two skids--or five skids

25  from San Antonio come in, and our Lubbock trucks go in there

1    and I--I didn't name all of the locations that come into the

2    Abilene location, but they all consolidate, and we put the

3    freight for Lubbock on the Lubbock trailers.  We pick up

4    freight also for the other locations, say Dallas or

5    San Antonio, and we put in theirs, and they go back out to

6    their facilities.

7    **Q.**    So all of the stuff goes to Abilene and then gets put on

8    the trucks that go back out to the different places?

9    **A.**    Yes, ma'am.

10   **Q.**    On February 1st, 2011, did you have a full staff of

11   people working in your Lubbock office that day?

12   **A.**    No, ma'am.

13   **Q.**    Was that due to the ice?

14   **A.**    Yes, ma'am.

15   **Q.**    Who else--  Were you working that day?

16   **A.**    Yes, ma'am.

17   **Q.**    Who, besides you, was working that day?

18   **A.**    Tracy Massey.

19   **Q.**    What is Mr. Massey's position at Con-way Freight?

20   **A.**    He's a freight operations supervisor, kind of an

21   assistant manager.

22   **Q.**    So on a day that was icy--on that day that was icy and

23   you and Mr. Massey were the only ones working, what were y'all

24   doing if the trucks weren't running?

25   **A.**    Catching up on paperwork.  We were answering the phones,

1    probably explaining to people that, hey, your--calling a lot of

2    our good customers, saying, hey, we don't have any freight

3    today, don't be expecting it.  Just manning the fort.

4    **Q.**    Did someone bring a shipment of items actually to the

5    Con-way Freight office?

6    **A.**    Right.  Fed Ex Express.

7    **Q.**    Now, is it common or uncommon for your office in Lubbock

8    to get deliveries from Fed Ex?

9    **A.**    We do get deliveries from Fed Ex for our supplies and

10   stuff like that.

11   **Q.**    Some of the smaller type items that you don't put on your

12   trucks?

13   **A.**    Yes, ma'am.

14   **Q.**    So it wasn't unusual for the Fed Ex people to come that

15   day?

16   **A.**    No, ma'am.

17   **Q.**    The shipment or the items that you got from Fed Ex that

18   day, what--where did that come from?

19   **A.**    It came from North Carolina, I believe.  Carolina

20   Biological.

21   **Q.**    The company's name was--on the packages said Carolina

22   Biologicals?

23   **A.**    On the packing slip.

24   **Q.**    On the packing slip.

25          And what did that shipment consist of?

1   **A.**   Ten boxes of phenol solution.

2   **Q.**   So--now, when you got the ten boxes that were sent--and

3   was it--on the packing slip, did it say these ten boxes were

4   going to Carolina Biological--excuse me--going to Con-way

5   Freight?

6   **A.**   Yes, they did.  They said--had our address on it and

7   Con-way Freight.

8   **Q.**   And from Carolina Biologicals?

9   **A.**   Yes, ma'am.

10  **Q.**   Now, is it your job at Con-way Freight there in Lubbock

11  to know what shipments and what things that you are actually

12  receiving from other vendors or other companies?

13  **A.**   Yes, ma'am.

14  **Q.**   So did you order anything from Carolina Biologicals?

15  **A.**   Didn't think so, no, ma'am.

16  **Q.**   And there are other people that work there, so, guess

17  somebody might have ordered and you may not have known that?

18  **A.**   Correct.

19  **Q.**   So did you start checking on what--what in the world is

20  this stuff from Carolina Biologicals?

21  **A.**   Yes, ma'am.

22  **Q.**   Had anyone told you to expect something from Carolina

23  Biologicals?

24  **A.**   No, ma'am.

25  **Q.**   Now, if someone else there at your office--  And let me

1    ask you this:  How many people would usually work there but for

2    the roads being icy?

3    **A.**    Counting the drivers, probably no more than twenty.

4    **Q.**    So if someone, for whatever reason, for Con-way Freight

5    purposes, had ordered something from Carolina Biologicals,

6    would they let you know, hey, we're going to get ten boxes from

7    these people?

8    **A.**    Yes, ma'am.  I have to approve the purchase orders.

9    **Q.**    So anything that's bought, that comes through you?

10   **A.**    Yes, ma'am.

11   **Q.**    Okay.  On the shipping documents, is there a place for

12   what is called a consignee?

13   **A.**    Yes, ma'am.

14   **Q.**    And what is a consignee?

15   **A.**    The person that's going to receive the product.

16   **Q.**    And on those shipping documents for those ten boxes, who

17   did it list as the consignee or the person or entity that was

18   to receive it?

19   **A.**    Con-way Freight.

20   **Q.**    Now, does Con-way Freight usually act as the consignee or

21   the recipient for an individual?

22   **A.**    No, ma'am.

23   **Q.**    Would you estimate for the jury, in 20 years, about how

24   many times you have approved Con-way Freight taking in

25   something for an individual?

1   **A.**     Two to three times.

2   **Q.**     When you saw the ten boxes that Fed Ex had delivered to

3   you, what did you do to try to determine the origin of the

4   shipment?

5   **A.**     We pulled the packing slip off of it and tried to figure

6   out where it came from, who it belonged to.  We really didn't--

7   At first, we thought it might be something for us, but then

8   that's not anything that we had ordered.

9   **Q.**     You have a notebook there in front of you, and I want to

10  refer your attention to what has been marked for identification

11  as Government's Exhibit 25.  Would you please look in the

12  notebook and find that exhibit.

13  **A.**     Yes, ma'am.

14  **Q.**     Do you have that?

15          Now, without telling us what is contained on that

16  document, do you recognize this as the packing slip that was

17  contained within those ten boxes that you received at Con-way

18  Freight from Carolina Biological?

19  **A.**     Yes, ma'am.

20  **Q.**     So after you look at the packing slip, what did you do

21  then?

22  **A.**     We looked to find how we would find the person that this

23  belonged to.

24  **Q.**     Okay.  And did you ask--I guess since Mr. Massey was the

25  only other one working there that day, did you ask him to do

1    some research about the substance that you thought might be in

2    those boxes?

3    **A.**    I asked him to look it up on the Internet to find out

4    what it was.

5    **Q.**    And what did you ask Mr. Massey to research?

6    **A.**    It said it was phenol.  I said--I asked him, what is

7    phenol solution.

8    **Q.**    And you asked him to research that over the Internet?

9    **A.**    Yes, ma'am.

10   **Q.**    Did he do so?

11   **A.**    Yes, ma'am.

12   **Q.**    After he did that, did he bring back to you pieces of

13   paper that appeared to have results from his research?

14   **A.**    Yes, ma'am.

15   **Q.**    Did you look at those results?

16   **A.**    I did.

17   **Q.**    And did those results concern you?

18   **A.**    I did.  It was nothing that we needed.  It said it was

19   dangerous, that you don't want to get it on you, you don't want

20   to drink it, you don't want to sniff it.  You're going to end

21   up dead if you did.

22   **Q.**    You don't want to smell it, touch it, or drink it?

23   **A.**    No.

24   **Q.**    Okay.

25   **A.**    The boxes also said that.

1   **Q.**   That it was hazardous material?

2   **A.**   Yes, ma'am.

3   **Q.**   Now, did the fact that the shipment was going to an

4   individual person--and could you tell that by looking, or how

5   did you determine that it was going to an individual?

6   **A.**   We looked at the packing slip, and the only reason we

7   could figure out that it was--  It was purchased by an

8   individual, that we didn't know who that individual was.

9   **Q.**   And did that further add to the confusion and concern?

10   **A.**   Absolutely.  We don't accept stuff normally, as you said

11   before.

12   **Q.**   Now, the bill-to name or the--on the packing slip, or the

13   person who had purchased it, what name was that?

14   **A.**   Khalid Aldawsari.

15   **Q.**   Now, did--  You already knew that it was hazardous

16   materials?

17   **A.**   Yes, ma'am.

18   **Q.**   And seeing this name on that packing slip, did that cause

19   you any concern?

20   **A.**   It did.

21   **Q.**   Did the fact that you did not know that Con-way was to

22   receive that shipment cause you concern?

23   **A.**   Yes, ma'am.

24   **Q.**   So after you did all of that, what did you do next?

25   **A.**   I called the chemical company.

1   **Q.**   Is that Carolina Biological Supply?

2   **A.**   Yes, ma'am.

3   **Q.**   So was there a phone number for them on the packing slip?

4   **A.**   Yes, ma'am.

5   **Q.**   So you called them up, and about what time of the day,

6   just approximately, was all this going on?

7   **A.**   About lunchtime.  Probably 1:00.

8   **Q.**   Sometime around lunch, after lunch?

9   **A.**   Yes, ma'am.

10  **Q.**   I'd like to refer your attention to what is in front of

11  you in that same book that have been marked for identification

12  as Government's Exhibits 1 and 2.  Do you see those items?

13  **A.**   Yes, ma'am.

14  **Q.**   Before coming to testify today, did you listen to

15  Government's Exhibit Number 1 and did you review Government's

16  Exhibit Number 2?

17  **A.**   Yes, ma'am.

18  **Q.**   Is Government's Exhibit Number 1 an audio of the

19  telephone conversation you had with Carolina Biological?

20  **A.**   Yes, ma'am.

21  **Q.**   Is Government's Exhibit Number 2 a transcript of that

22  audio?

23  **A.**   Yes, ma'am.

24  **Q.**   And does Government's Exhibit Number 1 truly and

25  accurately reflect that conversation that you had with Carolina

1    Biological on February 1st, 2011?

2    **A.**    Yes, ma'am.

3    **Q.**    And does the transcript accurately transcribe the words

4    that were said?

5    **A.**    Yes.

6           MS. WILLIAMS:  Your Honor, at this time, I would

7    tender Government's Exhibits 1 and 2 into evidence.

8           MR. DOYLE:  No objection, Your Honor.

9           THE COURT:  Without objection, 1 and 2 are admitted.

10          MS. WILLIAMS:  May we please play Government's

11   Exhibit Number 1 that is synchronized with the transcript, Your

12   Honor?

13          THE COURT:  You may.

14      (AUDIO RECORDING PLAYING)

15   **Q.**    (BY MS. WILLIAMS)  So when you were talking to Ms. Harris

16   from Carolina Biological, toward the end of that conversation,

17   your plan was to ship that--those ten boxes right back to them?

18   **A.**    I wanted to, yes.

19   **Q.**    Did you not want it at Con-way Freight?

20   **A.**    No, ma'am.  No, ma'am.

21   **Q.**    Now, after you had talked to Miriam Harris, the lady on

22   the phone at Carolina Biologicals, did you get another phone

23   call from Carolina Biologicals to you that same day?

24   **A.**    Yes, ma'am.

25   **Q.**    Do you remember the name of the person that called you?

 1   **A.**     I don't.

 2   **Q.**     Do you remember the title of the person that called you?

 3   **A.**     I think it was the vice-president of the company.

 4   **Q.**     Now, did that person give you any instructions regarding

 5   the ten-box shipment of phenol?

 6   **A.**     Told me not to give it to the consignee, or the person

 7   that was on there.

 8   **Q.**     By the way, did you open up one of those ten boxes?

 9   **A.**     Yes, ma'am, we did.

10   **Q.**     To see what was in there and exactly how it was packaged?

11   **A.**     Yes, ma'am.  It was packaged very, very well.  Something

12   that you did not want to get out.  It was in a--probably a

13   1-foot-by-1-foot box which had a cradle inside that box.

14   Inside that cradle was a bag, and inside that bag was a tin can

15   with a screw-on cap, and that cap was taped down on all four

16   sides so it wouldn't unscrew.  Now, we did not--we didn't take

17   it out of that bag, but on the side of the box, inside that can

18   was another bag with--looked like what a--would be absorbent

19   material.  And also in there was a glass bottle, what looked

20   like maybe a medicine bottle, a liquid medicine bottle that

21   also had a screw-on cap on it, and that cap was also taped down

22   on all four sides.

23   **Q.**     So you saw part of how the substance was packaged, but

24   are you saying there was a picture on the side of the box that

25   showed all of the different layers of packaging that the

1    substance had?

2    **A.**    Yes, ma'am.

3    **Q.**    I think you described, like, six or so layers of

4    packaging.

5    **A.**    Yes, ma'am.  That concerned me.

6    **Q.**    That concerned you also?

7    **A.**    Yes, ma'am.

8    **Q.**    Now, during the second phone call with--you had from

9    Bio--excuse me--Carolina Biologicals, where the--who you

10    believed was the vice-president--

11    **A.**    Yes, ma'am.

12    **Q.**    --that called you, while you were on the phone with

13    that--on that call with Carolina Biologicals, was Tracy Massey

14    on the phone with someone else?

15    **A.**    Yes, ma'am.

16    **Q.**    And where do y'all office in relation to one another

17    there at Con-way Freight?

18    **A.**    It would be like this.  I office here, he offices here,

19    with a glass in between us.

20    **Q.**    So your glass--your offices adjoin, and there's a glass

21    window, so you can see what he's doing and he can see what

22    you're doing?

23    **A.**    And hear each other.

24    **Q.**    And hear each other.

25            So Mr. Massey was on the phone with someone.  Did he

1  tell you that he was going to transfer a call to you?

2  **A.**   Yes, ma'am.

3  **Q.**   By the way, what is the telephone number for Con-way

4  Freight in Lubbock?

5  **A.**   (806) 763-9818.

6  **Q.**   I would like to refer your attention to what has been

7  marked for identification as Government's Exhibit 144, and I

8  believe it's loose.  It's not in the binder.  Yes, that one.

9  And you may take that out of the plastic sleeve.  If you would

10  please turn to page 24 that's in pencil on the bottom

11  right-hand side.

12          Okay.  Have you got page 24?

13  **A.**   Yes, ma'am.

14  **Q.**   Do you also see the date on there of 2-1-11, or

15  February 1st, 2011?

16  **A.**   No, ma'am.  On page 24?  I have a 1-18.

17  **Q.**   I'm sorry?

18  **A.**   I have 1-13 through 1-18, 2011.

19  **Q.**   Turn to page 26, handwritten 26.  I apologize.  I

20  misspoke.

21  **A.**   I do have a 2-8-11.

22  **Q.**   All right.  2-1-11?

23  **A.**   2-1-11.

24  **Q.**   On any of those dates where it says 2-1-11, do you see

25  Con-way Freight's telephone number on there?

1    **A.**    Yes, ma'am.

2    **Q.**    Can you tell us, please, the time that is logged by the

3    entry where you see Con-way Freight's telephone number?

4    **A.**    3:43 p.m.

5    **Q.**    Now, before we leave this document, would you please turn

6    to page 19, and that will be the handwritten 19.  I hope I've

7    got this one right.

8              Do you have page 19?

9    **A.**    Yes, ma'am.

10   **Q.**    All right.  Do you see date entries for 12-18-10 and

11   12-20-10?

12   **A.**    Yes, ma'am.

13   **Q.**    In relation to those date entries, do you see Con-way

14   Freight's telephone number?

15   **A.**    Yes, ma'am.

16   **Q.**    Thank you.

17              Now back to February 1st, 2011.

18   **A.**    Yes, ma'am.

19   **Q.**    When Tracy Massey transferred the telephone call to you,

20   did he tell you who was on the phone?

21   **A.**    He did.

22   **Q.**    What did he say?

23   **A.**    "This is Khalid."

24   **Q.**    Now, "This is Khalid."  What did that mean to you?

25   **A.**    Means the person that was on the packing slip.

1    **Q.**    So you had already seen that--part--that name--part of

2    that name--

3    **A.**    Yes, ma'am.

4    **Q.**    --on the packing slip.

5          So did you pick up that phone call?

6    **A.**    Yes, ma'am.

7    **Q.**    And tell us about the conversation.

8    **A.**    I picked up the phone call.  The person on the line said

9    that, hey, I had some stuff sent to you.  I'm going to come

10   pick it up.

11          And I said, I'm sorry, I don't have that freight

12   anymore.  I sent it back, because I didn't know whose it was,

13   and it wasn't mine, so I sent it back to the shipper.

14          At that point he asked me--  I asked him why he sent

15   it to me.

16          He said, where is my product, or freight?

17          I said--I asked him, why did you send it to me?

18          He says, is it on Fed Ex?

19          I said no.  I asked him why he sent it to me.

20          Each question, he got a little bit more agitated.

21   He asked if it was on UPS.  I said no.  Why did you send it to

22   me?

23          He then asked if it--if I could stop it, and I said,

24   no, sir, I can't stop it.  Why did you send it to me?

25          And each time, he got a little bit more angry.  So

1    he says, you've got to stop that.

2            I said the only way I--the only person that can stop

3    that is Carolina Biologicals, and I don't have any way of doing

4    that; you'll have to call them.

5    **Q.**    Would you describe him as persistent?

6    **A.**    Yes, ma'am.

7    **Q.**    Did he ever get angry with you about the shipment?

8    **A.**    With each question, yes, ma'am.

9    **Q.**    Did he ever answer your question about, why did you have

10   it sent to me?

11   **A.**    No, ma'am.

12   **Q.**    Now, you have referred to "he," so this caller was a male

13   caller.  Did he ever give you his name?

14   **A.**    I don't remember that, but--just that Tracy told me who

15   he was.

16   **Q.**    What kind of an accent did you think he had?

17   **A.**    I would guess an Arabic accent or a Middle Eastern

18   accent.

19   **Q.**    Was he speaking English to you?

20   **A.**    Yes, ma'am.

21   **Q.**    Now, you told him that you had already shipped the boxes

22   back to Carolina Biological?

23   **A.**    Yes, ma'am.

24   **Q.**    But actually, it was still sitting right there.  Right?

25   **A.**    Yes, ma'am.

1    **Q.**    And Carolina Biological had--

2    **A.**    Told me not to give it to him.

3    **Q.**    --told you not to give it to him?

4    **A.**    Yes, ma'am.

5    **Q.**    But other arrangements had not yet been made about what

6    to do with it?

7    **A.**    No, ma'am.

8    **Q.**    After you spoke with Khalid on the phone, did you contact

9    anyone at Con-way Freight about this?

10   **A.**    Yes, ma'am.  I talked to our security manager for our

11   region.

12   **Q.**    And after you talked with him maybe more than once, did

13   you contact any law enforcement agency about the situation?

14   **A.**    We did later on that day.  We--the--he advised me to call

15   the Lubbock police.

16   **Q.**    And did you do so?

17   **A.**    Yes, ma'am.

18   **Q.**    Okay.  And did the Lubbock police come that day?

19   **A.**    Yes, ma'am.

20   **Q.**    And at some point, did agents from the Federal Bureau of

21   Investigation come to Con-way Freight?

22   **A.**    Yes, ma'am, the next morning.

23   **Q.**    Now, did you later speak with Carolina Biological Supply

24   about actually returning the shipment to them?

25   **A.**    Yes, ma'am.

1  **Q.**   And were you later instructed that you were to keep the

2  substance in Lubbock at your place?

3  **A.**   Yes, ma'am.

4  **Q.**   Now, who told you to keep it there?

5  **A.**   The FBI.

6  **Q.**   So where did you store those ten boxes of chemical?

7  **A.**   I stored it in a secure room under lock and key at our

8  facility.

9  **Q.**   Who would have access to that room?

10  **A.**   Me.

11  **Q.**   Only you?

12  **A.**   Yes, ma'am.  If--Tracy would if I wasn't here--wasn't

13  there, and only--at least--I had to go in there or Tracy had to

14  go in there if anybody else was going to go in that room.  We

15  also stored our--some of our parts and supplies in that room.

16  **Q.**   How long did you keep those ten boxes of phenol?

17  **A.**   I believe two weeks.

18  **Q.**   And did you ultimately return that or ship that back to

19  Carolina Biological Supply?

20  **A.**   Yes, ma'am.

21          MS. WILLIAMS:  I pass the witness.

22          THE COURT:  Your witness, sir.

23          MR. DOYLE:  May I proceed, Your Honor?

24          THE COURT:  You may.

25          MR. DOYLE:  Thank you.

1                        CROSS-EXAMINATION

2    BY MR. DOYLE:

3    **Q.**    Mr. Gibson, my name is Paul Doyle.  We have never met

4    before, have we?

5    **A.**    No, sir.

6    **Q.**    So just so I'm clear, you guys ship the same types of

7    material as Fed Ex and UPS Parcel.  Same size.  Right?

8    **A.**    No.

9    **Q.**    You do not?

10   **A.**    Not--not--not UPS Parcel.  Not on a regular basis; how

11   about that.  UPS Parcel and Fed Ex Express Parcel are more of

12   a--we would ship, say--they would ship this (indicating) or a

13   letter or, you know, you go down to their place and they

14   already have their envelopes that you put them in or the box

15   that you put it in.  In fact, you probably see on TV, the mail

16   says, "If it fits, it ships."

17   **Q.**    Sure.

18   **A.**    That's not anything that we normally ship.  There's a

19   time that we may--copy paper, we may ship a box of copy paper.

20   That's not something that we normally ship.  We would ship a

21   whole skid of copy paper, say 10, 15 boxes.

22   **Q.**    Got it.  But you guys are certainly distinguished from a

23   Mailbox, Etc., a Fed Ex where you can have supplies shipped to

24   individuals.  You are not a receiving company for individuals

25   to come pick up.

1   **A.**    No, ma'am--I mean no, sir.

2   **Q.**    And when Fed Ex--  The only things you-all receive are

3   objects that you need for supplies for your work?

4   **A.**    Yes, sir.

5   **Q.**    So I guess you said in 20 years, you may have received a

6   package for somebody else that doesn't work there three or four

7   times?

8   **A.**    Yes, sir.  And we knew ahead of time that it was going to

9   happen.

10  **Q.**    So if an individual decides to send something--chemicals,

11  for that matter--to you-all, it immediately raises a red flag?

12  **A.**    Yes, sir.

13  **Q.**    And right when you saw the box and right when you saw the

14  name, you knew something was wrong?

15  **A.**    No.  We looked at it.  In fact, I--I asked--the fact is

16  that--could it be windshield wiper fluid, because I had thought

17  I had ordered some, and I asked him to check it out.  And then

18  we pulled the packing slip and saw what it was and, like, Jay,

19  you didn't order this.  And by the way that it was packaged, it

20  was, like, there's no way this is--

21  **Q.**    So it certainly caused enough concern for you to

22  investigate what it was?

23  **A.**    After we looked at it, yes.

24  **Q.**    And after you looked at it, you were concerned?

25  **A.**    Sure.  Something that was shipped to us that was

1   chemicals, we didn't have any idea and didn't know who the

2   person was that shipped it to us.

3   **Q.**    Within hours of receiving that package and doing some

4   research, you had already come to the conclusion that you were

5   not going to deliver this to Mr. Aldawsari; is that correct?

6   **A.**    We were told not to.  We were under the--  First of all,

7   we were going to try to find out who it was.  You saw by the

8   tape that we were trying to find the person's name and where we

9   would do it, but the fact is, after we talked--we were told not

10  to, we weren't going to.

11  **Q.**    And you put it in a secure room behind lock and key?

12  **A.**    Yes, sir.

13  **Q.**    Nobody at the company knows Mr. Aldawsari?

14  **A.**    No, sir.

15  **Q.**    As far as you know, nobody has ever seen him there?

16  **A.**    No, sir.

17  **Q.**    As far as you know.  Right?

18  **A.**    As far as I know, no.

19  **Q.**    Nobody has any reason to believe he ever came up there

20  after the phone call.  Correct?

21  **A.**    Correct.

22  **Q.**    In fact, you led him to believe that it was back--being

23  shipped back, had already gone back out?

24  **A.**    Yes, sir.

25  **Q.**    And in terms of the weather, I know the roads were icy

1    and everything, but the package that Fed Ex had, it only had

2    your name on it?

3    **A.**    Con-way Freight.

4    **Q.**    That's right.  It only had--  It didn't have Khalid

5    Aldawsari or his address anywhere marked on that box?

6    **A.**    Just his name.

7    **Q.**    His name on the inside.  Right?

8    **A.**    On the packing slip.

9    **Q.**    Right.  And you had the materials with you for, what did

10   you say, two weeks?

11   **A.**    I think so.  I think that's about right.

12   **Q.**    You notified Lubbock PD.  Right?

13   **A.**    Yes, sir.

14   **Q.**    That day?

15   **A.**    Yes, sir.

16   **Q.**    And then you spoke to the FBI the next morning.  Right?

17   **A.**    Yes, sir.

18   **Q.**    And if the FBI had asked you to cooperate with them,

19   would you have?

20   **A.**    Absolutely.

21   **Q.**    If the FBI had asked you to call back Mr. Aldawsari and

22   tell him, "Actually, I called it back, it was back here, you

23   can come pick it up," you would have done that.  Right?

24   **A.**    If the FBI had asked me to do that, I would have.

25   **Q.**    And that never happened?

1   **A.**   No, sir.

2        MR. DOYLE:  No further questions--

3   **A.**   I tell you, I probably would have talked to my people

4   first before I would have done anything.

5   **Q.**   (BY MR. DOYLE)  And if they told you to, you would have?

6   **A.**   Yes.

7        MR. DOYLE:  Okay.  Thank you, sir.

8        THE COURT:  Redirect?

9        MS. WILLIAMS:  Very brief, Your Honor.

10            REDIRECT EXAMINATION

11   BY MS. WILLIAMS:

12   **Q.**   Your intent was to cooperate with whomever was

13   investigating?

14   **A.**   Absolutely.

15   **Q.**   On February 1st of 2011, when the ten boxes of phenol

16   came to Con-way Freight, did you know at that time that

17   Mr. Aldawsari had picked up something from Con-way Freight

18   there in Lubbock in December of 2010?

19   **A.**   No, ma'am.

20   **Q.**   Did you learn that later?

21   **A.**   Yes, ma'am.

22        MS. WILLIAMS:  No further questions.

23        THE COURT:  You can ask about that if you wish.

24        MR. DOYLE:  Sure.

25

1                          RECROSS-EXAMINATION

2    BY MR. DOYLE:

3    **Q.**    How did you learn that he had picked up something from

4    Con-way Freight?

5    **A.**    Later on, after all this had came out.

6    **Q.**    Okay.  And what is it that you believe he picked up?

7    **A.**    Some nitric acid, I think.

8    **Q.**    And are you sure he picked it up from Con-way Freight?

9    **A.**    I didn't see him do it, but, I mean--

10   **Q.**    So you don't have personal--you're not sure of that?

11   **A.**    I have people that do.

12   **Q.**    Does Con-way Freight ship nitric acid?

13   **A.**    Yes.

14              MR. DOYLE:  No further questions.

15              THE COURT:  You may step down.  Thank you, sir.

16              Is the witness excused?

17              MS. WILLIAMS:  Yes, please, Your Honor.

18              THE COURT:  You are excused.  Thank you, sir.

19              Call your next witness.

20              MR. HAAG:  Thank you, Your Honor.  The United States

21   calls Tim Dallas.

22              THE COURT:  Raise your right hand, sir, and please

23   be sworn.

24        (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

25              THE COURT:  Have a seat, please, sir.

1                        TIMOTHY DALLAS,

2    GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

3                     DIRECT EXAMINATION

4    BY MR. HAAG:

5    **Q.**   Good morning, Mr. Dallas.

6    **A.**   Good morning.

7    **Q.**   Please state your name.

8    **A.**   Timothy Everett Dallas.

9    **Q.**   How are you employed?

10   **A.**   I'm employed at Carolina Biological Supply Company.

11   **Q.**   What is your title with Carolina Biological Supply

12   Company?

13   **A.**   I'm the director of logistics.

14   **Q.**   How long have you been with Carolina Biological?

15   **A.**   About 13 years.

16   **Q.**   Now, where is Carolina Biological Supply based?

17   **A.**   We're based in Burlington, North Carolina.

18   **Q.**   What sort of services does Carolina Biological Supply

19   provide?

20   **A.**   We provide science and math education products.

21   **Q.**   If you would, would you give this jury an example of a

22   typical product that Carolina Biological might sell?

23   **A.**   Typical products would be microscopes, telescopes,

24   chemicals, science kits, things of that nature.

25   **Q.**   And when you say a science kit, would you just give the

1   jury a brief description of what sort of kits you would

2   assemble there at Carolina Biological?

3   **A.**     We assemble kits for any topic of science.  It can be

4   soils, catastrophic events, balancing and weighing, in which a

5   set of experiments are written, and then we put the products

6   around the instructions to make experiments for classrooms.

7   **Q.**     How many warehouses does Carolina Biological have?

8   **A.**     We have the main location.  We have a distribution center

9   in Whitsett, which is 11 miles away.

10  **Q.**     So one in Burlington and one in Whitsett; is that

11  correct?

12  **A.**     That's correct.

13  **Q.**     About how far apart are those two facilities?

14  **A.**     They are 11 miles.

15  **Q.**     How do you generally conduct your business with the

16  public?

17  **A.**     Primarily we are--we have a catalog, phone, fax, mail,

18  and then the Internet.

19  **Q.**     Is the majority of your business done through other than

20  a person walking into your company headquarters?

21  **A.**     Oh, absolutely, yes.

22  **Q.**     Can the public order your products through the website?

23  **A.**     Most products, but not everything.

24  **Q.**     If someone were to order a product through your website,

25  would you discuss with the jury, how is that order processed?

1  **A.**     In a typical order, it's ordered through the web.   If

2  it's just something like petri dishes or test tubes, it would

3  automatically go into our warehouse management system.   The

4  order would then print.   It would be picked, packed, and

5  shipped.   A lot of times, it would do it on the same day.

6  **Q.**    Are you one of the custodians for Carolina Biological

7  Supply's records?

8  **A.**     Yes.

9  **Q.**    Prior to testifying today, have you examined Government's

10  Exhibits 25 through 28, which are before you?

11  **A.**     Yes, I have.

12  **Q.**    And are those exhibits business records of Carolina

13  Biological?

14  **A.**     Yes.

15  **Q.**    Were those records made by a person with knowledge of, or

16  made from information transmitted by a person with knowledge of

17  the acts and events appearing on them?

18  **A.**     Yes.

19  **Q.**    Were the records made at or near the act or events

20  appearing on them?

21  **A.**     Beg your pardon?

22  **Q.**    Were the records made at or near the time of the events

23  appearing on them?

24  **A.**     Yes.

25  **Q.**    Is it the regular practice of Carolina Biological to make

1    these records?

2    **A.**    Yes.

3    **Q.**    And were the records kept in the course of a regularly

4    conducted activity?

5    **A.**    Yes.

6             MR. HAAG:  Your Honor, at this time, move to admit

7    Government's Exhibits 25 through 28.

8             MR. DOYLE:  No objection.

9             THE COURT:  They are received.

10   **Q.**    (BY MR. HAAG)  Go ahead and turn your attention to those

11   records that are Government's Exhibits 25 through 28.  We're

12   going to start with Government's Exhibit Number 27, and you

13   should see it up on the screen that will come up.

14            MR. HAAG:  And if you would highlight the top half

15   of that, please.

16   **Q.**    (BY MR. HAAG)  Would you please describe for the jury

17   what this document is?

18   **A.**    This is an order confirmation letter.

19   **Q.**    And how is this usually generated?

20   **A.**    This is generated through an email.

21   **Q.**    Is this an automated response that Carolina would send,

22   or is it something that someone hand-drafts?

23   **A.**    This is an automated response.

24   **Q.**    What is the date of the order confirmation on this

25   document?

1   **A.**     January 31st, 2011.

2   **Q.**     And if you would, let's go ahead and move up a little bit

3   towards the bottom half of the document.

4          Would you please read for the jury what--the bill-to

5   and the ship-to information that was listed on the order

6   confirmation?

7   **A.**     The bill-to, this order was billed to Khalid Aldawsari at

8   2400 Glenna Goodacre Boulevard, Apartment 2303, in Lubbock,

9   Texas.  The ship-to is to Con-way Freight at 2809 Avenue C,

10  Lubbock, Texas.

11  **Q.**     Moving down on the document, what product was ordered?

12  **A.**     The product that was ordered was ten 500-milliliter

13  bottles of phenol.

14  **Q.**     In preparing to testify in this case, did you review the

15  prior orders of phenol that had been placed with Carolina

16  Biological?

17  **A.**     Yes, I did.

18  **Q.**     About how many other times, in your review of Carolina

19  Biological's record, was ten bottles of phenol ordered?

20  **A.**     Very few.  Three or four, maybe five--

21          MR. DOYLE:  I'm going to object, Your Honor;

22  relevance.

23          THE COURT:  I think I see the relevance.  I'm going

24  to overrule.

25          Proceed.

1   **Q.**   (BY MR. HAAG)  What is the usual quantity of phenol that

2   an entity would order from Carolina Biological?

3   **A.**   Typically one.

4            MR. DOYLE:  Same objection, Your Honor.

5            THE COURT:  Your objection is continuing.

6            You may answer.

7   **A.**   Typically one 500-milliliter bottle.  Maybe sometimes

8   two.

9   **Q.**   (BY MR. HAAG)  And to give the jury some context, let's

10  say in the case of a large university, what would a large

11  university typically order on a yearly basis for phenol?

12  **A.**   Again, probably one 500-milliliter bottle.

13  **Q.**   Moving on to the right side of the same column, what was

14  the extended--or the price for the phenol?

15  **A.**   The phenol was $319.50.

16  **Q.**   What is the expected ship date that's listed on there?

17  **A.**   January 31st, 2011.

18  **Q.**   And if we go a little bit further down in the document,

19  with freight and handling, what was the total price for the

20  order?

21  **A.**   The total was $434.57.

22  **Q.**   If we could turn to Government's Exhibit 26, please.

23  Would you please describe for the jury what this document is?

24  **A.**   This is an invoice.

25  **Q.**   And what is an invoice?

1    **A.**    An invoice is simply an itemized bill.

2    **Q.**    Is this the document that generates with the billing of

3    the product?

4    **A.**    Yes, it is.

5    **Q.**    What is the date that's listed on the invoice?

6    **A.**    The invoice date is January 31st, 2011.

7    **Q.**    And under the shipping terms, it says FOB shipping point.

8    What does that mean?

9    **A.**    FOB is freight on board.

10   **Q.**    And what does that mean, in layman's terms?

11   **A.**    That just means that our company's liability ends when

12   the product is shipped.

13   **Q.**    What is the order number that's listed there on the

14   invoice, the sales order number?

15   **A.**    The sales order number is 24547970WB.

16   **Q.**    Does this document reflect the same bill-to and ship-to

17   address that we saw in the previous document?

18   **A.**    Yes, it does.

19   **Q.**    Does it also reflect that ten bottles of phenol was

20   ordered?

21   **A.**    Yes, sir.

22   **Q.**    Let's move to Government's Exhibit 25, the packing list.

23            MR. DOYLE:  No objection.

24            THE COURT:  I gather 25, 26, 27, and 28 have been

25   received without objection.

1          MR. DOYLE:  Okay.

2          THE COURT:  Is that right?

3          MR. DOYLE:  That's right, yes, sir.

4          THE COURT:  Okay.

5     **Q.**   (BY MR. HAAG)  Looking at Government's Exhibit 25, would

6     you please describe for the jury what this is?

7     **A.**   This is a packing list.

8     **Q.**   And describe for the jury, on a packing list, how are the

9     different documents distributed on a packing list?

10    **A.**   Okay.  When an order is placed, this document will

11    print out so that the people in the warehouse will know that

12    the order exists and they can go retrieve the material, pick

13    it, and then pack it and send it to the customer.

14    **Q.**   And where do the different copies of the packing list go?

15    **A.**   This particular packing list is a two-part form, a top

16    and a bottom.  It's perforated.  The--one half goes--travels

17    with the package ultimately to the customer, and the second

18    half is collected at shipping.

19    **Q.**   Moving up to the top upper left-hand corner, what is the

20    date listed on the packing list?

21    **A.**   January 31st, 2011.

22    **Q.**   Does the packing list reflect the same bill-to and

23    ship-to address that we have discussed with the previous two

24    documents?

25    **A.**   Yes, sir.

1   **Q.**   Does it also reflect those same ten bottles of phenol

2   liquid?

3   **A.**   Yes.

4   **Q.**   Moving on down, there's going to be--right above where

5   it's highlighted--where the phenol is highlighted, it says pick

6   date.  What is the pick date?

7   **A.**   That is the date that the order was picked off the shelf

8   to be packed and shipped.

9   **Q.**   What is the date reflected in the packing list?

10  **A.**   January 31st, 2011.

11  **Q.**   Please turn to the next page of the document.  Looking up

12  in the upper left-hand corner, there's a section marked Picked

13  By, and there's two initials of LL.  What does that mean?

14  **A.**   Those are the initials of the person that picked that

15  order.  That's Lori Lineberry.

16  **Q.**   What carrier was used for this shipment?

17  **A.**   Fed Ex.  The FEE means Fed Ex Express.

18  **Q.**   And if we go--  Is that under Shipping Method--or Ship

19  Method over in the center of the screen?

20          Where it says Ship Method over in the center of the

21  screen--

22  **A.**   Yes, that's correct.

23  **Q.**   --that reflects Fed Ex?

24  **A.**   Yes.

25  **Q.**   Are there any special shipping requirements for phenol?

1   **A.**    Yes, sir.  It's a hazardous material, so it has to be

2   packed in compliance with DOT regulations.

3   **Q.**    Are you familiar with those regulations for how phenol

4   needs to be packed?

5   **A.**    Yes, sir, I am.

6   **Q.**    Would you describe for the jury how phenol must be

7   packaged before it can be transported?

8   **A.**    Well, ten bottles were ordered.  Each bottle would have

9   to be packed separately.  You can only put 500 milliliters in

10  one container.  The bottle would go into a metal can.  The

11  metal can would be filled with some type of vermiculite or some

12  other absorbent.  Then the can is packed in a special box

13  that's called a 4-G box that is specifically for hazardous

14  materials, and then the box would be shipped with the

15  appropriate hazardous labels.

16  **Q.**    How are the various containers and boxes sealed?

17  **A.**    They are sealed with reinforced tape.

18  **Q.**    Let's talk about this shipment where we've just examined

19  the documents.  How did you first discover that there was an

20  issue with the shipment?

21  **A.**    The way that I became aware of this is that my shipping

22  manager had just received a call from Con-way Freight, and

23  Con-way had told--asked the shipping manager why we shipped

24  this delivery to them, because they didn't place an order.

25  They also did not know the name of the person whose name was on

1    the order.  So they--they just called, wanting to know why we

2    shipped it to them, so he contacted me to let me know this was

3    going on.

4    **Q.**    And after you became aware of it, did you have a chance

5    to look at the order?

6    **A.**    I did.

7    **Q.**    And what concerned you about the order?

8    **A.**    Several things.  I saw that, first, there was a very

9    large quantity.  Of course, the main thing that concerned me

10   was the fact that the person that we had that ordered this did

11   not--was not affiliated with the business that we shipped it

12   to.  So that was the main thing.

13   **Q.**    Did you have any concerns about what the product was,

14   that it was phenol?

15   **A.**    Yes, I did.

16   **Q.**    And did you have any concerns about the quantity of the

17   product?

18   **A.**    Yes, I did.

19   **Q.**    When you learned there was an issue with the shipment,

20   was there a major sporting event that was to occur in the

21   future?

22   **A.**    Yes, sir, there was.

23   **Q.**    What event was to occur?

24   **A.**    The Super Bowl was about to occur in Texas.

25   **Q.**    Did that cause you any concern?

1   **A.**   Yes, it did.

2   **Q.**   After you were informed of the situation by the

3   transportation manager, what did you do?

4   **A.**   I immediately called our chief financial officer of the

5   company.  The reason I called him is because he is our chief

6   safety officer.

7   **Q.**   And after consulting with him, who did--or I'm sorry.

8   What is his name?

9   **A.**   His name is Ken Pitman.

10  **Q.**   And after consulting with Mr. Pitman, what did you do

11  next?

12  **A.**   We conferenced our company attorney.

13  **Q.**   What happened after you conferenced with the company

14  attorney?

15  **A.**   We told him our concern, and he contacted the FBI.

16  **Q.**   After reporting the incident to the FBI, did you give any

17  instructions to your Customer Service Department about this

18  order?

19  **A.**   Yes, sir, I did.  I told Customer Service not to allow

20  this shipment to go out, not to let a replacement order go out,

21  and to stop shipping all phenol until further notice.

22  **Q.**   You said that you instructed no more phenol shipments to

23  go out.  Who did you tell that to?

24  **A.**   I told that to my transportation--my shipping manager,

25  and I told it to the customer service managers.

1   **Q.**   Did you later receive a telephone call from FBI Special

2   Agent Michael Orndorff in Lubbock?

3   **A.**   Yes, sir.

4   **Q.**   Did you have several conversations with Special Agent

5   Orndorff throughout this incident?

6   **A.**   Yes, I did.

7   **Q.**   On February 3rd of 2011, did Special Agent Orndorff

8   request your assistance with anything?

9   **A.**   Yes, he did.

10   **Q.**   What did he request your assistance with?

11   **A.**   He wanted us to make some phony phenol, something that

12   looked like phenol, that was bottled like phenol and labeled

13   like phenol but it was safe.  It was basically water.

14   **Q.**   While you were in the process of doing this, did the FBI

15   make any requests of your Customer Service Department?

16   **A.**   Yes, they did.

17   **Q.**   What did they request your Customer Service Department to

18   do?

19   **A.**   They requested that we try to string Mr. Aldawsari along,

20   keep him--make him think his order was going to be delivered,

21   and so they wanted us to stay in touch with him.

22   **Q.**   Did the Customer Service attempt to string Mr. Aldawsari

23   along?

24   **A.**   Yes, sir.

25   **Q.**   Was that attempt ultimately successful?

1   **A.**    For a while.  It was successful for a while, but it

2   wasn't completely successful.

3   **Q.**    In the end, did Mr. Aldawsari cancel his order with

4   Carolina Biological?

5   **A.**    Yes, he did.

6   **Q.**    Since this order has been placed, has Carolina Biological

7   changed its policy with regard to chemicals?

8   **A.**    Yes, sir, we have.

9   **Q.**    Would you please explain for the jury the changes that

10   you have made with your policy?

11   **A.**    Well--

12             MR. DOYLE:  I'm going to object to the relevance of

13   this, Your Honor.

14             THE COURT:  What's the relevance?

15             MR. HAAG:  Your Honor, I believe that this would go

16   to show the steps that they took to correct the incident.  I'll

17   withdraw the question.

18             THE COURT:  All right, sir.

19             MR. HAAG:  Pass the witness, Your Honor.

20             THE COURT:  Your witness, sir, Mr. Doyle.

21                         CROSS-EXAMINATION

22   BY MR. DOYLE:

23   **Q.**    Mr. Dallas, my name is Paul Doyle.  We have never spoken

24   before, have we?

25   **A.**    No, sir.

1  **Q.**    When your company received the direction from the FBI to,

2  quote, string Mr. Aldawsari along, who did you receive that

3  from?

4  **A.**    Agent Orndorff.

5  **Q.**    And did you issue an office-wide policy to do their best

6  to keep him at bay?

7  **A.**    No, sir, I wouldn't say that.  We--we issued a statement

8  that if he called, to transfer the call to our customer service

9  manager.

10  **Q.**    And who was the customer service manager?

11  **A.**    Debra Wirbelauer.

12  **Q.**    What did you tell her to say or do?

13  **A.**    I didn't tell her to say anything.  We--I told her what

14  Agent Orndorff said and that the calls would be coming to her.

15  As far as what to say to him, I didn't tell her anything.

16  **Q.**    You had also mentioned that Agent Orndorff asked you-all

17  to make ten similar packaged bottles but basically with fake

18  phenol in it; is that correct?

19  **A.**    Yes, sir.

20  **Q.**    And did you-all do that?

21  **A.**    We did.

22  **Q.**    Who did that?

23  **A.**    Our formulations laboratory.

24  **Q.**    And how quickly did he do that?

25  **A.**    He did it immediately, within a day.

1   **Q.**   What happened after you had those made?

2   **A.**   Actually not much.  The phenol never left.  One bottle, I

3   think, left, but the rest of it never left the company.

4   **Q.**   Where did it go?

5   **A.**   The one bottle?

6   **Q.**   Yes.

7   **A.**   It left with one of the FBI agents.

8   **Q.**   And when did that happen?

9   **A.**   I'm not exactly sure of the exact date, but I would--it

10   would be early in February.

11   **Q.**   So after speaking to Orndorff, you instructed

12   Ms. Wirbelauer--is that how you pronounce her name?--

13   **A.**   Yes, sir.

14   **Q.**   --to string him along, and then you instructed your lab

15   manager to create ten fake bottles of phenol?

16   **A.**   Yes, sir.

17   **Q.**   And you-all did both of those tasks; is that correct?

18   **A.**   That is correct.

19   **Q.**   Did you ultimately have a conversation with Orndorff in--

20   let's say around February 22nd, 23rd about the investigation?

21   **A.**   Probably.  I would say yes.

22   **Q.**   And did you learn that an arrest was imminent?

23   **A.**   I don't know.  I don't know how to answer that.

24   **Q.**   Well, did you keep a timeline of events?  Did you create

25   a timeline of events?

1   **A.**   I did keep a timeline of events, yes, sir.

2   **Q.**   And when did you create this?

3   **A.**   I created it--I was--I was told that I had to go to our

4   company's board of directors meeting and advise them on the

5   events that had happened, so I created that timeline prior to

6   that meeting.

7   **Q.**   Okay.

8           MR. DOYLE:  May I approach the witness, Your Honor?

9           THE COURT:  You may.

10          (APPROACHES WITNESS)

11  **Q.**   (BY MR. DOYLE)  I'm going to show you what is Defense

12  Exhibit Number 3.  Do you recognize this?

13  **A.**   Yes, I do.

14  **Q.**   Okay.  Is this the timeline you created?

15  **A.**   I did.

16  **Q.**   And you filed this with your company?

17  **A.**   No, I didn't file it with my company.

18  **Q.**   You--

19  **A.**   I made this for my own use.

20  **Q.**   Okay.  Okay.  If you go to the third page of this

21  document, first paragraph, did you document a conversation you

22  had with Orndorff?

23  **A.**   Third page, first paragraph?

24  **Q.**   Third page, first paragraph, last sentence.

25  **A.**   Okay.  Okay.  Yes, sir.

1   **Q.**   And what did you write, sir?

2   **A.**   "On February 3rd, Agent Orndorff asked Carolina

3   Biological--"

4              THE COURT:  Slowly, please.

5   **A.**   I'm sorry.  "On February 3rd, Agent Orndorff asked

6   Carolina Biological to contact Aldawsari on the premise of

7   reshipping his order--"

8              THE COURT:  Okay.  A little more slowly.  The court

9   reporter has to keep up with you.

10             THE WITNESS:  Do I need to repeat it?

11             THE COURT:  No, that's all right.

12  **Q.**   (BY MR. DOYLE)  No, no.  I'm talking about--  That's the

13  second--that's the last paragraph of the second page.  The

14  third page, first paragraph.

15             Continue reading.  Go on to the next page.

16  **A.**   "He wanted us to send him ten bottles of what appeared to

17  be phenol but would actually be something harmless.  After

18  discussing this with Ken Pitman--"

19  **Q.**   Hold on.  Stop.  We're not on the same page.

20             MR. DOYLE:  May I approach the witness, Your Honor?

21             THE COURT:  You may.

22  (APPROACHES WITNESS)

23  **A.**   This page is number 3.

24  **Q.**   (BY MR. DOYLE)  Oh, I'm sorry.  That's just the way it's

25  numbered.  The third page you have here, the first paragraph.

1    **A.**    Okay.  "When I called Agent Orndorff that he would

2    not"--I'm sorry, "When I"--that's what it says.  "When I called

3    Agent Orndorff that he would not reorder and I thought our role

4    in this adventure was over, I told him that when all of this

5    was over, to please give me a call and let me know what it was

6    all about.  His response was:  I'll give you a call, but I

7    won't have to tell you what it was about because you will hear

8    it on TV."

9    **Q.**    And you indicated that the last contact you had with an

10   agent was on February 22nd; is that correct?

11   **A.**    Yes, sir.

12   **Q.**    So this conversation with Orndorff occurred prior to

13   February 22nd; is that correct?

14   **A.**    Yes, sir.

15   **Q.**    And this phenol item is a restricted chemical.  Right?

16   **A.**    Yes, sir.

17   **Q.**    And it cannot be delivered to individuals.  Correct?

18   **A.**    It's not supposed to be, that is correct.

19   **Q.**    And it's also not supposed to be delivered to Fed Ex

20   locations; is that correct?

21   **A.**    Yes, sir, that is correct.

22   **Q.**    It's supposed to be delivered to educational

23   institutions.  Correct?

24   **A.**    Yes.

25   **Q.**    And the minute you learned where this had been shipped,

1   you-all made it very clear to Con-way Freight not to deliver

2   this chemical to Mr. Aldawsari; is that correct?

3   **A.**   That is correct.

4   **Q.**   And you made it clear to all of your employees not to

5   ship or re-ship this chemical to Mr. Aldawsari.  Correct?

6   **A.**   That is true, yes.

7           MR. DOYLE:  No further questions.

8           THE COURT:  Redirect?

9                        REDIRECT EXAMINATION

10  BY MR. HAAG:

11  **Q.**   Mr. Dallas, we'll talk about two things here on redirect.

12           With regard to the fake phenol, was this something

13  that Special Agent Orndorff asked if you could do?

14  **A.**   Yes, sir.

15  **Q.**   And was it something that you went ahead and, on your

16  own, began formulating it so that it would be ready to go if it

17  was needed?

18  **A.**   Yes, sir.

19  **Q.**   With regard to those notes that Mr. Doyle was talking

20  about, when did you prepare those notes of your recollection of

21  events?

22           MR. DOYLE:  Judge, I'll offer the notes if you'd

23  like.

24           MR. HAAG:  I don't want to offer them, Your Honor; I

25  just want to ask a question about them.

1          THE COURT:  That's okay.  Have a seat, Mr. Doyle.

2    **A.**    I'm not sure of the exact date, but it was just prior to

3    having to go to the board meeting and talk to these people.

4    **Q.**    (BY MR. HAAG)  And approximately when was the board

5    meeting?

6    **A.**    I'm going to say approximately the first of March, the

7    end of February.

8          MR. HAAG:  No further questions, Your Honor.

9          THE COURT:  All right.  You're excused.  Thank you,

10   sir.

11         MR. DOYLE:  Judge, a few questions.

12         THE COURT:  Let's see.

13         MR. DOYLE:  It's related to what--

14         THE COURT:  Let's see.

15         MR. DOYLE:  First of all, I'd like to offer the

16   notes into evidence.

17         MR. HAAG:  Your Honor, we object to those because

18   they're not business records.

19         THE COURT:  The objection is sustained.

20         MR. DOYLE:  Judge, it's a personal memorandum that

21   was--

22         THE COURT:  I understand, but obviously it's several

23   pages, and I don't know what the relevance of everything in

24   there is.

25         MR. DOYLE:  Well, first of all, the relevance--

1          THE COURT:  I'll tell you what.  I'll look at it

2     over the break and decide, but--

3          MR. DOYLE:  Okay.  Fair enough.  A couple of

4     questions.

5                         RECROSS-EXAMINATION

6     BY MR. DOYLE:

7     **Q.**    With regard to the fake phenol that was created, who is

8     Agent Joseph Norris?

9     **A.**    Joseph Norris is an agent out of the Charlotte, North

10    Carolina, office.

11    **Q.**    And did he show up at your place of business and pick up

12    one of the boxes, or some of the fake phenol?

13    **A.**    He picked up one box.

14    **Q.**    And did he indicate to you that he had a sense of urgency

15    in getting that box of phenol to Quantico?

16    **A.**    Yes, sir.

17    **Q.**    And what was the purpose of taking it there?

18         THE COURT:  If you know.

19    **A.**    I don't know.  All I know is, they were going to do some

20    kind of experiments with it.

21    **Q.**    (BY MR. DOYLE)  Do you recall, in the memorandum, noting

22    that he wanted to put a tracking device in the box?

23    **A.**    I noted that that was said, yes.

24    **Q.**    And this happened shortly after you made the fake phenol?

25    **A.**    What happened?

1   **Q.**   The agent came to pick it up.

2   **A.**   Yes, sir.

3   **Q.**   Did he indicate he would drive overnight if he had to to

4   get it to Quantico?

5   **A.**   Yes, sir.

6                    MR. DOYLE:  No further questions.

7                    THE COURT:  Mr. Haag?

8                    MR. HAAG:  Nothing further, Your Honor.

9                    THE COURT:  All right.  You are excused.  Thank you,

10   sir.

11                    The witness is excused?

12                    MR. HAAG:  Yes, Your Honor.

13                    THE COURT:  We will take our 15-minute morning

14   break, ladies and gentlemen.

15                    All rise for the jury.

16   (RECESS TAKEN)

17                    THE COURT:  Anything before we bring the jury in?

18                    MR. HAAG:  Nothing from the United States, Your

19   Honor.

20                    THE COURT:  Defendant's Exhibit 3 is--contains--all

21   relevant information was asked on the stand, so we'll proceed

22   as an offer of proof only.

23                    Okay.  Bring the jury in, please.

24   (THE JURORS ARE SEATED IN THE JURY BOX)

25                    THE COURT:  All right.  The rest of you may be

1    seated.

2                    Mr. Haag, your next witness, please.

3                    MR. HAAG:   Thank you, Your Honor.   The United States

4    calls Debra Wirbelauer.

5            (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

6                            DEBRA WIRBELAUER,

7    GOVERNMENT'S WITNESS, TESTIFIED ON HER OATH AS FOLLOWS:

8                            DIRECT EXAMINATION

9    BY MR. HAAG:

10   **Q.**   Good morning, Ms. Wirbelauer.

11   **A.**   Good morning.

12   **Q.**   Please state your name for the jury.

13   **A.**   Debra Wirbelauer.

14   **Q.**   Would you please spell your last name?

15   **A.**   W-i-r-b-e-l-a-u-e-r.

16   **Q.**   If you would, you're a little bit softspoken, so if you

17   would just speak into the microphone and please keep your voice

18   up.

19   **A.**   Okay.

20   **Q.**   How are you employed?

21   **A.**   I'm employed with Carolina Biological Supply Company in

22   Burlington, North Carolina.

23   **Q.**   How long have you been with Carolina Biological?

24   **A.**   Twenty-three years.

25   **Q.**   What is your title or your--what is your title with

1    Carolina Biological?

2    **A.**    I am the manager of customer service.

3    **Q.**    And for all practical purposes, what is the largest

4    segment of Carolina Biological that you run?

5    **A.**    The order entry and Customer Service Department.

6    **Q.**    What is the toll-free number for the Customer Service

7    Center at Carolina Biological?

8    **A.**    1-800-334-5551.

9    **Q.**    Would you please briefly describe for the jury what the

10   Customer Care Center or the Customer Call Center does for

11   Carolina Biological?

12   **A.**    Okay.  We handle all the orders coming in to the company,

13   whether it's by phone, mail, fax, web.  We handle all customer

14   service issues and the invoicing.

15   **Q.**    Where is the Customer Service Center located at?

16   **A.**    It's in Whitsett, North Carolina.

17   **Q.**    Would you please summarize for the jury, from the time

18   someone orders something through the web, how is the order

19   processed through your center?

20   **A.**    Okay.  We currently use a company called MarketLive where

21   they order over the web, and it comes into our system, like, I

22   think, approximately two hours after the order is placed.

23   There's a delay in that.  Once it comes into our JD Edwards

24   software, the order is checked by a customer service

25   representative for any kinds of restrictions, whatnot.  Some

1    orders can go straight through if there's no restrictions on

2    them.  If there are restrictions, we're supposed to check them

3    to see if they can be shipped, and that can take as long as

4    24 hours.

5    **Q.**    If an order is held and you do--what are the sort of

6    things that you do with an order that's held because it has a

7    special restriction?

8    **A.**    If it's something that we see that's restricted that

9    cannot be sold, like, on an individual basis, things like that,

10   we contact the customer, let them know that we cancelled the

11   order because we're unable to ship it to them.

12   **Q.**    Do you respond to telephone inquiries at the Customer

13   Service Center?

14   **A.**    Yes, sir.

15   **Q.**    Does Carolina Biological Supply record the calls that are

16   made to the Customer Service Center?

17   **A.**    Yes, sir.

18   **Q.**    Why do they record those phone calls?

19   **A.**    We mainly record the calls for training purposes, just

20   for--see how the representatives are doing, how our customers

21   are being treated, and mainly just for training.

22   **Q.**    Are you familiar with the system that Carolina Biological

23   uses to record its phone calls?

24   **A.**    Yes, sir.

25   **Q.**    How long has Carolina Biological used that system?

1  **A.**   About--around three to four years.

2  **Q.**   Is that system regularly checked and tested to ensure

3  that it's properly working?

4  **A.**   Yes, sir.

5  **Q.**   Does the recording system produce an accurate result?

6  **A.**   Yes, sir.

7  **Q.**   Did the recording system produce an accurate result in

8  the conversations that you had and that were recorded in this

9  case?

10  **A.**   Yes, sir.

11  **Q.**   Are you familiar with the defendant, Khalid Aldawsari's,

12  voice?

13  **A.**   Yes, sir.

14  **Q.**   How are you familiar with his voice?

15  **A.**   I had several conversations with Mr. Aldawsari.

16  **Q.**   During any of those conversations, did Mr. Aldawsari

17  identify himself?

18  **A.**   Yes, sir.

19  **Q.**   Additionally, were there phone calls that you made to

20  Mr. Aldawsari?

21  **A.**   Yes, sir.

22  **Q.**   And where did you obtain the information to call

23  Mr. Aldawsari?

24  **A.**   From the--  Well, are you talking about the number?

25  **A.**   Yes, ma'am.

1    **Q.**   We had his number based on the recordings--I mean, that

2    he had called in.  He had provided his number to several

3    customer service representatives, and also on his order.

4    **Q.**   Are you--  I'm sorry.  On his order form, did he provide

5    his telephone number?

6    **A.**   Yes, sir, I do believe he did, yes.

7    **Q.**   And did you dial that number when you called him?

8    **A.**   Yes, sir.

9    **Q.**   Now, you talked about that the telephone calls that are

10   coming in to Carolina Biological are recorded.  What about the

11   telephone calls to the managers?  Are those automatically

12   recorded?

13   **A.**   No, sir.

14   **Q.**   How would those calls have to be recorded?

15   **A.**   We have what we call Call Copy On Demand, and it's a

16   system where we can activate a recording device to record our

17   telephone conversations.

18   **Q.**   Prior to testifying today, have you reviewed Government's

19   Exhibits 3 through 10, and 13 through 24?

20   **A.**   Yes, sir.

21   **Q.**   Are these exhibits the phone calls that were made by the

22   defendant to Carolina Biological and transcripts of those

23   calls?

24   **A.**   Yes, sir.

25   **Q.**   Are these fair and accurate recordings of the calls made

1    to Carolina Biological in February of 2011?

2    **A.**    Yes, sir.

3    **Q.**    Did you prepare the transcripts to the company of the

4    phone calls?

5    **A.**    Did I--

6    **Q.**    Did you prepare the transcripts?

7    **A.**    I provided the phone calls--the copies of the phone

8    calls, yes.

9    **Q.**    Were you the one that wrote out the transcript?

10   **A.**    No.

11   **Q.**    Did you review the transcripts for accuracy?

12   **A.**    Yes.  When you came to the facility, we did go over them,

13   yes.  We listened to them.

14   **Q.**    Do those transcripts fairly and accurately reflect the

15   conversations in each telephone call?

16   **A.**    Yes, sir.

17            MR. HAAG:  Your Honor, at this time, move to admit

18   Government's Exhibits 3 through 10, and 13 through 24.

19            MR. DOYLE:  No objection, Your Honor.

20            THE COURT:  Without objection, received.

21   **Q.**    (BY MR. HAAG)  Before we get to the telephone calls,

22   let's talk a little bit about the defendant's order.  Have you

23   reviewed the order and what's been admitted into evidence in

24   Government's Exhibit Number 27?

25   **A.**    Yes, sir.

1    **Q.**    Should this order have been sent to the warehouse?

2    **A.**    No, sir.

3    **Q.**    Why shouldn't it have been sent to the warehouse?

4    **A.**    It was a chemical that was restricted that should not

5    have been sold on an individual basis, that should only have

6    been sold to a university or a company that had an open net

7    30-day account with the company.

8    **Q.**    And if you would, you'll just need to keep your voice up

9    just a little bit.  I'm sorry.

10   **A.**    Okay.  Sorry.

11   **Q.**    Now, Tim Dallas talked earlier about Carolina

12   Biological's cooperation with the FBI.  During the course of

13   these telephone calls that we're going to be listening to, were

14   the customer service operators aware of the cooperation with

15   the FBI?

16   **A.**    No, sir, they were not.

17   **Q.**    On February 2nd, 2011, did you send an email to your

18   operators with any instructions?

19   **A.**    Yes, sir, I did.

20   **Q.**    What did you instruct them to do?

21   **A.**    I instructed that if they received a call from

22   Mr. Aldawsari, to transfer the call to me or to Tom Rollins,

23   one of my supervisors.

24   **Q.**    Tom Rollins or Tom Graves?

25   **A.**    No, at that time, it was Tom Rollins, one of my

1   supervisors.

2   **Q.**   Okay.  And who is he?

3   **A.**   He was one of the supervisors with Carolina Biological.

4   He assisted Tim Dallas, and the first day that he came over,

5   they went over to talk to the CSR that had received the call.

6   **Q.**   And who is Tom Graves?

7   **A.**   Tom Graves is the director of customer service.

8   **Q.**   Did there come a point in time where phone calls were

9   referred to him as well?

10   **A.**   Yes, sir.

11   **Q.**   On February 9th of 2011, did Tom Graves send an email to

12   the Customer Service Department with any instructions?

13   **A.**   Yes, sir.

14   **Q.**   What did he instruct them to do?

15   **A.**   He was out of town when this first happened, and when he

16   got back into town, he instructed them to--the same, to--any

17   calls that came through from Mr. Aldawsari, to transfer to his

18   voicemail.

19   **Q.**   I'll turn your attention to those phone calls.  Let's

20   first talk about Government's Exhibits 3 and 4.  Is this an

21   incoming or an outgoing telephone call?

22   **A.**   Can I open this?

23   **Q.**   Yes, ma'am, please.

24   **A.**   This is an incoming call.

25   **Q.**   When did this call come in to Carolina Biological?

1  **A.**   On February the 1st, 2011, at 4:51 p.m.

2  **Q.**   About how long is this telephone call after the telephone

3  call between Jay Gibson at Con-way Freight and Miriam with

4  Carolina Biological?  And that's at Government's Exhibit 1 and

5  2.

6  **A.**   1 and 2?  Oh, okay.

7  **Q.**   If you'll flip back to Government's Exhibit 2.

8  **A.**   Oh, okay.  It was approximately about four hours.

9  **Q.**   At the time of this call, had you sent your instruction

10  to contact you if Mr. Aldawsari called about the phenol?

11  **A.**   No, sir.

12  **Q.**   Which customer service representative answered the call?

13  **A.**   On--

14  **Q.**   On February 1st.

15  **A.**   Okay.  The first call was to Sheila Snyder.

16  **Q.**   Do you recognize her voice on the recording?

17  **A.**   Yes, sir.

18       MR. HAAG:  Your Honor, at this time, we would ask to

19  play Government's Exhibit 3.

20       (AUDIO RECORDING PLAYING)

21  **Q.**   (BY MR. HAAG)  Let's talk about Government's Exhibit 5

22  and 6.  Was this an incoming or an outgoing telephone call?

23  **A.**   Outgoing call.

24  **Q.**   And what telephone number did you call?

25  **A.**   (972) 989-5785.

1    **Q.**    Who made this phone call?

2    **A.**    I did, Debra Wirbelauer.

3    **Q.**    Did you have a script with questions that you were

4    supposed to ask during this phone call?

5    **A.**    Yes, sir.

6    **Q.**    Who provided you that script?

7    **A.**    The FBI.

8    **Q.**    In general, what were you trying to do with the questions

9    on the script?

10   **A.**    I was just trying to find out what his intent was with

11   the product and what--what school that he was attending.

12   **Q.**    When did you make this call?

13   **A.**    On February the 3rd, 2011, at 1:07 p.m.

14   **Q.**    Did you make a telephone call before this one that we're

15   going to listen to?

16   **A.**    Yes, sir, I did.

17   **Q.**    And what happened with that telephone call?

18   **A.**    We had tested the Call Copy On Demand, and it worked, and

19   then when we made the original call, evidently I did not do

20   something correctly.  It did not record.

21   **Q.**    Is this phone call immediately done after the previous

22   phone call?

23   **A.**    Yes, sir.

24           MR. HAAG:  Your Honor, at this time, play

25   Government's Exhibit Number 5.

1          (AUDIO RECORDING PLAYING)

2     **Q.**    (BY MR. HAAG)   Turning to Government's Exhibit Number 7,

3     was this an incoming or an outgoing telephone call?

4     **A.**    This was an outgoing call.

5     **Q.**    What telephone number did you call?

6     **A.**    989--I mean, I'm sorry, (972) 989-5785.

7     **Q.**    Whose number did you believe that to be?

8     **A.**    Khalid Aldawsari.

9     **Q.**    Who made the phone call?

10    **A.**    I did, Debra Wirbelauer.

11    **Q.**    When did you make this call?

12    **A.**    On February the 4th, 2011, at 11:23 a.m.

13    **Q.**    Did anyone ask you to make that call?

14    **A.**    Yes, they did.

15    **Q.**    Who asked you to make the phone call?

16    **A.**    Tim Dallas and the FBI.

17    **Q.**    What was your purpose in making this phone call?

18    **A.**    To let him know that we had not got the product back and

19    that the phenol was now on backorder with the company.

20    **Q.**    Were you trying to obtain any information during this

21    phone call?

22    **A.**    Well, I just--really just to make sure to let him know

23    that I hadn't got the product back from Con-way yet and that

24    the order was on backorder and just trying to keep him, I

25    guess, on the hook, I guess you'd say.

Case 5:11-cr-00015  Document 245  Filed 12/17/12  Page 87 of 257  PageID 3205

1          MR. HAAG:  Your Honor, at this time, play

2    Government's Exhibit Number 7.

3          (AUDIO RECORDING PLAYING)

4    **Q.**   (BY MR. HAAG)  Let's go to Government's Exhibit 9,

5    please.  Was this an incoming or an outgoing telephone call?

6    **A.**   Incoming call.

7    **Q.**   When did this call come in to Carolina Biological?

8    **A.**   February the 8th, 2011, at 5:46 p.m.

9    **Q.**   Which customer service representative answered the call?

10   **A.**   Brad Chaisson.

11   **Q.**   Do you recognize his voice on the recording?

12   **A.**   Yes, sir.

13   **Q.**   At the time of this telephone call, had Tom Graves sent

14   out the email about transferring phone calls to him?

15   **A.**   No, sir.

16          MR. HAAG:  At this time, please play Government's

17   Exhibit 9.

18          (AUDIO RECORDING PLAYING)

19   **Q.**   (BY MR. HAAG)  Let's proceed to Government's Exhibit 13.

20   Was this an incoming or an outgoing telephone call?

21   **A.**   It was an incoming call.

22   **Q.**   When did this call come in to Carolina Biological?

23   **A.**   February the 10th, 2011, at 5:18 p.m.

24   **Q.**   Which customer service representative answered the call?

25   **A.**   Jessica Clayton.

1    **Q.**    Do you recognize her voice on the recording?

2    **A.**    Yes, sir.

3    **Q.**    At this point, had the email been sent out by Tom Graves

4    about transferring calls to him?

5    **A.**    Yes, sir.

6              MR. HAAG:  Play Government's Exhibit 13, please.

7              (AUDIO RECORDING PLAYING)

8    **Q.**    (BY MR. HAAG)  If you'll turn to Government's Exhibit 15,

9    please.  Was this an incoming or an outgoing telephone call?

10   **A.**    Incoming.

11   **Q.**    When did this call come in to Carolina Biological?

12   **A.**    February the 10th, 2011, at 5:21 p.m.

13   **Q.**    Is this the same day as the previous call that we just

14   listened to?

15   **A.**    Yes, sir.

16   **Q.**    Which customer service representative answered the call?

17   **A.**    Michelle Cash.

18   **Q.**    Do you recognize her voice?

19   **A.**    Yes, sir.

20             MR. HAAG:  At this time, play Government's

21   Exhibit 15.

22             (AUDIO RECORDING PLAYING)

23   **Q.**    (BY MR. HAAG)  Let's turn to the last phone call on that

24   page.  Turning to Government's Exhibit 17, was this an incoming

25   or an outgoing telephone call?

1    **A.**    It was incoming.

2    **Q.**    When did this call come in to Carolina Biological Supply?

3    **A.**    February the 10th, 2011, at 6:43 p.m.

4    **Q.**    So is this about an hour and a half after the last call?

5    **A.**    Yes, sir.

6    **Q.**    Which company service representative answered the call?

7    **A.**    Michelle Cash.

8    **Q.**    And did Ms. Cash ultimately transfer the call to another

9    customer service representative?

10   **A.**    Yes, sir.

11   **Q.**    Who did she ultimately transfer the call to?

12   **A.**    Laura Bianco.

13   **Q.**    Do you recognize their voices on the recording?

14   **A.**    Yes, sir.

15   **Q.**    Who is Laura Bianco?

16   **A.**    She is one of the floor supervisor, group leads.

17           MR. HAAG:  Your Honor, at this time, play

18   Government's Exhibit 17, please.

19           (AUDIO RECORDING PLAYING)

20   **Q.**    (BY MR. HAAG)  Turning to Government's Exhibit 19, was

21   this an incoming or outgoing telephone call?

22   **A.**    Excuse me.  Is that 19 or 20?  I don't--

23   **Q.**    19 and 20.  I'm sorry.

24   **A.**    Okay.  It is an incoming call.

25   **Q.**    When did this call come in to Carolina Biological Supply?

1  **A.**    February the 11th, 2011.

2  **Q.**    And would that be the day after the series of calls we

3  just listened to?

4  **A.**    Yes, sir.

5  **Q.**    Who was the customer service representative who answered

6  the call?

7  **A.**    Brad Chaisson.

8              MR. HAAG:  Your Honor, at this time, please play

9  Government's Exhibit 19.

10             THE COURT:  How long-- Excuse me.  How long will

11  this take?

12             MR. HAAG:  Two minutes, Your Honor.

13             THE COURT:  Two minutes?  Go ahead.

14       (AUDIO RECORDING PLAYING)

15             THE COURT:  Okay.  It's nearly 12:00.  What do you

16  say we break for lunch and come back about 1:00?  Okay.  Thank

17  you.

18             Court is in recess until 1:00.

19       (LUNCH RECESS TAKEN)

20             THE COURT:  Need anything before we bring the jury

21  in?

22             MR. HAAG:  No, Your Honor.

23             THE COURT:  Okay.  Bring the jury in, please.

24       (THE JURORS ARE SEATED IN THE JURY BOX)

25             THE COURT:  Thank y'all very much for being so

1    prompt.

2              All right.  Proceed.

3              MR. HAAG:  Thank you Your Honor.

4    **Q.**   (BY MR. HAAG)  Before the break, we had just finished

5    with Government's Exhibits 19 and 20.  I would ask you to look

6    at Government's Exhibits 20 and 21.  Is this an ingoing or an--

7    incoming or an outgoing telephone call?

8    **A.**   It's an incoming call.

9    **Q.**   When did this call come in to Carolina Biological?

10   **A.**   February the 11th, 2011, at 3:55 p.m.

11   **Q.**   Is that going to be later on the same day as Government's

12   Exhibits 19 and 20?

13   **A.**   Yes, sir.

14   **Q.**   Which customer service representative answered the phone

15   call?

16   **A.**   Becky Stow.

17   **Q.**   Are you familiar with her voice?

18   **A.**   Yes, sir.

19             MR. HAAG:  Your Honor, at this point, please play

20   Government's Exhibit 21.

21             (AUDIO RECORDING PLAYING)

22   **Q.**   (BY MR. HAAG)  Turning to our last exhibit, Government's

23   Exhibits 23 and 24, was this an incoming or outgoing telephone

24   call?

25   **A.**   It was outgoing.

1  **Q.**    Who placed this?

2  **A.**    I did, Debra Wirbelauer.

3  **Q.**    Who did you call?

4  **A.**    I called Khalid Aldawsari.

5  **Q.**    When did you make this call?

6  **A.**    On February the 15th, 2011, at 4:02 p.m.

7  **Q.**    Did anyone ask you to make this telephone call?

8  **A.**    Yes.

9  **Q.**    Who asked you to make this call?

10 **A.**    Tim Dallas and the FBI.

11 **Q.**    Why did they ask you to make the call?

12 **A.**    They wanted me to see if I could keep him on the line to

13 see if he would allow us to ship him the material instead of

14 cancelling the order.

15         MR. HAAG:  Your Honor, at this time, ask to play

16 Government's Exhibit 23.

17         THE COURT:  All right.

18     (AUDIO RECORDING PLAYING)

19 **Q.**    (BY MR. HAAG)  One question to clarify on the times.  The

20 times that you've been discussing before the jury, is that

21 Eastern Standard Time?

22 **A.**    Yes, sir.

23 **Q.**    Is that the time zone that you're at in North Carolina?

24 **A.**    Yes, sir.

25         MR. HAAG:  Pass the witness, Your Honor.

1              THE COURT:  Your witness, sir.

2              MR. DOYLE:  Thank you, Your Honor.

3                        CROSS-EXAMINATION

4    BY MR. DOYLE:

5    **Q.**    Ms. Wirbelauer?  Is that correct?

6    **A.**    That's fine.

7    **Q.**    On February 11th, we just heard a phone call between

8    Mr. Aldawsari and Mr. Graves, and it was transferred to

9    Mr. Graves and then you guys stopped the recording; is that

10   right?

11   **A.**    It does cut off once the call is transferred.

12   **Q.**    Okay.  And you guys had it set up in place to where

13   you-all--because we heard it a number of times here--would

14   transfer him to Mr. Graves.  Right?

15   **A.**    Uh-huh.  Yes, sir.

16   **Q.**    And at times, we hear his voicemail.  Right?

17   **A.**    Yes, sir.

18   **Q.**    But for some reason, this time, it got cut off?

19   **A.**    Well, before the agents--if they hit Conference and

20   conference with Mr. Graves, it will--the call will continue,

21   but if they actually hit the transfer button and transfer, then

22   it releases the call.

23   **Q.**    Okay.  But we're all in agreement that, on that phone

24   call, Mr. Aldawsari said, cancel the order?

25   **A.**    Yes, sir.

1  **Q.**   Is Mr. Graves in town?

2  **A.**   No, sir.

3  **Q.**   Now, you would agree with me, at my count, Aldawsari

4  calls on February 1st multiple times; is that correct?

5  **A.**   Yes, sir.

6  **Q.**   And every time, he used his name, told you who he was?

7  **A.**   Yes, sir.

8  **Q.**   He gave you his phone number?

9  **A.**   Yes, sir.

10  **Q.**   He gave you his email if you needed it?

11  **A.**   Yes, sir.

12  **Q.**   He answered all your questions about what he was doing

13  with it?

14  **A.**   Yes, sir.

15  **Q.**   He came up with a story that he was going to Texas Tech?

16  **A.**   Yes, sir.

17  **Q.**   He certainly wasn't discreet about attempting to get the

18  phenol.   Right?

19  **A.**   No, sir, he was not.

20  **Q.**   In fact, he became known--  How many customer service

21  managers do y'all have?

22  **A.**   I'm the only manager.   Now, we have several supervisors.

23  **Q.**   Supervisors.   How many people--  We heard from a number

24  of them.   It sounds like maybe he hit almost every one of them.

25  **A.**   Most of the people he talked to were customer service

1    representatives.  The only--I'm the only manager he talked to.

2    Tom Graves is the director, and he talked to Laura Bianco,

3    which is a floor or group lead supervisor.

4    **Q.**    My point is, he talked to a number of your employees over

5    a two-week period?

6    **A.**    Yes, sir.

7    **Q.**    And certainly drew quite a bit of attention to himself?

8    **A.**    Yes, sir.

9    **Q.**    So much so that he became known at your company as the,

10   quote, phenol guy.  Right?

11   **A.**    Yes, sir.

12   **Q.**    And you guys, each time, would ask him the same questions

13   that somebody else asked him.  Right?

14   **A.**    Yes, sir.

15   **Q.**    And he still kept calling.  Right?

16   **A.**    He did, yes, sir.

17   **Q.**    At some point in time, despite Mr. Aldawsari cancelling

18   the order with Mr. Graves on the 11th--right?--

19   **A.**    Yes, sir.

20   **Q.**    --you were told to try and string him along a little

21   further.  Right?

22   **A.**    Yes, sir.

23   **Q.**    I guess your words were, "keep him on the line"?

24   **A.**    Right.

25   **Q.**    And that call was the last call we heard, which was on

 1   February 15th?

 2   **A.**   Yes, sir.

 3   **Q.**   And that call was at the direction of Agent Orndorff?

 4   **A.**   Yes, sir.

 5   **Q.**   And have you met him before?

 6   **A.**   Yes, sir.

 7   **Q.**   And is he the gentleman sitting at the table right here?

 8   **A.**   Yes, sir.

 9   **Q.**   Did he tell you why, or did he just give you an order as

10   to what to do?

11   **A.**   I was just given directions on what to do.

12   **Q.**   But they wanted you to do your best to try and deliver--

13   or at least set him up for a delivery to receive phenol on the

14   15th?

15   **A.**   Yes.

16   **Q.**   At the direction of Agent Orndorff?

17   **A.**   Yes.  I don't know if it was actually phenol.  I can't

18   testify to that.  I just know that they wanted me to keep him

19   on the line, see if he would take a shipment.

20   **Q.**   And he just said he wanted his money back?

21   **A.**   Yes, sir.

22   **Q.**   So now we are--  The first contact with you-all was on

23   January 31st through the Internet.  Right?

24   **A.**   Yes, sir.

25   **Q.**   We're 15 days into this investigation.  Right?

1  **A.**    Yes, sir.

2  **Q.**    And they want you to try your best to get him whatever it

3  is they want you to send him?

4  **A.**    Yes, sir.

5            MR. DOYLE:  No further questions, Your Honor.

6            THE COURT:  Redirect?

7                        REDIRECT EXAMINATION

8  BY MR. HAAG:

9  **Q.**    Would you describe Mr. Aldawsari as persistent?

10  **A.**    Yes, sir.

11  **Q.**    If Mr. Aldawsari--  Well, let me back up.

12            If you discovered that any customer had given you a

13  fake name or a fake email or a fake credit card number, what

14  would that have done to the order?

15  **A.**    It would have cancelled the order.  We would notify them

16  to cancel the order.

17            MR. HAAG:  No further questions, Your Honor.

18            THE COURT:  All right.  You may step down.  Thank

19  you, ma'am.

20            MR. DOYLE:  One further question, Your Honor.

21            THE COURT:  Oh.  What's that?

22                        RECROSS-EXAMINATION

23  BY MR. DOYLE:

24  **Q.**    In regards to Mr. Aldawsari being persistent, he was

25  persistent and certainly wasn't somebody who appeared to have

1    other options.  Would you agree?  It was 15--it was 11 days of

2    him calling, and if he had other options, he could have shut

3    that down a lot earlier.

4              MR. HAAG:  Objection, Your Honor; calls for

5    speculation.

6              THE COURT:  I'm going to sustain it.

7              MR. DOYLE:  No further questions.

8              THE COURT:  The recordings speak for themselves.

9              You may step down.

10             Is the witness excused and free to go?

11             MR. HAAG:  Yes, Your Honor.

12             THE COURT:  You are free to go.  Thank you, ma'am.

13             Call your next witness, please.

14             MR. HAAG:  Your Honor, the United States calls

15   Joseph Zajac.

16        (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

17             THE COURT:  Could you spell your name, please, sir?

18             THE WITNESS:  Last name?

19             THE COURT:  Yes.

20             THE WITNESS:  Z-a-j-a-c.

21             THE COURT:  Thank you.

22

23

24

25

1                            JOSEPH ZAJAC,

2   GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

3                          DIRECT EXAMINATION

4   BY MR. HAAG:

5   **Q.**     Good afternoon, Mr. Zajac.

6   **A.**     Good afternoon.

7   **Q.**     Would you please state your name?

8   **A.**     Joseph Zajac.

9   **Q.**     Do you own QualiChem Technologies?

10  **A.**     Yes.

11  **Q.**     How long have you owned QualiChem?

12  **A.**     QualiChem Technologies started a d/b/a back in 2004.

13  **Q.**     Where is QualiChem Technologies based out of?

14  **A.**     The physical address for mailing is in Roswell, Georgia,

15  and the warehouse is in Kennesaw, Georgia.

16  **Q.**     Where is your office located at?

17  **A.**     Kennesaw, Georgia.

18  **Q.**     We're going to be talking about December 2010.  At that

19  time, were there any other employees in QualiChem besides

20  yourself?

21  **A.**     There was one person that managed the warehouse.

22  **Q.**     And earlier, we had talked about this case; is that

23  correct?

24  **A.**     Yes.

25  **Q.**     And when we earlier talked, it was your recollection that

1   you were the only employee; is that correct?

2   **A.**   Yes.

3   **Q.**   But you have since remembered you had one more person

4   that you hired around that time?

5   **A.**   Yeah, I got the years messed up, because he hired in

6   roughly a year prior in that same date frame.

7   **Q.**   Do you have any experience with metallurgy?

8   **A.**   Yes.

9   **Q.**   Would you please describe your experience with

10   metallurgy?

11   **A.**   I have a bachelor's of engineering in metallurgical

12   engineering and material science option.

13   **Q.**   The name of your company is QualiChem Technologies.

14   Would you describe for the jury what services your company

15   provides?

16   **A.**   We're consultants for the use of chemicals and

17   chemical-related feed equipment, corrosion inhibitors, scale

18   inhibitors, the test kits and any of the associated pieces of

19   equipment that you would use to use that chemical properly.

20   **Q.**   Earlier, you said you had a warehouse.  Do you ship

21   orders of products directly from that warehouse?

22   **A.**   Yes.

23   **Q.**   Do you ship every order of product from that warehouse?

24   **A.**   No.

25   **Q.**   What is the process that you use for some of your orders

1   of chemicals?

2   **A.**    Some of the orders are directly shipped from the

3   warehouse, if we stock the item.  Those are typically all

4   non-Hazmat.  And we have a portion of chemistries where people

5   will third-party label it for us and then they'll blind ship

6   it.

7   **Q.**    You just told the jury that you blind ship it.  Would you

8   describe for them what that means?

9   **A.**    Blind shipping means, if we don't have the chemistry,

10  what they'll do is, they have the chemistry; we buy it for a

11  certain amount and then add an additional amount to it.  They

12  will then put our label on it and ship it with all our

13  information to wherever we want to ship it to.  So we don't--we

14  never physically touch the product.

15          THE COURT:  Just to be clear, sir, the "they" you

16  are referring to is some other--

17  **A.**    What other entity, what other business.  I think we--I

18  have, like, twelve different vendors that will private-label

19  what other chemistry their--is their core competency.

20  **Q.**    (BY MR. HAAG)  And on the situation where there's a blind

21  ship, do you see or touch the product physically at all?

22  **A.**    No.

23  **Q.**    We're going to be talking today about one of those

24  entities that does blind shipping for you.  What entity is

25  that?

1   **A.**    AquaPhoenix.

2   **Q.**    Where is AquaPhoenix located at?

3   **A.**    Pennsylvania.

4   **Q.**    Is that also where AquaPhoenix ships its chemicals from?

5   **A.**    To my knowledge, the majority of them are shipped from

6   AquaPhoenix, but they might have blind shippers as well.

7   **Q.**    Do you conduct most of your business in person or through

8   the Internet?

9   **A.**    The majority of the business is through the Internet.

10  **Q.**    Do you have more than one website?

11  **A.**    Yes.

12  **Q.**    How many websites do you have?

13  **A.**    Somewhere in the ballpark between 230 to 240 websites.

14  **Q.**    What is the name of the website that we're going to be

15  talking about here today?

16  **A.**    boilerandcoolingwater.com.

17  **Q.**    Why did you use the name Boiler and Cooling Water for

18  your website?

19  **A.**    The domain name, which was boilerandcoolingwater.com, was

20  chosen for the criteria of search engine optimization.

21  **Q.**    If you would, describe for the jury what that means.

22  **A.**    Search engine optimization is when things naturally rank

23  on the Internet.  You have two different types which people

24  will pay to advertise on the advertising links, which will be

25  the top, the right, and the bottom.  When you focus on search

1   engine optimization, you are trying to organically rank your

2   website domain high up on the searches on the Internet.  So

3   if--selecting Boiler and Cooling Water, you get a lot more

4   credit from exact domain matching.  If someone is searching for

5   boiler water or cooling water, the domain actually has boiler

6   water and cooling water in the initial domain phrase;

7   therefore, you have a little bit more of an advantage instead

8   of just putting a website that says QualiChem Technologies.

9   It's going to give you more credit to go with an exact domain

10  name to naturally link higher on the Internet.

11  **Q.**    So if a computer user inputs in their Google search

12  boiling and cooling water--

13  **A.**    I'll rank number one.

14  **Q.**    --is your website going to come up first?

15  **A.**    More than likely, it's number one, yes.

16  **Q.**    And you've talked about the name Boiler and Cooling

17  Water.  Do you sell chemicals for those machines?

18  **A.**    Yes, yes.

19  **Q.**    What sort of--what sort of chemicals do you sell for

20  boilers and for coolers?

21  **A.**    Corrosion inhibitors, oxygen scavengers, amines that

22  increase water pH, scale preventions, phosphonates, nitrites,

23  borates, anything that would prevent--the water being used, to

24  prevent corrosion or scaling on the equipment.

25  **Q.**    And when you fill orders through AquaPhoenix, do you or

1    AquaPhoenix determine which shipper will be used?

2    **A.**    AquaPhoenix determines on the majority of the products,

3    yes.

4    **Q.**    Are you one of the custodians for QualiChem Technologies'

5    records?

6    **A.**    Yes.

7    **Q.**    Prior to testifying today, have you reviewed Government's

8    Exhibits 33 and 34?

9    **A.**    Yes.

10    **Q.**    And they should be in front of you in that book, sir.

11            Were these records made by a person with knowledge

12    of or made from information transmitted by a person with

13    knowledge of the act and events appearing on them?

14    **A.**    Yes.

15    **Q.**    Were these records made at or near the act or events

16    appearing on them?

17    **A.**    Yes.

18    **Q.**    Is it the regular practice of QualiChem technologies to

19    make these records?

20    **A.**    Yes.

21    **Q.**    Were these records kept in the course of regularly

22    conducted activity?

23    **A.**    Yes.

24            MR. HAAG:  Your Honor, at this time, move to admit

25    Government's Exhibits 33 and 34.

1          MR. DOYLE:  No objection, Your Honor.

2          THE COURT:  Without objection, 33 and 34 are

3    received.

4    **Q.**   (BY MR. HAAG)  I'll turn your attention to those records,

5    and we will begin with page--Government's Exhibit 34, page 2.

6    **A.**   34, page 2.  Should I pull it out?

7          THE COURT:  Yes, you may.

8    **Q.**   (BY MR. HAAG)  Yes, you can pull it out, and it's on your

9    screen right in front of you too, Mr. Zajac.

10   **A.**   Oh, okay.  Okay.

11         MR. HAAG:  And if you would, if you would please

12   highlight that.  Thank you.

13   **Q.**   (BY MR. HAAG)  Did you receive an order for nitric acid?

14   **A.**   Yes.

15   **Q.**   According to this document, when was that order placed?

16   **A.**   It was placed on December 13th, 2010, at 1:48 a.m.

17   **Q.**   Which website was that order placed through?

18   **A.**   boilerandcoolingwater.com.

19   **Q.**   What is an Internet protocol address?

20   **A.**   Internet protocol is a unique IP address associated with

21   either a domain or its particular web browser on a particular

22   computer.

23   **Q.**   Prior to this order, had this Internet protocol address

24   visited your website before?

25   **A.**   That computer visited the website two times prior to

1    placing that order.

2    **Q.**    If you would, read for the jury the billing information

3    on that order.

4    **A.**    The bill-to is Khalid Aldawsari, 2400 Glenna Goodacre

5    Boulevard, Apartment 20303, Lubbock, Texas 79401.

6    **Q.**    And if you would, please read the telephone number and

7    the email address.

8    **A.**    (972) 989-5785, k.al-dawsari@ttu.edu.

9    **Q.**    If you would, please read for the jury-- Well, let me

10   ask it this way.  Is the shipping address the same as the

11   billing address?

12   **A.**    Shipping address is the same as the billing address.

13   **Q.**    What was the payment method used for the order?

14   **A.**    It was a Visa card ending in 6956.

15   **Q.**    What was the name given on the credit card?

16   **A.**    Khalid Ali-M Aldawsari.

17   **Q.**    Now, here on the shipping method, it reads, Fed Ex

18   Ground.  Is that something that you put in there or something

19   that the customer would place in there?

20   **A.**    No, that automatically will default to Fed Ex Ground,

21   because Fed Ex Ground is one of the few softwares that will

22   integrate jointly with our software.

23   **Q.**    Going back to the bill-to address for just one second,

24   the email address listed is k.aldawsari@ttu.edu.  Did you draw

25   any inference when you saw that email address?

1  **A.**    Yes.

2  **Q.**    What inference?

3  **A.**    That domain, which is after the @ sign, represents a

4  university.  You cannot purchase .edu's.  That needs to be

5  purchased by a university or some type of a college or

6  university or a school.  So dot--@ttu.edu tells me it's a

7  college student or someone affiliated with a university.

8  **Q.**    What was ordered in the order here?

9  **A.**    A quantity of two nitric acids, 70 percent concentrates,

10  which were six times--six containers of two and a half liters.

11  **Q.**    And what quantity of six containers was ordered?

12  **A.**    Two.

13  **Q.**    And if you would, going all the way down to the grand

14  total, what is the grand total for that purchase?

15  **A.**    With shipping, $448.36.

16  **Q.**    To your knowledge, what are the legitimate uses of nitric

17  acid?

18  **A.**    Nitric acid is roughly--it's produced, I believe,

19  2 billion pounds a year.  The majority of it is in fertilizer.

20  Where we sell it typically is people that are refining gold,

21  silver, trying to darken oak or etch metals, which is kind of--

22  if you're studying the atomic structures of material or--

23         MR. DOYLE:  Your Honor, I'm going to object to this.

24         THE COURT:  Okay.  Let's move on.

25         MR. HAAG:  Thank you, Your Honor.

1   **Q.**   (BY MR. HAAG)  Were you aware at the time of any

2   illegitimate uses of nitric acid?

3   **A.**   Yes.

4   **Q.**   What was the illegitimate use you were aware of?

5   **A.**   It's also used as an explosive.

6   **Q.**   When you received the order, did you see any issue with

7   the shipping address that's listed there?

8   **A.**   Yes.  That product cannot be shipped to an apartment

9   complex.

10  **Q.**   Why couldn't it be shipped to an apartment complex?

11  **A.**   Because that quantity of chemicals gets shipped on a

12  common carrier, LTL freight.

13  **Q.**   And we have had heard that phrase "LTL" before, but could

14  you just tell the jury again what that means?

15  **A.**   LTL means less than truckload.  So that means a large

16  tractor-trailer would have to deliver the product.

17  **Q.**   And what was the issues with a less-than-truckload

18  carrier going to an apartment complex?

19  **A.**   It can't get in the apartment complex or it can't get out

20  of the apartment complex.

21  **Q.**   At the time of this order, did you have any policies

22  regarding whether you could ship nitric acid to a residential?

23  **A.**   Yes, we would--our policy at the time was to ship only to

24  university and businesses.

25  **Q.**   What did you do to address the shipping issue in the

1    case?

2    **A.**    I sent an email and I--I sent an email saying we cannot

3    ship the chemistry due to Hazmat restrictions.

4    **Q.**    Let's go ahead and go to Government's Exhibit 34, page 1,

5    please.

6              MR. HAAG:  If you would, highlight that top portion.

7    **Q.**    (BY MR. HAAG)  Is this the email that you sent to

8    Mr. Aldawsari?

9    **A.**    Yes.

10   **Q.**    Would you please read that email for the jury.

11   **A.**    "Thank you for the order.  Unfortunately we cannot ship

12   the--"

13             THE COURT:  Slowly, please.

14   **Q.**    (BY MR. HAAG)  I'm sorry, sir.  If you could slow down

15   just one second.  The court reporter is taking down everything

16   you say.

17   **A.**    Okay.  I'm sorry.  "Thank you for the order.

18   Unfortunately we cannot ship this product to an apartment

19   because of Hazmat restrictions on it.  We need a business or

20   university address in order to process the order.  Please

21   provide an updated shipping address or we can cancel the order

22   for you."

23   **Q.**    Did you receive a response to this email?

24   **A.**    Yes.

25   **Q.**    What was the response?

1    **A.**    The response was an alternative shipping address.

2    **Q.**    If we could go to page 3 of that same exhibit.

3    **A.**    "You can--"

4    **Q.**    I'm sorry.  If you would, would you please read the email

5    response to that?

6    **A.**    "You can ship it to any post office in Lubbock, Texas,

7    for example, Fed Ex, and I will pick it up from there.  I will

8    give you an address of Fed Ex.  803 University Avenue, Lubbock,

9    Texas, (806) 744-6320."

10    **Q.**    Now, in December 2010, did you ever see this response?

11    **A.**    I don't recall reading that email.

12    **Q.**    How did you obtain the updated shipping information from

13    Mr. Aldawsari then?

14    **A.**    I received a phone call and I spoke to him direct.

15    **Q.**    Did he verbally give you the address during the phone

16    call?

17    **A.**    Yes.

18    **Q.**    Did you ask the defendant during that conversation

19    whether the address had a loading dock?

20    **A.**    Yes.

21    **Q.**    Why did you ask him about a loading dock?

22    **A.**    Because when a common carrier truck comes in, if they

23    have a loading dock, typically they're going to have to back up

24    to the loading dock to unload it.  If they-- And I know the

25    truck can get there.  If they don't have a loading dock, then

1    there's an additional $50 fee that you charge for a lift gate.

2    **Q.**    How did Mr. Aldawsari respond as to whether there was a

3    loading dock at this location?

4    **A.**    He indicated there was a loading dock.

5    **Q.**    Was there anything unusual about the defendant's demeanor

6    during the conversation?

7    **A.**    No.

8    **Q.**    Was there anything unusual about somebody requesting that

9    nitric acid be shipped to an apartment?

10   **A.**    That's unusual, yes.

11   **Q.**    Has it happened to you before?

12   **A.**    Yes.

13   **Q.**    And was that occasion before this incident?

14   **A.**    Yes.

15   **Q.**    Did you end up reporting that order to the Federal Bureau

16   of Investigation?

17   **A.**    Yes.

18   **Q.**    After speaking with Mr. Aldawsari, what did you do?

19   **A.**    I updated the shipping address with the proper address,

20   city, state, and zip code, which isn't on that email.

21   **Q.**    Did you receive another email from Mr. Aldawsari at

22   5:49 a.m. on December 15th?

23   **A.**    Yes.

24   **Q.**    If we could go to page 5 of that document, please.

25           Would you please read the email that you received?

1   **A.**    "Hello.  I was wondering--"

2   **Q.**    (BY MR. HAAG)  I'm sorry.  If you could slow down just a

3  little bit, Mr. Zajac.  I'm sorry.

4   **A.**    "Hello.  I am wondering if you will ship the items I

5  requested.  Please provide me a feedback regarding my order and

6  the shipment.  And I think I had sent you an alternative

7  address.  Thanks."

8   **Q.**    Did you respond to this email?

9   **A.**    Yes.

10   **Q.**    How did you respond?

11   **A.**    With the tracking information.

12          MR. HAAG:  Let's go to Government's Exhibit 34,

13  page 7.  And we've got--there's a portion above that, but if

14  you'll go one portion below it to your response on

15  December 15th.  I'm sorry.  Go up just a little bit.  Right

16  there.  Stop.

17   **Q.**    (BY MR. HAAG)  If you'll read for the jury your response

18  to Mr. Aldawsari on December 15th at 8:46 a.m.

19   **A.**    "Yes, your order ships today to the updated address.

20  Lubbock's Freight Forward handles Hazmat for us."

21   **Q.**    Did you receive from Mr. Aldawsari a response to your

22  email?

23   **A.**    Yes.

24          MR. HAAG:  If you would scroll up, please.  I'm

25  sorry.  Up to the top of the page.

1   Q.   (BY MR. HAAG)  What did Mr. Aldawsari inquire of you at

2   10:37 a.m.?

3   A.   "Thanks, but could you provide me the carrier name and

4   the track ID, please?  I would appreciate it.  Thanks again."

5   Q.   Did you respond to this email?

6   A.   Yes.

7   Q.   Did you recall, when we talked earlier, responding to

8   that email?

9   A.   No.

10   Q.   At the time that we talked, did you believe that you had

11   never given a response?

12   A.   Yes.

13   Q.   Since that time, have you had an opportunity to look at

14   Mr. Aldawsari's emails?

15   A.   Yes.

16   Q.   And did you identify an email you sent him giving him the

17   shipping information?

18   A.   Yes.

19   Q.   Who shipped-- Excuse me.

20        Does federal law require any special handling of

21   nitric acid?

22   A.   Federal law and Hazmat--the Hazmat restriction for DOT

23   transportation classifies it as a hazardous material.

24   Q.   Is that something that you or AquaPhoenix would handle?

25   A.   AquaPhoenix handles that.

1  **Q.**   How did AquaPhoenix ship the nitric acid in this case?

2  **A.**   They shipped it on an LTL common carrier freight company

3  called Con-way.

4  **Q.**   When did AquaPhoenix ship the nitric acid?

5  **A.**   I believe it was Tuesday.

6  **Q.**   Do you remember what date that was?

7  **A.**   December 14th.

8  **Q.**   I'll show you Government's Exhibit 33.  If you would,

9  please describe what this is for the jury.

10  **A.**   This is an invoice that is produced for any order that's

11  placed on the website.

12  **Q.**   And is the information on the invoice the same as the

13  order confirmation that we looked at earlier?  With the

14  change--

15  **A.**   With the update, yeah.  The ship-to was updated, and then

16  in the public view area, the tracking information was entered

17  into the commentary.

18  **Q.**   Right.  And under Order Comments, would you please read

19  for the jury what's listed in the invoice?

20  **A.**   Ship 12-14-2010, Con-way PRO Number 576-721574.

21  **Q.**   Telephone records show that the defendant called

22  QualiChem Technologies on December 17th and December 18th,

23  2010.  Do you recall speaking with Mr. Aldawsari on either of

24  those dates?

25  **A.**   No.

1          MR. HAAG:  Pass the witness, Your Honor.

2          THE COURT:  Your witness, Mr. Doyle.

3          MR. DOYLE:  Can you pull up the last--the last--33?

4                    CROSS-EXAMINATION

5    BY MR. DOYLE:

6    **Q.**    Mr. Zajac, my name is Paul Doyle.  We have never met

7    before?

8    **A.**    No.

9    **Q.**    The address--I just want to make it clear--that this is

10   being shipped to is a Fed Ex.  This is the December 15th

11   shipment of nitric acid to Fed Ex by Con-way Freight; is that

12   correct?

13   **A.**    Correct.

14   **Q.**    So if the jury was led to believe that an individual

15   picked this nitric acid up at Con-way Freight in the middle of

16   December, that would not be accurate?

17   **A.**    I do not know how it was picked up.  It could have been

18   rejected for delivery, because that's not a common practice for

19   you to be allowed to ship to--

20         MR. DOYLE:  I'm going to object to responsiveness.

21   **Q.**    (BY MR. DOYLE)  You don't know?

22   **A.**    I don't know.

23   **Q.**    But it was--it was listed to go to Federal Express, but

24   the carrier was Con-way Freight.  Correct?

25   **A.**    Yes.

```
 1   Q.   Okay.

 2            MR. DOYLE:  No further questions, Your Honor.

 3            THE COURT:  All right.  Anything?

 4            MR. HAAG:  No, Your Honor.

 5            THE COURT:  The witness is excused?

 6            MR. HAAG:  Yes, Your Honor.

 7            THE COURT:  Thank you, sir, you are excused.

 8            Call your next witness.

 9            MS. WILLIAMS:  The United States calls Marcus

10   Jordan.

11            THE COURT:  If you'll raise your right hand and be

12   sworn, please, sir.

13      (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

14            THE COURT:  Have a seat.

15                      MARCUS JORDAN,

16   GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

17                      DIRECT EXAMINATION

18   BY MS. WILLIAMS:

19   Q.   Please state your name.

20   A.   Marcus Anthony Jordan.

21   Q.   You're going to need to speak up a little bit so we can

22   be sure and hear you.

23   A.   Marcus Anthony Jordan.

24   Q.   How are you employed?

25   A.   Con-way Freight.
```

1    **Q.**    How long have you worked for Con-way Freight?

2    **A.**    Two years.

3    **Q.**    Do you work for--  What city do you work for Con-way

4    Freight?

5    **A.**    Tulsa, Oklahoma.

6    **Q.**    You're in Tulsa now?

7    **A.**    (Witness nods head up and down.)

8    **Q.**    How long have you been in the Tulsa office?

9    **A.**    About three months.

10   **Q.**    Where were you before that?

11   **A.**    Lubbock, Texas.

12   **Q.**    So up until about three months ago, you had worked at

13   Con-way Freight in Lubbock; is that right?

14   **A.**    Yes, ma'am.

15   **Q.**    What was your job at Con-way Freight in Lubbock?

16   **A.**    I was a customer service representative.

17   **Q.**    What does that mean that you would do?

18   **A.**    Just take phone calls and assist customers with any of

19   their needs.

20   **Q.**    Were these usually companies that you helped with or were

21   they individuals?

22   **A.**    Both.

23   **Q.**    Some of both?

24   **A.**    Yes, ma'am.

25   **Q.**    I want to turn your attention back to December 20th of

1  2010 and ask if you remember helping someone with some packages

2  that day.

3  **A.**   Okay.

4  **Q.**   Do you remember that day?

5  **A.**   Yes, ma'am.

6  **Q.**   Can you tell us, please, about what time you went to work

7  that day?

8  **A.**   Approximately 2:00.  Between 2:00 and 3:00.

9  **Q.**   In the afternoon?

10  **A.**   Yes, ma'am.

11  **Q.**   Now, were you one of the drivers that would drive one of

12  the trucks to deliver things, or did you stay there at the

13  office?

14  **A.**   No, ma'am, I did not leave.  I had--I was at an office,

15  or a desk.

16  **Q.**   So your job was to stay there?

17  **A.**   Yes, ma'am.

18  **Q.**   So back on December 20th of 2010, did--well, and just

19  generally, from time to time, would the drivers bring packages

20  back, or boxes or shipments back that they were unable to

21  deliver?

22  **A.**   Yes, ma'am.

23  **Q.**   Would you describe for the jury some circumstances under

24  which the drivers might not be able to deliver something?

25  **A.**   Maybe if it was damaged and refused, if it was--you

1   couldn't access the location due to--you know, could be

2   something as simple as, like, mud, if it had rained or anything

3   like that.

4   **Q.**   Okay.  So if the truck couldn't get in there--

5   **A.**   Right.

6   **Q.**   --then the driver would have to bring the load back?

7   **A.**   Yes, ma'am.

8   **Q.**   So on that day, did you become aware that one of the

9   drivers had to bring some boxes back to Con-way Freight because

10   they couldn't be delivered?

11   **A.**   Yes, ma'am.

12   **Q.**   What driver was it that brought some boxes back?

13   **A.**   Todd Ryan.

14   **Q.**   Do you remember how many boxes he brought back?

15   **A.**   Yes, ma'am.  It was two cartons on one pallet.

16   **Q.**   Say that again.

17   **A.**   It was two cartons on one pallet.

18   **Q.**   Why did he return the boxes?

19   **A.**   He couldn't access the road.  It was too narrow.

20   **Q.**   Now, when drivers bring boxes back, what is your job?

21   **A.**   It's--my job is to actually make sure that the exception

22   is noted on the delivery receipt and make sure that the morning

23   CSR is aware of it so, that way, she can follow up on it.

24               THE COURT:  CSR, did you say?

25               THE WITNESS:  Yes.  Customer service representative.

1  **Q.**    (BY MS. WILLIAMS)  And when you say you note the

2  exception on the delivery receipt, what does that mean?

3  **A.**    That's just noted that we attempted to--to actually

4  attempt to deliver it, but there was something that happened,

5  the reason why it was not delivered.

6  **Q.**    I'd like for you to open that notebook that's in front of

7  you and find the exhibit that's been marked for identification

8  as Government's Exhibit 35.

9  **A.**    Okay.

10  **Q.**    Do you have that?

11  **A.**    Yes, ma'am.

12  **Q.**    Before you testified today, had you looked at this or at

13  a copy of this?

14  **A.**    Yes, ma'am.

15  **Q.**    And do you recognize this document?

16  **A.**    Yes, ma'am.

17  **Q.**    Is this one of those records or documents that's--is this

18  one of those records or documents that is made in the regular

19  course of Con-way Freight's business?

20  **A.**    Yes, ma'am.

21  **Q.**    And what--  Is this one of the delivery documents that

22  you were describing to us, or a delivery receipt?

23  **A.**    Yes, ma'am, this is a delivery receipt.

24  **Q.**    And so when this document is made, somebody that knows

25  about the delivery, they fill out this piece of paper.

1    **A.**    Yes, ma'am.

2    **Q.**    Is that right?

3            And it's the regular practice of Con-way Freight to

4    make this record?

5    **A.**    Yes, ma'am.

6            MS. WILLIAMS:   Your Honor, at this time, I would

7    tender Government's Exhibit 35 into evidence.

8            MR. DOYLE:   No objection, Your Honor.

9            THE COURT:   Without objection, it is received.

10   **Q.**    (BY MS. WILLIAMS)   How soon after Todd Ryan brought the

11   boxes back to Con-way Freight did you receive a call from

12   someone about those boxes?

13   **A.**    About 30 to 45 minutes.

14   **Q.**    The person that called about those boxes, did the person

15   tell you his or her name?

16   **A.**    Yes.

17   **Q.**    Okay.   And what name was that?

18   **A.**    Khalid.

19   **Q.**    Khalid?

20   **A.**    Yes.

21   **Q.**    And did you recognize that to be the same Khalid that--or

22   the same name that was on the document?

23   **A.**    Yes, ma'am.

24           MS. WILLIAMS:   Could you please display Government's

25   Exhibit 35?

1    **Q.**    (BY MS. WILLIAMS)  So the person that called said his

2    name was Khalid, and you had a piece of paper in front of you

3    that said Khalid?

4    **A.**    Yes, ma'am.

5    **Q.**    What did the person ask you or tell you?

6    **A.**    Just that he was looking to receive the two cartons.  And

7    I was aware at that point that they--that we had them, and so

8    at that point, I told him that we did have them.

9    **Q.**    Did you and he make arrangements for him to go to Con-way

10   and pick up the boxes?

11   **A.**    Yes, ma'am.

12   **Q.**    Now, at the time that you were talking to Khalid, or to

13   Mr. Aldawsari, did you have any concerns about the situation?

14   **A.**    Just the accent, the Middle Eastern accent.  That did

15   catch my attention.

16   **Q.**    The Middle Eastern accent--

17   **A.**    Yes, ma'am.

18   **Q.**    --caught your attention, but it didn't alarm you at that

19   point, did it?

20   **A.**    No, it did not.

21   **Q.**    Did you give Mr. Aldawsari the directions on how to get

22   to Con-way Freight?

23   **A.**    Yes, I gave him the address.

24   **Q.**    And did someone come and pick up those boxes?

25   **A.**    Yes, ma'am.

1   **Q.**   Who came to pick them up?

2   **A.**   Khalid Aldawsari.

3   **Q.**   Now, how did you know it was Khalid Aldawsari?

4   **A.**   Because of the--after the phone conversation and then

5   whenever I saw him and the voice, I recognized the voice.

6   **Q.**   You recognized it to be the same voice.  Did you ask him

7   for any identification?

8   **A.**   No, ma'am.

9   **Q.**   Did the person that was there to pick up those boxes

10  appear to you to go with the person that it said they were

11  being shipped to?

12  **A.**   Yes, ma'am.

13  **Q.**   Were you concerned a little bit at that point?

14  **A.**   Just with the accent and the--yes, ma'am.

15  **Q.**   Were you concerned because he appeared to be Middle

16  Eastern?

17          MR. DOYLE:  Judge, that's leading.

18          THE COURT:  I'm sorry?

19          MR. DOYLE:  She's leading.  She's leading the

20  witness.

21          THE COURT:  I don't think that was leading.  Try not

22  to lead.

23          MS. WILLIAMS:  I will not, Your Honor.

24  **Q.**   (BY MS. WILLIAMS)  What was concerning you?

25  **A.**   Just the accent and the appearance.

1    **Q.**    His accent and his appearance?

2    **A.**    Yes, ma'am.

3    **Q.**    Why did you let him take those boxes without asking him

4    for any identification?

5    **A.**    Just trying to avoid stereotyping.

6    **Q.**    You didn't want to be stereotypical?

7    **A.**    No, ma'am, I did not.

8    **Q.**    How long after you talked to Mr. Aldawsari on the phone

9    did he come pick up the boxes?

10   **A.**    It was approximately 20 to 30 minutes, 20 to 30 minutes.

11   **Q.**    Do you see the person in the courtroom today that came

12   and picked up the boxes from you on December 20th, 2010?

13   **A.**    Yes, ma'am.

14   **Q.**    Would you please tell us where he's seated and what he's

15   wearing?

16   **A.**    He's wearing a black suit with a silver tie, far left.

17   **Q.**    I'm pointing to the defendant in this case.  Is this the

18   person that came and picked up those boxes?

19   **A.**    Yes, ma'am.

20   **Q.**    When the defendant, Mr. Aldawsari--when he got there,

21   what did you and he do?  He got there, and did you have a

22   conversation?

23   **A.**    Just asked him if he was looking for the two cartons.  He

24   said yes, and the--popped the trunk.  And the conversation was

25   very minimal.

1    **Q.**    The conversation was what?

2    **A.**    Very minimal.  Not very much was said.

3    **Q.**    Did you help the defendant load those boxes into his car?

4    **A.**    Yes, ma'am.

5    **Q.**    Do you remember what kind of car he was driving?

6    **A.**    A four-door Sedan.

7    **Q.**    Do you remember the make--

8    **A.**    No, I don't.

9    **Q.**    --model, color, any of that?

10   **A.**    No, I just remember it was a four-door Sedan, car.

11   **Q.**    Do you recall seeing anything in the trunk?

12   **A.**    College books, yes, ma'am.

13   **Q.**    Was the defendant fluent in English?

14   **A.**    No, no.  I had trouble distinguishing--

15   **Q.**    You were able to--  I'm sorry, I didn't mean to

16   interrupt.  Go ahead.

17   **A.**    I had slight troubles distinguishing, but I could

18   understand what--what he was saying.

19   **Q.**    You understand he was there to pick up boxes--

20   **A.**    Yes, ma'am.

21   **Q.**    --and so you gave him boxes?

22             How did the defendant act when he came to pick up

23   the boxes?

24   **A.**    Very quiet.  Very quiet.

25   **Q.**    Did he act nervous or upset in any manner?

1  **A.**    No.

2  **Q.**    Did he sign for the items?

3  **A.**    Yes, ma'am.

4  **Q.**    And is his--did he sign--  Where on here did he sign?

5  **A.**    Where it says consignee's signature to the right of the

6  star.

7  **Q.**    To the right what?

8  **A.**    Of the--of that--of the star right by consignee's

9  signature.

10  **Q.**    Okay.  Where it says--

11  **A.**    Right underneath where it says residential delivery.

12  **Q.**    All right.  So where it says consignee's signature there

13  on the bottom, and then right under the consignee, there's a

14  little star, so was that to indicate this was where he needed

15  to sign?

16  **A.**    Sign here, right.

17  **Q.**    All right.  And then after that is something unreadable.

18  Right?

19  **A.**    Right.  Underneath that.

20  **Q.**    Now, on the very bottom where it says Driver, do you

21  recognize whose signature that is?

22  **A.**    Yes.  That's Todd's.

23  **Q.**    Todd Ryan?

24  **A.**    Yes, ma'am.

25  **Q.**    The driver that brought the boxes back because he

1  couldn't get the truck in?

2  **A.**    Right.

3  **Q.**    Did Mr. Aldawsari tell you that day that he was going to

4  receive other shipments at Con-way Freight?

5  **A.**    No, ma'am.

6  **Q.**    Did he ask you if he could send other--or have other

7  shipments sent to him at Con-way Freight?

8  **A.**    No, ma'am.

9          MS. WILLIAMS:  I'll pass the witness.

10          THE COURT:  Your witness, sir.

11          MR. DOYLE:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. DOYLE:

14  **Q.**    You said that one reason that you gave him the boxes was

15  because you didn't want to profile him.  Correct?

16  **A.**    Yes.

17  **Q.**    But you also knew that this had already been approved to

18  be delivered to Federal Express.  Correct?

19  **A.**    To--  No.

20  **Q.**    Well, you knew that your shipping company, your truck had

21  items that had his name on them and they were shipped initially

22  to Fed Ex.  Right?

23  **A.**    No.

24  **Q.**    You don't believe they were initially shipped to Fed Ex?

25  **A.**    No.

1   **Q.**   Okay.  Do you know where they were shipped?

2   **A.**   They were shipped to his address.

3   **Q.**   To his address?  Okay.  And what is his address sir?

4   **A.**   It's 803 University Avenue, or--yeah, it's 803, I

5   believe.

6   **Q.**   Would it surprise you that that's a Fed Ex location?

7   **A.**   No.

8   **Q.**   Regardless, you had no reason to believe--since whoever

9   was shipping it had already sent it, it wasn't your job to

10   decide whether or not he was supposed to get it.  Correct?

11   **A.**   You could say that, yes.

12   **Q.**   And the reason it came back to you is because your driver

13   couldn't--

14   **A.**   Access that area.

15   **Q.**   --ship it there?

16   **A.**   Because he couldn't access the area.

17   **Q.**   But the name on the box--the address on the box, in your

18   mind, you thought it was his home.  Right?

19   **A.**   Yes.

20   **Q.**   That's what you're telling me?

21          So you had no reason to reject it.  Correct?

22   **A.**   Right.

23   **Q.**   Certainly you wouldn't give Mr. Aldawsari a box that had

24   Con-way Freight addressed to it, you know, whose address--to be

25   shipped to Con-way Freight.  You wouldn't give that to him,

1   would you?

2   **A.**   No.

3   **Q.**   Okay.

4           MR. DOYLE:  No further questions.

5           THE COURT:  Your witness, Ms. Williams.

6           MS. WILLIAMS:  Would you please pull up 35 again?

7                    REDIRECT EXAMINATION

8   BY MS. WILLIAMS:

9   **Q.**   So the piece of paper that you had in front of you has

10  what consignee up there?

11  **A.**   Khalid Aldawsari, and his address, 803 University Avenue.

12  **Q.**   Khalid Aldawsari at 803 University?

13  **A.**   Yes, ma'am.

14  **Q.**   Did you have any way of knowing that that was not a home

15  address?

16  **A.**   No.

17  **Q.**   I guess you have learned today that it's a Fed Ex--

18          MR. DOYLE:  I'm going to object.

19          THE COURT:  Don't lead.  Don't lead.

20  **Q.**   (BY MS. WILLIAMS)  Do you see anywhere on this piece of

21  paper that it says Fed Ex?

22  **A.**   No.

23          MS. WILLIAMS:  No further questions.

24          THE COURT:  All right.  You may step down.  Thank

25  you, sir.  Witness is free to go?

1           MS. WILLIAMS:  Yes, Your Honor.

2           THE COURT:  Free to go.

3           Call your next witness.

4           MS. WILLIAMS:  The United States calls Joe White.

5      (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

6           THE COURT:  Please be seated.

7                     JOE WHITE,

8  GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

9                  DIRECT EXAMINATION

10  BY MS. WILLIAMS:

11  **Q.**    Please state your name.

12  **A.**    My name is Joe White.  I'm a special agent with the

13  U.S. Department of State Diplomatic Security Service.

14  **Q.**    How long have you been with the Department of State?

15  **A.**    Eight years.

16  **Q.**    Would you describe, please, for the jury what the

17  Diplomatic Security Service is?

18  **A.**    Certainly.  We're the investigative agency within the

19  State Department responsible for investigating visa and

20  passport fraud-related crimes.

21  **Q.**    You have been with the State Department eight years?

22  **A.**    Uh-huh.

23  **Q.**    To what office are you currently assigned?

24  **A.**    Currently I'm assigned to our Office of Mobile Security

25  Deployments in Washington, D.C.

1   **Q.**   Back in February of 2011, to what office were you

2   assigned?

3   **A.**   A part of the North Texas Joint Terrorism Task Force in

4   Dallas.

5   **Q.**   As a State Department agent--

6   **A.**   As a State Department--

7   **Q.**   --you were with the Joint Terrorism Task Force?

8   **A.**   Yes.

9   **Q.**   All right.  Would you describe for the jury, please, what

10   the Joint Terrorism Task Force is?

11   **A.**   Certainly.  It's an FBI-led partner agency task force

12   made up of state, local, and federal law enforcement agencies

13   responsible to investigate acts of terrorism within our

14   respective area.

15   **Q.**   It's a task force made up of several different agencies?

16   **A.**   Yes.

17   **Q.**   Or representatives from several agencies?

18   **A.**   Yes.

19   **Q.**   As a person who is an agent with the Department of State,

20   are you aware of the kinds of documents that are kept by the

21   Department of State in its regular course of business?

22   **A.**   Yes.

23   **Q.**   Now, does the Department of State deal with visas?

24   **A.**   Yes, we issue--the Department issues visas.

25   **Q.**   Would you please describe for the jury a sampling of some

1    of the different kinds of visas that would be available if

2    someone wanted to come to the United States?

3    **A.**    Certainly.  There's two basic categories.  There's a

4    non-immigrant visa and an immigrant visa.  And within the

5    non-immigrant visa, there are tourist visas, student visas, and

6    work visas.

7    **Q.**    Tourist, student, and work?

8    **A.**    Correct.

9    **Q.**    I'm having a little bit hard time hearing you, so keep

10   your voice up and speak a little bit more slowly.

11   **A.**    No problem.

12   **Q.**    For example, how does someone get a tourist visa?

13   **A.**    An individual would go to a consulate or embassy overseas

14   and apply for a tourist visa.

15   **Q.**    And a work visa would come--how would one get a work

16   visa?

17   **A.**    Typically the same process.  However, there are companies

18   that have partnerships in the U.S. and they can petition for

19   applicants to receive a visa.

20   **Q.**    Now, you described these three types of visas as

21   non-immigrant visas.

22   **A.**    Yes.

23   **Q.**    What is the difference between a non-immigrant visa and

24   an immigrant visa?

25   **A.**    An immigrant visa is awarded to an individual and allows

1   them to actually move and immigrate to the United States, and

2   from there, they are allowed to apply for naturalization later

3   down the road.

4   **Q.**   Now, you said that a student visa is a non-immigrant

5   visa.  Correct?

6   **A.**   Yes.

7   **Q.**   So what--how does a person get a student visa and what

8   does it allow him or her to do?

9   **A.**   A student visa is--an individual would go apply at an

10   embassy or a consulate and apply for a student visa to attend

11   the college or university or institution of learning in the

12   United States.  They would have to enroll in a curriculum, be

13   approved by the college in the United States, and adhere to the

14   guidelines set forth by that institution.

15   **Q.**   And as an agent with the Department of State, you are

16   familiar with that process?

17   **A.**   Yes.

18   **Q.**   Are there records generated within the Department of

19   State when someone applies for a student visa?

20   **A.**   Yes, there are.

21   **Q.**   And are those records kept regularly by the State

22   Department?

23   **A.**   Yes, and they are also maintained by Citizen Immigration

24   Services through the SEVIS database.

25   **Q.**   What is SEVIS?  And spell that for us.

1  **A.**    S-E-V-I-S.  It's the Student Exchange Visitor Information

2  Service.

3  **Q.**    So there are a number of different places that records

4  are kept?

5  **A.**    Yes.

6  **Q.**    You--as an employee of the Department of State, are you

7  familiar with the records that that department keeps and

8  maintains for those that are seeking to enter the United States

9  to go to school?

10  **A.**    That department being SEVIS?

11  **Q.**    No, Department of State.

12  **A.**    Right.  Yes, I am.

13  **Q.**    You don't keep SEVIS records?

14  **A.**    No.

15  **Q.**    The Department of State doesn't?

16  **A.**    Correct.

17  **Q.**    I want to refer your attention to what's in front of you

18  and marked for identification as Government's Exhibit 166.

19  Before you came to testify today, had you reviewed these

20  documents?

21  **A.**    Yes.

22  **Q.**    And to your knowledge, are these documents a complete

23  record of the student visa documents that are maintained by the

24  State Department for Khalid Ali-M Aldawsari?

25  **A.**    Yes.

1          MS. WILLIAMS:  Your Honor, at this time, I would

2     tender Government's Exhibit 166.

3          MR. COGDELL:  May I see it, Your Honor, and have a

4     quick sidebar with counsel?

5          THE COURT:  Yes.

6     (DISCUSSION OFF THE RECORD BETWEEN COUNSEL)

7          MR. COGDELL:  No objection.

8          THE COURT:  Without objection.

9     **Q.**   (BY MS. WILLIAMS)  When a person applies for and receives

10    a student visa, is there a--is there a form name that we use to

11    refer to that besides just student visa?

12    **A.**   F-1 student visa.

13    **Q.**   F-1?

14    **A.**   Is one of the categories, yes.

15    **Q.**   And visitor visas are called something else?

16    **A.**   Tourist visas are typically a B-1 or a B-2.

17    **Q.**   All right.  So here, we're going to talk about an F-1

18    student visa.  Correct?

19    **A.**   Yes.

20    **Q.**   Now, are there restrictions placed on a person who has

21    come to the United States on a student visa?

22    **A.**   Yes.

23    **Q.**   What kinds of restrictions are there?

24    **A.**   For example, they are required to adhere to the

25    conditions the curriculum set forth at the institution to which

1    they are attending.  They must maintain a certain grade-point

2    average.  Their attendance policy must be well kept.  And if

3    there's any other extracurricular conditions the school may set

4    upon them, they have to adhere to those as well.

5    **Q.**    When a person is in the United States from another

6    country on a student visa, are they allowed to work?

7    **A.**    No.  There are certain circumstances in which a student

8    may work if it's part of a residency or an internship that may

9    be paid through the curriculum, but they are not allowed to

10   seek outside employment for their own sake.

11   **Q.**    For example, if someone was here on a student visa, they

12   couldn't go to work at McDonald's or--

13            MR. COGDELL:  I don't mean to be technical, but it

14   is her witness.  Objection; leading.

15            THE COURT:  Don't lead.

16            MS. WILLIAMS:  I'll rephrase.

17   **Q.**    (BY MS. WILLIAMS)  If a person is here on a student visa,

18   can they go to work at McDonald's?

19   **A.**    No.

20   **Q.**    Or Dillard's?  Can they go work at Dillard's?

21   **A.**    No.

22   **Q.**    Any kind of paid employment that they can do other than

23   what you've named?

24   **A.**    No.

25   **Q.**    Is there a fixed number or a certain number of student

1   visas that the United States issues each year?

2   **A.**   No, not that I'm aware of.

3   **Q.**   Now, because of the work restriction, are there some

4   students that come to the United States that have sponsors?

5   **A.**   Yes.

6   **Q.**   I'm going to refer your attention to page 48 of

7   Government's Exhibit 166.

8            MS. WILLIAMS:   And if you would display that,

9   please.

10  **Q.**   (BY MS. WILLIAMS)  Would you please describe for the jury

11  what this document within Mr. Aldawsari's visa records is?

12  **A.**   It's a letter of financial responsibility.

13  **Q.**   From whom?

14  **A.**   Career Development Department at SABIC, which is the

15  Saudi Basic Industries Corporation.

16  **Q.**   And without reading the letter, what does this--what is

17  this letter used for to tell the State Department?

18  **A.**   It indicates to the Department and to the--or to the

19  learning institution that the applicant will--is financially

20  responsible enough to pay for the course of study, and in case

21  he can't, this corporation here will be able to cover the

22  finances involved.

23  **Q.**   Someone will take care of his schooling?

24  **A.**   Yes.

25  **Q.**   When a person is in the United States on a student visa,

1    may they change the school they are going to without notifying

2    anyone?

3    **A.**    No.

4    **Q.**    I'd like to refer your attention to page 23 of this

5    exhibit.  And let me ask you this question first.  Were you

6    aware, from reviewing these documents, the school that

7    Mr. Aldawsari was to attend when he came--when he first came

8    into the United States?

9    **A.**    Vanderbilt.

10   **Q.**    Vanderbilt University?

11   **A.**    Yes.

12   **Q.**    In page 23 of Government's Exhibit 166, what does this

13   indicate?

14   **A.**    Indicates that he was accepted at Texas Tech University.

15   **Q.**    So would this have been one of the required documents

16   that he would have to provide to the State Department in order

17   to change schools?

18   **A.**    Yes.

19   **Q.**    Where does a person apply for a student visa?

20   **A.**    At any embassy or consulate abroad.

21   **Q.**    And who actually grants the visa?

22   **A.**    The issuing post, being the embassy or consulate that

23   they apply at, has the ultimate authority in issuing that

24   document.

25   **Q.**    Are there any records checks that are made on people that

1    are applying for student visas?

2    **A.**    Yes.  Every applicant is screened in our--against our

3    database.

4    **Q.**    And are those a number of different kinds of records

5    checks?

6    **A.**    Yes.

7    **Q.**    Are those records checks conducted in the United States

8    or in the foreign country from which the student is coming?

9    **A.**    They are typically U.S. databases that can be accessed

10   from a foreign post.

11   **Q.**    Now, are there different categories of records checks

12   that are done on some students as opposed to others?

13   **A.**    Yes, there are.

14   **Q.**    Would you describe for us what those different kinds of

15   checks are?

16   **A.**    Certainly.  After an applicant applies, the identifiers

17   provided in the applicant's application are ran through our

18   database to see if there are any similarities or if that

19   individual has applied for a visa at any other post or if there

20   is any lookouts on that individual's identifiers.

21            Occasionally there is the request for an SAO, which

22   is a security advisory opinion, and a security advisory opinion

23   is where the post requests that headquarters, State Department

24   in Washington, D.C., perform other records checks in order to

25   advise on whether or not the post should issue that visa to

1    that person or not.

2    **Q.**    Now, in Mr. Aldawsari's case--  And let me refer you to

3    page 42 of Government's Exhibit 166.

4            Well, let's just talk about it.  All right.  What is

5    on page 42?

6    **A.**    It's the first page of a 2008 visa application.

7    **Q.**    All right.  Now--  And you said 2008.  Do these records

8    cover more years than just 2008?

9    **A.**    Yes.  There's an application for 2008 and 2009.

10   **Q.**    And are those calendar years or school years?

11   **A.**    Calendar years.

12   **Q.**    So on the 2008 visa application, can you explain to us,

13   please, what this box in the middle that says donkey 12 August

14   2008 Riyadh--what does that mean?

15   **A.**    "Donkey" is regarding the security advisory opinion I

16   discussed earlier.  "Donkey" is one of the categories within

17   that process.  The Department decided to use animal names as

18   categories.  Instead of using one, two, three, four, they chose

19   animal names, and donkey is one of those categories that

20   identifies what type of checks they would want run later on.

21   **Q.**    So if he's in the donkey category, what does that mean?

22   **A.**    It means when they ran his name initially through our

23   database, there was a name similarity somewhere else in our

24   database that indicated they wanted more scrutiny applied to

25   this application.

1   **Q.**   To your knowledge, was there more scrutiny applied to

2   this application?

3   **A.**   Yes.  During the process, the application information was

4   sent back to headquarters in Washington, D.C., and they

5   performed more records checks, basically, with various other

6   agencies and then advised back to post on whether or not to

7   issue the document.

8   **Q.**   And is it your understanding that, ultimately,

9   Mr. Aldawsari was granted the F-1 student visa to come to the

10   United States in 2008?

11   **A.**   Yes.

12   **Q.**   Does that visa have to be renewed each year?

13   **A.**   Yes, administratively, yes.

14   **Q.**   Administratively, it does.

15           So--and was his renewed for 2009?

16   **A.**   Yes.

17   **Q.**   Was it renewed for 2010?

18   **A.**   No.

19   **Q.**   Do you know or do the records reflect what Mr. Aldawsari

20   was to study at Vanderbilt University?

21   **A.**   I believe it was chemical engineering.

22   **Q.**   All right.  Let's move on.  Let me ask you one more

23   question.  When a person goes to get their visa, they go to the

24   post or the consulate in their home country?  Is that how that

25   works?

1   **A.**   They can apply in their home country or a neighboring

2   country.

3   **Q.**   And can you tell from these records where Mr. Aldawsari

4   applied?

5   **A.**   Yes.  In Riyadh, Saudi Arabia.

6             MS. WILLIAMS:  I'll pass the witness.

7             THE COURT:  Your witness, sir.

8             MR. COGDELL:  Thank you.  May I proceed, Your Honor?

9             THE COURT:  Yes, sir.

10                         CROSS-EXAMINATION

11   BY MR. COGDELL:

12   **Q.**   Good afternoon, Mr. White.

13   **A.**   Good afternoon.

14   **Q.**   My name is Dan Cogdell.  I don't think you and I have

15   ever laid eyes on each other before.  Am I right about that?

16   **A.**   That's right.

17   **Q.**   Okay.  I've got to ask you about donkey.

18   **A.**   Okay.

19   **Q.**   If I'm understanding you right, the fact that he was--

20   Well, let's just go there.  What are the other categories or

21   animals other than donkey?

22   **A.**   There's eagle, mantis, bear.

23   **Q.**   And are these in increasing order of concern or

24   decreasing order of concern?

25   **A.**   I'm not sure exactly of the order, and there--as far as I

1    know, there's not any particular order of seriousness.

2    **Q.**    Okay.  Where does--where does the tattoo "donkey" fit in

3    in terms of the level of scrutiny that the Department of State

4    applies?

5    **A.**    The donkey is the title for the category that indicates a

6    name similarity or a name match existed in our system, and

7    that's also--the donkey is the most common hit in our system

8    for applicants.

9    **Q.**    Okay.  So if I'm understanding you right, the fact that

10   he was classified as a donkey, or in the donkey category, gave

11   your department reason to give him a little more--or additional

12   scrutiny than somebody with a different category?

13   **A.**    That's correct.

14   **Q.**    Okay.  Now, in terms of the name association, would you

15   agree with me, Mr. White, that it's quite common for Middle

16   Eastern names to be similar or repetitive or, in fact, have

17   exactly the same name?

18   **A.**    Yes.

19   **Q.**    Kind of like a person named White?

20   **A.**    Yes.

21   **Q.**    Or Smith?

22   **A.**    Yes.

23   **Q.**    Okay.  And the name Khalid is a very--it's unusual to us

24   probably, but the name Khalid is a fairly common name in Middle

25   Eastern countries.  Would you agree with me?

1    **A.**   I would, yes.

2    **Q.**   Now, Ms. Williams asked you if his passport was renewed

3    in 2009 and 2010 and you said yes.  Right?

4    **A.**   Yes.

5    **Q.**   Can you tell us what the current classification of his

6    passport is?

7    **A.**   I'm not sure of the classification of his passport, but

8    his current visa status is revoked.

9             MR. COGDELL:  Can we have page 2, please, of

10   Government's 166?  And if we could zero in please, ma'am, on

11   revoked, revoked, revoked, revoked.

12   **Q.**   (BY MR. COGDELL)  Explain to the jury what "revoked"

13   means.

14   **A.**   It means that his active visa at the time was revoked, so

15   that if he left the country, he would not be able to use that

16   visa to return to the United States.

17   **Q.**   He's not free to stay here anymore.  Would you agree with

18   me?

19   **A.**   Correct.

20   **Q.**   So hypothetically, if he walked out that courthouse

21   today--or this courthouse today, what would happen to him?

22   **A.**   I would presume he would be arrested again.

23   **Q.**   Let's be--let's be--let's completely candid with each

24   other, Mr. White.  You're pretty sure he would be arrested,

25   aren't you?

1    **A.**    Yes.

2    **Q.**    Probably before he hit--what's the street out in front of

3    the courthouse here?  I don't even know the name of the street.

4    Probably before he got down the courthouse steps, he would be

5    arrested.  Right?

6    **A.**    Yes.

7    **Q.**    In fact, he wouldn't be allowed to leave the courthouse.

8    He's in custody.  They would take from custody and deport him

9    back to Saudi Arabia.  Right?

10   **A.**    Yes.

11   **Q.**    He ain't coming back here anymore as long as the

12   Department of State has anything to do with it?

13   **A.**    Right.  He has no valid travel document to come back to

14   the United States.

15   **Q.**    And if he tried to get back into this country, he would

16   face significant efforts, if not an impossibility.  Agree with

17   me?

18   **A.**    Yes.

19   **Q.**    Are you--  You have looked through Government's

20   Exhibit 166?

21   **A.**    Yes.

22   **Q.**    Without drilling down any further into the jury's time,

23   would you agree with me that there are numerous flags, if you

24   will, in this document that's--he's on a watch list; he's not

25   to be allowed reentry into this country.  It's--this document

1   is replete with those suggestions?

2   **A.**   Yes, it is.

3   **Q.**   Okay.

4           MR. COGDELL:  May I have just a minute, Your Honor?

5           THE COURT:  Yes

6   (PAUSE)

7           MR. COGDELL:  Nothing further.  Thank you, sir.

8           THE COURT:  Redirect?

9                       REDIRECT EXAMINATION

10  BY MS. WILLIAMS:

11  **Q.**   I was not clear on a couple of things earlier.  When a

12  person goes to get a student visa, they don't go to the Saudi

13  Arabian consulate in Saudi Arabia; they go to what consulate?

14          THE COURT:  You're leading.

15          MR. COGDELL:  She's leading and she's also beyond

16  the scope of cross.

17          THE COURT:  Well, it is that also.

18          MS. WILLIAMS:  All right.

19  **Q.**   (BY MS. WILLIAMS)  Is it true or not true that even

20  though a person is not legally allowed to come back into the

21  United States, they sometimes can and do?

22          MR. COGDELL:  Objection--

23  **Q.**   (BY MS. WILLIAMS)  Is that true or not true?

24          MR. COGDELL:  Excuse me.

25          THE COURT:  Sustained.

1                    MR. COGDELL:  Ask that the jury be instructed to

2       disregard the question.

3                    THE COURT:  Well, I'll repeat what I'll probably say

4       many times to you.  Questions are not evidence; answers are.

5                    MR. COGDELL:  Thank you.

6                    THE COURT:  Anything else?

7                    MS. WILLIAMS:  No, sir.

8                    THE COURT:  Thank you.  You may step down.  The

9       witness is excused?

10                   MR. COGDELL:  Yes, sir.

11                   THE COURT:  You are excused, sir.  Thank you very

12      much.

13                   Call your next witness.

14                   MS. WILLIAMS:  The United States calls Andy Clayton.

15                   THE COURT:  Mr. Clayton, if you'll come up.

16                   UNIDENTIFIED JUROR:  Your Honor?

17                   THE COURT:  Yes?

18                   THE JUROR:  Could we clarify on something?  I think

19      we're all a little bit confused, because they said it--they

20      first said it was renewed--his visa was renewed in 2009 but not

21      2010.

22                   THE COURT:  Well--

23                   UNIDENTIFIED JUROR:  We have 2008 and '9 but not in

24      '10.

25                   THE COURT:  I'm sorry.  The system simply doesn't

1    permit y'all to ask questions, but I tell you what.  If you

2    will write that to me, I'll see about having them check on it.

3    Okay?

4            MR. COGDELL:  I think we can probably reach a

5    stipulation on that, at least for this limited purpose.

6            THE COURT:  All right.  Well, go ahead.

7            MR. COGDELL:  I think.

8        (DISCUSSION OFF THE RECORD BETWEEN COUNSEL)

9            MR. COGDELL:  We can't reach a stipulation now, but

10   we may be--maybe after the break.

11           THE COURT:  Okay.  All right.

12           MS. WILLIAMS:  We'll check those records, Your

13   Honor.

14       (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

15                       ANTHONY CLAYTON,

16   GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

17                     DIRECT EXAMINATION

18   BY MS. WILLIAMS:

19   **Q.**    Please state your name.

20   **A.**    My name is Anthony Clayton.

21   **Q.**    You're going to need to keep your voice up so we can hear

22   you.

23   **A.**    Yes, ma'am.

24   **Q.**    How are you employed?

25   **A.**    I am a project director--

1           THE COURT:  Speak up, please, sir.

2   **A.**    I'm a project director with McDougal Properties.

3   **Q.**   (BY MS. WILLIAMS)  In what city?

4   **A.**    In Lubbock.

5           THE COURT:  I'm sorry.  Is there something wrong

6 with the mike?  Can you speak up a little louder, sir?  Your

7 voice is very soft.

8           THE WITNESS:  Okay.  Is that better?

9           THE COURT:  No.  Is it off?

10         MR. COGDELL:  I don't know that the microphone is

11 on.  I can't hear Mr. Clayton at all.

12         THE COURT:  Try it again.

13         THE WITNESS:  How's that?

14         THE COURT:  Okay.  Now.

15  **A.**    McDougal Properties in Lubbock, Texas.

16  **Q.**   (BY MS. WILLIAMS)  What is McDougal Properties?

17  **A.**    Owner and management of multifamily housing apartment

18 communities.

19  **Q.**   How long have you been employed with McDougal?

20  **A.**    Eighteen years.

21  **Q.**   What is your position with them?

22  **A.**    As project director, I'm--I manage properties.  I'm a

23 property manager.

24  **Q.**   Are you the project director or property manager of a

25 particular apartment complex in Lubbock?

1    **A.**    The Centre at Overton Park Apartments.

2    **Q.**    Would you describe for the jury, please, what that

3    apartment complex is like?

4    **A.**    The Centre is 278 units directly across from Texas Tech,

5    right across from Jones Stadium, housing mostly students.

6    **Q.**    And since we're in Amarillo, describe for everybody what

7    Jones Stadium is, in case they don't know.

8    **A.**    Texas Tech football stadium.

9    **Q.**    Near what intersection is that apartment complex located?

10   **A.**    It's on the intersection of Avenue X and Glenna Goodacre

11   Boulevard.

12   **Q.**    What is the physical address there?

13   **A.**    2400 Glenna Goodacre Boulevard.

14   **Q.**    What type of people mostly rent the apartments that are

15   there at the center?

16   **A.**    We are approximately 95 percent students.

17   **Q.**    Would you tell us, please, the monthly rental rates for

18   apartments, and how big are the apartments there?

19   **A.**    Rental rates start at $850 a month and go up to as much

20   as 2500.  Square footage, 688 square feet, all the way up to

21   close to 3,000 square feet.

22   **Q.**    For the lower end, the $850 range, how many bedrooms and

23   bathrooms would you get in an apartment like that?

24   **A.**    That will be a one-bedroom.

25   **Q.**    As the project manager for that property, are you a

1    custodian of the records that are maintained there?

2    **A.**    Yes.

3    **Q.**    What kind of records do y'all keep regarding your

4    tenants?

5    **A.**    We have their personal history, rental history, criminal

6    background, credit history.

7    **Q.**    When a person comes to rent an apartment, what kind of

8    paperwork do they have to fill out?

9    **A.**    It starts with the application, which is where we get the

10   information that--when we run the credit, criminal, and so

11   forth.

12   **Q.**    Okay.  And once you determine that a person is suitable

13   to live in those apartments and--is a lease executed?

14   **A.**    Yes.

15   **Q.**    Okay.  And what other pieces of paper--  Is there

16   something called a resident file checklist?

17   **A.**    Yes, ma'am.

18   **Q.**    All of these pieces of paper that you keep in a

19   resident's file or with relation to a particular apartment, all

20   of these are kept in the regular course of business?

21   **A.**    Yes.

22   **Q.**    The entries that are made on those records, are they made

23   by someone who knows about the information that's put on those

24   records at that time?

25   **A.**    Yes.

1    **Q.**    Does your office, your business rely on these records in

2    order to conduct its day-to-day operations?

3    **A.**    Yes.

4    **Q.**    I'd like to refer your attention to what have been marked

5    for identification as Government's Exhibits 36, 37, 38, and 39.

6    Look in that notebook, please.

7    **A.**    36. . .

8    **Q.**    Do you see all four of those documents that I have

9    referred to?

10   **A.**    Yes, ma'am.

11   **Q.**    Before you came to testify today, had you looked at each

12   one of those documents?

13   **A.**    Yes.

14   **Q.**    And is each one of those documents the type of business

15   record, although they are all different, but are they a type of

16   business record that you regularly keep--

17   **A.**    Yes, ma'am.

18   **Q.**    --at the Centre?

19   **A.**    Yes.

20              MS. WILLIAMS:  Your Honor, at this time, I would

21   tender Government's Exhibit 36, 37, 38, and 39.

22              MR. DOYLE:  Judge, I only object to 38.  I don't--

23              THE COURT:  The basis for your objection on 38?

24              MR. DOYLE:  It's not relevant, Your Honor.

25              THE COURT:  I need to see it.  Hand it to the

1    deputy, please.

2         (APPROACHES COURTROOM DEPUTY)

3         MR. DOYLE:  In the middle portion, Judge, where it

4    describes. . .

5         THE COURT:  36, 37, and 39 are received.  38 is--

6    his objection is sustained.

7    **Q.**   (BY MS. WILLIAMS)  Please tell the jury what Number 36

8    is.

9    **A.**   It is a--it's a rental application.

10        MS. WILLIAMS:  Go ahead and put up 36, please.

11   **Q.**   (BY MS. WILLIAMS)  And this rental is for whom?

12   **A.**   This is the rental application for Mr. Aldawsari.

13   **Q.**   When was this rental application submitted?

14   **A.**   April 30, 2010.

15   **Q.**   If you would--and this information that is up at the top

16   of this exhibit, this personal information, is this information

17   that would have been given to your office by the renter

18   himself?

19   **A.**   Yes.

20   **Q.**   Would you tell us, please, the apartment number that was

21   rented to Mr. Aldawsari?

22   **A.**   The apartment number was 2303.

23   **Q.**   Where on this form is that found?

24   **A.**   Actually it would be on the reverse side.

25   **Q.**   On the second page?

1  **A.**   Yes.

2  **Q.**   All right.  2303?

3  **A.**   Yes, ma'am.

4  **Q.**   What was the monthly rental amount?

5  **A.**   The total monthly rent--market rent that shows on that is

6  960.

7  **Q.**   What all does that include?  Rent?  Utilities?

8        THE COURT:  Don't lead.  What all does that include?

9  **Q.**   (BY MS. WILLIAMS)  What all does that include?

10  **A.**   That includes rent.

11  **Q.**   Anything else you charge them for?

12  **A.**   From time to times, we have--we have a special, but that

13  price reflects it is basic market rent.  A resident is

14  responsible for their utilities, cable--and their cable and

15  Internet.

16  **Q.**   All right.  Tell us, please, the dates of the lease.  How

17  long was the lease for?

18  **A.**   The start date was April the 20th, 2010.  Ending date,

19  July 31st, 2010.

20  **Q.**   Now, do you rent for only three months?

21  **A.**   Actually that's--that's a typo.  It should have been

22  2011.

23  **Q.**   So the ending date should have been what?

24  **A.**   July 31st, 2011.

25  **Q.**   So it was a lease for what length of time?

1   **A.**    For a year.

2   **Q.**    It should have been for one year?

3   **A.**    Yes.

4   **Q.**    All right.  On page 3 of Government's Exhibit 36, is this

5   page filled out by the renter?

6   **A.**    Yes, ma'am.

7   **Q.**    What information is given on this page about the name,

8   date of birth, and country of origin?

9   **A.**    I don't guess I understand the question.

10   **Q.**    What is the information that the person that rented this

11   apartment put on this application for his name, his date of

12   birth, and his country of origin?

13   **A.**    You want me to read his name?

14   **Q.**    Uh-huh.

15   **A.**    Khalid Aldawsari.  Country of origin, Saudi Arabia.

16   **Q.**    Okay.

17            THE COURT:  Date of birth, 4-24-1990.

18   **A.**    4-24-1990.

19   **Q.**    (BY MS. WILLIAMS)  Now, in Government's--let's look at

20   Government's Exhibit 37, if you would, please.  What is this

21   document?

22   **A.**    That's a checklist for the benefit of our staff to make

23   sure all the paperwork is put together properly.

24   **Q.**    And on the third page of this, what does the third page

25   of this tell us?  The same thing?  Apartment--

1  **A.**    Just--it's--it's kind of a synopsis of what--what's all

2  required.  That's a--what we call a quote sheet.  Tells what

3  the rent is going to be.  Tells what, you know, we require as

4  far as rental history.  Again, that's--that's something that's

5  an internal document for our bookkeeping, for our records.

6  **Q.**    On any of the documents that you have the renter fill out

7  or that your office staff fills out, do you have the renter put

8  his or her email address?

9  **A.**    Email address is taken on the application.

10  **Q.**    It's on the application itself, so that would be on

11  Government's Exhibit 36.  Let's go back and look at that, and

12  would you find that for us, please, and tell us what email

13  address Mr. Aldawsari would have given?

14  **A.**    K.Aldawsari@gmail.com.

15  **Q.**    As the project director or the property management of

16  that apartment complex, at some point, did you become aware

17  that there was a problem with one of the renters back in

18  February of 2011?

19  **A.**    Yes, ma'am.

20  **Q.**    A general question.  There may be problems with lots of

21  renters.  But specifically with Mr. Aldawsari, did you become

22  aware of an issue?

23  **A.**    Yes, ma'am.

24  **Q.**    Without telling me what you were told, how did you become

25  aware of an issue?

1   **A.**   We were initially visited by the FBI.

2           MR. DOYLE:  This calls for hearsay, Your Honor.

3           THE COURT:  I think that's non-hearsay.  I'm going

4   to permit it.

5           MS. WILLIAMS:  Thank you, Your Honor.

6   **Q.**   (BY MS. WILLIAMS)  You were notified by the--

7           THE COURT:  Okay.  Next question.

8   **Q.**   (BY MS. WILLIAMS)  Were you notified by the FBI?

9   **A.**   Yes.

10          THE COURT:  That's what he said.  Next question.

11  **Q.**   (BY MS. WILLIAMS)  When the FBI contacted you, what did

12  you do?

13  **A.**   Gave them the information that they requested.

14  **Q.**   Did you cooperate with the FBI?

15  **A.**   Yes.

16  **Q.**   Does the Centre at Overton Park have a controlled access

17  system?

18  **A.**   Yes.

19  **Q.**   What does that mean?

20  **A.**   Every resident is issued a key fob.  To gain access to

21  any of the perimeter doors at the property and to any common

22  areas within our leasing office, you have to have that key fob.

23  And then each key fob is programmed for that--each individual

24  resident by name and apartment number.

25  **Q.**   If only one person is renting an apartment, how many key

1    fobs does--are issued for that apartment?

2    **A.**    One per person.

3    **Q.**    If there are two people?

4    **A.**    Each would have their own.

5    **Q.**    Was Mr. Aldawsari the only renter of this apartment?

6    **A.**    Yes.

7    **Q.**    Do you have a requirement--is there a requirement that if

8    there is more than one person living in an apartment, they must

9    be on the lease?

10    **A.**    Yes.

11    **Q.**    To your knowledge, was only one key fob issued for

12    Apartment 2303?

13    **A.**    Yes.

14    **Q.**    Now, that key fob, it has to be used to get in all of the

15    perimeter doors?

16    **A.**    Correct.

17    **Q.**    What about the parking garage?

18    **A.**    The parking garage as well.

19    **Q.**    Okay.  And from the parking garage to the interior of the

20    building, must the key fob be used?

21    **A.**    Yes.

22    **Q.**    And are there records that are kept of a person's usage

23    of their particular key fob?

24    **A.**    Yes.

25    **Q.**    Is there a business center at the Centre at Overton Park?

1  **A.**    Yes.

2  **Q.**    What is in the business center?

3  **A.**    We have computers and a copy and fax machine.

4  **Q.**    How many computers were there in February 2011 in the--

5  **A.**    I believe there were eight.

6  **Q.**    Does everyone at the Centre have access to the business

7  center?

8  **A.**    Yes.

9  **Q.**    Must they use their key fob to go in there?

10  **A.**    Yes, ma'am.

11  **Q.**    When the computers are used in the business center--  Let

12  me back up.

13        Is there a program on those computers that erases

14  what--any activity there may have been on the computers?

15  Erases that each night?

16  **A.**    Yes.

17  **Q.**    When you were contacted by the FBI, what kind of

18  information did you give to them?

19  **A.**    We gave them the audit trail for the controlled access

20  that we just discussed.  Gosh, any information that they

21  needed, I--

22  **Q.**    Did you provide to them the rental documents?

23  **A.**    Yes.

24  **Q.**    Did you provide to them any of the computers from the

25  business center?

1    **A.**    Yes.

2    **Q.**    Did you provide access to them for their use?

3    **A.**    Yes, ma'am.

4    **Q.**    Before we--

5              THE COURT:  Excuse me.  I'm not sure I--  You say

6    you provided access for them.  A fob?  Is that what you--

7              THE WITNESS:  I believe so.  They had access to the

8    property, yes.

9    **Q.**    (BY MS. WILLIAMS)  Law enforcement had access to the

10   property--

11   **A.**    Yes, ma'am.

12   **Q.**    --during this investigation?

13   **A.**    Yes.

14   **Q.**    Let me back up for just a minute and talk about

15   Government's Exhibit 39.  What is this document?

16   **A.**    That would be a package log-in sheet for when the

17   residents are--  Packages are delivered to our leasing office

18   for the residents.  We accept them for the residents, and when

19   we do, we log the packages in, contact the resident that they

20   have a package, and then--so they can come pick them up.

21   **Q.**    How is the resident contacted that they have a package?

22   **A.**    Text message.

23   **Q.**    Now, I see a lot of blacked-out places on these pages.

24   What is blacked out here?

25   **A.**    That would have been the name and apartment number.

1    **Q.**    For people not associated--for other renters in your

2    apartment complex?

3    **A.**    Yes.

4    **Q.**    Now, you did not block out the name K. Aldawsari and his

5    apartment number.  Correct?

6    **A.**    I didn't block out any of these.

7    **Q.**    Okay.  But his name is not blocked out?

8    **A.**    His name is not blocked out, yeah.

9    **Q.**    But the others that are blocked out would be people not

10   associated with this?

11   **A.**    Correct.

12   **Q.**    When a package arrives, it's logged in, the tenant is

13   notified, and then what happens?

14   **A.**    They come down to the office to pick up the package.

15   **Q.**    And sometimes it's noted that they have come to pick up

16   the package?

17   **A.**    Yes.  Most of the time, we ask that the resident sign

18   that they have received it.  They don't always cooperate, but

19   we prefer that they sign that they received the package.

20   **Q.**    During--at some point during the investigation in this

21   case, did you become aware that Mr. Aldawsari had been

22   arrested?

23   **A.**    Yes.

24   **Q.**    What was--what did you do as far as his apartment was

25   concerned?

1  **A.**    He was issued a 24-hour notice to vacate for criminal

2  activity.

3  **Q.**    Where did you put--

4          MR. DOYLE:  Judge, I'm going to object to this, the

5  relevance as to--

6          THE COURT:  Strike that.  It's irrelevant.  Go

7  ahead.

8          MS. WILLIAMS:  Yes, Your Honor.  I'm not going into

9  that.

10  **Q.**    (BY MS. WILLIAMS)  Where did you put the eviction notice?

11  Don't tell me what was on it, but where did you put it?

12          MR. DOYLE:  I still object.

13          THE COURT:  What's the relevance?

14          MS. WILLIAMS:  The relevance, Your Honor, is, is

15  that after the eviction notice was given, there were items of

16  abandoned property that the Federal Bureau of Investigation

17  took from that apartment.

18          THE COURT:  Well--

19          MS. WILLIAMS:  And--

20          THE COURT:  So what fact at issue is made more or

21  less probable by the answer to that question?

22          MS. WILLIAMS:  That--well, that no one else had

23  access to that apartment.  That he was evicted and no one else

24  had access--

25          THE COURT:  Well, just ask him whether--  Did anyone

1    else have access to that apartment after he left, other than

2    the FBI?

3                THE WITNESS:  No, sir.

4                THE COURT:  Next question.

5    **Q.**   (BY MS. WILLIAMS)  At some point after the defendant was

6    arrested, did you go into his apartment?

7    **A.**   Yes.

8    **Q.**   Was there personal property in his apartment?

9    **A.**   Yes.

10   **Q.**   What did you do with that personal property that was in

11   the apartment?

12               MR. DOYLE:  I'm going to object to this as well,

13   Your Honor.

14               THE COURT:  No, I'm going to permit this.

15   **A.**   We removed--my staff removed the property from the

16   apartment outside into the hallway.

17   **Q.**   (BY MS. WILLIAMS)  Did you leave it in the hallway?

18   **A.**   No.  It was eventually disposed of in the Dumpster.

19   **Q.**   Did you turn any of that property over to anyone in law

20   enforcement?

21   **A.**   Yes.  After we moved it out of the apartment, law

22   enforcement did come and inspect it prior to us throwing it

23   away.

24   **Q.**   Were a number of items taken from that pile of property?

25   **A.**   I believe they did take some things.

1    **Q.**    What law enforcement did not take, what did you do with

2    the rest of the property?

3    **A.**    We disposed of it.

4    **Q.**    You threw it in the Dumpster?

5    **A.**    Yes, ma'am.

6    **Q.**    Did you inspect the defendant's apartment after you had

7    removed his personal property?

8    **A.**    Yes, ma'am.

9    **Q.**    Was there any damage done to the defendant's apartment?

10   **A.**    Yes.

11   **Q.**    What sort of damage was that?

12               MR. DOYLE:  Judge, I'm going to object to relevance.

13               THE COURT:  What's the relevance?

14               MS. WILLIAMS:  Well, the relevance, Your Honor, is--

15               THE COURT:  What fact at issue will be made more or

16   less probable by the answer to that question?

17               MS. WILLIAMS:  The intent and the demeanor of the

18   defendant, the damage that was done.  The violent tendency,

19   Your Honor.

20               THE COURT:  Let's see.  I'm going to permit you to

21   answer it.  What damage was done?

22               THE WITNESS:  We had to replace all the--well, all

23   the interior doors and the exterior--

24               THE COURT:  No, what damage was done?

25               THE WITNESS:  All the doors had been what looked

1    like beaten, punched, holes punched in the doors.

2                 THE COURT:  Okay.  Next?

3                 MS. WILLIAMS:  No further questions.

4                 THE COURT:  Your witness, sir.

5                 MR. DOYLE:  Thank you, Your Honor.

6                            CROSS-EXAMINATION

7    BY MR. DOYLE:

8    **Q.**    My name is Paul Doyle.  We have not met before.

9             Tell me, what kind of time did you spend at the

10   apartment complex on a typical day?

11   **A.**    I'm on-property pretty much eight hours a day.

12   **Q.**    Okay.  So you're there physically managing it?

13   **A.**    Well, I have that property and the one across the street.

14   But yes, I am on-site every day.

15   **Q.**    And you regularly see the residents coming and going?

16   **A.**    Yes.

17   **Q.**    Did you see Mr. Aldawsari often?

18   **A.**    No.

19   **Q.**    Did you ever see him with friends?

20   **A.**    I can't recall ever seeing him.

21   **Q.**    Was he ever engaging with the employees, you?

22   **A.**    Not my--not me.

23   **Q.**    Okay.  The key fob, when did you give that--  Let me ask

24   you this question.  When was your first contact with the FBI?

25   **A.**    I wouldn't know the--remember that date.

1  **Q.**   Was it before or after he was--the arrest was made?

2  **A.**   Before.

3  **Q.**   Okay.  Do you know how many days before?

4  **A.**   I'd say a couple of weeks, something like that.

5  **Q.**   And you gave them--  Do you know who you gave the key fob

6  to?

7  **A.**   Yes.

8  **Q.**   And who is that?

9  **A.**   Mr. Quigley.

10 **Q.**   Mr. Quigley?

11 **A.**   I believe so, yes.

12 **Q.**   And this key fob gave the agents access to what?

13 **A.**   To the entire property.

14 **Q.**   All right.  Now, the--from what I'm understanding, the

15 apartment complex that you manage that Mr. Aldawsari chose to

16 live in tracks when he comes in the garage with his car; is

17 that right?

18 **A.**   We have that ability, yes, to make--to record that, yes.

19 **Q.**   To record that.  It tracks when he comes into the gate to

20 go into his residence; is that right?

21 **A.**   Right.

22 **Q.**   In fact, if he's ordering packages, the packages don't go

23 directly to him; they actually go to the business center?

24 **A.**   Correct.

25 **Q.**   And you guys have got to call, and he's got to go down

1    there and pick up the packages?

2    **A.**    Correct.

3    **Q.**    And y'all track when he gets the packages to the best of

4    your ability?

5    **A.**    Yes.

6    **Q.**    At least, that's what they're supposed to do.  Right?

7    **A.**    Right.

8    **Q.**    And that's what the chart the jury saw was?  Different

9    residents picking up packages?

10   **A.**    Correct.

11   **Q.**    So you-all do the best you can--  And I think this is for

12   safety purposes.  Right?

13   **A.**    Well, logging packages and having them sign for it is for

14   our benefit.  In case something comes up missing, we can, you

15   know, document that the resident picked it up.

16   **Q.**    Fair enough.  And I'm sorry.  I didn't make myself clear.

17   In terms of the key fob and the gates and the security and

18   having one per person--

19   **A.**    Right.

20   **Q.**    --that's really for security of the residents.  Correct?

21   **A.**    Yes.

22   **Q.**    But it also gives you an idea, if you wanted to look,

23   who's coming and who's going and when?

24   **A.**    Sure.

25   **Q.**    And certainly if the FBI wanted to look and see when he's

1   coming and going, they could see that too?

2   **A.**   Sure.

3   **Q.**   And you gave them access to that?

4   **A.**   Sure.

5   **Q.**   You also--

6           MR. DOYLE:  And if you could go to Exhibit 36,

7   page 7.

8           (PAUSE)

9   **Q.**   (BY MR. DOYLE)  There were a couple of occasions in the

10  few months before Mr. Aldawsari was arrested where he actually

11  failed to pay his rent on time.  Those were some documents you

12  provided the government?

13  **A.**   Yes.  That is a--what we call a late notice.

14  **Q.**   So--and it sounded to me like his apartment was in

15  somewhat of disarray.  He failed to keep that clean.  Correct?

16  **A.**   Once he was out of the apartment, I saw that, yes.

17  **Q.**   Sure.  And he couldn't even pay his rent on time on a

18  regular basis?

19  **A.**   I think he was late a couple of times, which is not

20  unusual at all.

21  **Q.**   Okay.

22          MR. DOYLE:  No further questions.

23          THE COURT:  Do you have anything, Ms. Williams?

24          MS. WILLIAMS:  No, Your Honor.

25          THE COURT:  How long is your next witness?

1              MR. HAAG:  Your Honor, Mr. Covey will probably be

2   about 45 minutes, 30 to 45 minutes.  He's the--he seized the

3   evidence in the apartment.

4              THE COURT:  Let's take our afternoon break now.

5   Fifteen minutes, ladies and gentlemen.

6         (THE JURORS EXIT THE COURTROOM)

7              THE COURT:  You may be seated.

8              Here's the problem the jury asked.  I'll get to it

9   in a second.

10             All right.  The juror, Ms. Godsey, said:  Your

11  Honor, we would like clarity on something.  I think we're all a

12  little bit confused, because it says--they first said it was

13  renewed--his visa was renewed in 2009, not 2010, but we have

14  2008 and '9 and not in '10.

15             Is there any way we can--that I can shake that out

16  for the jury to everybody's satisfaction, or do we just leave

17  them--

18             MR. COGDELL:  We're willing to stipulate that his

19  visa was active and approved in '08, '09, and '10.  It was

20  revoked in '11 shortly after the arrest.

21             MS. WILLIAMS:  And I'm sure that's true, but I just

22  would like a minute to check with the agent.

23             THE COURT:  Okay.  Well, check, and then I can tell

24  them that, yes, it was 2008, '9, and '10.

25             MS. WILLIAMS:  Yes, sir.

1           THE COURT:  Okay.  Recess for 15 minutes.

2      (RECESS TAKEN)

3      (OUTSIDE THE PRESENCE OF THE JURY)

4           THE COURT:  Do we have an answer for the jury?

5           MS. WILLIAMS:  Yes, Your Honor.  Your Honor, the

6      answer is that student visas do not have to be renewed every

7      year, only when the student changes universities.  So when he

8      changed from Vanderbilt to Tech from 2008 to 2009, it had to be

9      renewed, but as long as he stayed at Tech, his student visa was

10     good until he left or finished.

11          MR. COGDELL:  That's not what they want to know.

12     They want to know when it was revoked, and it was revoked

13     after--

14          THE COURT:  No, I don't think that was what they--

15     They didn't ask about being revoked.

16          MR. COGDELL:  Do what?

17          THE COURT:  I don't think they asked about revoked.

18     Let me look.  You can all be seated.  I'm sorry.

19          Here's what she said.  She said:  Your Honor, could

20     we clarify on something?  I think we're all a little bit

21     confused, because it says--they first said it was renewed--his

22     visa was renewed in 2009 but not 2010.  We have 2009 but not in

23     '10.

24          That's what they said.  Nothing about revocation.

25          MR. COGDELL:  I'm not willing to agree with

1  Ms. Williams' assertion because he was no longer at Tech.  He

2  was at Plains Community College, and it wasn't reviewed there,

3  so that's--

4           THE COURT:  The only thing I can suggest to you is

5  you call him back.

6           Are we going to call him back?

7           MS. WILLIAMS:  Well, we can.  I think there's a

8  problem, because the defendant did move from Texas Tech to

9  South Plains and didn't notify--

10          THE COURT:  Well, and so, you know--

11          MS. WILLIAMS:  So surely they don't want that in.

12          MR. DOYLE:  Well, we need to get him back on the

13  stand.

14          MR. COGDELL:  Let's just get him back on the stand

15  and prove up that fact when it got revoked.

16          THE COURT:  Look.  Let me just--a suggestion that

17  you do not have to follow, do not have to follow.  Why don't we

18  just say the visa of 2009 did not have to be renewed so long as

19  he was at Texas Tech.

20          MR. COGDELL:  That's fine.

21          MS. WILLIAMS:  Yes, Your Honor.

22          THE COURT:  That's--

23          MR. COGDELL:  That's it?  That's fine.

24          THE COURT:  That's it.  Okay.

25          Bring the jury in, please.

```
 1                (THE JURORS ARE SEATED IN THE JURY BOX)

 2                THE COURT:  I think I have an answer to your

 3    question.  At least I hope so.  The 2009 visa did not have to

 4    be renewed so long as he was at Louisiana--Louisiana Tech--

 5    Texas Tech.  Okay?

 6                Proceed with your next witness.

 7                MR. HAAG:  Thank you, Your Honor.  The United States

 8    calls Special Agent Aaron Covey.

 9                (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

10                THE COURT:  Please be seated.

11                          AARON COVEY,

12    GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

13                        DIRECT EXAMINATION

14    BY MR. HAAG:

15    Q.    Please state your name.

16    A.    Aaron Covey.

17    Q.    Would you please spell your last name?

18    A.    Yes.  C-o-v-e-y.

19    Q.    How are you employed?

20    A.    Currently employed as a special agent with the FBI in the

21    Dallas Division.

22    Q.    Which section of the Dallas FBI do you serve in?

23    A.    I currently serve in the Cybercrimes Section.

24    Q.    If you would, keep your voice up just a little bit.

25    There's a microphone, if you need to move it a little closer to
```

1    you.

2              How long have you been an FBI special agent?

3    **A.**    Since January of 2004.

4    **Q.**    We're going to be talking today about an evidence

5    response team.  What is an evidence response team?

6    **A.**    An evidence response team is a specialized team that is

7    trained to go to a crime scene or a search warrant, collect

8    evidence based on the training, and be able to collect that

9    evidence in a certain manner.

10   **Q.**    How many evidence response teams are there in the Dallas

11   field office?

12   **A.**    There are currently three teams.

13   **Q.**    How long have you been on an evidence response team?

14   **A.**    Since the early part of 2006.

15   **Q.**    Are you the leader of an evidence response team?

16   **A.**    Yes, I am.

17   **Q.**    Were you the evidence response team leader in this case?

18   **A.**    Yes.

19   **Q.**    Let's talk about a search of the defendant's apartment

20   that you led.  On February 23rd, 2011, did you conduct a search

21   of the defendant's apartment?

22   **A.**    Yes, I did.

23   **Q.**    Was that search authorized by a court of law?

24   **A.**    Yes, it was.

25   **Q.**    What was the apartment number and the address of the

1  apartment where you searched?

2  **A.**    2400 Glenna Goodacre Boulevard, Apartment 2303, in

3  Lubbock, Texas.

4  **Q.**    And again, if you would keep your voice up just a little

5  bit, please.

6          Would you please briefly describe for the jury the

7  standard practice that the FBI evidence response team--or FBI

8  evidence response team uses in conducting a search of a

9  residence?

10  **A.**    Yes.  Upon verifying if we have legal authority to enter

11  the premise that we're entering--we make sure we have that

12  authority.  After we verify we have that authority, we make

13  entrance into the home to do an administrative walk-through.

14  After following that walk-through, then our photographer takes

15  entry photographs.

16          After those photographs have been taken, then the

17  team proceeds to search for particular items that we have been

18  requested to search for.  After those items are recovered or

19  seized, those are logged on an evidence control log, as well as

20  documented on a control sheet.  After following we find those

21  items, exit photographs are taken, and then the premises is

22  left.

23  **Q.**    The initial set of photographs that you take when you

24  enter a residence, are those taken before anything is touched?

25  **A.**    That's correct.

1   **Q.**   And the exit photographs, are those taken after you've

2   removed all the items of evidence?

3   **A.**   That's correct.

4   **Q.**   Would you describe for the jury, when an item of evidence

5   is located, what is the procedure for marking that item of

6   evidence?

7   **A.**   The standard practice is, upon finding a piece of

8   evidence, normally that evidence is photographed in place.

9   After that photograph is taken, that item is collected.  It is

10  given an item number, and then again, the item number is logged

11  on the evidence control log by the evidence control technician.

12  **Q.**   Once it's logged by the evidence control technician, do

13  you place it in any sort of container?

14  **A.**   Yes.

15  **Q.**   Was the standard practice that you just described

16  followed in this case?

17  **A.**   Yes, it was.

18  **Q.**   How many people were on the evidence response team that

19  searched the defendant's apartment?

20  **A.**   Five.

21  **Q.**   Would you please describe the role of each of those five

22  people?

23  **A.**   Yes.  One was myself, as the team leader, as well as we

24  have an evidence control technician, whose responsibility is to

25  log all of the evidence that was seized.  We have a

1    photographer that's in charge of taking the entry photographs,

2    as well as any photographs of the items in place, and then also

3    taking the exit photographs.  And then we have three other

4    additional members that are responsible for searching the

5    premise.

6    **Q.**    We're going to be talking about that search in just a

7    second.  Did you swab any areas of the defendant's apartment?

8    **A.**    Yes, we did.

9    **Q.**    What area did you swab?

10   **A.**    There was a small refrigerator that was in the bedroom

11   area, and swabs were taken of that--inside of the refrigerator.

12   **Q.**    Why were you conducting a swab of that refrigerator?

13   **A.**    Those swabs were taken to discover if there was any kind

14   of explosive residue or chemical residue within that

15   refrigerator.

16   **Q.**    To whom did you custody--  Excuse me.  To whom did you

17   transfer custody of those swabs?

18   **A.**    That custody was transferred back to the evidence control

19   room, and then from there would be the responsibility of the

20   case agent.

21   **Q.**    Who was the case agent in this case?

22   **A.**    Michael Orndorff.

23   **Q.**    The evidence that you seized from the defendant's

24   apartment, where was that evidence stored at?

25   **A.**    That was stored in an evidence control room in Lubbock,

1    Texas.

2    **Q.**    Who was responsible for that evidence once you removed it

3    from the defendant's apartment and took it to the Lubbock

4    office?

5    **A.**    That would be the evidence control technician or the

6    special agent that was in charge of the case.

7    **Q.**    And who was the special agent in charge of this case?

8    **A.**    Michael Orndorff.

9    **Q.**    Did he assume custody of the evidence once you had

10   removed it from the apartment?

11   **A.**    That's correct.

12   **Q.**    Prior to testifying today, have you reviewed Government's

13   Exhibits 40 through 133, and 426 through 428?

14   **A.**    Yes, I have.

15   **Q.**    And you will see those exhibits that are down just to

16   the--below you.  All those exhibits are boxed up so the jury

17   can't see what they are.  And we've got in front of you also a

18   book that has all those exhibits.

19          Do you recognize these items as the items you seized

20   from the defendant's apartment?

21   **A.**    Yes, I do.

22          THE COURT:  Could I have those numbers again?  I'm

23   sorry, I missed--

24          MR. HAAG:  Yes, Your Honor.  The items of evidence

25   are Government's Exhibits 40 through 133, and 426 through 428.

1          THE COURT:  Okay.  Thank you.

2          MR. HAAG:  Thank you, Your Honor.

3    **Q.**   (BY MR. HAAG)  With regard to the items of physical

4    evidence, are each of the items of physical evidence in the

5    same or substantially the same condition as when you seized

6    them on February 23rd, 2011?

7    **A.**   Yes, they are.

8    **Q.**   With regard to the photographs, are you familiar with the

9    scenes depicted in the photographs?

10   **A.**   Yes.

11   **Q.**   Do the photographs fairly and accurately depict each of

12   those scenes?

13   **A.**   Yes, they do.

14   **Q.**   With regard to the diagram that you made of this

15   apartment, is that a reasonably accurate representation of the

16   defendant's apartment as it appeared on February 23rd, 2011?

17   **A.**   Yes, it is.

18          MR. HAAG:  Your Honor, move to admit Government's

19   Exhibits 40 through 133, and 426 through 428.

20          MR. COGDELL:  May I have just a minute, Your Honor?

21   I have a very few specific objections.

22          THE COURT:  Yes, sir.

23     (PAUSE)

24          MR. COGDELL:  May we approach, Your Honor?

25          THE COURT:  Well, just tell me which ones you object

1    to.

2                    MR. COGDELL:  I'm sorry.  40, 118, and 119.

3                    THE COURT:  Hand them to the clerk, please.

4                    MR. COGDELL:  They may need an explanation, Your

5    Honor, as to why--

6                    THE COURT:  I'll see.

7          (APPROACHES COURTROOM DEPUTY)

8                    THE COURT:  Your objection as to 40 is what?

9                    MR. COGDELL:  May we approach, Your Honor?

10                   THE COURT:  Just tell me the--

11                   MR. COGDELL:  403.  And that begs for the

12   explanation that you're not hearing.

13                   THE COURT:  All right.  And your objection on 118

14   and 119?

15                   MR. COGDELL:  That is not the condition those

16   documents were discovered in.  That's a recreation or a

17   demonstration.  In other words, it was--

18                   THE COURT:  Well, I'll show you--on 118 and 119, do

19   you know that that is the suit that you found?

20                   THE WITNESS:  It appears to be the same suit that we

21   found.

22                   THE COURT:  I'm going to hold off on 118 and 119

23   until somebody says that's the one.

24                   MR. COGDELL:  Yes, sir.

25                   THE COURT:  I guess I better see you on the side.

1      (BENCH DISCUSSION HELD OFF THE RECORD)

2            THE COURT:  I'm going to sustain the objection to 40

3    and overrule the objection on 118 and 119.

4            MR. COGDELL:  Yes, sir.

5            MR. HAAG:  Thank you, Your Honor.

6    **Q.**    (BY MR. HAAG)  Let's go ahead and go through the

7    exhibits.  We'll start with Exhibit Number 41, please.  Would

8    you please describe for the jury what this is a photograph of?

9    **A.**    Yes.  This is a photograph of the front of the apartment

10   complex located at 2400 Glenna Goodacre Boulevard.

11   **Q.**    And we're facing what's going to be the--I believe the

12   south side of the apartment complex.  Which side of the

13   apartment complex was the defendant's apartment located on?

14   **A.**    From here, it would be on the left side.

15   **Q.**    Let's go to Government's Exhibit 42, please.  Would you

16   describe for the jury what this is a photograph of?

17   **A.**    This is a photograph of the front door to Apartment 2303.

18   **Q.**    Government's Exhibit 43.  What is this a sketch of?

19   **A.**    This is a sketch of the inside of Apartment 2303.

20   **Q.**    In this sketch, you have marked several different rooms.

21   Would you describe what each of the rooms were in

22   Mr. Aldawsari's apartment?

23   **A.**    Yes.  The letter A was the kitchen.  Letter B was the

24   living room.  Letter C, we labeled as the bedroom.  Letter D,

25   we labeled as the bedroom closet.  Letter E was the bathroom.

1   Letter F, we labeled as a washer/dryer area.  Letter G was some

2   shelves.  And letter H, we labeled as a coat closet.

3   **Q.**   In front of you, you're going to have a laser pointer,

4   and it's going to be the red dot in the middle of that.  If you

5   would, would you point out on the sketch for the jury where the

6   front door of the apartment is?

7   **A.**   The door was located approximately in this--right here on

8   this side of the sketch.

9   **Q.**   And would you please, with the laser pointer, show the

10  jury where the kitchen was at?

11  **A.**   Yes.  The kitchen area was right here, located just to

12  the left of the door.

13  **Q.**   The living room area?

14  **A.**   Living room area is this section here.

15  **Q.**   The bedroom area?

16  **A.**   Bedroom area would be this section here.

17  **Q.**   The closet?

18  **A.**   Closet area is this area.

19  **Q.**   And the bathroom?

20  **A.**   And the bathroom would be this area here.

21  **Q.**   And then the washer/dryer area?

22  **A.**   It would be this area right here.

23  **Q.**   And then the shelves?

24  **A.**   Would be the letter G labeled here.

25  **Q.**   And the coat closet?

1    **A.**    Be right next to it, right here.

2    **Q.**    Did you label any items that you discovered on this

3    diagram?

4    **A.**    Yes, we did.

5    **Q.**    And using the evidence items that you've labeled on

6    there, would you please show the jury where you found each of

7    those items, using the sketch.

8    **A.**    Yes.  We found the box of nitric acid in the bedroom

9    area, as well as we found an additional box of nitric in the

10   bedroom area.  We found the batteries, lights, wires, and alarm

11   clocks, which is labeled as Item Number 3, also in the bedroom

12   area.  We found a spliced lamp cord also within that same

13   bedroom area.  We found a receipt for nitric acid also within

14   this same bedroom area.  We found a lab equipment set, which

15   was in the closet area.  We found chemical suits within that

16   same closet area.  We found an ASUS laptop computer, which was

17   on this couch area of this front living room.  And then a box

18   of sulfuric acid, we found in the closet area of the bedroom.

19   **Q.**    And I've got the receipt for nitric acid as 14.  Was that

20   actually found in the kitchen?

21   **A.**    Yes, I'm sorry.  That was found in the kitchen area in a

22   drawer in this area.

23   **Q.**    Let's go ahead and turn to the next exhibit, Government's

24   Exhibit 44, please.  What is this a photograph of?

25   **A.**    This was the entry photograph of the front living area of

1    the bedroom--or, excuse me, of the apartment.

2    **Q.**    And you mentioned that you found a laptop computer.

3    Using the laser pointer, would you show the jury where you

4    found that laptop computer in this photograph?

5    **A.**    Yes.  In this living room, there was a couch right here.

6    We found the laptop right here on the couch.

7    **Q.**    Let's move on to Government's Exhibit 45.  What is this a

8    photograph of?

9    **A.**    This is a photograph of the back side or the underside of

10   the laptop.

11   **Q.**    Government's 46?

12          MR. HAAG:  Your Honor, if I may clarify something

13   for the jurors.  We have placed it here in the photograph form,

14   but the actual exhibit is the item itself.  But rather than

15   pulling everything out of the boxes, we've just got a

16   photograph.

17          THE COURT:  I see it.

18   **Q.**    (BY MR. HAAG)  What is Government's Exhibit 46?

19   **A.**    This is the ASUS laptop that was found in the living

20   area.

21   **Q.**    Thank you.

22          Government's Exhibit 47.  What is this going to be?

23   **A.**    This is a Pay Pal receipt for the ASUS laptop.

24   **Q.**    What is the ship-to address that's listed on that Pay Pal

25   receipt?

1  **A.**    Ship-to is Khalid Aldawsari, and the ship address was

2  2400 Glenna Goodacre Boulevard, Apartment 2303, Lubbock, Texas.

3  **Q.**    Government's Exhibit 48, what is this a photograph of?

4  **A.**    This is a different view of that living room area.  There

5  was a shelf there, as well as you can see the couch there as

6  well.

7  **Q.**    We see here a series of bookshelves.  Did you recover any

8  items from those bookshelves?

9  **A.**    Yes, we did.

10  **Q.**    What did you recover?

11  **A.**    We recovered several notebooks, as well as a memory card,

12  a memory thumb drive, if you will, and again, just some

13  notebooks from that area.

14  **Q.**    Let's go ahead and turn to Government's Exhibit 49,

15  please.  What is this a photograph of?

16  **A.**    This is a photograph of one of the shelves that was in

17  that bookcase.

18  **Q.**    Government's Exhibit 50, what is this a photograph of?

19  **A.**    This is an additional shelf in that bookcase.

20  **Q.**    Government's Exhibit 51, please.  What is this exhibit?

21  **A.**    This is one of the spiral-bound notebooks that was found

22  on one of the shelves in that book case.

23  **Q.**    Government's Exhibit 52.  What are these two items here?

24  **A.**    This is the memory card, as well as the LaCie memory

25  stick or thumb drive that was recovered from that front living

1    room area and that bookshelf.

2    **Q.**    Were those items laying loose on the bookshelf?

3    **A.**    No.  They were--they were put in a book and they--they

4    were in a book.  They were secreted in a book.

5    **Q.**    Was it in a compartment that was in the book, or was it

6    just stuck within the book and closed?

7    **A.**    It was just put within the book and closed.

8    **Q.**    Moving to Government's Exhibit Number 53, please.  What

9    is this item?

10   **A.**    This was the LaCie memory drive that was recovered from

11   that living area within the book.

12   **Q.**    Government's 54.  What is this exhibit?

13   **A.**    This was two screwdrivers that were found in the front

14   living area, again on that bookshelf.

15   **Q.**    Government's 55.  What is this a photograph of?

16   **A.**    This is a photograph of the kitchen area.

17   **Q.**    And if you would, would you please identify some of the

18   items that are on the counter of the kitchen area?

19   **A.**    Yes.  On the counter, we have a box for an Oster blender.

20   Next to that--or to the right of that, we have a stockpot.  And

21   then over on the opposite counter, appears to be a base for

22   that Oster blender.

23   **Q.**    Government's Exhibit 56, what is this a photograph of?

24   **A.**    This is one of the shelves that were in one of the

25   cupboards in the kitchen.

1   **Q.**   It may be a little hard for the jurors to see what the

2   label is on those boxes.  Would you please read what the label

3   is on those boxes?

4   **A.**   Yes.  It is Great Value aluminum foil.

5   **Q.**   And to the right of the aluminum foil, what are those

6   items?

7   **A.**   Those are two rolls of tape.

8   **Q.**   Government's Exhibit 57, what is this a photograph of?

9   **A.**   This is a photograph of inside of the refrigerator in the

10   kitchen.

11   **Q.**   This photograph was taken earlier than your search; is

12   that correct?

13   **A.**   Correct.

14   **Q.**   Did the refrigerator appear that same way when you

15   searched it on February 23rd?

16   **A.**   Yes, it did.

17   **Q.**   Moving to Government's Exhibit 58, what is this a

18   photograph of?

19   **A.**   This is the door area of the refrigerator.

20   **Q.**   Government's 59, what is this a photograph of?

21   **A.**   This is the freezer area of the refrigerator.

22   **Q.**   Government's Exhibit 60, what is this a photograph of?

23   **A.**   This is inside one of the cupboards that, I believe, was

24   directly next to the refrigerator.

25   **Q.**   In this photograph, we see several red boxes.  What are

1   those red boxes?

2   **A.**    Those appeared to be some type of a noodle product, much

3   like Ramen noodles.

4   **Q.**    Government's Exhibit 61, please.  What is this a

5   photograph of?

6   **A.**    This is one of the drawers in the kitchen that we had

7   pulled out and photographed prior to taking anything and

8   looking into that drawer.

9   **Q.**    Looking at Government's Exhibit 62, please.  What is this

10   a photograph of?

11   **A.**    This photograph is an invoice that was found in that

12   drawer.

13   **Q.**    And we'll look at 63, or look at it a little closer.

14   Government's 63, please.  Is this the exhibit that you seized

15   from the kitchen drawer?

16   **A.**    Yes, this is that same receipt.

17   **Q.**    What is the consignee who is listed on that receipt?

18   **A.**    The consignee is listed as Khalid Aldawsari,

19   803 University Avenue, Lubbock, Texas.

20   **Q.**    And down where it says Description of Articles and Marks,

21   what is listed there?

22   **A.**    It is listed as nitric acid.

23   **Q.**    Government's Exhibit 64, please.  What is this a

24   photograph of?

25   **A.**    This is that same drawer.  So once that receipt was

1   moved, these are the items that were underneath there.

2   **Q.**   And working from left to right, would you describe for

3   the jury what those items are going to be?

4   **A.**   Yes.  On the left is a stun gun.  Directly to the right

5   of that is a soldering-type kit.  Underneath that soldering kit

6   is--I think it's a mounting wire kit or additional wires that

7   were found in that drawer.

8   **Q.**   Government's Exhibit 65, please.  What is this a

9   photograph of?

10   **A.**   This is a photograph of that--the wire kit that was found

11   underneath that soldering kit.

12   **Q.**   Government's 66, please.  And what is this exhibit?

13   **A.**   This exhibit is the soldering kit laid out in a manner to

14   be able to see what was in there.

15   **Q.**   Government's 67.  What is this exhibit?

16   **A.**   This is the stun gun that was found in that drawer.

17   **Q.**   Government's Exhibit 68.  What is this a photograph of?

18   **A.**   This is an overview of the bedroom area in the apartment.

19   **Q.**   And if you would--  Some of the items might be a little

20   bit hard to make out.  There's a bed frame that we can see over

21   on the left-hand side of the photograph.  What is the box

22   that's located next to that bed frame?

23   **A.**   That is the small refrigerator.

24   **Q.**   Is that the same refrigerator where you took the swabbing

25   from?

1    **A.**    Yes, it is.

2    **Q.**    And then we see several boxes; is that correct?

3    **A.**    Correct.

4    **Q.**    Go to Government's Exhibit 69, please.  What is this a

5    photograph of?

6    **A.**    This is that same bedroom, just from a different angle.

7    **Q.**    We see several items that are in the far corner of the

8    picture; is that correct?

9    **A.**    Yes.

10   **Q.**    Are we going to be talking about those items next?

11   **A.**    Yes.

12   **Q.**    Let's go ahead and look at Government's Exhibit 70,

13   please.  What is this exhibit--or, excuse me, what is this a

14   photograph of?

15   **A.**    This photograph is of a scale, what appears to be a baby

16   scale that was found in the bedroom.

17   **Q.**    Government's Exhibit 71, please.  What is this physical

18   exhibit?

19   **A.**    This is the scale that was found in the bedroom.

20   **Q.**    Government's 72, please.  What is this a photograph of?

21   **A.**    This is a photograph of some boxes that were found in the

22   bedroom, as well as the box that has--has the label 1-A-7.  Has

23   some additional various items contained within that box.

24   **Q.**    Let's go ahead and focus on those three boxes.  We see--

25   up in the photograph, we see two boxes that are approximately

1    the same exact size.  What are those two boxes?

2    **A.**    Those two boxes contain the nitric acid.

3    **Q.**    And then there's the box that you mentioned that was

4    labeled 1-A-7.  What did that box contain?

5    **A.**    That box contained various items, such as a Christmas

6    tree light set, some clocks, some batteries, and a couple of

7    additional items.

8    **Q.**    Let's go ahead and look at some of those items.

9    Government's 73, please.  What is this a photograph of?

10   **A.**    This is a photograph of the label that was on one of the

11   boxes which contained the bottles of nitric acid.

12   **Q.**    Would you please read on the front section, where is this

13   box from--or the shipper, rather?

14   **A.**    The "From" address is AquaPhoenix Scientific, 9 Barnhart

15   Drive in Hanover, Pennsylvania.

16   **Q.**    And who is the recipient?

17   **A.**    Khalid Aldawsari, 803 University Avenue, P.O. 3856,

18   Lubbock, Texas.

19   **Q.**    Government's Exhibit 74, please.  What is this a

20   photograph of?

21   **A.**    This is a photograph of the packing list that was in one

22   of the boxes.

23   **Q.**    Government's Exhibit 75, please.  And what is this?

24   **A.**    This is the packing list.

25   **Q.**    And go ahead--looking at the bill-to and the ship-to

1   address, what is the bill-to address that's listed on the

2   packing list?

3   **A.**   The bill-to address?

4   **Q.**   Yes, sir.

5   **A.**   The bill-to is QualiChem Technologies, 3939 Royal Drive,

6   Suite 226, in Kennesaw, Georgia.

7   **Q.**   Is that that same ship-to address that we saw previously?

8   **A.**   That is correct.

9   **Q.**   And what is the description of the product then located

10   at the bottom?

11   **A.**   Nitric acid.

12   **Q.**   Turning to Government's 76, please.  What is this a

13   photograph of?

14   **A.**   This is a photograph of the material safety data sheet

15   that was found in the box.

16   **Q.**   Now, what is a material safety data sheet?

17   **A.**   A material safety data sheet is directly from the

18   manufacturer that lets the person that's handling the

19   chemicals--how to handle them if there's a spill, how to be

20   able to take care of that spill or if there's any kind of

21   danger with those chemicals.

22   **Q.**   Does it advise the end user of any dangers that might be

23   present with the chemicals?

24   **A.**   Yes, it does.

25   **Q.**   Let's look at Government's 77, please.  What is this a

1    material safety data sheet for?

2    **A.**    It is for--the chemical family name was acid, as well as

3    acetocic.   Acid--excuse me--azotic acid, engraver's acid, aqua

4    fortis.

5    **Q.**    Okay.   And right up there, it says Product Identity.

6    Would you please read what that says.

7    **A.**    Yes.   "Nitric acid."

8    **Q.**    And if you would, hazard identification, where it says

9    "oxidizer," and it says "emergency overview," would you please

10   read from where it says "emergency overview" down to where it

11   says "appearance."

12   **A.**    Yes.   "Oxidizer.   Contact with combustible/organic

13   material may cause fire.   May cause pulmonary edema.   Causes

14   severe burns by all exposure routes."

15   **Q.**    Turning to Government's Exhibit 78, please.   What is this

16   a photograph of?

17   **A.**    This is a photograph of the--one of the open boxes which

18   contained bottles of nitric acid.

19   **Q.**    Let's look at Government's Exhibit 79, please.   What is

20   this a photograph of?

21   **A.**    These are the bottles of nitric acid that were in the

22   boxes.

23   **Q.**    And if we could go back for 78--to Government's 78 for

24   just one second.   The picture here shows six bottles.   Were

25   there six bottles in each box?

1   **A.**    Correct.

2   **Q.**    Let's go ahead on to Number--Government's 80, please.

3   What is this a photograph of?

4   **A.**    This was the box I previously mentioned that had the

5   label 1-A-7 on it that had the miscellaneous items within that

6   box.

7   **Q.**    And if you would, we're going to see them laid out here

8   in just a second, but would you just explain for the jury some

9   of the items that they can see on top here?

10   **A.**    Yes.  Within the box, there is a 100 Constant On

11   miniature lights set.  They have an alarm clock.  They have a

12   pack of batteries, as well as you can see there the green light

13   set that was in that box.

14   **Q.**    Government's Exhibit 81, please.  What is this a

15   photograph of?

16   **A.**    This is a photograph of the contents that were in that

17   box.

18           MR. HAAG:  If you would, please, highlight those

19   items that are on the floor.

20   **Q.**   (BY MR. HAAG)  Working over to the left-hand side of the

21   photograph, we can see that there--what looks to be a cord.

22   Would you please describe for the jury what that is on the far

23   left of the photograph?

24   **A.**    Yes.  That is one of the lights from the string of

25   lights, and it is spliced with some type of an electrical cord.

1    **Q.**    Okay.  Moving just to the right and up from that spliced

2    lamp cord light, what are those?

3    **A.**    Those are the miniature lights set.

4    **Q.**    We see a couple of boxes, but then moving on, would you

5    please describe what's at the bottom of the screen that's in

6    silver?

7    **A.**    Yes.  That is a disassembled alarm clock.

8    **Q.**    Was it disassembled when you found it?

9    **A.**    Yes, it was.

10   **Q.**    Working to the right of that, what is that a box

11   containing?  Or, excuse me, what is that box of?

12   **A.**    That box is a box for a miniature lights set.

13   **Q.**    Okay.  And working up, what--or working up from the

14   lights set, what is that?

15   **A.**    It is a voltmeter.

16   **Q.**    And working just to the right--  Well, let me ask this

17   question.  Is the multimeter the black or the silver object in

18   the photograph?

19   **A.**    The voltmeter is the black object.

20   **Q.**    Okay.  Just to the right of the multimeter, what is that

21   object?

22   **A.**    That is an additional clock or alarm clock.

23   **Q.**    Government's 82, please.  What is this a photograph of?

24   **A.**    This is that small light which was spliced with some type

25   of an electrical cord.

1    **Q.**    Looking here, we see some exposed wires up in the top of

2    the photograph and exposed wires towards the bottom of the

3    photograph.   Is this how this item originally appeared when you

4    seized it?

5    **A.**    Yes, it was.

6    **Q.**    Government's Exhibit 83, please.   What is this exhibit?

7    **A.**    This is the voltmeter that was found in that box.

8    **Q.**    Government's 84, please.   What is this a--or what is this

9    exhibit?

10   **A.**    This is one of the battery packs that was found in that

11   same box.

12   **Q.**    Government 85.   What is this exhibit?

13   **A.**    This is an additional set of batteries that was found in

14   that box.

15   **Q.**    Government 86.   What is this exhibit?

16   **A.**    This is the silver clock and the box which was found in

17   that box previously mentioned.

18   **Q.**    Government's 87.   What is this exhibit?

19   **A.**    This is the miniature lights set and the box that we

20   recovered from that box.

21   **Q.**    Government's 88.   What is this exhibit?

22   **A.**    This was one of the clocks or the alarm clock that was

23   found in that box.

24   **Q.**    And up here, these little pieces right here, is this part

25   of the alarm clock?

1    **A.**     That's correct.

2    **Q.**     Government's eighty--excuse me, 90--or 89.  I'm sorry.

3    Government's Exhibit 89.  What is this exhibit?

4    **A.**     This is one of the clocks or alarm clock that was found

5    in that box.

6    **Q.**     At the time you found this alarm clock, was it

7    disassembled like this?

8    **A.**     Yes, it was.

9    **Q.**     Government's Exhibit 90, please.  What is this exhibit?

10   **A.**     This exhibit is--looks like some frays of wires.  That

11   would have been some shavings of wires.

12   **Q.**     Government's Exhibit 91, please.  What is this exhibit?

13   **A.**     Again, this is the small light which was spliced to some

14   type of electrical cord.

15   **Q.**     Government's 92, please.  What is this a photograph of?

16   **A.**     This is the closet area within that bedroom.

17   **Q.**     And we're going to be talking about some items that were

18   seized from the closet area next; is that correct?

19   **A.**     Yes.

20   **Q.**     In this photograph, would you please describe for the

21   jury--  We see two blue items.  What are these?

22   **A.**     Those are two containers which were labeled as wire

23   containers.

24   **Q.**     Just to the right of the two blue containers is a box.

25   What is that box?

1   **A.**     That box contained the bottles of sulfuric acid.

2   **Q.**     Government's 93, please.  What is this exhibit?

3   **A.**     Those are the two containers that were found in that

4   closet.

5   **Q.**     Government's Exhibit 94.  And what is this an exhibit--or

6   photograph of?  Excuse me.

7   **A.**     This is a photograph of a passport that was found in that

8   closet.

9   **Q.**     Whose passport was this?

10  **A.**     Khalid Aldawsari.

11  **Q.**     Government's 95, please.  What is this exhibit?

12  **A.**     This is the passport that was found.

13  **Q.**     Government's 96, please.  What is this a photograph of?

14  **A.**     This is a--this is a photograph of the box that contained

15  the sulfuric acid.

16  **Q.**     Go ahead and go to Government's 97 and we'll take a

17  closer look at that.  What is this a photograph of?

18  **A.**     These are the bottles of sulfuric acid that was contained

19  in the box in the previous picture.

20  **Q.**     Government's Exhibit 98, please.  What is this a

21  photograph of?

22  **A.**     This is a close-up shot of one of the bottles of sulfuric

23  acid.

24  **Q.**     And if you would, please read what it says here as far as

25  the contents.

1   **A.**   Yes.  "950 milliliters of concentrated sulfuric acid,

2  98 percent concentration, for use in the two-stage biodiesel

3  process.  Danger, corrosive."

4   **Q.**   Here on the warning, if you'd please read what that says.

5   **A.**   I'm sorry.  Where?

6   **Q.**   Right down here below, it says, "Danger, corrosive," and

7  down in this next paragraph, it has a warning.  Would you

8  please read what that warning says?

9   **A.**   Yes.  "Harmful if swallowed.  Causes burns.  Do not get

10  on skin or clothing.  Do not get in eyes.  Do not swallow.  Do

11  not breathe fumes."

12   **Q.**   Government's Exhibit 99, please.  What is this exhibit?

13   **A.**   This was a phone--or a Nokia phone that was recovered.

14   **Q.**   Where was this item of evidence recovered?

15   **A.**   This was in the closet.

16   **Q.**   Government's 100, please.  What is this exhibit?

17   **A.**   This is an additional Nokia phone that was found in the

18  closet.

19   **Q.**   Government's 101, please.  What is this exhibit?

20   **A.**   This is an additional clock that was found in the closet.

21   **Q.**   And we see that it's on a green background.  Did you move

22  it in order to photograph it?

23   **A.**   That's correct.

24   **Q.**   Government's Exhibit 102, please.  What is this item?

25   **A.**   This is a receipt from amazon.com for a Sharp Quartz

1    backlight analog alarm clock.

2    **Q.**    And are the billing address and the shipping address the

3    same for this item?

4    **A.**    Yes, they are.

5    **Q.**    Would you please read what that--what the billing and

6    shipping address are?

7    **A.**    Yes.  Khalid Ali-M Aldawsari, 2400 Glenna Goodacre

8    Boulevard, Apartment 2303, Lubbock, Texas 79401.

9    **Q.**    And down at the bottom, would you please read the company

10   that's affiliated with this receipt, on the bottom right-hand

11   corner right above the government's sticker?

12   **A.**    Yes, amazon.com.

13   **Q.**    Moving to Government's Exhibit 103, please.  What is this

14   exhibit?

15   **A.**    This is the clock that was recovered.

16   **Q.**    And we see that there's a part of it, at least, that's

17   off.  Is this the condition in which you found it?

18   **A.**    Yes, it is.

19   **Q.**    Government's Exhibit 104, please.  What is this a

20   photograph of?

21   **A.**    This is a photograph of a box which contained a large

22   glass beaker.

23   **Q.**    And at the time you found this item, was it still

24   packaged up?

25   **A.**    Yes, it was.

1  **Q.**   And did you remove it from the packaging so you could see

2  the item inside?

3  **A.**   Yes.

4  **Q.**   Government's 105, please.  What is this item?

5  **A.**   This is a packing slip for a Pyrex low-form beaker.

6  **Q.**   And if you would, please, read--  Are the ship-to and the

7  bill-to address the same?

8  **A.**   Yes, they are.

9  **Q.**   And who are they to?

10  **A.**   They are to Khalid Ali-M Aldawsari at 2400 Glenna

11  Goodacre Boulevard, Apartment 2303, in Lubbock, Texas.

12  **Q.**   Down here on the bottom, the highlighting where it says

13  "Name," what is the name of the product?

14  **A.**   Pyrex Griffin Low-Form 2,000 Milliliter Beaker Graduated.

15  **Q.**   Government's Exhibit 106, please.  What is this item?

16  **A.**   This is the 2,000 milliliter beaker.

17  **Q.**   107, please.  What is this item?

18  **A.**   This is a receipt or an invoice for additional glassware.

19  **Q.**   What is the shipping--what is the ship-to information

20  that's located on this receipt?

21  **A.**   Shipping information was Khalid Ali-M Aldawsari,

22  2400 Glenna Goodacre Boulevard, Apartment 2303, Lubbock, Texas.

23  **Q.**   And down here where it talks about the quantity and the

24  product details, would you please just read quantity and this

25  first line of the product details for each box?

1  **A.**    Yes.   Quantity, 2, for a flask, Erlenmeyer narrow-mouth

2  Pyrex glass, 1 liter, and one glass stir rod, 12 inches.

3  **Q.**    Moving to Government's Exhibit 108, please.   What is this

4  exhibit?

5  **A.**    This is the beaker.

6  **Q.**    Moving to Government's Exhibit 109.   And what is this?

7  **A.**    This is an additional beaker.

8  **Q.**    Government's Exhibit 110.   What is this exhibit?

9  **A.**    This is the glass--a glass stir rod that was found in one

10  of the boxes.

11  **Q.**    And was it wrapped in this same condition when you found

12  it?

13  **A.**    Yes.

14  **Q.**    Government's Exhibit 111, please.   What is the ship-to

15  address that's listed on this receipt?

16  **A.**    Khalid Ali-M Aldawsari, Apartment 2303, 2400 Glenna

17  Goodacre Boulevard, Lubbock, Texas.

18  **Q.**    Would you please read the name of the manufacturer that

19  sent this item?

20  **A.**    Yes.   Cole-Parmer.

21  **Q.**    Looking here in the product description, what's the

22  product description?

23  **A.**    It is one for a flask, Ehrlenmeyer, 2-liter.

24  **Q.**    Government's Exhibit 112, please.   What is this exhibit?

25  **A.**    This is a glass flask.

1   **Q.**   Government's Exhibit 113.  What is this a photograph of?

2   **A.**   This is a chemistry set that was found in the closet

3   area.

4   **Q.**   At the time that you found the chemistry set, was it out

5   like this or was it in a box?

6   **A.**   It was a box.

7   **Q.**   Were all the items inside the box laid out and

8   photographs taken for this photograph?

9   **A.**   Yes.

10   **Q.**   Government's Exhibit 114, please.  And what is this

11   physical exhibit?

12   **A.**   This would be the chemistry set.

13   **Q.**   Government's 115, please.  What is this document?

14   **A.**   This is a packing slip or an invoice from amazon.com.

15   **Q.**   What is the shipping address that's listed on this

16   invoice?

17   **A.**   Shipping address was Khalid Ali-M Aldawsari, 2400 Glenna

18   Goodacre Boulevard, Apartment 2303, Lubbock, Texas.

19   **Q.**   And under Product Details, would you please read the

20   description of the product?

21   **A.**   Chemistry laboratory equipment set, all professional.

22   **Q.**   Government's Exhibit 116.  What is this exhibit?

23   **A.**   This is a--

24   **Q.**   Or excuse me.  What is this photograph?  My apologies.

25   **A.**   This is a photograph of a box which contained a chemical

1    suit which was found in the closet.

2    **Q.**    Is this the condition in which you found that suit?

3    **A.**    Yes, it is.

4    **Q.**    Let's go ahead and look at Government's Exhibit 117.

5    What is this a photograph of?

6    **A.**    This is a photograph of the label on the outside of the

7    box in the previous photograph.

8    **Q.**    Government's Exhibit 118, please.  What is this a

9    photograph of?

10   **A.**    This is a photograph of that chemical suit found in that

11   box.

12   **Q.**    And did you take the suit and lay it out so you could get

13   a full picture of what it looked like?

14   **A.**    Yes.

15   **Q.**    Government's Exhibit 119.  And what is this physical

16   exhibit?

17   **A.**    This is the suit that was found in that box.

18   **Q.**    120, please.  What is this item of evidence?

19   **A.**    This is a surgical mask.

20   **Q.**    And if we could go back just briefly to Government's

21   Exhibit 68.  These items of evidence that we have been talking

22   about, the suit and the glassware and Pyrex and the Ehrlenmeyer

23   flask, using this diagram, would you show the jury where the

24   items were found?

25   **A.**    Yes.  They were found in this--the Pyrex and the

1    glassware were in these boxes right here.

2    **Q.**    Thank you.

3            If we can go back, I'm not sure what number we were

4    on, or the last--I think it was 118 or 119.  Try 120, the

5    surgical mask.

6            Let's go to 121, please.  And what is this exhibit?

7    **A.**    This is the Five Star spiral-bound notebook that was

8    found on the shelf area of the front living room.

9    **Q.**    Let's go to 122.  What is this exhibit?

10    **A.**    This is a Mead journal also found on that bookshelf.

11    **Q.**    We're going to be talking about all of these later on in

12    the course of this trial.  123, please.

13            We'll just go ahead and go through these rather

14    quickly.  124.  What is this exhibit?

15    **A.**    This is a spiral-bound Steno notebook also found in the

16    apartment.

17    **Q.**    Let's go ahead and skip on--we'll go to 126.  What is

18    this exhibit?

19    **A.**    This was another notebook-type that was found in the

20    apartment.

21    **Q.**    128, please.  We're going to skip one.  What is this

22    exhibit?

23    **A.**    This was a spiral-bound notebook that was found in the

24    apartment.

25    **Q.**    130, please.  What is this exhibit?

1   **A.**   This was one of the other notebooks that was found in the

2   apartment.

3   **Q.**   132, please.  What is this exhibit?

4   **A.**   Another Mead journal, also found in the apartment.

5   **Q.**   And 133.  What is this exhibit?

6   **A.**   It was a Mead journal, also found in the apartment.

7   **Q.**   With regard to Government's Exhibits 426 through 428,

8   what are those items?

9   **A.**   Those are the actual items.

10   **Q.**   With regard to?

11   **A.**   The nitric acid and sulfuric acid.

12   **Q.**   And for purposes of today's court, we don't have them

13   here in court, but they are in the custody of the FBI?

14   **A.**   Yes, they are.

15               MR. HAAG:  Pass the witness, Your Honor.

16               THE COURT:  Your witness, Counsel.

17               MR. COGDELL:  Thank you.

18                         CROSS-EXAMINATION

19   BY MR. COGDELL:

20   **Q.**   Good afternoon, Special Agent Corey.

21   **A.**   Covey.

22   **Q.**   Covey?

23   **A.**   Covey.

24   **Q.**   Covey?

25   **A.**   Yes, sir.

1  **Q.**    I'm terrible with names, and I'll prove that, I assure

2  you, through more than just you.

3           You have been with the FBI since 2004?

4  **A.**    That's correct.

5  **Q.**    How old are you?

6  **A.**    I'm forty years old.

7  **Q.**    You are forty?

8  **A.**    Yes, sir.

9  **Q.**    You do not look forty.

10          MR. COGDELL:  May I use the whiteboard over here,

11  Your Honor?

12          THE COURT:  I suppose, if you can speak up, you can

13  try it.  Why don't you move the whiteboard over by you?

14          MR. COGDELL:  Yes, sir, that's what I'm going to do.

15          (PAUSE)

16  **Q.**    (BY MR. COGDELL)  Special Agent Covey, what is--  Have

17  you ever heard the term "FISA warrant" before?

18  **A.**    Yes, I have.

19  **Q.**    And FISA stands for Foreign Intelligence Surveillance

20  Act, does it not?

21  **A.**    I believe so, yes.

22  **Q.**    And there was a FISA warrant.  You are aware of that?

23          MR. HAAG:  Your Honor, I apologize, but I think

24  we're going to get into some pretrial matters that have already

25  been addressed and resolved.

1          THE COURT:  Where are we going?

2          MR. COGDELL:  Just want to show that there was a

3  FISA warrant--

4          THE COURT:  To what?

5          MR. COGDELL:  To show that there was surveillance in

6  Mr. Aldawsari's apartment.

7          THE COURT:  Well, just ask him that.  We don't need

8  to go into FISA.

9          MR. COGDELL:  And I wasn't going to give a lecture

10  on it, but I'll go straight there.

11          THE COURT:  All right.

12  **Q.**    (BY MR. COGDELL)  There was a--there was opportunities to

13  have--in Mr. Aldawsari's apartment itself, Mr. Covey, there

14  were--there was surveillance ongoing before the date of your

15  search warrant.  Correct?

16  **A.**    I'm not sure of the details of that surveillance.

17  **Q.**    Okay.  Did you read the search warrants--the traditional

18  search warrant that was ultimately granted that allowed your

19  team to gain access to Mr. Aldawsari's apartment?

20  **A.**    Yes.

21          MR. COGDELL:  May I approach, Your Honor?

22          THE COURT:  Fine.

23      (APPROACHES WITNESS)

24  **Q.**    (BY MR. COGDELL)  I want to show you, Special Agent

25  Covey, what I've marked for identification purposes only as

1    Defendant's Exhibit A.  Ask you to look at that and see if--

2    where the tab is, is that the search warrant that allowed your

3    team to enter into Mr. Aldawsari's apartment?  And that was on

4    February 23rd.  Correct?

5    **A.**    I believe this is the same warrant.

6    **Q.**    Okay.  The date that you told Mr. Haag about, the date

7    that the inventory and the search that we have just discussed--

8    or you have just discussed happened on February 23rd, 2011.

9    Correct?

10   **A.**    I believe so, yes.

11   **Q.**    Okay.  And would you look at that blue tab, Special Agent

12   Covey, and see--

13            MR. COGDELL:  May I approach, Your Honor?

14            THE COURT:  Uh-huh.

15       (APPROACHES WITNESS)

16   **Q.**    (BY MR. COGDELL)  See if it refreshes your date as to

17   February--I believe it's 14th when the other surveillance

18   began.

19   **A.**    From this document, it appears that you are correct.

20   **Q.**    So between February 14th and February 23rd, would you

21   agree with me that the FISA warrant was in place and the agents

22   were--

23            THE COURT:  Wait.  I don't want to hear FISA

24   anymore.

25            MR. COGDELL:  Okay.

1   **Q.**   (BY MR. COGDELL)  Agents were surveilling the interior of

2   Mr. Aldawsari's home beginning on February 14th.  Agree with

3   me?

4   **A.**   According to this document, yes, but I'm not aware of the

5   details of the surveillance.

6   **Q.**   Fair enough.  You did touch upon--  Let me get that back.

7   Thank you.

8          You did touch upon, Special Agent Covey, the fact

9   that some covert pictures were taken in your testimony with

10  Mr. Haag, did you not?

11  **A.**   Yes.  He had asked if one of the photos were previously

12  taken, and I agreed that it was previously taken.

13  **Q.**   For example, if--

14          MR. COGDELL:  Ms. Christensen, if I could see 56,

15  please, ma'am.

16  **Q.**   (BY MR. COGDELL)  I think you told Mr. Haag that 56 was a

17  covert search obtained--

18  **A.**   No, I did not--

19          THE COURT:  "Covert" is your word.  He's saying it

20  was taken prior.  Is that correct?

21          THE WITNESS:  That's correct.

22          MR. COGDELL:  I thought Mr. Haag asked him if it was

23  taken during the--at another time in a covert search.

24  **Q.**   (BY MR. COGDELL)  Be that as it may, you didn't take that

25  picture.  Right?

1    **A.**    I'd have to look at our photo log to verify if that is on

2    our photo log or not.

3    **Q.**    Okay.  But there were pictures taken by other FBI agents

4    who had entry into the apartment.  You agree with me on that.

5    Right?

6    **A.**    There were prior pictures taken, yes.

7    **Q.**    Yes.  Do you know the dates of those prior pictures?

8    **A.**    I do not know.

9    **Q.**    Okay.  I only have seen one FBI 302 that was authored by

10   you.  Were there others?

11   **A.**    No, I believe it was just that single one.

12   **Q.**    Okay.  And for the benefit of the jury, an FBI 302 is

13   kind of like the FBI version of an offense report.  Right?

14   **A.**    Yes.

15   **Q.**    The details, what you did, when you did it, what the

16   dates were, and what the particulars were.  Right?

17   **A.**    It's more of an overview, yes.

18   **Q.**    Okay.  And you only prepared one FD 302 in this case, and

19   that was an inventory of the pictures that were taken.  Right?

20   **A.**    To my recollection, that's correct.

21          MR. COGDELL:  Let me, if I can, Ms. Christensen,

22   continue to get your help, please, ma'am.  Show us 66, if you

23   don't mind.

24   **Q.**    (BY MR. COGDELL)  This soldering kit, is that the

25   condition that it was in when you obtained it, Special Agent

1   Covey?

2   **A.**   When we obtained it, it was from that--that--the drawer

3   that--it was put in that box in that drawer.

4   **Q.**   All right.  And could you tell, for example--

5          MR. COGDELL:  If we could--if we could zero in,

6   Ms. Christensen, on the plug itself where it appears to be

7   zip-tied together or twisted together.

8   **Q.**   (BY MR. COGDELL)  Could you tell if that had ever been

9   used before?

10  **A.**   I couldn't tell, no.

11  **Q.**   Okay.

12          MR. COGDELL:  65, please, Ms. Christensen.  If you

13  could kind of zoom in, please, ma'am, on the--

14  **Q.**   (BY MR. COGDELL)  See the very top of the packaging?

15  **A.**   Yes, sir.

16  **Q.**   Does it appear that that's intact and it's never been

17  used?

18  **A.**   Yes, sir.

19          MR. COGDELL:  Government's 70, Ms. Christensen.

20  **Q.**   (BY MR. COGDELL)  And this is--

21          MR. COGDELL:  If you could zoom in on that, please,

22  ma'am.

23  **Q.**   (BY MR. COGDELL)  That is--I think you called it a baby

24  scale?

25  **A.**   It appeared to be a baby scale.

1  **Q.**  Does it look like it had ever been used before?

2  **A.**  I couldn't tell.

3  **Q.**  Didn't show any signs of wear or use.  Would you agree

4  with me?

5  **A.**  Agree.

6  **Q.**  71.  Is that the same or a different baby scale?

7  **A.**  Same scale.

8  **Q.**  Let me get this--  I'm sorry.

9       MR. COGDELL:  May I put this back over here, Your

10  Honor?

11       THE COURT:  Yes.

12       (PAUSE)

13       MR. COGDELL:  If we could zoom in, please, ma'am.

14  **Q.**  (BY MR. COGDELL)  Same question.  Doesn't look like it's

15  ever been used?

16  **A.**  Correct.

17  **Q.**  Government's Exhibit 72.

18       MR. COGDELL:  If we could zoom in on what--that box,

19  Ms. Christensen, that says 1-A-7.

20  **Q.**  (BY MR. COGDELL)  Do you remember, off the top of your

21  head, the contents of that box?

22  **A.**  The entire contents, I don't remember the--  I know that

23  the light set was found in there, the voltmeter, some

24  batteries, and then the spliced wire.

25  **Q.**  And I think Mr. Haag went over some specific close-ups of

1    those.  Right?

2  **A.**    That's correct.

3              MR. COGDELL:  If we could see 77, please, ma'am.

4    And if you could zoom in on the warning concerning odor.  If

5    you'll roll down just a little bit.  See where it says "odor,"

6    please, ma'am?

7  **Q.**    (BY MR. COGDELL)  Do you see that?  Do you know what the

8    phrase "acrid"--"strong acrid" means?

9  **A.**    No, sir.

10  **Q.**    Ever conducted a search of a meth lab or a facility where

11   methamphetamine was being produced?

12  **A.**    No, sir.

13  **Q.**    Okay.

14              MR. COGDELL:  Next, Ms. Christensen, 78.

15  **Q.**    (BY MR. COGDELL)  This is a picture of six bottles of

16   liquid.  Right?

17  **A.**    Yes.

18              MR. COGDELL:  If you could zoom in there.

19  **Q.**    (BY MR. COGDELL)  Does it look like those bottles have

20   ever been removed or opened?

21  **A.**    No, sir.

22              MR. COGDELL:  79, please, Ms. Christensen.  If you

23   could zoom in--can you zoom in on the top of the bottles, if

24   you will.

25  **Q.**    (BY MR. COGDELL)  It appears like those bottles have

1  never been opened before.  Is that consistent with your

2  observation and your memory, Special Agent Covey?

3  **A.**   Yes, sir.

4            MR. COGDELL:  Government's 93.  If we could zoom in

5  at the top of those bottle caps, the top of the caps, if you

6  would.

7  **Q.**   (BY MR. COGDELL)  Once again, Special Agent Covey, does

8  it look like these things have ever been used before?

9  **A.**   It didn't appear so.  It's hard to tell with these type

10 of bottles.

11 **Q.**   Okay.  Certainly didn't show any signs of wear or abuse,

12 or even use.  Right?

13 **A.**   Yes, sir.

14 **Q.**   Government's Exhibit 94.  This is the passport that you

15 recovered, Special Agent Covey, in the search.  Right?

16 **A.**   Correct.

17 **Q.**   And that was Mr. Aldawsari's passport.  Correct?

18 **A.**   Yes.

19 **Q.**   Would you agree with me that the--you saw a number of

20 shipping labels during your search efforts that were addressed

21 to Mr. Aldawsari in his true name.  Correct?

22 **A.**   Khalid Aldawsari, yes.

23 **Q.**   Khalid Aldawsari.  Right?

24            And his true address.  Right?

25 **A.**   Correct.

1   **Q.**   Did you see any passports or any identification that

2   appeared to be an effort by Mr. Aldawsari to deceive people as

3   to his true identity?

4   **A.**   No.

5   **Q.**   Now, how long was your search team there?

6   **A.**   I don't recall.  We were there for a couple hours, if I

7   recall.

8   **Q.**   Is it fair to say, Special Agent Covey, that you looked

9   through--I mean, you had free reign.  Right?  I don't mean--

10  **A.**   Yes, we searched the entire apartment.

11  **Q.**   I don't mean you just--  A judge had granted y'all lawful

12  authority to search the entire contents of the--the apartment

13  and its entire contents.  Correct?

14  **A.**   That's correct.

15  **Q.**   And you made and conducted and participated in as

16  thorough of a search as you could.  Right?

17  **A.**   Yes, sir.

18  **Q.**   95.  The yellow pieces of paper and--that appear to be

19  contained in Mr. Aldawsari's passport, was that of any

20  evidentiary significance to you, Special Agent Covey?

21  **A.**   I don't know.

22  **Q.**   Did you obtain that passport or did some other agent?

23  **A.**   Some other agent did.

24  **Q.**   Okay.

25          MR. COGDELL:  97, please, Ms. Christensen.  Now, if

1    you could zoom in on the top of the bottle.

2    **Q.**   (BY MR. COGDELL)   Once again, it appears that--does it

3    not, Special Agent Covey, that the sulfuric acid--none of these

4    have ever been opened.   Right?

5    **A.**   Correct.

6         MR. COGDELL:   Now, if you could give us a

7    wider-angle shot, please, Ms. Christensen.

8    **Q.**   (BY MR. COGDELL)   The one in the center--by the--by

9    the--let's go there--looks like there's some leakage.   Right?

10   **A.**   There's some brown spots.   I can't tell you what that is

11   for sure.

12   **Q.**   But once again, if we look at the very top of that, it

13   doesn't look like the original protectant, if you will, has

14   been altered or removed.   Agree with me?

15   **A.**   Yes, sir.

16        MR. COGDELL:   98, Ms. Christensen.   If you could

17   zoom in, please, ma'am, on the warning labels.

18   **Q.**   (BY MR. COGDELL)   It says, "Do not breathe fumes."   Have

19   you ever been around sulfuric acid to know the extent or the

20   intensity of the fumes?

21   **A.**   I personally have not, no.

22   **Q.**   Okay.

23        MR. COGDELL:   104, please, ma'am.

24   **Q.**   (BY MR. COGDELL)   This is a beaker.   Right?

25   **A.**   Correct.

1    **Q.**   Like many of the other pictures and the like, it doesn't

2    look like it's ever even been used.  Agree with me?

3    **A.**   Yes, sir.

4              MR. COGDELL:  106, Ms. Christensen.  If we could

5    zoom in at the bottom, if you will, and see if there's any

6    residue at the bottom.

7    **Q.**   (BY MR. COGDELL)  Can you see any trace evidence that

8    that--the beaker was ever used, Special Agent?

9    **A.**   Not to the human eye, no.  There's nothing there that I

10   can see.

11   **Q.**   Was it tested to--  Fair point.  You said not to the

12   human eye.  Was it tested, as far as you know, by the FBI lab

13   to see if there was any trace evidence of any chemicals or any

14   attempts at mixing anything in those beakers?

15   **A.**   I don't know.

16   **Q.**   Who would know?

17   **A.**   The case agent.  Our responsibility was simply just to

18   collect the evidence and then turn that evidence over.

19   **Q.**   And the case agent, you testified on direct, was

20   Mr. Orndorff, but to refresh the jury's memory, Mr. Orndorff is

21   this handsome gentleman here with his hand in the air.

22   Correct?

23   **A.**   That's correct.

24             MR. COGDELL:  Once again, if you could focus at the

25   bottom.

1  **Q.**   (BY MR. COGDELL)   At least to the human eye, there's

2  certainly no trace evidence or visual evidence that the beaker

3  or the Pyrex container ever had anything mixed in that.  Right?

4  **A.**   Correct.

5           MR. COGDELL:  109.  Same thing, Ms. Christensen.

6  **Q.**   (BY MR. COGDELL)  Now, these are different beakers, I

7  take it?  We're not looking at the same beaker three or four

8  different times, I hope.

9  **A.**   Different beakers.

10  **Q.**   Okay.  And same question.  No visual evidence of anything

11  ever being mixed in that beaker.  Right?

12  **A.**   Correct.

13  **Q.**   110.  This looks to be--

14           MR. COGDELL:  Zoom in at the very top.

15  **Q.**   (BY MR. COGDELL)   That's a--what, in my house, might be

16  a martini mixer, but here, that's a--that's something you stir

17  a beaker with.  Right?

18  **A.**   Correct.

19  **Q.**   It appears to be in the original container or packaging,

20  that--that stir stick, or whatever you call it, is.  Right?

21  **A.**   That's correct.

22  **Q.**   112.

23           MR. COGDELL:  Bottom of it, please, Ms. Christensen.

24  I'm sorry.

25  **Q.**   (BY MR. COGDELL)  Once again, nothing at the bottom of

1   that, it appears.  Right?

2   **A.**   Correct.

3   **Q.**   113.  This is, I guess, a group shot of many of those

4   same things I've just put the jury through watching

5   individually.  Right?

6   **A.**   Correct.

7   **Q.**   And I think you told Mr. Haag that when the FBI executed

8   its search warrant of Mr. Aldawsari's apartment in Lubbock,

9   that those things were in the original box.  Right?

10  **A.**   That's correct.

11  **Q.**   Do you recall if the box had even been opened?

12  **A.**   I don't recall.

13  **Q.**   Whose job would it be, Special Agent Covey, to note

14  whether or not the box had originally been opened?

15  **A.**   That would have been the agent that found it or the

16  evidence response team member that found it.

17  **Q.**   I heard the first part; I didn't hear the second part.

18  The first part, you said the agent that found it.  Let's stop

19  there.  Who was that?

20  **A.**   I'm sorry?

21  **Q.**   I think you--I thought you just told us it would be the

22  job of the agent that found that, that is, that chemistry set,

23  that documented whether or not it had originally been opened

24  before.  Right?

25  **A.**   Correct.  The member that found that is--normally it's

1    their responsibility.

2    **Q.**   Okay.  And that's the question.  That's where I'm going.

3    Who's the member that found that?

4    **A.**   I would have to look at the evidence recovery log to see

5    who that was.

6    **Q.**   Do you have that with you?

7    **A.**   I don't have that with me, no.

8              MR. COGDELL:  Can I beg upon Counsel?  Can I have a

9    sidebar with Mr. Haag, Your Honor?

10             THE COURT:  You may.

11       (DISCUSSION OFF THE RECORD BETWEEN COUNSEL)

12             MR. COGDELL:  May I approach, Your Honor?

13             THE COURT:  You may.

14       (APPROACHES WITNESS)

15   **Q.**   (BY MR. COGDELL)  Special Agent Covey, I'm going to give

16   you what's just been given to me by Mr. Haag, which is the

17   evidence control log.  Would you see if you can find who the

18   agent is that found that chemistry set?

19   **A.**   It was Special Agent Todd Henson.

20             MR. COGDELL:  And may I approach, Your Honor?

21             THE COURT:  You may.

22       (APPROACHES WITNESS)

23   **Q.**   (BY MR. COGDELL)  Let me give that back to Mr. Haag

24   before I lose it.  I assure you I will.

25             Who is Special Agent Todd Henson?

1   **A.**   He is an--he's an agent on one of the evidence response

2   teams.

3   **Q.**   And is he in the Dallas office, like you?

4   **A.**   Yes, he is.

5   **Q.**   Still there?

6   **A.**   Yes.

7   **Q.**   Okay.

8          MR. COGDELL:  Ms. Christensen, the other--the

9   following picture was 114.  And if you could zoom in, please,

10  ma'am, on the cellophane bag, or whatever it is in the center.

11  **Q.**   (BY MR. COGDELL)  Does that look or appear like it's ever

12  been opened?

13  **A.**   No.

14         MR. COGDELL:  116, please, Ms. Christensen, and

15  thank you so much.

16  **Q.**   (BY MR. COGDELL)  116 is the Hazmat suit, and I--I think.

17  We saw a picture of that suit displayed.  Right?

18  **A.**   Correct.

19  **Q.**   But that was the condition that you found it in--

20  **A.**   That's correct.

21  **Q.**   --or it was found.  Right?

22  **A.**   Yes, sir.

23  **Q.**   And once again, from looking at this picture, Special

24  Agent Covey, it doesn't appear that the Hazmat suit was ever

25  even opened up, at least in terms of the packaging itself.

1   Right?

2   **A.**   That's correct.

3   **Q.**   Now, I just--it went in one ear and out the other, and I

4   apologize.  How long did you say you were there in

5   Mr. Aldawsari's apartment?

6   **A.**   I don't remember the exact time.  If I had to take a

7   guess, it would be a couple of hours.

8   **Q.**   And during that two hours, did you find any phenol?

9   **A.**   No.

10  **Q.**   Last question.  During the search of Mr. Aldawsari's

11  apartment, Special Agent Covey, were there any strong or

12  pungent or overwhelming odors?

13  **A.**   Not to my recollection, no.

14             MR. COGDELL:  That's all I have.  Thank you, sir.

15             THE COURT:  Redirect?

16             MR. HAAG:  Thank you, Your Honor.

17             If you'll bring up Government's Exhibit 77, please.

18                      REDIRECT EXAMINATION

19  BY MR. HAAG:

20  **Q.**   Talk a little bit about the material safety data sheet.

21  If you would go about halfway down the document where it says,

22  Section Two, Hazard Identification, starting where it says

23  "Eyes," and if you would, please read the hazard identification

24  for the eyes.

25  **A.**   Yes.  "May cause severe burns, blindness or permanent eye

1   damage."

2   **Q.**   Please read the hazard identification for the skin.

3   **A.**   "May cause severe burns."

4   **Q.**   For injection?

5   **A.**   "May cause burning of the upper digestive tract and

6   respiratory tract."

7   **Q.**   Inhalation?

8   **A.**   "May cause severe burns, pulmonary edema."

9                 MR. HAAG:  Pass the witness, Your Honor.

10                MR. COGDELL:  One--on that final area.

11                THE COURT:  Okay.

12                          RECROSS-EXAMINATION

13   BY MR. COGDELL:

14   **Q.**   Special Agent Covey, do you know of any suggestion by any

15   law enforcement agent that Mr. Aldawsari was suffering from eye

16   damage, skin damage, or severe burns?

17   **A.**   I don't know.  I've never heard of any.

18                MR. COGDELL:  Thank you.

19                THE COURT:  All right.  Thank you, sir.  The witness

20   is excused?

21                MR. COGDELL:  Yes, sir.

22                MR. HAAG:  Yes, Your Honor.

23                THE COURT:  You're excused, sir.

24                Call your next witness.

25                MR. HAAG:  Your Honor, the United States calls

1    Special Agent Keith Quigley.

2         (THE OATH IS ADMINISTERED BY THE COURTROOM DEPUTY)

3              THE COURT:  Please be seated.

4                          KEITH QUIGLEY,

5    GOVERNMENT'S WITNESS, TESTIFIED ON HIS OATH AS FOLLOWS:

6                       DIRECT EXAMINATION

7    BY MR. HAAG:

8    **Q.**    Please state your name.

9    **A.**    Keith Quigley.

10   **Q.**    How are you employed?

11   **A.**    I'm a special agent of the FBI.

12   **Q.**    Which office are you assigned to with the FBI?

13   **A.**    I'm in the Lubbock office.

14   **Q.**    How long have you been an FBI special agent?

15   **A.**    A little over fourteen years.

16   **Q.**    Have you received specialized training in

17   counter-terrorism investigations?

18   **A.**    Yes.

19   **Q.**    Would you please briefly describe for the jury that

20   training?

21   **A.**    I've been involved in terrorism training, a week-long

22   seminar in San Antonio and various periodical trainings

23   throughout my career in the Bureau.

24   **Q.**    And, sir, if you would--you have a microphone.  Just pull

25   that a little bit closer so the jury can hear your answers.

1    Thank you.

2              Let's talk about some of the items from the

3    defendant's abandoned property and vehicle that you recovered.

4    On March 8th of 2011, did you receive a telephone call from

5    Andy Clayton?

6    **A.**    Yes.

7    **Q.**    After speaking with Mr. Clayton, what, if anything, did

8    you do?

9    **A.**    I went to the apartment complex and met with him.

10   **Q.**    Once you met with Mr. Clayton, what did you do next?

11   **A.**    I went up to Mr. Aldawsari's apartment, where he and some

12   of his employees cleared out the apartment and placed those

13   items in the hallway outside the apartment.

14   **Q.**    Once those items were placed in the hallway, what did you

15   do?

16   **A.**    I looked through those items.

17   **Q.**    How many other employees were with Mr. Clayton when he

18   was cleaning out the abandoned property?

19   **A.**    It was Mr. Clayton and four of his employees.

20   **Q.**    Did you seize any items from the defendant's abandoned

21   property?

22   **A.**    Yes.

23   **Q.**    To your knowledge, did anyone else, other than Andy

24   Clayton and his employees, have access to that property?

25   **A.**    Not that I'm aware of.

1  **Q.**   These were items that were not seized during the search

2  on February 23rd; is that correct?

3  **A.**   Right.

4  **Q.**   When you saw them on March 8th, 2011, did you seize them

5  because you felt that they had evidentiary significance?

6  **A.**   Right.

7  **Q.**   You should have before you Government's Exhibits 134

8  through 141, and 429.  Prior to testifying today, have you

9  examined those exhibits?

10 **A.**   Yes.

11 **Q.**   Is this the property that you retrieved from the

12 defendant's abandoned property?

13 **A.**   Yes.

14 **Q.**   Are these exhibits in the same or substantially the same

15 condition as when you seized them on March 8th?

16 **A.**   Yes.

17         MR. HAAG:  Your Honor, at this time, move to admit

18 Government's Exhibits 134 through 141, and 429.

19         MR. COGDELL:  Can I have a quick sidebar, Your

20 Honor, with Mr. Haag?

21         THE COURT:  Yes.

22 (DISCUSSION OFF THE RECORD BETWEEN COUNSEL)

23         MR. HAAG:  Your Honor, may I approach?

24         THE COURT:  Yes.  You--approach?  Okay.

25 (APPROACHES WITNESS)

1          MR. COGDELL:  The only one we have an objection to

2     is 429, Your Honor.

3          THE COURT:  All right.  Hand it to me, please--hand

4     it to the courtroom deputy, please.

5          134 through 141 are admitted without objection.

6          MR. COGDELL:  And if the court wishes, I will

7     certainly provide the basis for my concern on 429.

8          THE COURT:  Your objection is?

9          MR. COGDELL:  My objection is, there's no showing as

10    to who wrote that.  It's 403, if you look closely at the

11    document, Your Honor.

12         THE COURT:  I just read that.

13         MR. COGDELL:  It's hearsay.

14         THE COURT:  This was recovered from the apartment in

15    the stack outside the--was it by itself?

16         THE WITNESS:  I don't know if that piece was by

17    itself or in the notebook, sir.  It might have been in the

18    spiral notebook.

19         THE COURT:  I'm going to hold off on admitting that

20    without further identification.

21         MR. HAAG:  Your Honor, if I may--  With regard to

22    the handwriting issue or the--

23         THE COURT:  Well, I don't know.

24         MR. HAAG:  If I may, Your Honor.

25         THE COURT:  Yes, sir.

1          MR. HAAG:  What has been admitted into evidence is

2     the defendant's journals, and as part of the foundation, the

3     jury, for itself, can compare the handwriting between the two

4     documents.

5          THE COURT:  Okay.  But is that a complete document?

6     I mean, is that all there is?

7          MR. HAAG:  Yes, Your Honor.

8          THE COURT:  I believe you, but that's not evidence.

9     I need somebody to--

10         MR. HAAG:  Yes, Your Honor.  Yes, Your Honor.

11         THE COURT:  I mean, I'm not disbelieving you, but as

12    I will tell them, I can't take evidence from that area, only

13    from this area.

14         MR. HAAG:  Yes, Your Honor.

15         THE COURT:  Go ahead, sir.

16    **Q.**    (BY MR. HAAG)  With regard to Government's Exhibit 429,

17    where did you find this document at?

18    **A.**    I found that document outside Mr. Aldawsari's apartment

19    as they were discarding it.

20    **Q.**    Was that document folded up when you found it?

21    **A.**    I don't recall specifically, but I know I took that

22    document away from that area.

23         MR. HAAG:  Your Honor, at this time, move to admit--

24         THE COURT:  Was it by itself?  Was it in a notebook

25    or was it just as I see it today?

1          THE WITNESS:  Yes, sir.  I took numerous documents

2     from that area, so I know that was one of them that I took back

3     to my office.  I can't recall that specific document.

4          THE COURT:  What I'm saying is, was it in that

5     single--was it in the state that it was in--that it's in today?

6          THE WITNESS:  Yes.  Yes, sir.

7          THE COURT:  It was torn out of whatever it was--

8          THE WITNESS:  That's what I recall obtaining, yes,

9     sir.

10         MR. COGDELL:  Renew the objection, Your Honor.

11         THE COURT:  I'm going to permit it, and the evidence

12    can--the jury can evaluate it for--at a later date.

13         MR. COGDELL:  With the court's pleasure, may I have

14    the witness on cross before the court makes its final decision?

15         THE COURT:  Certainly, yeah.

16                         EXAMINATION

17    BY MR. COGDELL:

18    **Q.**   Special Agent, if I'm understanding you right with

19    respect to 429, which is the single sheet of paper, it was out

20    in the common area of--was it a hallway outside of

21    Mr. Aldawsari's apartment?

22    **A.**   What the employees of the apartment complex did is, they

23    were removing--

24         MR. COGDELL:  Objection; nonresponsive.

25         THE COURT:  Wait.

1  **Q.**  (BY MR. COGDELL)  Was this document, Special Agent, 429,

2  was it inside Mr. Aldawsari's apartment or was it outside

3  Mr. Aldawsari's apartment?

4  **A.**  It was brought outside into the hallway.

5  **Q.**  When you saw it, it was outside.  Correct?

6  **A.**  Correct.

7  **Q.**  And until you saw this document, you don't have any idea

8  where it came from.  Correct?

9  **A.**  Right.

10  **Q.**  You don't have any personal knowledge of where this--

11  whether or not this document came from inside Mr. Aldawsari's

12  apartment before you found it or not.  Correct?

13  **A.**  I know they brought the item out into the hallway.

14  **Q.**  You know what they told you.  Right?

15  **A.**  No, I saw what they were doing.

16  **Q.**  And did you see this document inside his apartment?  Yes

17  or no?

18  **A.**  No, sir.

19  **Q.**  And where you first saw it was outside in a common

20  hallway.  Right?

21  **A.**  Correct.

22        MR. COGDELL:  Renew the objection, Your Honor.

23        THE COURT:  I'm going to overrule the objection.

24  The jury can give it as much weight as the document deserves.

25        MR. COGDELL:  Thank you for the time on that issue,

1    Your Honor.

2                   THE COURT:  Not at all.

3                   MR. HAAG:  Your Honor, may I approach the witness

4    again?

5                   THE COURT:  You may.

6              (APPROACHES WITNESS)

7                          DIRECT EXAMINATION

8                               CONTINUED

9    BY MR. HAAG:

10   **Q.**    Let's go ahead and take a look at those items that you

11   recovered from the abandoned property, beginning with

12   Government's Exhibit 134, please.

13                  MR. COGDELL:  Judge, I don't mean to be--  Objection

14   to the phrase, "abandoned property."

15                  THE COURT:  Okay.

16                  MR. HAAG:  I'll rephrase, Your Honor.

17                  THE COURT:  All right.

18   **Q.**    (BY MR. HAAG)  Let's begin with Government's Exhibit 134,

19   please.  Would you please describe for the jury what this is?

20   **A.**    That's a spool of speaker wire.

21   **Q.**    Moving on--

22                  MR. HAAG:  And if you would, highlight the section

23   over to the right side.  I'm sorry.  A little bit further to

24   the right where it's got the wire coming down.

25   **Q.**    (BY MR. HAAG)  Looking here at the right side of this

1   wire, did it appear at least part of it had been cut?

2   **A.**   Yes, sir.

3   **Q.**   Looking at Government's Exhibit 135, please.  What is

4   this exhibit?

5   **A.**   Looks like a strainer.

6   **Q.**   Government's Exhibit 136, please.  What is this exhibit?

7   **A.**   That's a two-stove burner.

8   **Q.**   And what is the fuel that's used to--for that two-stove

9   burner?

10  **A.**   Propane.

11  **Q.**   Looking at Government's Exhibit 137.  What is that?

12  **A.**   Two propane canisters.

13  **Q.**   Looking at Government's 138, please.  What is this

14  exhibit?

15  **A.**   That is a kitchen pot with a glass lid.

16  **Q.**   At the time that you recovered this item, was that

17  sticker still on there?

18  **A.**   Yes, sir.

19  **Q.**   And I'm sorry.  Just to remove the confusion, not the

20  government's exhibit sticker.  The sticker to the left of that.

21  **A.**   Yes.

22  **Q.**   Government's Exhibit 139, please.  What is this?

23  **A.**   Two pair of handcuffs.

24  **Q.**   Government's Exhibit 140.  What is this exhibit?

25  **A.**   Some coffee strainers.

1          THE COURT:  Filters?

2          THE DEFENDANT:  I'm sorry.  Filters, yes.

3  **Q.**   (BY MR. HAAG)  Government's Exhibit 141, please.

4  **A.**   A Nokia cell phone.

5  **Q.**   And Government's 429, please?

6  **A.**   This is a piece of notebook paper with some writing on

7  it.

8  **Q.**   And if you would, would you please read the writing

9  that's on the first page of this document?

10  **A.**   Yes.  "Studio 6 Northwest, camera, 2395 Stemmons Trail,

11  Dallas, Texas.  I-35 Northeast Highway, zip code 752--"

12          THE COURT:  Well, it doesn't say--

13  **A.**   "Zip."  It says "zip."  I'm sorry.  "Zip, 75220.  Phone,

14  "(214) 904-1400."  Then it says, "Number 2, Studio 6, Garland

15  NE, 9801 Adleta Court, Dallas, Texas, 75243; phone,

16  (214) 342-5400."

17          Under that, "Number 3, Studio 6, Richardson North,"

18  I believe, "N, 12301 North Central Expressway, Dallas, Texas,

19  75243; phone, (972) 716-0600."

20          Under that, "Cotton Bowl Stadium, 1300 Robert B.

21  Cullum Boulevard, Dallas, Texas, 75210; phone, (214) 939-2222."

22  **Q.**   (BY MR. HAAG)  On April 15th, 2011, did you conduct an

23  inventory search?

24  **A.**   Excuse me.  One more time?

25  **Q.**   I'm sorry.  On April 15th, 2011, did you conduct an

1   inventory search?

2   **A.**   An inventory search of?

3   **Q.**   Of a vehicle.

4   **A.**   Yes.

5   **Q.**   Would you please briefly describe for the jury, what is

6   the purpose of an inventory search?

7   **A.**   Prior to that inventory search, we had seized

8   Mr. Aldawsari's vehicle, and I had got a call from the--from

9   our forfeiture specialist that the United States Marshal's

10  Service was going to be removing the car from Lubbock and

11  taking it to the--a storage facility they deemed fit.  So

12  myself and our financial analyst went out to Mr. Aldawsari's

13  vehicle and removed all the personal items out of the vehicle

14  prior to us giving it to the U.S. marshals.

15  **Q.**   Did you seize any items from the defendant's vehicle

16  during your inventory?

17  **A.**   Yes.

18  **Q.**   Where was the defendant's vehicle stored from

19  February 23rd, 2011, until you inventoried it on April 15th,

20  2011?

21  **A.**   It was stored at his apartment prior to us seizing it.

22  Once we got a seizure warrant for his vehicle, we took it to

23  the Lubbock County Sheriff's Department in a secured storage

24  facility.

25  **Q.**   Is there restricted access to the Lubbock County

1    Sheriff's Department?

2    **A.**    Yes.

3    **Q.**    You have before you Government's Exhibits 142 and 143.

4    Prior to testifying today, have you examined those exhibits?

5    **A.**    Yes.

6    **Q.**    Are those the items that you seized from the defendant's

7    vehicle on April 15th, 2011?

8    **A.**    Yes.

9    **Q.**    Are those items in the same or substantially the same

10   condition as when you seized them?

11   **A.**    Yes.

12             MR. HAAG:  Your Honor, at this time, move to admit

13   Government's 142 and 143.

14             MR. COGDELL:  May I have just a second, Your Honor?

15        (PAUSE)

16             MR. COGDELL:  No objection as to 143, Your Honor.

17   Objection, hearsay, as to 142.

18             THE COURT:  Let me see it.

19             MR. COGDELL:  Yes, sir.

20        (APPROACHES COURTROOM DEPUTY)

21             THE COURT:  143 is received without objection.

22             I'm going to receive over objection.  The jury can

23   give it as much weight as it wishes to.

24             MR. COGDELL:  I think I stated my basis.  Hearsay.

25   Correct?

1              THE COURT:  Yeah.  It's not offered for the truth

2    thereof; it's just offered as being found in his car.

3              MR. COGDELL:  I think it will be--I think that's

4    self-evident.

5              THE COURT:  Well--

6              MR. COGDELL:  But my position is, the government is

7    offering it for the truth of the matter, sir.

8              MR. HAAG:  Your Honor, if I may, this exact same

9    exhibit is also listed at Government's 425 with a business

10   records receipt.

11             THE COURT:  Well, then, why--just so we are all

12   clean, why don't we just wait until it comes in at a later

13   date.

14             MR. HAAG:  Yes, Your Honor.

15             THE COURT:  So I'm admitting it subject to its

16   further identification as a business record.

17             MR. HAAG:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MR. HAAG:  Your Honor, would the court prefer that I

20   wait to view this document until later with the--

21             THE COURT:  I think so.  Probably be best.

22             MR. HAAG:  Yes, Your Honor.

23   **Q.**   (BY MR. HAAG)  Let's go ahead and look at--

24             THE COURT:  It's been identified as recovered from

25   his--from the automobile.

1          MR. HAAG:  Yes, Your Honor.

2          THE COURT:  And you're going to later overcome his

3     hearsay objection as a business record--

4          MR. HAAG:  Yes, Your Honor.

5          THE COURT:  --so it can be admitted for the truth

6     therein.

7          MR. HAAG:  Yes, Your Honor.

8          THE COURT:  Okay.  Let's don't show it now; let's

9     show it later.  But it's identified subject to.

10          MR. HAAG:  Thank you, Your Honor.

11    Q.   (BY MR. HAAG)  Let's go ahead and look at Government's

12    Exhibit 143 then.  What is this document?

13    A.   It's a title to a vehicle Mr. Aldawsari owned.

14    Q.   And if you would, would you please read the year model of

15    the vehicle?

16    A.   2006.

17    Q.   What is the make of the vehicle?

18    A.   Hyundai.

19    Q.   What is the body style of the vehicle?

20    A.   It's a four-door.

21    Q.   If you would, right above there, what is the previous

22    owner that's listed on the certificate of title?

23    A.   Automax Car Sales in Oklahoma.

24    Q.   And who is the owner of the vehicle?

25    A.   Mr. Aldawsari.

1    **Q.**    We'll be talking about that in a little bit more detail

2    later on.

3              MR. HAAG:  Pass the witness, Your Honor.

4              THE COURT:  Your witness.

5              MR. COGDELL:  Thank you.

6                        CROSS-EXAMINATION

7    BY MR. COGDELL:

8    **Q.**    Good afternoon, Mr. Quigley.

9    **A.**    Hello.

10   **Q.**    You and I have never laid eyes on each other, I don't

11   think.  Right?

12   **A.**    I've seen you before in another hearing, sir.

13   **Q.**    Okay.  But I've never had the opportunity to question

14   you.

15   **A.**    No.

16   **Q.**    Nice to see you.

17             Let's go in reverse order.  You told Mr. Haag about

18   the search of Mr. Aldawsari's vehicle on--did you say

19   April 15th?

20   **A.**    I believe so, yes.

21   **Q.**    During the search of that vehicle, Special Agent Quigley,

22   did you find any maps?

23   **A.**    I don't recall at the present time.  I took out numerous

24   items from his vehicle.

25   **Q.**    Anything in the car that would reflect a target being

1    designated?

2    **A.**    Not that I can recall.

3    **Q.**    Any routes drawn on--directions on where to go to, for

4    example, George W. Bush's house?

5    **A.**    No.  I did take a GPS unit out of his vehicle.

6    **Q.**    Okay.  Let's go to the GPS unit.  Let's back way up.

7    There were actually a couple of different--at least two or

8    three different phases of the Aldawsari investigation.  Would

9    you agree with me?

10   **A.**    Sure.

11   **Q.**    Phase 1 was, early in February, I think around the 4th,

12   you and other agents actually began to physically surveil

13   Mr. Aldawsari.  Right?

14   **A.**    Correct.

15   **Q.**    And that consisted of, I guess, you and--was there an IRS

16   CID agent named Travis Thorson involved in this investigation

17   as well?

18   **A.**    Yes, sir.

19   **Q.**    Let's go way back.  Can you estimate for us, Special

20   Agent Quigley, approximately how many different law enforcement

21   agents--let's start with agencies and then get to agents.  How

22   many agencies have been involved in the investigation of

23   Mr. Aldawsari?

24   **A.**    Numerous.  I can--

25   **Q.**    We've got the FBI.  Right?

1   **A.**   Sure, yes.

2   **Q.**   Got IRS?

3   **A.**   Right.

4   **Q.**   We've got Homeland Security.  Right?

5   **A.**   Right.

6   **Q.**   We've got, I guess, Lubbock Police Department.  Right?

7   **A.**   Right.

8   **Q.**   We've got some sort of joint terrorism task force.

9   Right?

10  **A.**   Sure.

11  **Q.**   That's five.  Who am I forgetting?

12  **A.**   I think the Lubbock County Sheriff's Department as well.

13  **Q.**   Okay.  That's six.  Right?

14  **A.**   Uh-huh.

15  **Q.**   And with at least six different agencies, can you give

16  the jury a flavor, Special Agent Quigley, as to approximately

17  how many different agents that you are aware of have made--or

18  participated in the investigation of Mr. Aldawsari?

19  **A.**   Oh, agents or law enforcement officers, 100 or more

20  maybe.

21  **Q.**   Say that again.

22  **A.**   100 or more maybe.

23  **Q.**   100 or more?

24  **A.**   Maybe, yes.

25  **Q.**   Did any of those hundred or more agents find any phenol,

1    as far as you are aware?

2    **A.**    No, sir.

3    **Q.**    Okay.  Let's go back to where I was taking us to before.

4    On February 4th, you and an IRS agent, Mr. Thorson, who I

5    referenced earlier, were physically surveilling Mr. Aldawsari

6    in his apartment area.  Right?

7    **A.**    I know a number of us were, yes.

8    **Q.**    Okay.  How many times did you physically surveil

9    Mr. Aldawsari?  How many different dates?

10   **A.**    Numerous dates.

11   **Q.**    Help me with "numerous."

12   **A.**    From--from that time we initiated, it was--it was pretty

13   much--if not every day for myself, it was every few days.

14   **Q.**    When did the physical surveillance begin, if you know?

15   **A.**    You mean 24-7, sir, or just--

16   **Q.**    Any physical surveillance.

17   **A.**    Oh, it--

18   **Q.**    When--  I'm sorry.

19   **A.**    I'm sorry.

20   **Q.**    My bad.

21   **A.**    Yes.

22   **Q.**    When did any physical surveillance begin?

23   **A.**    In February.

24   **Q.**    Do you know what date?

25   **A.**    Not offhand, no.

1             MR. COGDELL:  Can I approach, Your Honor?

2             THE COURT:  You may.

3     (APPROACHES WITNESS)

4    **Q.**   (BY MR. COGDELL)  I'm going to show you, Special Agent

5   Quigley, what I'm going to mark for identification purposes

6   only as Defense Exhibit C and see if that refreshes your memory

7   as to when the physical surveillance of Mr. Aldawsari began.

8    **A.**   Yes.

9    **Q.**   Does it?

10   **A.**   Yes.

11   **Q.**   When did it physically begin?

12   **A.**   February 4.

13   **Q.**   May I have that back?

14   **A.**   Yes, sir.

15   **Q.**   And if you need to refer to it, just let me know.

16   **A.**   Sure.

17   **Q.**   So beginning on February 4th, the physical surveillance

18   of Mr. Aldawsari began.  And explain to the jury what that

19   entailed, that is, this initial physical surveillance.

20   **A.**   Right.  The initial surveillance was specific to us

21   sitting in our vehicles, trying to determine what his comings

22   and goings were at his apartment complex.

23   **Q.**   Okay.  Now, you weren't here earlier when an apartment

24   manager--pardon me--supervisor testified, but did y'all

25   actually get a key fob or a fob that would allow y'all--that

1   being law enforcement agents--access to Mr. Aldawsari's

2   apartment?

3   **A.**   Yes, sir.

4   **Q.**   And were you utilizing that key fob?

5   **A.**   Personally?

6   **Q.**   Yes, sir.

7   **A.**   No, sir.

8   **Q.**   Who was?

9   **A.**   We had different agents that had used it when we had

10   searches subsequent to me obtaining that key fob.

11   **Q.**   Okay.  So the initial physical surveillance, Special

12   Agent, is it 24-7 at that point, or is it sort of stopping and

13   starting and restarting and restopping?

14   **A.**   Right.  It was intermittent.  It wasn't 24-7 initially.

15   **Q.**   Fair enough.  How long did the intermittent surveillance

16   last?  Started on the 4th of February and lasted until when?

17   **A.**   I couldn't tell you that specifically right now, but it

18   was sometime in February, before--sometime soon after that.

19   **Q.**   Okay.  If I suggested to you that there was an entry--a

20   court-ordered or authorized entry--stealth entry into

21   Mr. Aldawsari's apartment, if I suggested to you that began on

22   February 14th, on or about February 14th, is that consistent

23   with your memory?

24   **A.**   That could be, yes.

25   **Q.**   And did you participate in any of that stealth--and when

1    I say "stealth," Mr. Aldawsari was unaware of it, as far as you

2    know.  Right?

3    **A.**    Right.

4    **Q.**    Did you participate into that stealth entry into his

5    home?

6    **A.**    I did not go into his home.

7    **Q.**    Do you know who the agent was that began that process, or

8    agents that began that process?

9    **A.**    Not specifically.

10   **Q.**    Okay.

11   **A.**    If you refresh my memory, I might.

12   **Q.**    I may later on, but I don't, frankly, have it right in

13   front of me and don't want to burn the time.  But there were

14   viewing devices installed in Mr. Aldawsari's apartment at that

15   time.  Right?  Or on or about that time?

16   **A.**    Right.

17   **Q.**    And that allowed the agents to see, physically, what

18   Mr. Aldawsari was doing.  Right?

19   **A.**    In his apartment, yes.

20   **Q.**    Yes, sir.  I mean, not unlike this courtroom, there

21   were--I don't know where the cameras are, but there were

22   cameras placed--I won't go into specifics, but there were

23   several cameras placed in Mr. Aldawsari's apartment that, as

24   far as you know, he wasn't aware of that allowed law

25   enforcement to watch what he was doing.  As long as he was in

1    that apartment, y'all were watching exactly what he was doing.

2    Right?

3    **A.**    Yes.

4    **Q.**    Now, was there a similar device, Special Agent Quigley,

5    that was plugged into his computer, if you will?

6    **A.**    Yes.

7    **Q.**    And what did that allow the agents to do?

8    **A.**    I believe it allowed them to obtain remote access to his

9    activities.

10   **Q.**    So is it accurate to say that at least--

11              MR. HAAG:  Your Honor, I apologize.  May I approach?

12              THE COURT:  Yes.

13        (BENCH DISCUSSION HELD OFF THE RECORD)

14   **Q.**    (BY MR. COGDELL)  Let me just ask it this way, as cleanly

15   as I can, Special Agent Quigley.  The FBI and/or law

16   enforcement was able to monitor not only Mr. Aldawsari

17   physically through the cameras in his apartment--right?--but

18   they were also able to monitor his computer and what he was

19   seeing on his computer.  Right?

20   **A.**    Yes.

21   **Q.**    And would you agree that, as far as you were aware,

22   somebody was watching what he was doing 24-7?

23   **A.**    Yes.

24   **Q.**    At least one person, if not more, was watching what he

25   was doing.  Fair?

1    **A.**    Right.

2    **Q.**    Okay.  And that period lasted between February 14th and

3    February 23rd.  Right?

4    **A.**    Right.

5    **Q.**    If I--I'm picking the 23rd as the date of the search.

6    **A.**    Sure.

7    **Q.**    Okay.  Let me--

8              MR. COGDELL:  Ms. Christensen, I'm going to ask for

9    your assistance again, please, ma'am.  If I could see 134,

10   please, ma'am.  And if you could blow up exactly the same part

11   of the spool that you blew up for Mr.--maybe I shouldn't use

12   the term "blow up"--for Mr. Haag.

13   **Q.**    (BY MR. COGDELL)  You say that it looks like it's been

14   cut.  Right?

15   **A.**    Yes.

16   **Q.**    Have you ever seen--  This area here.  Right?  You say

17   it's been cut?

18   **A.**    Yes.  It looks like it has, yes.

19   **Q.**    Have you ever seen one of those in its native state, if

20   you will?

21   **A.**    Yes.

22   **Q.**    And it doesn't look just like that?

23   **A.**    I've used speaker wire before, I've bought speaker wire

24   before, and that appears that it has been cut, yes.

25   **Q.**    What does it look like otherwise?

1   **A.**    It appears that some kind of device was used to cut the

2   end of that.

3   **Q.**    They've got to cut it to get it on the spool.  Right?

4   **A.**    Right.  I've done construction work myself.  I've worked

5   with speaker wire myself.  It looks like something that I could

6   have used some kind of tool to cut the end of that speaker

7   wire.

8   **Q.**    Okay.

9          MR. COGDELL:  135, please, Ms. Christensen.  And if

10   you could zoom in on the screen itself.

11   **Q.**   (BY MR. COGDELL)  Does that look like it's been used?

12   **A.**    Yes, that could have been used, yes.

13          MR. COGDELL:  May I approach, Your Honor?

14          THE COURT:  Uh-huh.

15       (APPROACHES WITNESS)

16   **Q.**   (BY MR. COGDELL)  Where is it dirty?

17          MR. COGDELL:  May I approach, Your Honor?

18          THE COURT:  Yeah.

19       (APPROACHES WITNESS)

20   **Q.**   (BY MR. COGDELL)  Are you saying it's up in there?  Where

21   does it look like it's been used?

22   **A.**    I'm saying it could have been used.  I'm not saying it's

23   been used; I'm saying it could have been used.

24   **Q.**    Do you see any residue or any sort of trace in the screen

25   itself?

1   **A.**   I can't see any here on the screen, no.

2   **Q.**   Okay.  And who would you have given that to?

3   **A.**   I would have brought it back to our office.

4   **Q.**   And do you know the name of the person, Mr. Quigley--

5   Special Agent Quigley, that you gave it to?

6   **A.**   I just placed it in our property room.

7   **Q.**   Okay.

8           MR. COGDELL:  Next exhibit, Ms. Christensen, is 136.

9   **Q.**   (BY MR. COGDELL)  Would you agree with me, Mr. Quigley,

10  that doesn't look like it's been used at all?

11  **A.**   It could have.

12  **Q.**   Well, let's stay away from "could have."  Can you show me

13  anywhere on that burner that shows signs of use, wear, or

14  abuse?

15  **A.**   I can't really see that either way right now.

16  **Q.**   Okay.  Would the lab have checked this exhibit for

17  residue?  In the normal course and scope of an investigation of

18  this scope, would you expect that the lab would have done an

19  analysis on this to determine if it had been used?

20  **A.**   I don't know what the lab did or didn't--

21  **Q.**   Sir?

22  **A.**   I don't know what the lab did or didn't do with that

23  item.

24  **Q.**   Okay.  I think I got you on this one.  Let's look at 137.

25  **A.**   Okay.

1   **Q.**   Surely you're going to agree with me that that hasn't

2   been opened.  Right?

3   **A.**   Yes, that appears that they are still wrapped in the

4   package, yes.

5          MR. COGDELL:  138, Ms. Christensen.

6   **Q.**   (BY MR. COGDELL)  Again, does this look like it's been

7   used before?

8   **A.**   It could have.  The sticker is on the side of it, so--I

9   would have taken the sticker off the side of it if I used it.

10   **Q.**   Okay.  139.

11          Where were these--  If I'm understanding your

12   testimony correctly, Mr. Quigley--or Special Agent Quigley, I'm

13   sorry--this was conducted at a search several days or at--not a

14   search.  The original--the search happened on February 23rd at

15   Mr. Aldawsari's apartment.  Right?

16   **A.**   Correct.

17   **Q.**   And the pictures that Mr. Haag and I are questioning you

18   about or were questioning you about, these are items that were

19   not obtained during the search?

20   **A.**   Yes, sir.

21   **Q.**   And if--  So somebody missed a couple of pair of

22   handcuffs?

23   **A.**   Yes, sir.

24   **Q.**   Do you know how that might happen?

25   **A.**   No, sir.

1  **Q.**   140.  Are you going to give me this one, that it hasn't

2  been used?

3  **A.**   Yeah, they're still in the package, so--I'm assuming when

4  you use a coffee filter, you throw it away.

5  **Q.**   Sir?

6  **A.**   When you use a coffee filter, you throw it away.

7  **Q.**   Well, you'd also have to open it up out of the package to

8  get to it.  Right?

9  **A.**   Yes.  It looks like these coffee filters are still in the

10  package, yes.

11  **Q.**   141, Special Agent Quigley, the Nokia phone.  Same

12  question I asked you with respect to the handcuffs.  Do you

13  know how it might occur that, during the course of a search of

14  this depth and intensity, they wouldn't pick up a cell phone?

15  **A.**   I don't know why.

16  **Q.**   And that--refresh my memory, Special Agent, on that--the

17  day that you obtained these items.

18  **A.**   I believe it was March 8th.

19  **Q.**   Okay.

20        MR. COGDELL:  May I have just one minute, Your

21  Honor?

22        THE COURT:  You may.

23        (PAUSE)

24  **Q.**   (BY MR. COGDELL)  Just one more area, Special Agent.

25  I'll show you--

1              MR. COGDELL:  What exhibit number?

2              MR. HESTER:  Defense Exhibit 34.

3    **Q.**  (BY MR. COGDELL)  Let me show you what I'm now marking--

4              MR. COGDELL:  And I haven't showed it--  I'll show

5    this to you.  May I approach, Your Honor?

6              THE COURT:  Yes, you may.

7         (APPROACHES WITNESS)

8    **Q.**  (BY MR. COGDELL)  Let me show you what has been marked

9    for identification purposes, Special Agent Quigley, as D-34 and

10   see if you have ever seen that document before.

11   **A.**  It says "Surveillance logs for Mr. Aldawsari."

12   **Q.**  And did you participate in the creation of that document,

13   that is, what's styled as a surveillance log of Mr. Aldawsari?

14   **A.**  No.

15   **Q.**  Do you have any idea of whether or not the contents

16   reflected in Defense Exhibit 34 are accurate or not?

17   **A.**  I cannot answer that.

18   **Q.**  So you just don't know one way or the other?

19   **A.**  Right, right.

20   **Q.**  And I'll do this through another witness, but if you

21   would just look generally or quickly at that document, Special

22   Agent Quigley, and tell me whether or not the times reflected

23   in that document are generally consistent with your awareness

24   or your knowledge of the surveillance that was occurring of

25   Mr. Aldawsari.

1    **A.**    That--that appears to be correct.

2    **Q.**    Okay.  And do you know whose job it would have been to

3    create or maintain a surveillance log in this case?  Would that

4    be the case agent in charge?

5    **A.**    It might be the surveillance squad themselves.

6    **Q.**    Do you know who the surveillance squad was, who the head

7    of the surveillance squad was?

8    **A.**    I believe it was Jim Bryant, and he may have had various

9    team leaders as well.

10   **Q.**    And is Mr. Bryant--is he from the Lubbock area as well?

11   **A.**    I believe he may have grown up in Plainview, so he's got

12   some ties to Lubbock.

13   **Q.**    I'm sorry.  I'm not asking you where he was born.  Is he

14   stationed in Lubbock, or was he stationed in Lubbock at the

15   time?

16   **A.**    He was in Lubbock at the time, I believe, yes.

17   **Q.**    Okay.  All right.  During--  How many times did you

18   physically--or personally physically surveil Mr. Aldawsari?

19   Once?  Twice?  Ten times?

20   **A.**    Gosh.  Without all my--the documents in front of me,

21   it--it was several.  It was numerous.  I was an agent in

22   Lubbock.  We didn't have many of us.

23   **Q.**    Give me your best guess.

24   **A.**    Oh, it was--it was pretty much daily before the

25   surveillance team came from Dallas.

1    **Q.**    And the surveillance team got in play on February 14th?

2    **A.**    Yeah.  So in between the time it was initiated and the

3    time they got there, could have been every day, every other

4    day, could have been every few days.

5    **Q.**    I think you and I agree that it's ten days between the

6    time your physical surveillance started and the electronic

7    surveillance began.  Right?

8    **A.**    Sure.

9    **Q.**    And there was--  In fact, did you not, Special Agent

10   Quigley, place a transponder on Mr. Aldawsari's vehicle?

11   **A.**    I did not do that.

12   **Q.**    Was one placed?

13   **A.**    Yes, sir.

14   **Q.**    And explain to the jury what a transponder is.

15   **A.**    It's a GPS unit.  It tracks the location of where a

16   vehicle travels.

17   **Q.**    So in addition to the physical surveillance that was

18   occurring before the electronic surveillance began, we have the

19   transponder surveillance.  Right?

20   **A.**    Yes, sir.

21   **Q.**    You've participated in undercover and surveillance

22   activities before, I'm assuming, in your career as a law

23   enforcement agent?

24   **A.**    I've not directly participated or been directly involved

25   in it, but I've been around when it's happened, yes.

1   **Q.**   This was your first time?

2   **A.**   No, I've been around when it's happened, but I did not

3   directly participate in the undercover activity.

4   **Q.**   Okay.  Well, this--was this your first time that you

5   engaged personally in surveillance then?

6   **A.**   No, sir.

7   **Q.**   Okay.  You have done that before?

8   **A.**   Yes, sir.

9   **Q.**   Many times?

10  **A.**   Yes, sir.

11  **Q.**   And as far as you were--as far as you were aware, Special

12  Agent Quigley, was Mr. Aldawsari--did he know y'all were

13  physically surveilling him?

14  **A.**   Not that I'm aware of, sir.

15  **Q.**   Never gave you any hint or clue that he did?

16  **A.**   No, sir.

17  **Q.**   Are you familiar with the phrase "heat run"?

18  **A.**   Yes, sir.

19  **Q.**   In my part of the world, that's when, if a suspect under

20  surveillance thinks there's law enforcement behind him, he'll

21  make a U-turn or he'll try to avoid whomever he might think is

22  surveilling him.  Right?

23  **A.**   Right.

24  **Q.**   Consistent with your understanding of the nomenclature of

25  it?

 1   **A.**    Correct.

 2   **Q.**    Ever see him engage in any heat runs?

 3   **A.**    Not necessarily, no.

 4             MR. COGDELL:  I don't have anything else, Your

 5   Honor.  Thank you, Special Agent Quigley.

 6             THE COURT:  Redirect?

 7             MR. HAAG:  Thank you, Your Honor.

 8                          REDIRECT EXAMINATION

 9   BY MR. HAAG:

10   **Q.**    To which FBI office is Jim Bryant assigned?

11   **A.**    Dallas.

12   **Q.**    Thank you, sir.

13             MR. HAAG:  No further questions, Your Honor.

14             THE COURT:  Thank you, sir.  You are excused.  The

15   witness is free to go?

16             MR. HAAG:  Yes, Your Honor.

17             THE COURT:  Free to go.  Thank you, sir.  Call your

18   next witness.

19             MR. HAAG:  Yes, Your Honor.  The United States--

20             THE COURT:  How long will the next witness take?

21             MR. HAAG:  Probably about 25 to 30 minutes, Your

22   Honor.

23             THE COURT:  What do y'all think?  Everybody who

24   wants to leave now, raise your hand.  Okay.  Do you have to

25   leave now?

1          UNIDENTIFIED JUROR:  Can we time him?

2          THE COURT:  Okay.  All right.  Let's go.  If you're

3    not finished by a quarter after five, we're going to stop for

4    the day.

5          MR. HAAG:  Thank you, Your Honor.

6          MR. COGDELL:  We ain't going to get done with him, I

7    don't think.

8          THE COURT:  Oh, okay.  Let's call it.  See you

9    Monday morning, 9:00.  Please don't discuss the case, even with

10   your nearest and dearest.  Don't read, write, or watch or

11   listen to any news accounts.  Don't do any independent

12   research.  Take good care of yourselves and have a nice

13   weekend.  See you on Monday morning.

14         MR. HAAG:  Your Honor, I'm sorry.  One thing before

15   the jury leaves.  I did notice a bunch of media outside.  I

16   would ask the court for an instruction to avoid media over the

17   weekend or viewing--

18         THE COURT:  Absolutely.  In fact, if the media tries

19   to contact you, you let me know and I'll take care of that.

20         Okay.  All rise.

21   (THE JURORS EXIT THE COURTROOM)

22         THE COURT:  I don't think I need to say what common

23   sense ought to tell everybody, but I would consider any attempt

24   to contact a juror during the course of this trial contempt of

25   court and obstruction of justice, so--

```
 1              MR. COGDELL:  Yes, sir.

 2              THE COURT:  Like I said, I don't think I need to say

 3      that, but I will just in case.

 4              All right.  Monday morning, 9:00.

 5              MR. HAAG:  Thank you, Your Honor.

 6          (END OF DAY)

 7                            *  *  *  *  *

 8

 9        I certify that the foregoing is a correct transcript from

10      the record of proceedings in the above-entitled matter.  I

11      further certify that the transcript fees and format comply with

12      those prescribed by the Court and the Judicial Conference of

13      the United States.

14

15       s/ Mechelle Daniel            DATE  DECEMBER 17, 2012

16      Mechelle Daniel
        Official Court Reporter
17

18

19

20

21

22

23

24

25
```